No. 94- 10002C; 94-10003C; 94-10005C;94-10006C; 94-10007C; 94-10008;
94-10010C; 94-10020C; 94-10030C;
94-10040C (consolidated)
Judge Lettow

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

CLAREMONT VILLAGE COMMONS, *et al*,

Plaintiffs,

v.
UNITED STATES,
Defendant.

---

DEFENDANT'S PRETRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

BRIAN M. SIMKIN
Assistant Director

KENNETH M. DINTZER
Assistant Director
DAVID A. HARRINGTON
KENNETH D. WOODROW
TIMOTHY P. McILMAIL
SEAN DUNN
MICHAEL AUSTIN
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
(202) 514-7300

February 15, 2007

Attorneys for Defendant

# TABLE OF CONTENTS

**PAGES**

DEFENDANT'S PRETRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW . . . . . 1

QUESTIONS PRESENTED . . . . . 1

STATEMENT OF FACTS DEFENDANT EXPECTS TO PROVE AT TRIAL . . . . . 2

I. Statutory Background . . . . . 2

A. The Section 221(d)(3) And 236 Programs . . . . . 2

B. Benefits Of Participating In The Section 221(d)(3) And Section 236 Programs . . . . . 3

1. Low-Risk, High Leverage Financing . . . . . 3

2. Tax Benefits . . . . . 4

3. Other Opportunities For Project Owners . . . . . 5

C. The Preservation Statutes . . . . . 5

1. ELIHPA . . . . . 6

2. LIHPRHA . . . . . 6

D. The HOPE Act . . . . . 9

II. The Plaintiffs . . . . . 9

A. The Initial Deals . . . . . 11

1. Claremont Village Commons . . . . . 11

2. Covina West Apartments . . . . . 12

3. Del Vista Village . . . . . 13

4. De Soto Gardens . . . . . 13

5. Kittridge Gardens I . . . . . 14

6. Kittridge Gardens II . . . . . 14

7. Oxford Park . . . . . 15

8. Parthenia Townhomes . . . . . 16

9. Pioneer Gardens . . . . . 16

10. Puente Park Apartments . . . . . 17

11. Further Benefits . . . . . 18

B. The Properties Prior To Title II . . . . . 19

C. Plaintiffs Each Signed A Use Agreement . . . . . 21

D. Prepayment Of The HUD-Insured Mortgages . . . . . 22

E. Los Angeles Rent Stabilization Ordinance . . . . . 23

DEFENDANT'S CONTENTIONS OF LAW . . . . . 25

I. The Los Angeles Properties Would Not Have Prepaid Their Mortgages . . . . . 25

II. The Preservation Statutes Did Not Effect A Regulatory Taking Under Penn Central . . . . . 26

A. The Preservation Statutes Had No Economic Impact Upon Plaintiffs . . 27

1. The Sale Option Eliminates Any Potential Economic Impact . . . 28

2. Even Under Assumptions Favorable To Plaintiffs, The Preservation Statutes Did Not Result In A "Severe Economic Deprivation" . . . . . 29

3. Plaintiffs' Diminution-In-Profits Approach Provides No Insight . . . . . 32

B. The Preservation Statutes Did Not Frustrate Investment-Backed Expectations . . . . . 37

1. The Preservation Statutes Did Not Interfere With The Primary Expectations Of A Reasonable Investor In Low-Income

Housing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

a. Expectations Of Reasonable Developers And Investors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

b. The Preservation Statutes Did Not Affect Developer's And Investor's Reasonable Expectations . . . . . . . . . . . . 39

2. Plaintiffs' Partners Placed Little Import Upon The Opportunity To Prepay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

C. The Preservation Statutes Do Not Have The Character Of A Taking . . . 42

1. The Preservation Statutes Promoted Important, Long-Standing Government Objectives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

2. The Preservation Statutes Did Not Shift The Burden Of Providing Low-Income Housing On To Plaintiffs . . . . . . . . . . . 45

III. Plaintiffs' Lost-Profits Model Does Not Provide A Proper Measure Of Just Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

A. Plaintiffs Are Only Entitled To Nominal Damages . . . . . . . . . . . . . . . . . 46

B. Plaintiffs' Damage Model Overstates Just Compensation . . . . . . . . . . . . 47

1. Plaintiffs Incorrectly Assesses Compensation At The End Of The Alleged Taking Period Using <u>Ex Post</u> Data . . . . . . . . . . 47

2. Dr. Peiser Employs The Wrong Discount Rates . . . . . . . . . . . . . 51

C. Plaintiffs' Lost-Profit Model Contains Numerous Errors . . . . . . . . . . . . 52

1. Plaintiffs' Model Ignores HAP Contracts That Overlapped With The Prepayment Dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

2. Dr. Peiser Makes No Allowance For Phasing-In Market Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

3. Dr. Peiser Incorrectly Assumes That Each Plaintiff Could Have Obtained Permanent Financing On The Assumed Prepayment Date . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

4. Dr. Peiser Overstates The Hypothetical Price For The Five Properties That Were Sold . . . . . 54

5. Dr. Peiser's Model Fails To Consider The Effect Of LARSO Upon Damages . . . . . 54

6. Dr. Peiser's Report Suffers From Numerous Other Errors . . . . . 55

CONCLUSION . . . . . 56

## TABLE OF AUTHORITIES

**CASES:** **PAGES:**

Almota Farmers Elevator & Warehouse Co. v. United States,
409 U.S. 470 (1973) . . . . . . 48

American Pelagic Fishing Co., LLP v. United States,
379 F.3d 1363 (Fed. Cir. 2004) . . . . . . 41

Andrus v. Allard,
444 U.S. 51 (1979) . . . . . . 27

Armstrong v. United States,
364 U.S. 40 (1960) . . . . . . 45

Bass Enterprises Prod. Co. v. United States,
54 Fed. Cl. 400 (2002) . . . . . . 43

Bass Enterprises Production Co. v. United States,
381 F.3d 1360 (Fed. Cir. 2004) . . . . . . 42

Bowles v. United States,
31 Fed. Cl. 37 (1994) . . . . . . 30

CCA Assocs. v. United States,
___ Fed. Cl. ___, 2007 WL 315350 (2007) . . . . . . 34

Chancellor Manor v. United States,
331 F.3d 891 (Fed. Cir. 2003) . . . . . . passim

Cienega Gardens v. United States,
38 Fed. Cl. 64 (1997) . . . . . . 25

Cienega Gardens v. United States,
331 F.3d 1319 (Fed. Cir. 2003) . . . . . . passim

City Line Joint Venture v. United States,
71 Fed. Cl. 486 (2006) . . . . . . 34

City of Monterey v. Del Monte Dunes at Monterey, Ltd.,
526 U.S. 687 (1999) . . . . . . 27

Commonwealth Edison Co. v. United States,
271 F.3d 1327, 1348 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.,
508 U.S. 602 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

Danforth v. United States,
308 U.S. 271 (1939) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

FCC v. Florida Power Corp.,
480 U.S. 245 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

First English Evangelical Lutheran Church v. County of Los Angeles,
482 U.S. 304 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Florida Rock Industries, Inc. v. United States,
45 Fed. Cl. 20 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Florida Rock Industries, Inc. v. United States,
791 F.2d 893 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Forest Properties, Inc. v. United States,
177 F.3d 1360 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Formanek v. United States,
26 Cl. Ct. 332 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Greenbrier v. United States,
193 F.3d 1348 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Independence Park Apartments v. United States,
61 Fed. Cl. 692 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Independence Park Apartments v. United States,
449 F.3d 1235 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Jentgen v. United States,
228 Ct. Cl. 527 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Keystone Bituminous Coal Ass'n v. DeBenedictis,
480 U.S. 470 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Kirby Forest Indus., Inc. v. United States,
467 U.S. 1 (1984) . . . . . . . . . . 47, 48

Loveladies Harbor v. United States,
21 Cl. Ct. 153, 160 (1990) . . . . . . . . . . 30

Loveladies Harbor, Inc. v. United States,
28 F.3d 1176 (Fed. Cir. 1994) . . . . . . . . . . 27, 42

Lucas v. South Carolina Coastal Council,
505 U.S. 1003 (1992) . . . . . . . . . . 27, 28

MacLeod v. County of Santa Clara,
749 F.2d 541 (9th Cir. 1984) . . . . . . . . . . 39

Olson v. United States,
292 U.S. 246 (1934) . . . . . . . . . . 47

Pennsylvania Coal Co. v. Mahon,
260 U.S. 393 (1922) . . . . . . . . . . 26, 39

RCK Properties, Inc. v. United States,
528 U.S. 951 (1999) . . . . . . . . . . 33

Rose Acre Farms, Inc. v. United States,
373 F.3d 1177 (Fed. Cir. 2004) . . . . . . . . . . passim

Ruckelshaus v. Monsanto Co.,
467 U.S. 986 (1984) . . . . . . . . . . 37

Tabb Lakes, Ltd v. United States,
10 F.3d 796 (Fed. Cir. 1993) . . . . . . . . . . 35, 48

Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,
535 U.S. 302 (2002) . . . . . . . . . . 27, 35

United States v. 50 Acres of Land,
469 U.S. 24 (1984) . . . . . . . . . . 47, 49

United States v. Dickinson,
331 U.S. 745 (1947) . . . . . . . . . . 41

United States v. Dow,
357 U.S. 17 (1958) . . . . . . . . . . 41, 48

Walcek v. United States,
49 Fed. Cl. 248 (2001) . . . . . . . . . . 32

Webb's Fabulous Pharmacies, Inc. v. Beckwith,
449 U.S. 155 (1980) . . . . . . . . . . 37

Wyatt v. United States,
271 F.3d 1090 (Fed. Cir. 2001) . . . . . . . . . . 41

Yancey v. United States,
915 F.2d 1534 (Fed. Cir. 1990) . . . . . . . . . . 30, 49

Yee v. City of Escondido,
503 U.S. 519 (1992) . . . . . . . . . . 44

Yuba Natural Res., Inc. v. United States,
904 F.2d 1577 (Fed. Cir. 1990) . . . . . . . . . . 3

**STATUTES:**

12 U.S.C. § 1715l(d)(3) . . . . . . . . . . 2

12 U.S.C. § 1715z-1 . . . . . . . . . . 2

12 U.S.C. § 4101 . . . . . . . . . . 6, 7

12 U.S.C. § 4102 . . . . . . . . . . 7, 8

12 U.S.C. § 4103(b) . . . . . . . . . . 7, 28, 40

12 U.S.C. § 4108 . . . . . . . . . . passim

12 U.S.C. § 4109 . . . . . . . . . . 8, 28, 45

12 U.S.C. § 4110 . . . . . . . . . . passim

12 U.S.C. § 4114 . . . . . . . . . . passim

12 U.S.C. § 4115(c) . . . . . . . . . . 8

42 U.S.C. § 12702 . . . . . . . . . . 43

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| CLAIMONT VILLAGE COMMONS, *et al*, | |
| Plaintiffs, | |
| v. | No. 94- 10002C; 94-10003C; 94-10005C; 94-10006C; 94-10007C; 94-10008; 94-10010C; 94-10020C; 94-10030C; 94-10040C (consolidated) |
| UNITED STATES, | Judge Lettow |
| Defendant. | |

**DEFENDANT'S PRETRIAL MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

Pursuant to the Court's May 23, 2006 order, and paragraph 14(b) of Appendix A of the Rules of the United States Court of Federal Claims ("RCFC"), defendant, the United States, respectfully submits the following memorandum of contentions of fact and law regarding the claims of plaintiffs Claremont Village Commons, Covina West Apartments, Del Vista Village, De Soto Gardens, Kittridge Gardens I, Kittridge Gardens II, Oxford Park, Parthenia Townhomes, Pioneer Gardens, and Puente Park Apartments.

## QUESTIONS PRESENTED

1. Whether the Emergency Low Income Housing Preservation Act ("ELIHPA" or "Title II") or the Low Income Housing Preservation and Resident Homeownership Act ("LIHPRHA" or "Title VI") effected a regulatory taking of plaintiffs' property, and

2. If the Court concludes that a regulatory taking has occurred, what compensation, if any, is owed to plaintiffs.

## STATEMENT OF FACTS DEFENDANT EXPECTS TO PROVE AT TRIAL

### I. Statutory Background

#### A. The Section 221(d)(3) And 236 Programs

Modern national housing policy began in the New Deal era with the passage of the National Housing Act of 1934. Initially, the Federal Government sought to provide low-income housing by subsidizing projects developed, owned, and managed by local public housing authorities. By the 1960s, however, the Federal Government shifted its focus by enacting legislation to encourage the construction, ownership, and management of moderate- and low-income housing by private owners. In 1961, Congress amended the National Housing Act to establish the Section 221(d)(3) program, 12 U.S.C. § 1715l(d)(3). This program authorized the Federal Housing Administration, and subsequently the Department of Housing and Urban Development ("HUD") to provide mortgage insurance and to fund below-market interest rate loans to stimulate private development of moderate- and low-income housing. After 1968, owners received market-rate mortgages with an interest subsidy under a program known as "Section 236." See 12 U.S.C. § 1715z-1.

Claremont Village, Covina West, Pioneer Gardens, and Puente Park were developed pursuant to the Section 236 program. DX322 at 14-15. Del Vista, De Soto Gardens, Kittridge Gardens I and II, Oxford Park, and Parthenia Townhomes were developed pursuant to the Section 221(d)(3) program. Id.

To obtain a Government-insured mortgage and additional taxpayer-funded benefits, the developers of a Section 221(d)(3) or Section 236 project entered into a "regulatory agreement" with HUD whereby the owner accepted specific restrictions on the mortgaged property, including

restrictions on tenant income, allowable rental rates, and cash distributions that could be received from the project. See generally Cienega Gardens v. United States, 331 F.3d 1319, 1234-35 (Fed. Cir. 2003). The regulatory agreement remained in effect as long as the property was subject to the insured mortgage. The mortgage note prohibited prepayment of the mortgage without the Government's approval for the project's first 20 years. Consequently, it was only after 20 years that the owner could prepay without the Government's approval, dissolve the affordability restrictions, and realize any residual value (i.e., equity) in the project.

### B. Benefits Of Participating In The Section 221(d)(3) And Section 236 Programs

The Section 221(d)(3) and 236 programs, as established by Congress, provided lucrative and immediate benefits to entice developers and investors to participate. Most significantly, the programs provided low-risk, Government-insured financing, and tax benefits. These were the principal reasons that developers chose to construct and operate projects pursuant to Section 221(d)(3) and Section 236. DX420.

#### 1. Low-Risk, High Leverage Financing

The Section 221(d)(3) and 236 programs enabled developers to obtain low-risk, high-leverage financing that was far superior to that available for a conventional multi-family housing project. Specifically, developers of these projects were able to obtain Government-insured, non-recourse loans at below market interest rates. The loans were amortized over 40 years and financed a full 90 percent of the project's replacement cost. In addition, developers were entitled to a Government credit called the Builder's and Sponsor's Profit and Risk Allowance ("BSPRA"). See DX7G, 14B, 24B, 30B, 33A, 47B, 68B, 68C, 70C, 337. The BSPRA further reduced a developer's cash outlay to between zero and 3.5 percent of the project's replacement

cost.[1] Id. By contrast, banks typically required developers to put down 20 to 25 percent to finance a comparable conventional project. Favorable financing was a principal reason that developers chose to participate in the Section 221(d)(3) and 236 programs.

### 2. Tax Benefits

The other principal reason developers chose to participate in the Section 221(d)(3) and 236 programs was tax benefits. Projects developed under these programs were entitled to use accelerated depreciation. Accelerated depreciation, when combined with the project's high leverage, made these projects particularly attractive as tax shelters. DX420. Accelerated depreciation and high leverage ensured that a project would record large paper losses throughout its initial years. These losses could be passed through to the project's individual owners, who could use them to offset profits from other investments. Id.

For this reason, developers of Section 221(d)(3) and 236 projects had two ways to take advantage of the projects' tax benefits. First, if they had income from other sources, developers could retain their interest in the property and use the tax benefits to reduce their own tax burden. When developers kept tax benefits for their own use, they ordinarily recouped their initial investment within one or two years, depending upon their tax bracket, by sheltering their outside income. Second, developers could sell shares in their property at a premium to private investors, who would in turn use the project's tax losses to shelter their own income. By monetizing the tax benefit in this manner, developers could obtain a substantial, almost immediate profit.

---

[1] Because HUD-insured loans were non-recourse, the developer never put at risk more than this small, initial cash investment.

### 3. Other Opportunities For Project Owners

Several other, less significant opportunities for profits also were available to developers of moderate- and low-income housing projects: annual cash distributions; management and other fees; and possible profits from the project's residual value.

Under the Section 221(d)(3) and 236 programs, budget-based rents were set at a level that allowed annual cash distributions to the owner. The regulatory agreement limited distributions to 0.6 percent of the project's total value. Because of the low initial cash investment, however, this provided a generous, double digit return (often in excess of 25 percent) on the owner's original cash investment. Owners also were allowed to profit by selling a wide range of services, such as property management or building maintenance, to their own project. Finally, there existed the potential for profit from realizing the project's residual value (i.e., the owner's equity) after 20 years. As explained in a contemporary treatise, however, "there are several reasons why in normal course this [last] expectation might not be realized in federally assisted housing." DX421 (Charles L. Edson & Bruce S. Lane, A Practical Guide to Low- and Moderate-Income Housing (B.N.A. 1972)).

## C. The Preservation Statutes

In the late 1980s, as the 20-year anniversary approached for many Section 221(d)(3) and 236 properties, Congress became concerned that many owners would prepay their mortgages, triggering a dramatic drop in the nation's supply of low-income housing. See, e.g., H.R. Conf. Rep. No. 100-426, at 192 (1987) (estimating almost 950,000 low-income housing units lost through mortgage prepayments). Consequently, in 1988 and 1990, Congress enacted two statutes (collectively, the "Preservation Statutes") to preserve low-income housing.

**1. ELIHPA**

In 1988, as a temporary measure, Congress enacted ELIHPA, Pub. L. No. 100-242, 101 Stat. 1877-86 (1988). The statute, which was enacted with a two-year sunset provision, instituted a permitting process under which owners interested in prepaying their mortgage were required to apply to HUD for approval. ELIHPA §§ 221-23. This enabled HUD, using the agency's knowledge and expertise, to assess whether a project warranted preservation as low-income housing.

As an alternative to prepayment, Congress authorized numerous benefits "to provide a fair return [to] the owner." Id. §§ 224-25. Financial benefits available to project owners under ELIHPA included a Government-insured equity take out loan funded by increased rents, increased annual cash distributions, Section 8 housing assistance contracts, and financing for capital improvements. Id. §§ 224(b), 231. In exchange for these financial benefits, owners executed a use agreement that extended the existing use restrictions on the property. Id. § 225(b); see also DX182A. Congress also authorized HUD to provide assistance to facilitate a project's sale to a qualified nonprofit organization, tenant cooperative, public agency, or other entity. Id. § 224(b). Participation by owners in the preservation process was voluntary.

Finally, to prevent prejudice to owners that chose to proceed under ELIHPA, Congress permitted such owners to switch to benefits authorized by any successor statute. ELIHPA § 230 (allowing owners to change course even after incentives under ELIHPA had been accepted).

**2. LIHPRHA**

In 1990, Congress replaced ELIHPA with LIHPRHA, Pub. L. No. 101-625, 104 Stat. 4249 (1990) (codified at 12 U.S.C. § 4101 et seq.). Like its predecessor, LIHPRHA asserted

HUD's regulatory jurisdiction over prepayment, required owners to seek approval to prepay their HUD-insured mortgage, and provided opportunities to exit the program or seek monetary benefits in the event of a denial. 12 U.S.C. §§ 4101(a), 4108-10, 4114. Significantly, LIHPRHA authorized prepayment under two distinct avenues. 12 U.S.C. § 4101(a); see also 12 U.S.C. §§ 4108, 4114.

An owner interested in pursuing the options provided by LIHPRHA was required to file notices of intent, conduct appraisals, and then submit plans of action. 12 U.S.C. § 4102(a). Further, owners with regulatory plans pending under ELIHPA were given the option of continuing under that statute or switching to LIHPRHA. 12 U.S.C. § 4101 note; see also ELIHPA § 230. All aspects of the preservation process under LIHPRHA were voluntary.

Pursuant to LIHPRHA, HUD could approve prepayment if prepayment would not cause a material hardship for current tenants or materially affect the availability of low-income housing in the area. 12 U.S.C. § 4108. As with ELIHPA, this enabled HUD to determine whether the project's preservation as low income housing was warranted. Id. (directing HUD to consider factors such as whether prepayment would "materially increase economic hardship for current tenants" or "affect . . . the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families").

LIHPRHA also allowed owners to sell their property to a "qualified purchaser" at the "fair market value of the housing based on the highest and best use of the property," i.e., the project's market value without HUD restrictions. 12 U.S.C. §§ 4103(b)(2), 4110(b)(1). To facilitate these sales, which released the owners from the program entirely, HUD funded virtually all transaction costs, provided mortgage insurance, and paid consultants to assist the parties.

HUD also provided loans and grants that enabled non-profit organizations to acquire the project. 12 U.S.C. § 4110(d). An owner seeking to sell would be allowed to prepay and exit the program if (1) it did not receive a bona fide offer within specified time frames, (2) HUD decided not to provide financial assistance in connection with an approved offer, or (3) the purchaser was unable to consummate the transaction for any other reason. 12 U.S.C. § 4114(1)(B).

As in ELIHPA, LIHPRHA permitted HUD to provide owners financial incentives in exchange for extending their properties' use restrictions. 12 U.S.C. § 4109. HUD could provide rent increases to owners, an increased rate of return based upon the property's market value as conventional rental housing, access to project equity through a Government-insured loan, and financing for capital improvements. Id.

Finally, LIHPRHA sought to ensure that owners were not disadvantaged by agency delay in processing applications or providing funds. The statute permitted owners to submit their first notice of intent two years before their original prepayment date to minimize any administrative delays after prepayment eligibility. 12 U.S.C. §§ 4102, 4119(1)(B). Additionally, Congress ordered HUD to review applications within 180 days and, if the review extended beyond that, HUD was to provide retroactive incentives and assistance to owners. 12 U.S.C. § 4115(c). Federal district courts were empowered to enforce Section 4115(c). Id. Moreover, if within a set period use agreement incentives were not provided, or a sale was not consummated, the owner was allowed to prepay the original mortgage and leave the program. 12 U.S.C. § 4114.

**D. The HOPE Act**

The Preservation Statutes were subject to frequent criticism due to their generous provisions and excessive cost to the Government. In the mid-1990s, Congress commenced hearings to explore alternatives. See Hearing before the Subcommittee on VA, HUD, and Independent Agencies of the House Committee on Appropriations, 104th Cong., 1st Sess. (January 24, 1995). HUD's Inspector General recommended, among other measures, that Congress "[d]iscontinue paying owners windfall profits for projects that threaten to prepay their mortgages and remove the low income character of the units." Hearing before the Subcommittee on VA, HUD, and Independent Agencies of the House Committee on Appropriations, 104th Cong., 1st Sess. (January 24, 1995) (statement of Susan Gaffney, HUD Inspector General). These concerns resulted in passage of the Housing Opportunity Program Extension Act of 1996 ("HOPE Act"), Pub. L. No. 104-120, 110 Stat. 834 (March 28, 1996). Although the HOPE Act did not expressly repeal LIHPRHA, it "restored the prepayment rights to owners" of moderate- and low-income housing. E.g., Chancellor Manor v. United States, 331 F.3d 891, 896 (Fed. Cir. 2003).

**II. The Plaintiffs**

The plaintiffs are ten unrelated limited partnerships developed to invest in low-income housing. Through the 236 and 221(d)(3) programs, each plaintiff developed one multifamily apartment building or complex in the late 1960s and early 1970s. The shares in most of the partnerships were sold, in part, to partners to take advantage of the tax benefits that arose from the investment.

Plaintiffs had no significant expectations regarding the opportunity to prepay the HUD-insured mortgage at the time of the partners' original investments.

Jona Goldrich, Sol Kest, Robert Stern, Robert Hirsch[2] (collectively, the "G&K partners") were partners in the plaintiff partnerships, as well as numerous other partnerships that invested in low-income housing, although the composition of each partnership varied. Typically, the G&K partners became general partners in the properties they developed. These individuals invested in low-income housing because, based upon the funding structure, there was no risk in the investments. The investments permitted the G&K partners to immediately profit and then collect dividends and fees in perpetuity.

Some or all of the G&K partners also own the following companies, which provided management and maintenance services for the plaintiffs: G&K Management Co., Inc.; Mechanical Services; Overland Computer Services; Pacific Coast Micro Utility Co. Ltd; Greater California Micro Utility, Ld; G&K Builders Supply; Active Mortgage Corp.; Overland Media Co., LLC. Thus, the G&K partners profited from the services rendered to plaintiffs.

The G&K partners syndicated many of their buildings. Under syndication agreements, the G&K partners sold as much as 99 percent of the properties to outside investors. When properties were syndicated by a third party, the syndicator created, and the G&K partners approved, prospectuses describing the investments. DX82E.

The outside investors who invested in plaintiffs' properties in the later 1960s and early 1970s had no investment backed expectations regarding the property's market value twenty years

[2] Warren Breslow was not one of the original partners on any of the ten plaintiffs, but he later became one of the G&K partners as the group developed properties in the late 1970s.

later. The only expectation actually backed with an investment was the lucrative tax benefits. Similarly, the G&K partners' decision to sell large shares of their low-income apartments demonstrated that they were not focused on the long-term returns but looking to profit immediately from their investment.

### A. The Initial Deals

The ten plaintiffs entered the HUD programs subject to the following terms.

#### 1. Claremont Village Commons

The Claremont Village partnership built a 150 unit apartment in 1970 under the Section 236 loan program. Under that program, the partnership was entitled to receive an insurable mortgage of 90 percent of the project's estimated replacement cost. The resulting mortgage of $2,547,800 accounted for the bulk of the financing of the project. DX68B at G-CV03376. The partnership was to finance the remaining $283,189 in costs. As the project's developers, however, the Claremont Village partnership was entitled to a Builder's and Sponsor's Risk Premium and Allowance ("BSPRA") equal to 10 percent of the "total estimated development cost," i.e., the estimated replacement cost, less land acquisition costs. Due to the BSPRA ($236,272) and land appreciation, the partnership was required to make an actual cash investment of only $16,917. DX420 at 20. The Claremont Village partnership's total cash outlay, therefore, was only 0.60 percent of the estimated cost of the Claremont Village apartment project. DX420 at 21.

By January 1, 1971, before the building was completed, the G&K partners had sold 49 percent ownership in the partnership to Sam Mesler, so that he could utilize the property's tax

benefits. DX324 at 3. Mr. Mesler was a general partner. Id. The G&K partners made a profit on the sale and utilized the remaining tax benefits themselves.

### 2. Covina West Apartments

The Covina West partnership built a 158 unit apartment in 1970 under the Section 236 loan program. Under that program, the partnership was entitled to receive an insurable mortgage of 90 percent of the project's estimated replacement cost. The resulting mortgage of $2,593,300 accounted for the bulk of the financing of the project. DX33A at CVC024880. The partnership was to finance the remaining $288,168 in costs. As the project's developers, however, the Covina West partnership was entitled to a BSPRA equal to 10 percent of the "total estimated development cost," i.e., the estimated replacement cost, less land acquisition costs. Due to the BSPRA ($220,770) and land appreciation, the partnership was required to make an actual cash investment of only $24,398. DX420 at 23-24. The Covina West partnership's total cash outlay, therefore, was only 0.85 percent of the estimated cost of the Covina West apartment project. Id.

By 1971, before the building was completed, the G&K partners had sold 25 percent ownership in the partnership to Leslie Sugar, and 25 percent ownership interest to Milton Gottlieb. Both Mr. Sugar and Mr. Gottlieb were general partners. DX324 at 5. The G&K partners also sold 10 percent interest to W.C. Backus and an additional 10 percent to Frank & Lynn Kirk. Id. These individuals purchased ownership shares in the partnership so that he could utilize the property's tax benefits. The G&K partners made a profit on the sales and utilized the remaining tax benefits themselves. The G&K partners continued to own a minority interest in the Covina West partnership at the time of the alleged taking.

**3. Del Vista Village**

The Del Vista Village partnership built a 160 unit apartment in 1971 under the Section 221(d)(3) loan program. Under that program, the partnership was entitled to receive an insurable mortgage of 90 percent of the project's estimated replacement cost. The resulting mortgage of $2,355,300 accounted for the bulk of the financing of the project. DX68C at G-CV00318. The partnership was to finance the remaining $261,723 in costs. As the project's developers, however, the Del Vista Village partnership was entitled to a BSPRA equal to 10 percent of the "total estimated development cost," i.e., the estimated replacement cost, less land acquisition costs. Due to the BSPRA ($206,729) and land appreciation, the partnership was not required to make any actual cash investment in the project. DX420 at 26.

By December 7, 1970, before the building was completed, the G&K partners had sold 50 percent ownership in the partnership to Sam Mesler, so that he could utilize the property's tax benefits. Mr. Mesler was a general partner. The G&K partners made a profit on the sale and utilized the remaining tax benefits themselves.

**4. De Soto Gardens**

The De Soto Gardens partnership built a 248 unit apartment in 1969 under the Section 221(d)(3) loan program. Under that program, the partnership was entitled to receive an insurable mortgage of 90 percent of the project's estimated replacement cost. The resulting mortgage of $3,494,500 accounted for the bulk of the financing of the project. DX14B at CVC020051. The partnership was to finance the remaining $388,336 in costs. As the project's developers, however, the De Soto Gardens partnership was entitled to a BSPRA equal to 10 percent of the "total estimated development cost," i.e., the estimated replacement cost, less land acquisition

costs. Due to the BSPRA ($283,840) and land appreciation, the partnership was not required to make any actual cash investment in the project. DX14B; DX420 at 30.

By March, 1969, before the building was completed, the G&K partners had sold 12.5 percent of the partnership to Richard Gunther and 12.5 percent to Stanford Tabb, both as general partners, so that they could utilize the property's tax benefits. DX324 at 7. The G&K partners made a profit on the sale and utilized the remaining tax benefits themselves.

**5. Kittridge Gardens I**

The Kittridge Gardens I partnership built a 128 unit apartment in 1968 under the Section 221(d)(3) loan program. Under that program, the partnership was entitled to receive an insurable mortgage of 90 percent of the project's estimated replacement cost. The resulting mortgage of $1,507,000 accounted for the bulk of the financing of the project. DX7G at CVC021364. The partnership was to finance the remaining $167,494 in costs. As the project's developers, however, the Kittridge Gardens I partnership was entitled to a BSPRA equal to 10 percent of the "total estimated development cost," i.e., the estimated replacement cost, less land acquisition costs. Due to the BSPRA ($123,336) and land appreciation, the partnership was required to make an actual cash investment of only $59,258. DX420 at 33. The Kittridge Gardens I partnership's total cash outlay, therefore, was only 3.5 percent of the estimated cost of the Kittridge Gardens I apartment project. Id. The G&K partners utilized all of the tax benefits themselves.

**6. Kittridge Gardens II**

The Kittridge Gardens II partnership built an 80 unit apartment in 1968 under the Section 221(d)(3) loan program. Under that program, the partnership was entitled to receive an insurable

mortgage of 90 percent of the project's estimated replacement cost. The resulting mortgage of $1,441,300 accounted for the bulk of the financing of the project. DX24B at G-CV02044. The partnership was to finance the remaining $161,729 in costs. As the project's developers, however, the Kittridge Gardens II partnership was entitled to a BSPRA equal to 10 percent of the "total estimated development cost," i.e., the estimated replacement cost, less land acquisition costs. Due to the BSPRA ($122,812) and land appreciation, the partnership was not required to make any actual cash investment in the project. DX420 at 36.

The G&K partners utilized all of the tax benefits themselves, although to best utilize the tax benefits, 75 percent of the ownership of the property was held by Goldrich and Kest, Inc., a separate entity owned by Mr. Goldrich and Mr. Kest that specialized in construction. DX324 at 10.

**7. Oxford Park**

The Oxford Park partnership built a 109 unit apartment in 1971 under the Section 221(d)(3) loan program. Under that program, the partnership was entitled to receive an insurable mortgage of 90 percent of the project's estimated replacement cost. The resulting mortgage of $1,519,800 accounted for the bulk of the financing of the project. DX47B at CVC021860. The partnership was to finance the remaining $168,923 in costs. DX420 at 39. As the project's developers, however, the Oxford Park partnership was entitled to a BSPRA equal to 10 percent of the "total estimated development cost," i.e., the estimated replacement cost, less land acquisition costs. Due to the BSPRA ($136,248) and land appreciation, the partnership was required to make an actual cash investment of only $32,675. DX420 at 38-39. The Oxford Park

partnership's total cash outlay, therefore, was only 1.9 percent of the estimated cost of the Oxford Park apartment project. Id.

The G&K partners sold 50 percent of the ownership of the property to Active Cleaning & Maintenance, and another 25 percent to Goldrich and Kest, Inc., to best utilize the tax benefits from the property. DX324 at 11.

**8. Parthenia Townhomes**

The Parthenia Townhomes partnership built a 24 unit apartment in 1971 under the Section 221(d)(3) loan program. Under that program, the partnership was entitled to receive an insurable mortgage of 90 percent of the project's estimated replacement cost. The resulting mortgage of $368,000 accounted for the bulk of the financing of the project. DX70C at CVC020469. The partnership was to finance the remaining $40,924 in costs. Id. As the project's developers, however, the Parthenia Townhomes partnership was entitled to a BSPRA equal to 10 percent of the "total estimated development cost," i.e., the estimated replacement cost, less land acquisition costs. Due to the BSPRA ($30,811) and land appreciation, the partnership was not required to make any actual cash investment in the project.

**9. Pioneer Gardens**

The Pioneer Gardens partnership built a 141 unit apartment in 1970 under the Section 236 loan program. Under the 236 program, the partnership was entitled to receive an insurable mortgage of 90 percent of the project's estimated replacement cost. The resulting mortgage of $2,446,500 accounted for the bulk of the financing of the project. DX30B at CVC025198. The partnership was to finance the remaining $271,919 in costs. Id. As the project's developers, however, the Pioneer Gardens partnership was entitled to a BSPRA equal to 10 percent of the

"total estimated development cost," i.e., the estimated replacement cost, less land acquisition costs. Due to the BSPRA ($227,414) and land appreciation, the partnership was required to make an actual cash investment of only $34,505. The Pioneer Gardens partnership's total cash outlay, therefore, was only 1.3 percent of the estimated cost of the Pioneer Gardens apartment project. DX420 at 46.

By June 1, 1971, and before the building was completed, the G&K partners had sold 24 percent ownership in the partnership to David Pick and 24 percent to Joseph Gorman, so that they could utilize the property's tax benefits. The G&K partners made a profit on the sale and utilized the remaining tax benefits themselves.

**10. Puente Park Apartments**

The Puente Park Apartments partnership built a 132 unit apartment in 1969 under the Section 236 loan program. Under that program, the partnership was entitled to receive an insurable mortgage of 90 percent of the project's estimated replacement cost. The resulting mortgage of $1,947,500 accounted for the bulk of the financing of the project. DX337 at CVC020371. The partnership was to finance the remaining $216,453 in costs. Id. As the project's developers, however, the Puente Park Apartments partnership was entitled to a BSPRA equal to 10 percent of the "total estimated development cost," i.e., the estimated replacement cost, less land acquisition costs. Due to the BSPRA ($170,169) and land appreciation, the partnership was not required to make any actual cash investment in the project. DX420 at 49.

By June 1, 1971, and before the building was completed, the G&K partners had sold 48 percent ownership in the partnership to Sam Mesler and 13 percent to Zyg Taube, so that they

could utilize the property's tax benefits. Messrs. Mesler and Taube were general partners. The G&K partners made a profit on the sale and utilized the remaining tax benefits themselves.

**11. <u>Further Benefits</u>**

The G&K Partners benefited both from the construction and management of the project. They contracted with their own construction company – Goldrich and Kest Construction, Inc. – to build the apartments. To manage the property, the apartment buildings contracted with G&K management – another wholly-owned company. The fees paid to these affiliated entities, including the construction costs and the management fees, were almost entirely funded by the Federally-backed mortgages and rents.

With the profits from the sale of interests in the building and the use of the tax benefits themselves, the G&K partners would have been able to recoup their initial investment in one or two years, depending upon the portion of the project sold to outside investors.

Thus, in return for minimal cash outlays of between zero and 3.5 percent of the project's cost, the partnerships received (a) uniquely advantageous financing, (b) the ability to utilize the project's tax benefits, (c) the ability to receive distributions of cash from operations, and (d) profits for the G&K partners by awarding them contracts for construction and project management.

Additionally, the partnerships were entitled to any profits generated by the sale or other disposition of the projects upon exiting the HUD program. Of course, at the time of project's development in the late 1960s and early 1970s, the residual value of the apartments would have depended upon interest rates, property values, the renters' market, and other variables existing

more than 20 years in the future. These variables would have been unknowable at the time of development.

**B. The Properties Prior To Title II**

Although the HUD-insurance programs made low-income housing available, those programs did not provide any direct assistance for tenants to pay rents.

Over time, HUD provided a number of programs to assist tenants in paying rent. One form of rental assistance was Housing Assistance Payment ("HAP" or "Section 8") contracts. These were contracts, which were signed by an apartments' owners and HUD, covered some set number of units in a given building. See, e.g., DX93-100. HAP contracts were project-based assistance, meaning that the assistance ran with the building. Seven of the plaintiffs participated in the HAP program. Id.[3]

HAP contracts provided that "[p]repayment of the mortgage shall not, by itself, affect any rights of the Owner or HUD under this Contract." DX93 at 9, § 27(c). When an apartment building signed a Section 8 contract it agreed to adhere to the HUD restrictions even if the owner prepaid the mortgage. Id.

HAP contracts provided benefits to apartment owners with HUD-insured mortgages. Without a HAP contract, the owners had to find tenants able to pay their entire rent, regardless of what percentage it was of their income. With HAP, tenants only had to pay 30 percent of their adjusted gross income (whatever that happened to be) as rent, with HUD paying the rest.

[3] Claremont Village Commons, De Soto Gardens, Kittridge Gardens I, Kittridge Gardens II, Oxford Park, Pioneer Gardens, and Puente Park Apartments. DX426.

A HAP contract reduced the apartment owner's credit risk (i.e, the risk that the rent would not be paid). Also, under HAP contracts, HUD paid its portion of the rent in a lump sum at the first of the month.

HAP contracts reduced the likelihood that a unit would be empty ("vacancy risk"). For HUD properties, there are generally waiting lists with from 10 to 1,000 names. This is not true for conventional properties. Indeed, G&K Management does not maintain waiting lists for its conventional properties. Not only did HAP contracts reduce vacancy risk by enlarging the pool of eligible tenants, it also provided subsidies for vacant units. Under the terms of plaintiffs' Section 8 contracts, HUD paid the owners 80 percent of the contract rents on vacant units, for up to 60 days.

Before 1996, HAP contracts were renewed in five year increments. Claremont Village, De Soto Gardens, Kittridge Gardens I and II, Oxford Park, Pioneer Gardens, and Puente Park each signed five-year HAP contracts that overlapped with their initial prepayment dates. Specifically, each of the properties faced the following initial prepayment dates and the accompanying expiration dates for their HAP contracts:

| Property | Prepayment date | HAP expiration date |
|---|---|---|
| Claremont Village Commons | 12/21/91 | 7/31/96 |
| De Soto Gardens | 11/2/90 | 6/30/91 |
| Kittridge Gardens I | 9/17/89 | 9/30/91 |
| Kittridge Gardens II | 4/14/91 | 9/30/91 |
| Oxford Park | 10/6/92 | 8/31/97 |
| Pioneer Gardens | 5/26/91 | 10/31/92 |
| Puente Park Apartments | 8/31/90 | 6/30/91 |

DX130; DX94-103A; DX345.

Thus, the properties would have been subject to affordability restrictions beyond their original prepayment dates even if they had prepaid their HUD-insured mortgages. In the absence of the Preservation Statutes, plaintiffs would have faced a choice: forego HAP assistance until the prepayment date or renew their HAP contract for five years although it would limit the rents the buildings could charge upon prepayment.

If plaintiffs had chosen to forgo the HAP contracts that overlapped their initial prepayment, the properties would have suffered substantial financial loss and faced potential foreclosure.

**C. <u>Plaintiffs Each Signed A Use Agreement</u>**

Plaintiffs were free to choose among the options available under the Preservation Statutes. Each plaintiff chose not to sell its property through the Preservation Statutes despite the fact that it could have extracted the entire fair market value of their equity. Had plaintiffs wished to sell their property to a non-profit organization for its appraised fair market value, there would have been a willing buyer available. If, for some reason, plaintiffs had not received a bonafide offer, plaintiffs could have prepaid their mortgages pursuant to12 U.S.C. § 4114.

Instead, the ten plaintiffs each filed notices of intent to seek Use Agreements under Title II. Later, when given the option of switching their applications to Title VI, each plaintiff refused. Through a process of appraisal and appraisal review, each plaintiff negotiated with HUD regarding what the property's value would be if there had been no HUD restrictions. Ultimately, plaintiffs and HUD reached the following valuations:

- Claremont Village Commons: $7,976,000 (DX189)
- Covina West Apartments: $8,342,000 (DX188C)

- Del Vista Village: $7,222,000 (DX211)
- De Soto Gardens: $12,750,000 (DX185D)
- Kittridge Gardens I: $7,365,000 (DX184D)
- Kittridge Gardens II: $5,700,000 (DX180)
- Oxford Park: $5,350,000 (DX227B)
- Parthenia Townhomes: $1,576,600 (DX196)
- Pioneer Gardens: $6,124,000 (DX197)
- Puente Park Apartments: $7,650,000 (DX144B)

These valuations served as the basis for plaintiffs' incentives in the preservation process. If plaintiffs had chosen to sell their properties under Title II, these values would have also served as the selling price.

By 1995, each of the plaintiffs signed Use Agreements with HUD. DX245-52, 258-59.[4] In exchange for valuable financial benefits, each plaintiff traded in their opportunity to prepay. The Use Agreements placed plaintiffs in the same or better financial position than they would have occupied had they prepaid their respective mortgages. If not, plaintiffs would have chosen to sell the properties at a market rate and pursue other investment opportunities.

**D. Prepayment Of The HUD-Insured Mortgages**

Prepayment of a HUD-insured mortgage has certain costs and risks for an owner. To prepay a HUD-insured mortgage, an owner must obtain a new, non-subsidized loan for the property.

Lenders were unwilling to make long-term, unsubsidized loans for the properties without evidence that the properties could obtain the conventional rents that they projected. Generally,

---

[4] The fact that the plaintiffs obtained funded Title II use agreements does not establish that their as-applied, regulatory taking claims are ripe. Plaintiffs' claims would be ripe only if HUD rejected requests to prepay pursuant to the Preservation Statues, see 12 U.S.C. § 4108, or plaintiffs establish that applying to prepay pursuant to the Preservation Statues was futile. Greenbrier v. United States, 193 F.3d 1348, 1359-60 (Fed. Cir. 1997).

lenders wanted an owner to demonstrate what conventional rates the property could get for two or three years before providing a long-term unsubsidized loan.

If an owner wished to prepay, it had two options: finance the prepayment with cash obtained from the partners, or obtain a bridge loan with the partners' personal property at risk if the loan defaulted. Either option increased the partners' investment – and risk – in the property. Also, if an owner prepaid, it would have to pay mortgage transaction costs twice. The first set of transaction costs would result from the bridge loan necessary to finance prepayment. The second set would result from securing a long-term mortgage after two or three years of a proven track record as a conventional property. Finally, in converting to a conventional property, an owner faced various "conversion costs" such as increased vacancies and increased costs for advertising and obtaining tenants.

### E. Los Angeles Rent Stabilization Ordinance

The Los Angeles City Counsel added the Los Angeles Rent Stabilization Ordinance (“LARSO”) to the Los Angeles Municipal Code in 1979 in response to a housing crises. DX352. The city imposed control on rents in a wide range of multifamily rental units. The ordinance set maximum rents at the rent in effect in April 1979, and allowed for periodic increases.

In 1980, the city counsel amended LARSO to add a vacancy decontrol provision, allowing owners to increase rents when rental units were vacated voluntarily or because of an eviction based upon specific grounds. Id.

From its inception, LARSO exempted from regulation "[h]ousing accommodations which a government unit, agency or authority owns, operates, or manages . . . ." DX352 (LARSO Section 151.02). This exemption encompassed a wide range of housing including federally-

subsidized, privately-owned multifamily developments, public housing, student housing owned by public universities, units with Section 8 rental subsidies, properties owned by HUD, the state, or the city after a mortgage or tax foreclosure. Id.

This "Government owned or operated" exemption from rent control was temporary, existing only during the period of Government ownership or regulation. In 1990, the Los Angeles City Council promulgated amendments to LARSO which were "not intended as substantive changes in the law . . .," but were intended "to clarify what has always been the intent of the City Council." DX352 (City of Los Angeles Ordinance No. 166320, Section 4, October 17, 1990). These amendments explained that rental units which were exempt from LARSO only because of their Government involvement would become subject to LARSO upon termination of Governmental regulation, and that "such units are not subject to 'vacancy decontrol' during the transitionary period." Id.

The 1990 amendments applied to all units that had previously been exempt on the basis of their governmental exemption, including LIHPRHA-eligible properties prepaying their mortgages, student housing sold by a public university, public housing sold by a public university and converted to non-student housing. Id. LARSO is a law of "general applicability" as that term is defined in LIHPRHA.

LARSO prohibited property owners from raising their rents to market rates after prepaying their HUD-insured mortgages. Independence Park v. United States, 449 F.3d 1235 (Fed. Cir. 2006). DeSoto Gardens, Kittridge Gardens I, Kittridge Gardens II, Oxford Park, and Parthenia Townhouses are within Los Angeles and, therefore, subject to LARSO. Because LARSO would have prevented these plaintiffs from raising the rents on the subject properties, it

would not have been economically feasible for these plaintiffs to obtain new mortgages and prepay the mortgages on the subject properties. Cienega Gardens v. United States, 38 Fed. Cl. 64, 84-85 (1997) (reversed and remanded on other grounds).

Tenants who have been in rent-controlled apartments for a significant duration are currently paying below-market rents. Tenants with rent controlled apartments – particularly those who have been in rent-controlled apartments for long periods – relocate less frequently than those with apartments not subject to rent control.

## DEFENDANT'S CONTENTIONS OF LAW

### I. The Los Angeles Properties Would Not Have Prepaid Their Mortgages

Even if Congress had not passed the Preservation Statutes, the five properties in the City of Los Angeles would have chosen to remain in the HUD program rather than prepay their mortgage and be subject to Los Angeles's rent control ordinance.

Los Angeles City Counsel passed LARSO in 1979, with the purpose of safeguarding tenants from excessive rent increases. LARSO significantly limits the ability of property owners to raise rents in Los Angeles. See DX353, §§ 151.02, 151.04. With few exceptions, rental properties in Los Angeles are limited to small increases, as provided by the city. See id. § 151.06. While LARSO exempts properties engaged in certain Federal programs, the ordinance expressly applies to any property leaving such a program, thereby preventing an immediate rent increase. See Id.

LARSO would have prevented plaintiffs from raising their rents to a "market level" had the plaintiffs prepaid their mortgages after 20 years in the HUD program. See id. The city would have limited plaintiffs to only "raise their rents by the amounts allowed for the annual allowable

rent increase after it had been 12 months since the last rent increase." In each of the years following prepayment, LARSO would have continued to limit plaintiffs to small annual rent increases until the tenants left, which would have "decontrolled" the apartment and permitted the owner to raise its rent to a market rate. See id. §§ 151.02, 151.04. In this way, the city would have treated plaintiffs like every other apartment owner in Los Angeles.

LARSO's limit on rent increases would have significantly reduced the value of the right to prepay – the opportunity plaintiffs claim the Government took. Indeed, the Court should conclude that because LARSO would have limited plaintiffs' ability to raise rents, the Los Angeles plaintiffs would not have chosen to convert to conventional properties, even if they had been given the opportunity to do so. See DX353, § 151.02. Specifically, if LARSO limited the Los Angeles plaintiffs' ability to raise rents, plaintiffs would not have generated enough cash flow to service the new mortgages that would result from the prepayment of the HUD-insured mortgages. DX426. Given the income stream available to plaintiffs under the LARSO restricted rents, plaintiffs would not have been able to obtain financing to prepay their mortgages and that plaintiffs would not have prepaid their mortgages. Id. Thus, given the proper application of LARSO in the but-for world, the Court should conclude that plaintiffs would not have prepaid their mortgages and would have stayed in the HUD program, even if the Government had not temporarily restricted plaintiffs' ability to prepay their mortgages.

## II. The Preservation Statutes Did Not Effect A Regulatory Taking Under *Penn Central*

A "regulatory taking" only occurs when Government action, although not encroaching upon or occupying private property, "goes too far." Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415 (1922). Claimants must bear the costs of regulations that restrict some of the uses of

their property, because "within limits, that is a burden borne to secure the advantage of living and doing business in a civilized community." Andrus v. Allard, 444 U.S. 51, 67 (1979) (internal quotes omitted).

To establish a regulatory taking, a plaintiff must provide evidence regarding: (1) the regulations' economic impact upon the claimant; (2) the extent to which the regulation has interfered with the plaintiff's reasonable, distinct investment-backed expectations; and (3) the character of the Government action. Penn Central, 438 U.S. at 124. A court must then balance these factors in an ad hoc analysis. City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 720 (1999); Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1005 (1992); see also Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 322 (2002) (Penn Central requires a "careful examination and weighing of all the relevant circumstances"). Although all three factors are to be balanced, "courts have traditionally rejected taking claims in the absence of severe economic deprivation." Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1195 (Fed. Cir. 2004).

### A. The Preservation Statutes Had No Economic Impact Upon Plaintiffs

The first prong of Penn Central addresses the severity of the economic impact of the challenged regulation. The consideration of economic impact is "intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim." Loveladies, 28 F.3d at 1176. "What has evolved in the case law is a threshold requirement that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation." Cienega Gardens, 331 F.3d at 1340 (citing Loveladies, 28 F.3d at 1177); see also Rose Acre, 373 F.3d at 1195 ("courts have traditionally rejected takings claims

in the absence of severe economic deprivation"); see also Lucas, 505 U.S. at 1019 n.8 ("in at least some cases the landowner with 95% loss will get nothing").

### 1. The Sale Option Eliminates Any Potential Economic Impact

Plaintiffs allege that the Preservation Statutes took their right to prepay. The owner's right to prepay, standing alone, has no intrinsic value. See Chancellor Manor, 331 F.3d 891, 903 (Fed. Cir. 2003). Prepayment is simply "a trigger for exiting the federal housing program;" that is, a means to the end of realizing and benefitting from equity in the property. Chancellor Manor, 331 F.3d at 905. The Preservation Statutes provided owners with several ways of achieving this end: (1) prepaying and converting the property to market-rate operation; (2) selling the property at a price based upon its appraised conventional market value; or (3) accepting a equity take-out loan and earning higher annual dividends based upon the project's appraised market-rate value. 12 U.S.C. §§ 4109, 4110, 4114. Thus, the Preservation Statutes did not prevent owners from benefitting from their property's residual value. See Penn Central, 438 U.S. at 136 (no taking occurs where the regulation does not interfere with the ability to obtain a "reasonable return" on the owner's investment).[5]

Additionally, by pursuing the sale option, an owner could fully realize the project's residual value by selling to a qualified purchaser. 12 U.S.C. § 4110. While the sale did not occur on the open market, the sale price was the project's market value at its highest and best use. 12 U.S.C. § 4103(b). Additionally, HUD funded transaction costs and otherwise facilitated the sale. 12 U.S.C. § 4110. Thus, economically, a sale under the Preservation Statutes was

---

[5] It was within HUD's discretion to authorize prepayment of the projects in Los Angeles, given LARSO's restriction on subsequent rent increases.

likely superior to an open market sale. Through the sale option, plaintiffs were able to fully realize the residual value of their apartment buildings and then invest that money in any way it saw fit. The Preservation Statutes, therefore, had no economic impact on plaintiffs. DX426.

Although the Preservation Statutes provided other options, it is sufficient to focus upon the economic impact of a HUD-facilitated sale. The availability of other options could only decrease – not increase – economic impact on plaintiffs. Nor can the sale option under the Preservation Statues be dismissed as a mere hypothetical. Plaintiffs were aware of the sale option. Indeed, the owners were approached by interested buyers, and HUD provided funding to facilitate numerous other sales across the nation and in California. Furthermore, if for some reason a sale could not be consummated, plaintiffs would have been entitled to prepay. 12 U.S.C. § 4114.

Plaintiffs did not ultimately pursue the sale option through the plan of action process. The fact that they chose to pursue use agreements instead merely demonstrates that any economic impact felt by plaintiffs resulted from their own business decision, not from the challenged regulations.

#### 2. Even Under Assumptions Favorable To Plaintiffs, The Preservation Statutes Did Not Result In A "Severe Economic Deprivation"

Plaintiffs apparently allege a permanent regulatory taking. Specifically, each plaintiff alleges that (1) the Government took that plaintiff's opportunity to prepay its mortgage and leave the HUD program, and (2) that opportunity will never be returned. See also Independence Park v. United States, 449 F.3d 1235 (Fed. Cir. 2006). Even under the most favorable assumptions, plaintiffs are unable to establish "severe economic deprivation," and thus are unable to demonstrate a regulatory taking under the Penn Central test.

To determine the economic impact of a permanent regulatory taking, courts typically apply a diminution in value approach to determine what effect the alleged taking had upon the overall property value. See Yancey v. United States, 915 F.2d 1534, 1541 (Fed. Cir. 1990); Florida Rock Industries, Inc. v. United States, 791 F.2d 893, 901 (Fed. Cir. 1986), cert. denied, 479 U.S. 1053 (1987). Under this approach, a court calculates the difference between the value of the property before and after the regulation divided by the value of the property before the regulation. Id. This approach yields losses of between zero and 100 percent. The Court can then determine whether a serious financial loss resulted from the regulatory imposition.[6]

Here, even if plaintiffs are granted every assumption in their favor, the evidence demonstrates that plaintiffs have not suffered anything near the economic impact that constitutes a taking.

Dr. William Hamm, an economic expert, calculated the economic impact using a variety of inputs. Dr. Hamm concluded that, when properly calculated, the Preservation Statutes caused the following economic impact upon plaintiffs:

- Claremont Village Commons: 2.9 percent
- Covina West Apartments: 6.3 percent
- Del Vista Village: 4.1 percent
- De Soto Gardens: 15.7 percent
- Kittridge Gardens I: 12.7 percent
- Kittridge Gardens II: 4.3 percent
- Oxford Park: 0.5 percent
- Parthenia Townhomes: 0.5 percent

[6] See, e.g., Florida Rock Industries, Inc. v. United States, 45 Fed. Cl. 20, 43-44 (1999) (73.1 percent diminution in value); Loveladies Harbor v. United States, 21 Cl. Ct. 153, 160 (1990), aff'd, 28 F.3d 1171 (Fed. Cir. 1994) (99 percent diminution); Bowles v. United States, 31 Fed. Cl. 37, 48-49 (1994) (between 91.8 percent and 100 percent); Formanek v. United States, 26 Cl. Ct. 332, 340 (1992) (taking – 88 percent); Yancey v. United States, 915 F.2d 1534, 1539 (Fed. Cir. 1990) (77 percent diminution).

- Pioneer Gardens: 6.7 percent
- Puente Park Apartments: 6.2 percent

DX426 at 69. Based upon this analysis, plaintiffs' takings claims must fail.

Dr. Hamm, moreover, also calculated the maximum possible economic impact alleged by the plaintiffs. Specifically, he took plaintiffs' alleged damages, as calculated by plaintiffs' expert Dr. Richard Pieser, and discounted them back to the initial prepayment date at the most favorable rate. He then compared these alleged damages to the property's value at that time, as identified by Dr. Peiser's report, and computed the alleged change in the valuation of the plaintiffs' property. He reached the following conclusions:

- Claremont Village Commons: 27.3 percent
- Covina West Apartments: 45.2 percent
- Del Vista Village: 39.8 percent
- De Soto Gardens: 39.2 percent
- Kittridge Gardens I: 36.4 percent
- Kittridge Gardens II: 27.1 percent
- Oxford Park: 37.5 percent
- Parthenia Townhomes: 37.6 percent
- Pioneer Gardens: 36.3 percent
- Puente Park Apartments 29.7 percent

DX426 at 66. Dr. Hamm explained in detail that these calculations vastly overstate any economic impact the plaintiffs actually incurred. These calculations are helpful, nevertheless, to demonstrate that, even with the plaintiffs' own numbers and the most favorable assumptions, none of the plaintiffs have incurred even 50 percent economic impact.

We are aware of no cases in which a court has found a taking where the diminution in value was less than 50 percent. Courts have, however, concluded that plaintiffs suffered no serious financial loss even with similar and higher percentages of economic impact: Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal., 508 U.S. 602,

645 (1993) (46 percent diminution); Jentgen v. United States, 228 Ct. Cl. 527, 532-33, 657 F.2d 1210, 1213 (1981) (50 percent diminution) cert. denied, 455 U.S. 1017 (1982); see also Walcek v. United States, 49 Fed. Cl. 248, 271-72 (2001), aff'd, 303 F.3d 1349 (Fed. Cir. 2002) (59.7 percent diminution).

The Court should conclude that the damages alleged by the plaintiffs do not constitute serious financial harm.

### 3. Plaintiffs' Diminution-In-Profits Approach Provides No Insight

The Court should conclude that the diminution-in-profits approach advocated by plaintiffs provides no insight into Preservation Statutes' economic impact.

In Dr. Peiser's expert reports, he advocates a return-on-investment, "snapshot," approach to measure the economic impact of the alleged taking. Under this approach, plaintiffs claim to measure the economic impact of the Government action based upon alleged changes in the plaintiffs' profits. Because the "snapshot" approach provides no useful insight into the alleged economic harm plaintiffs faced under the Preservation Statutes, the Court should reject this analysis.

First, plaintiffs' economic harm analysis completely ignores the opportunities the Government made available to plaintiffs from the first day of the alleged taking and throughout the alleged taking period. Clearly, any measure of economic impact must consider the options offered under the challenged regulation. See Penn Central, 438 U.S. at 137. Instead, plaintiffs' approach assumes that the only option available to the owners was remaining in the program at the original distribution. This, of course, was not the case. Because plaintiffs' model ignores the other options, the Court should reject plaintiffs' measure of economic harm.

Second, the diminution in profits approach provides no insight into the economic realities facing plaintiffs. Under plaintiffs' approach, Dr. Peiser only considers the alleged effect on quarterly cash flow. This approach ignores benefits the owners received from other sources, including accretion of equity on plaintiffs' mortgage and increases in the properties' value over time. Further, Dr. Peiser disregards that the Los Angeles properties were limited by LARSO and would not have prepaid. Finally, plaintiffs' approach ignores the change in risk that accompanies prepayment and becoming a conventional property, rather than remaining in the HUD program

The Federal Circuit has previously held that profit-based calculations are an inadequate substitute for the required evidence demonstrating the degree of diminution in the property's value. See Forest Properties, Inc. v. United States, 177 F.3d 1360, 1367 (Fed. Cir. 1999) ("The profit that Forest allegedly lost does not necessarily reflect the reduction in market value the denial of the permit caused."), cert. denied sub nom. RCK Properties, Inc. v. United States, 528 U.S. 951 (1999). These examples demonstrate that, if loss in profit is considered, the loss cannot be measured by putting profit in the denominator of the diminution calculation.

Plaintiffs' sole bases for proposing the diminution in profits approach are references to the method in Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1187 (Fed. Cir. 2004) and in Cienega Gardens, 331 F.3d at 1342-43. These cases do not compel the use of the proffered approach. In Cienega Gardens – the first case to ever reference to the "rate of return" analysis – the court expressly stated that it was adopting such an analysis "in view of the lack of any specific challenge by the government of the trial court's findings or of the Model Plaintiffs' methods and data." Indeed, the Court explained that it was only adopting a diminution in return, rather than the traditional diminution in value, "because the government neither argues error in

the trial court's adoption of the plaintiffs' expert's calculation of rate of return value, nor error in the trial court's repeated rejection of the government's data." Cienega Gardens, 331 F.3d at 1343 n.40. Certainly, the Federal Circuit did not express a preference for the rate of return analysis over the traditional approach long endorsed by the Supreme Court. Similarly, in Rose Acre, the court refused to endorse the rate-of-return analysis over the value analysis, but merely permitted the trial court to consider, in the first instance, which approach provided the better insight into the economic harm.[7]

Here, the Court should reject the rate-of-return analysis because the approach is economically unsound as the plaintiffs seek to apply it in this case. First, it seeks to measure the consequences of the alleged taking, rather than value of what was allegedly taken. As such, the approach is fundamentally at odds with the settled law of Constitutional takings: that just compensation for a taking is measured at the time of the alleged taking, First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 320 (1987), and does not include compensation for the consequences of the alleged taking. Yuba Natural Resources, Inc. v. United States, 904 F.2d 1577, 1583 (Fed. Cir. 1990) (stating that "lost profits . . . are consequential damages that are not recoverable as part of just compensation for a temporary taking.").

Second, it violates established Supreme Court jurisprudence holding that the economic impact of an alleged taking must be measured with reference to the parcel as a whole. Keystone Bituminous Coal Assoc. v. DeBenedictis, 480 U.S. 470, 497 (1987); Penn Central, 438 U.S. at

---

[7] Although this Court adopted plaintiffs' approach in Cienega Gardens v. United States, 67 Fed. Cl. 434 (2005), and CCA Assocs. v. United States, – Fed. Cl. – , 2007 WL 315350, those cases dealt strictly with temporary takings. The approach adopted in those cases, moreover, was rejected in City Line Joint Venture v. United States, 71 Fed. Cl. 486 (2006).

130-31; Tabb Lakes, Ltd v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993). Plaintiffs cannot simply divide the property into what was allegedly taken and what was not taken to demonstrate that the alleged taking was complete and compensable. Ultimately, any formula for measuring economic impact that puts profit in the denominator is tautological: you cannot properly measure the economic impact of an alleged taking by looking only at the effect of the alleged taking upon the portion of the property that allegedly was taken.

Third, plaintiffs' approach is flawed because it attempts to divide the property interest into temporal segments to argue that property was deprived of all economic use during a particular period of time. See Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 331 (2002); Maritrans, Inc., 342 F.3d at 1355 (stating that a claimant "may not confine the takings analysis . . . to [specific] periods . . . in order to argue that there were categorical takings during those periods"). Plaintiffs' approach considers only a single component or segment of plaintiff's property rights – the cash distributions to the owners – at a single point in time. This "snapshot" ignores all other expected cash flows that were reflected in the value of plaintiffs' property as a whole prior to the limitations on prepayment. Plaintiffs' methodology would yield the same measure of severity, regardless of whether the taking was permanent, or merely limited to a period of one month. The actual economic impact of a governmental action, however, is highly sensitive to the action's duration. An action limited to a single month could cause a negligible diminution in the economic value of the property, while a permanent taking of the same character could cause a major diminution in the property's value. Plaintiffs' approach, however, would find the impact to be the same in both cases.

Dr. Peiser, moreover, has chosen to take his snapshot prior to 1995, although the plaintiffs seek compensation long beyond that time. After 1995, the Government increased the distributions available to the plaintiffs, substantially increasing their cash flow. Dr. Peiser's refusal to take this increase into account causes his approach to grossly overstate economic impact. Dr. Peiser also ignores the reduction in regulation that flowed from the Use Agreements. Prior to the Use Agreements, plaintiffs were limited to a .6 percent return on the total cost of the original project. Dr. Peiser bases his entire snapshot approach upon this limited return. Under the Use Agreements, however, the limitation was completely eliminated. Thus, Dr. Peiser's approach systematically overstates the level of regulation to which the plaintiffs were subject after 1995.

Finally, the use of plaintiffs' return-on-investment approach ignores the widely accepted theory of dividend irrelevance. DX426. Application of his methodology would tend to reward investors who wish to take their returns in the form of cash, and penalize investors who seek capital gains by minimizing cash payouts, even though both sets of investors realize the same total return on their investment. Moreover, as a matter of economics, if the "but for" return on investment is zero or negative (which can occur at many properties), then the percent diminution is either not computable or meaningless.

Based upon the options available under Preservation Statutes, and upon the alleged change in value in the plaintiffs' property, the Court should conclude plaintiffs were not significantly harmed by the preservation legislation.

### B. The Preservation Statutes Did Not Frustrate Investment-Backed Expectations

The Penn Central analysis requires courts to consider whether the challenged Government conduct affected a plaintiff's "primary expectation concerning the use" of the affected property. Penn Central, 438 U.S. at 136. The expectation, moreover, "must be more than a 'unilateral expectation or an abstract need;'" it must be reasonable. Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005 (1984) (quoting Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 161 (1980)). Thus, a court must examine the expectations of a hypothetical, reasonable investor in the claimant's property. Chancellor Manor, 331 F.3d at 904 (citing Commonwealth Edison Co. v. United States, 271 F.3d 1327, 1348 (Fed. Cir. 2001)). Additionally, in Cienega Gardens, the court noted that the plaintiffs could not recover if they did not have actual (i.e., subjective) expectations that were frustrated by the regulation. 331 F.3d at 1346. The caselaw, therefore, establishes a two part test: first, to determine if a reasonable, objective investor would have considered the alleged expectation a primary reason to invest in the project; and second, to ensure that plaintiffs actually (subjectively) had such an expectation.

#### 1. The Preservation Statutes Did Not Interfere With The Primary Expectations Of A Reasonable Investor In Low-Income Housing

Because participants in the low-income housing programs were primarily focused on large, short-term returns, the Preservation Statutes could not have interfered with reasonable investment expectations.

##### a. Expectations Of Reasonable Developers And Investors

The primary motivations for developers and initial investors participating in the HUD Section 221(d)(3) and 236 programs were the immediate subsidies and incentives available from

the Government. Participation in the two low-income housing programs enabled developers to obtain below-market, Government-insured loans, which provided financing for 90 percent of a project's replacement cost. This low-risk, high-leverage financing was far superior to what could be obtained from banks for a conventional project. In addition, HUD provided developers a credit called the BSPRA, which further reduced the developer's initial cash investment. As a result, the initial cash investment for a HUD project was between zero and 3.5 percent of the project's total cost, whereas developers were typically required to put down 20 to 25 percent of the purchase price to finance a comparable conventional project. DX420.

Equally, if not more significant, the development of a Section 221(d)(3) or Section 236 property generated substantial tax benefits. Congress established the low-income housing programs upon the assumption that the tax benefits were the primary economic incentive to develop low-income housing. The availability of accelerated depreciation caused the HUD properties to produce significant tax losses. Additionally, because of the high leverage available to developers in the HUD program, the tax losses were more generous (and were available with a lower initial investment) than for a comparable conventional project. Together, favorable financing terms and tax benefits made the investment almost immediately profitable. DX420.

Similarly, investors who bought into the projects during or shortly after the buildings were built did so almost exclusively for the tax benefits. Such investors tended to be high-income individuals looking to shelter their income with the tax losses produced by the properties. DX420.

Of lesser significance to the developers and investors were annual cash distributions and the fees generated from the sale of management and other services to the project. The annual

cash distribution was paid for by project rents, which were established by a budget that included a dividend of 6 percent of the developer's original stated equity (i.e., 10 percent). Because the developer's actual cash investment was substantially less than 10 percent, however, the annual return on the original cash investment was substantial. Additionally, HUD allowed the owner to profit from the sale of services to the project. Owners typically profited from project management and various other services. DX420.

Finally, there existed the speculative possibility that the owners could realize profit from the project's residual value (i.e., owner's equity) 20 years or more in the future. DX420. This was, at most, a minor consideration for the reasonable developer. Id.

**b. The Preservation Statutes Did Not Affect Developer's And Investor's Reasonable Expectations**

Under the Penn Central test, courts are required to consider "the extent to which the regulation has interfered with distinct investment-backed expectations." Penn Central, 438 U.S. at 124 (emphasis added). In extreme cases, regulation may "so frustrate" expectations that it amounts to a taking. Id. (citing Pennsylvania Coal, 260 U.S. 393). In contrast, where multiple uses can be expected of property, but the law does not interfere with an owner's "primary" investment-backed expectation, a taking will not lie. See Penn Central, 438 U.S. at 136; MacLeod v. County of Santa Clara, 749 F.2d 541, 547 (9th Cir. 1984). This is true even where Government regulation, while not disturbing primary use, nevertheless frustrates other, more profitable, expected uses. MacLeod, 749 F.2d at 547-48.

The Preservation Statutes did not frustrate the primary expectations of a reasonable developer or investor. Neither ELIHPA nor LIHPRHA prevented developers from obtaining Government-insured financing or from taking advantage of the BSPRA. Nor did the

Preservation Statutes affect the available tax benefits. Indeed, these benefits were realized long before passage of the Preservation Statutes.

Similarly, the Preservation Statutes did not affect subsidiary expectations such as the ability to obtain management fees and the payment of annual cash dividends. The only subsidiary expectation even potentially affected was the opportunity to benefit from the project's residual value. By allowing the owner to cash out at the project's fair market value, however, the Preservation Statutes protected that interest as well. See 12 U.S.C. §§ 4103(b), 4110 (enabling the owner to realize equity by selling at the market value without HUD restrictions). Because the Preservation Statues neither disturbed the property's primary use as low-income housing, nor frustrated primary expectations, the investment-backed expectations prong of Penn Central does not support the conclusion that a regulatory taking occurred. See Penn Central, 438 U.S. at 136.

Plaintiffs argue, nevertheless, that the Preservation Statutes took their "right to prepay." Prepayment, however, has no value in and of itself. Prepayment is significant only insofar as it enables the owner to realize the project's residual value upon exiting the HUD program. See Chancellor Manor, 331 F.3d at 903. The Preservation Statutes permitted owners to exit the program and realize the project's residual value through a HUD-financed and facilitated sale. 12 U.S.C. § 4110. Because the owners could have exited the low-income housing program via the sale option, the alleged unavailability of a different route to the same end (i.e., prepayment) is of no moment.

**2. Plaintiffs' Partners Placed Little Import Upon The Opportunity To Prepay**

At and around the time the projects were completed, the plaintiffs placed little if any value upon the opportunity to prepay their HUD-insured mortgages.

A claimant must demonstrate that it had an actual (i.e., subjective) investment-backed expectation premised upon the regulation at issue. See Cienega Gardens, 331 F.3d at 1346 ("we start with an analysis of the [claimants'] actual expectation because we require [an] actual expectation . . . as a threshold matter"). Compensation where there was no actual reliance would be an unjustified windfall. See id. at n.42.

As explained above, the claimant entitled to compensation for a taking is the owner at the time of the taking – not the owner at an earlier or later date. E.g., United States v. Dow, 357 U.S. 17, 20-21 (1958) (citing Danforth v. United States, 308 U.S. 271 (1939); United States v. Dickinson, 331 U.S. 745 (1947)); American Pelagic Fishing Co., LLP v. United States, 379 F.3d 1363, 1372 (Fed. Cir. 2004) (quoting Wyatt v. United States, 271 F.3d 1090,1096 (Fed. Cir. 2001) (stating that "'[i]t is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation'"); Chancellor Manor, 331 F.3d at 901 (same).

The claimants here are ten limited partnerships, each of which owned a single multi-family apartment complex. In assessing each plaintiff's subjective investment backed expectation, the Court must inquire into what each plaintiffs' investment backed expectations were at the time it entered the HUD program. See Cienega Gardens VI, 331 F.3d at 1346 n.2.

Six of the plaintiffs were owned in various parts by individuals unrelated to the G&K partners – individuals who admittedly participated in the transactions almost solely for the tax benefits. Plaintiffs have no evidence whatsoever, except after-the-fact, self-serving testimony, regarding their initial expectations. Their claim, moreover, is illogical. Specifically, they did not care about the easy, immediate profits available under the program, but were instead focused

upon the possibility – however remote – of prepaying 20 years later and converting their properties to conventional tenants.

The Court should conclude that, at the time plaintiffs entered into the deals, they placed little value on the opportunity to prepay and that if they had such expectations, those expectations were not reasonable. Further, the Court should conclude that plaintiffs have failed to establish the elements of a regulatory taking and, as such, are not eligible for any compensation.

### C. The Preservation Statutes Do Not Have The Character Of A Taking

The final prong of Penn Central concerns the character of the Government action. Describing the nature of the investigation into the character of the Government's action, the Federal Circuit explained:

> a reviewing court consider[s] the purpose and importance of the public interest reflected in the regulatory imposition. In effect, a court [must] balance the liberty interest of the private property owner against the Government's need to protect the public interest through imposition of the restraint.

Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1176 (Fed. Cir. 1994). Two significant factors considered when evaluating the character of the Government's action are: (1) the nature of the interest the Government pursued in implementing the regulation; and (2) whether the Government sought to shift the public's burden on to the shoulders of a few. See Bass Enterprises Production Co. v. United States, 381 F.3d 1360, 1369-70 (Fed. Cir. 2004).

Here, the Preservation Statutes were enacted to promote a significant Government objective and, moreover, the cost of achieving this objective was borne by the public fisc. Thus, the Government's actions do not have the character of a taking.

**1. The Preservation Statutes Promoted Important, Long-Standing Government Objectives**

The United States' national housing policy is based upon the long-established national commitment to decent, safe, and sanitary housing for every American. 42 U.S.C. § 12702. Ensuring that a wave of mortgage prepayments did not leave thousands of low-income families homeless was a significant Government concern falling directly within the ambit of national housing policy. See Bass Enterprises Prod. Co. v. United States, 54 Fed. Cl. 400, 403 (2002), aff'd, 381 F.3d 1360 (Fed. Cir. 2004).

In the late 1980s, Congress and housing experts had become concerned that a large number of Section 221(d)(3) and 236 projects might prepay and exit the HUD programs, thus reducing the supply of low-income housing throughout the country. See S. Rep. No. 101-316 at 105 (1990), reprinted in 1990 U.S.C.C.A.N. 5763, 5867. In 1986 and 1987, the House Committee on Banking Finance and Urban Affairs held hearings on the potential loss of units due to the prepayment of insured mortgages. H. Rep. No. 100-122, reprinted in 1987 U.S.C.C.A.N. 3317, 3351. According to the Committee, "[t]he facts clearly indicate to the Committee that elderly and low income tenants have no alternative but to be thrown in the street without further action by Congress." 1987 U.S.C.C.A.N. at 3370; see also ELIHPA § 202(a)(4). Congress enacted ELIHPA to provide an "interim solution to this very serious problem" while further investigation was performed and a long-term solution developed. 1987 U.S.C.C.A.N. at 3317, 3351; see also ELIHPA § 202(a)(10). In enacting ELIHPA, "every attempt was made to balance the contract rights of owners with the need to try to preserve the existing stock of housing for low income persons." 1987 U.S.CCA.N. at 3353. Thus, HUD was given discretion to allow project owners to exit Government low-income housing programs, ELIPHA § 225(a), or

to ensure that owners remaining in the programs received "a fair return on the investment." ELIPHA §§ 224, 225(b).

Following passage of ELIHPA, Congress established a Preservation Commission which estimated that owners would terminate low-income affordability restrictions on approximately 243,000 units during the next 15 years. 1990 U.S.C.C.A.N. 5763, 5867-68. Congress determined that preserving the existing inventory of housing for low-income and moderate-income tenants was a significant component of national housing policy. Id. Congress also concluded that a Federal preservation strategy was, by far, the most cost-effective approach to "protect[] the interests of the owners, the tenants and the communities in which the housing is located." Id. Thus, in 1990, Congress passed LIHPRHA to alleviate the anticipated crisis in the availability of low-income housing while protecting the pecuniary interest of private-sector project owners.

At most, the Preservation Statutes were akin to standard rent control statutes. Property owners maintained control of the apartments, including the ability to manage the property, to turn away prospective tenants, and to sell the property at market value. Even if the Preservation Statutes had required owners to stay in the HUD program (and they did not), the statutes merely limited the owners' ability to raise tenant rents. Such rent control statutes are generally not considered to have the character of a taking. See Yee v. City of Escondido, 503 U.S. 519, 528-29 (1992); FCC v. Florida Power Corp., 480 U.S. 245, 251-52 (1987).

In sum, both ELIHPA and LIHPRHA were enacted to further the Government's important, long-standing commitment to promote an adequate supply of low-income housing.

### 2. The Preservation Statutes Did Not Shift The Burden Of Providing Low-Income Housing On To Plaintiffs

In an as-applied, regulatory taking claim, "the complaining party must offer evidence to show that the government has improperly shifted a public burden to a small class of private parties." Cienega Gardens, 331 F.3d at 1328 (citing Armstrong v. United States, 364 U.S. 40 (1960)). The Preservation Statutes were designed and implemented to ensure that property owners did not bear the financial burden. As Congress explained:

> ELIHPA attempted to balance the interests and concerns of both owners and tenants. . . . Congress . . . recognized that because of an administrative decision to permit owners to withdraw from the programs after twenty years, some of the original sponsors or subsequent purchasers may have anticipated an opportunity to benefit from the residual value of the housing. For these reasons, Congress rejected the notion of an absolute moratorium on prepayments. Rather, the law authorized HUD to provide owners with a series of valuable incentives either to extend the low-income affordability for the remaining terms of the mortgage or to transfer the housing to tenant cooperatives nonprofits or public entities.

1990 U.S.C.C.A.N. 5763, 5867.

Congressional efforts to protect the financial interest of project owners is reflected not merely in legislative history, but also in the terms of the Preservation Statutes. For instance, ELIHPA and LIHPRHA allowed projects that were not necessary for the Congressional preservation strategy to exit the program through prepayment. ELIHPA § 225(a); 12 U.S.C. § 4108. The Preservation Statutes also permitted project owners to realize their equity in a project (i.e., residual value) and exit the HUD program by selling at market value. 12 U.S.C. § 4110; see also ELIHPA § 230. Indeed, this option was facilitated by HUD using taxpayer dollars. See 12 U.S.C. § 4110(d). The Preservation Statutes also allowed owners to obtain an increased return on their equity by applying for incentives from the Government in exchange for

continued use restrictions on the project. ELIHPA §§ 224, 225(b); 12 U.S.C. § 4109. Finally, in the event that a sale could not be consummated, or if incentives were unavailable, the owner was allowed to prepay. 12 U.S.C. § 4114.

As explained above, the only expectation potentially affected by the Preservation Statutes is the opportunity to benefit from the residual value of the housing. See 1990 U.S.C.C.A.N. 5763, 5867. Under the sale option, however, the plaintiffs were entitled to realize the property's market value through a HUD-subsidized sale. See Parkridge Investors, 13 F.3d at 1199 ("fair market value is exactly what the partnership would receive as a result of a statutorily compelled sale to a non-profit"). The sale option, by itself, ensured that the Preservation Statutes would not shift a public burden on to owners such as plaintiffs.

## III. Plaintiffs' Lost-profits Model Does Not Provide A Proper Measure Of Just Compensation

The Court should reject plaintiffs' lost-profits model as it overcompensates the plaintiffs for any regulatory taking.

### A. Plaintiffs Are Only Entitled To Nominal Damages

The Court should conclude that, even if a regulatory taking has occured, plaintiffs are only entitled to nominal damages for the Government's taking of an opportunity plaintiffs would not have pursued.

Given the benefits available under the Preservation Statutes, there is no evidence that, had they been given a choice, plaintiffs would have chosen to forgo the preservation benefits and prepay their HUD-insured mortgage. In January 1995, Congress was considering a bill that would have restored plaintiffs' unlimited opportunity to prepay their mortgage. DX227A, 228. Nine of the plaintiffs (all except Puente Park Apartments), nevertheless, chose to sign Use

Agreements and receive the incentives after this bill was under consideration. This decision demonstrates that, even if plaintiffs had possessed the unfettered opportunity to prepay their mortgages in the but-for world, plaintiffs would have chosen to sign the funded Use Agreements anyway. As such, plaintiffs are only entitled to nominal compensation for the taking of an option plaintiffs would never have exercised.

### B. Plaintiffs' Damage Model Overstates Just Compensation

Even if the Court concludes that the plaintiffs are entitled to compensation under the Fifth Amendment, a position with which we disagree, the Court should still hold that Dr. Peiser's model overstates the compensation to which plaintiffs are entitled under the Constitution.

Plaintiffs overstate just compensation by calculating compensation at the end of the alleged taking, rather than at the time the taking occurred, and by employing an *ex-post* perspective. In addition, plaintiffs' calculations use inappropriate discount rates and unwarranted economic assumptions. Combined, plaintiffs' errors significantly overstate any compensation due.

#### 1. Plaintiffs Incorrectly Assesses Compensation At The End Of The Alleged Taking Period Using *Ex Post* Data

The overstatement of compensation stems in large part from Dr. Peiser's basic approach. If any principle is well-settled in takings law, it is that the proper date for valuing property taken by Government action – whether by condemnation, occupation, or regulation – is the date on which the taking occurred. See, e.g., First English, 482 U.S. at 320 (noting "the unexceptional proposition that the valuation of property which has been taken must be calculated as of the time of the taking"); United States v. 50 Acres of Land, 469 U.S. 24, 29 (1984) (just compensation is "'market value of the property at the time of the taking contemporaneously paid in money'"

(quoting Olson v. United States, 292 U.S. 246, 255 (1934)); Kirby Forest Industries, Inc. v. United States, 467 U.S. 1, 10 (1984); Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 803 (Fed. Cir. 1993) ("Compensation is always measured from the time the taking occurs.").

This "time of the taking" rule, moreover, embodies important public policy judgments. It means, for example, that the Government must bear the risk of diminutions in property value after the taking. United States v. Dow, 357 U.S. at 24; see also Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 477-78 (1973). At the same time, the certainty afforded by the rule allows Government officials to make informed decisions about the likely cost to the public fisc of a proposed taking or condemnation.

Dr. Peiser's model violates this rule in two ways. First, he utilizes *ex post* data - data that was not available at the time of the alleged taking. Second, he measures the taking from the date of trial for those properties still owned by the plaintiffs, and from the date of sale for those they have sold. In adopting this approach, plaintiffs contend that the relevant date for valuing plaintiff's prepayment rights should be the completely arbitrary date upon which the case happens to go to trial. This would be an error even if plaintiffs were alleging a temporary taking, First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 318 (1987)(temporary takings "are not different in kind from permanent takings."), but it is unrefutable given the permanent taking described in plaintiffs' compensation model. See also Independence Park, 449 F.3d at 1247.

Both the Supreme Court and the Federal Circuit have firmly rejected the notion that temporary takings and permanent takings are somehow subject to different valuation rules. In First English, itself a temporary takings case, the Supreme Court made clear that temporary takings "are not different in kind from permanent takings," 482 U.S. at 318, and referred to "the

unexceptional proposition that the valuation of property which has been taken must be calculated as of the time of the taking." Id. at 320. Similarly, the Federal Circuit explained in a regulatory takings case that "[f]air market value under the Fifth Amendment is normally ascertained at the date the governmental restrictions are imposed, which is the date of the taking." Yancey, 915 F.2d at 1543. Indeed, like the plaintiffs in this case, the plaintiffs in Yancey urged a more flexible, case-by-case approach to valuation. The Federal Circuit rejected that argument, observing: "We are aware of no cases allowing the flexibility that the Yanceys advocate." Id.

Plaintiffs offer no justification for departing from this settled law, and none exists. Plaintiffs' approach would produce odd and unjust results in cases where market values fall after the taking, for the Government would owe compensation only for the value remaining in the property at the end of the period, not for the value that the Government originally took from the owner. Moreover, plaintiffs' approach is flatly contrary to the policies underlying the "time of the taking" rule. The effect of the Plaintiffs' logic is to deny the Government the ability, *ex ante*, to estimate the cost to the public fisc of proceeding with a temporary taking, because the compensation award will depend not on the market value of the owner's property at the time of the taking but on unknowable events occurring during the takings period. That result cannot be reconciled with the principle that "just" compensation is no more or less than "the market value of the property at the time of the taking contemporaneously paid in money." United States v. 50 Acres of Land, 469 U.S. 24, 29 (1984) (emphasis added). Under that standard, the determinative question in calculating just compensation is "what a willing buyer would pay in cash to a willing seller at the time of the taking." 564.54 Acres, 441 U.S. at 511 (internal quotation omitted) (collecting cases). That test logically precludes the notion that *post hoc* fluctuations in value affect compensation.

The practical effect of Dr. Peiser's choice of valuation date is to cause a material increase in the compensation award to plaintiffs. That is because the plaintiffs' nominal damages in each year of the takings period must be discounted to real-dollar terms to calculate a final total. Using the trial date as proper valuation date, plaintiffs adjust their nominal losses upward by the discount rate. But because valuation must occur as of the time of the taking, all such nominal losses should have been adjusted downward by the discount rate.[8] As noted above, Dr. Peiser's *ex post* methodology permits plaintiffs to seek compensation based upon actual market increases that occurred after the time of the taking. Indeed, under plaintiffs' *ex post* methodology, a temporary taking could require greater compensation than a permanent taking of the very same property interest. A proper *ex ante* valuation – based upon information available to the parties at the time of the taking – could not result in such a nonsensical outcome. DX426.

Accordingly, because "the valuation of property which has been taken must be calculated as of the time of the taking" using an *ex ante* approach, First English, 482 U.S. at 320, the compensation sought by plaintiffs in this case is overstated and would not be "just."

Moreover, if the allegedly taken property is valued at the time of the taking (the initial prepayment date), the concept of mitigation is not relevant, as the value cannot change based upon the plaintiffs' subsequent actions. If, however, the Court concludes that damages should be measured from some time other than the initial taking date – a position with which we disagree – then the plaintiffs had and have a clear duty to mitigate the necessary compensation by selling

---

[8] This difference arises because the discount rate used in the valuation process (here 10 percent, see DX426, differs from the rate at which interest is assessed. Discounting plaintiffs' nominal losses forward (and thus upward) at 10 percent to the end of the alleged takings, and then applying the prejudgment interest rate, is erroneous. The correct approach is to discount nominal losses backward (and thus downward) to the time of the taking, and then apply the lower prejudgment interest rate going forward. Id.

their properties at the earliest possible date, either under the Preservation Statutes or subsequent to the passage of the HOPE act. The plaintiffs' failure to properly mitigate their costs causes their compensation model to overstate the appropriate compensation to which they are entitled.

### 2. <u>Dr. Peiser Employs The Wrong Discount Rates</u>

Dr. Peiser's incorrect application of discount rates improperly increases plaintiffs' alleged damages.

It is undisputed that, when discounting cash flow streams, each stream must be discounted based upon the riskiness of the cash flows. Dr. Peiser's model, however, ignores this basic economic principle in discounting the cash flows from the "actual" world.

Cash flows from HUD-insured properties are less risky than cash flows from conventional properties. Investors in HUD-subsidized properties avoid numerous risks faced by those investing in conventional properties, such as low vacancy rates, and reduced credit risk. Generally, HUD properties maintain rents below market rates, which makes the apartments precious commodities. HUD property owners maintain waiting lists with the names of potential tenants. These lists reduce the likelihood that property owners will face an un-rented – and thus unprofitable – apartment. Plaintiffs do not have such waiting lists for their conventional properties. HUD, moreover, allows owners to bill for a unit even when that unit is vacant, which results in reduced vacancy risks. Similarly, apartments with assistance contracts faced a reduced risk that tenants would fail to pay the rent, known as credit risk. Under the HAP contracts, the Government provided lump-sum rental payments to plaintiffs at the beginning of each month.

Because of the lower risk on the cash flows from HUD-insured properties, Dr. Peiser should have discounted those cash flows at lower discount rates. Dr. Peiser, however, discounts cash flows from properties with HUD-insured mortgages at the same rate he applies to those

properties if they had received market-rate rents. By using a single discount rate to apply to all of the cash flows in his model, Dr. Peiser's model illogically concludes that the risks associated with the cash flows from HUD-subsidized operations is equal to the risks associated with cash flows from the conventional market. Moreover, Dr. Peiser's model illogically assigns the same degree of risk to the payment of a judgment by the United States Treasury as to cash flows from tenants paying rent in the conventional market. This error improperly inflates plaintiffs' alleged damages.

### C. Plaintiffs' Lost-Profit Model Contains Numerous Errors

The Court should reject plaintiffs' lost-profits model because it is based upon numerous errors that render any result speculative.

#### 1. Plaintiffs' Model Ignores HAP Contracts That Overlapped With The Prepayment Dates

The Court should reject plaintiffs' compensation model because it ignores the limitations in plaintiffs' HAP contracts.

Prior to their initial prepayment dates, seven plaintiffs voluntarily entered into five-year Section 8 subsidy contracts with HUD. These contracts conferred certain benefits on plaintiffs, but they also limited plaintiffs' ability to raise rents, even in the absence of other HUD restrictions. Each of the plaintiffs chose to renew its contract for a five-year period extending beyond the property's assumed prepayment date. Dr. Peiser ignores the limitations in these Section 8 contracts when computing plaintiffs' alleged damages, although these contracts clearly would have prevented plaintiffs from raising rents on their initial prepayment date as predicted in Dr. Peiser's model.

Plaintiffs have also argued that, in the but-for world they would have obtained made-to-measure Section 8 contracts that would have ended on the prepayment date. There is no

evidence the Government would have been willing to enter into such ad hoc contracts to ease plaintiffs' transition into prepayment. Indeed, this argument is completely undermined by the fact that Kitridge Gardens I and II, De Soto Gardens, and Puente Park all signed 5 year Section 8 contracts before 1988 – HAP contracts that carried over long past their initial prepayment date. These contracts, signed before Congress passed or considered the Preservation Statutes, demonstrate that made-to-measure HAP contracts were not available to the plaintiffs.
Dr. Peiser's model, inexplicably, ignores the existence of these agreements.

**2. Dr. Peiser Makes No Allowance For Phasing-In Market Rents**

Dr. Peiser's lost-profits model incorrectly assumes that plaintiffs would have immediately raised rents to market rates in the but-for world on the initial prepayment date.

Plaintiffs' practices throughout their properties has been to phase in rent increases over 18 months or two years, to make the rents more agreeable to the tenants and to avoid the losses that would accompany widespread tenant evacuations. DX426. Dr. Peiser ignores this practice in his model, and in doing so, improperly increases damages.

**3. Dr. Peiser Incorrectly Assumes That Each Plaintiff Could Have Obtained Permanent Financing On The Assumed Prepayment Date**

Dr. Peiser overstates damages by assuming that each plaintiff would have obtained permanent financing at market rates on its initial prepayment date. There is no basis in fact for this assumption. Indeed, the most likely avenue available to plaintiffs outside the City of Los Angeles[9] involved a short-term bridge loan for several years while the properties demonstrated their earning power to the lenders. DX426. Then, and only then, would plaintiffs have been able

[9] As described above, the Los Angeles plaintiffs would have been subject to LARSO and unable to secure such financing.

to obtain market-rate loans. Id. This method of financing would have included higher interest payments on the bridge loan, and more transaction costs in obtaining two loans rather than one. Dr. Peiser's model ignores those costs.

**4. Dr. Peiser Overstates The Hypothetical Price For The Five Properties That Were Sold**

Dr. Peiser overstates the price for which Claremont Village, Covina West, Del Vista, Pioneer, and Puente Park could have sold their properties absent the Use Agreements. Accordingly, he overstates the compensation necessary to make the plaintiffs whole.

Dr. Peiser assumes that, but for the alleged taking, the plaintiffs that sold their properties after signing Use Agreements would have obtained a higher price when they sold their properties. He estimates the higher price by dividing his estimates of the properties' net operating income ("NOI") by the capitalization ("CAP") rates reported by CB Richard Ellis for Los Angeles County in the relevant quarter. In effect, Dr. Peiser assumes that the purchasers would have used the *average* CAP rate for the County to value the properties, rather than a higher or lower CAP rate.

Dr. Hamm has determined that Dr. Peiser has systematically applied a lower CAP rate that would otherwise be appropriate and, in so doing, overstated the properties' sale value absent the Use Agreements. DX426. Dr. Peiser then compounded this error by ignoring the additional closing costs the plaintiffs would have incurred had they sold their properties at the rates assumed in Dr. Peiser's report.

**5. Dr. Peiser's Model Fails To Consider The Effect Of LARSO Upon Damages**

If the Court concludes that the five plaintiffs subject to LARSO would have prepaid their mortgages – a position with which we disagree – the Court should still conclude that Dr. Peiser

erred when he failed to consider the effects of LARSO on his damages model.

Dr. Peiser's assumes – without factual basis – that the plaintiffs would have been able to obtain market rents at the time of prepayment by obtaining Section 8 certificates for their tenants. Even if this was true, Dr. Peiser has previously testified that such certificates produced below market rents. As this Court explained "[Plaintiffs] assert that the Use Agreements and HAP contracts have not provided plaintiffs with the anticipated benefits to alleviate their takings damages due to the government's failure properly to adjust the rental rates associated with Section 8 certificates upward as the market has risen." Independence Park Apartments v. United States, 61 Fed.Cl. 692, 700 (2005), rev'd on other grounds, 449 F.3d 1235 (Fed. Cir. 2006). Dr. Peiser's model in this case completely fails to reflect the alleged slow rise in the value of Section 8 certificates to which he testified during the previous trial. If the model were to take into account the alleged below market rent increases under the certificates, the damages alleged for the five plaintiffs subject to rent control would drop.

**6. Dr. Peiser's Report Suffers From Numerous Other Errors**

As described in Dr. Hamm's report – and as will be detailed at trial – Dr. Peiser's report suffers from a series of additional errors, each of which contributes to the plaintiffs' overstatement of necessary compensation. These errors include Dr. Peiser's incorrect assumption regarding the property turnover rates to apply in his model, as well his decision to penalize the Government for decisions plaintiffs made in the actual world that caused increased damages under Dr. Peiser's model. These errors cause the model to overstate necessary compensation and undermine the overall reliability of the model.

## CONCLUSION

The evidence and testimony presented at trial will demonstrate that Preservation Statutes did not effect a taking and that plaintiffs are not entitled to compensation.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Acting Director

/s Brian M. Simkin
BRIAN M. SIMKIN
Assistant Director

/s Kenneth M. Dintzer
KENNETH M. DINTZER
Assistant Director
DAVID A. HARRINGTON
KENNETH D. WOODROW
TIMOTHY P. McILMAIL
SEAN DUNN
MICHAEL AUSTIN
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
(202) 514-7300

February 15, 2007

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on the 15th day of February, 2007, a copy of "DEFENDANT'S PRETRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Kenneth M. Dintzer