**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CLAREMONT VILLAGE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 94- 10002C; 94-10003C; 94-** |
| **v.** | ) | **10005C; 94-10006C; 94-10007C; 94-** |
| | ) | **10008; 94-10010C; 94-10020C; 94-** |
| **UNITED STATES,** | ) | **10030C; 94-10040C (consolidated)** |
| | ) | **Judge Lettow** |
| **Defendant.** | ) | |
| | ) | |

**<u>SET III PLAINTIFFS' PRE-TRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW</u>**

Everett C. Johnson
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Fax: (202) 637-2201

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

A. Relevant History Of The Case ........ 1

B. Issues To Be Tried ........ 7

II. CONTENTIONS OF FACT ........ 10

A. The Regulatory Agreements ........ 10

B. Plaintiffs' Properties ........ 13

C. ELIHPA and LIHPRHA ........ 23

D. Preservation Benefits ........ 34

E. The HOPE Act ........ 38

F. Just Compensation ........ 39

G. Interest on Just Compensation Award ........ 75

III. CONTENTIONS OF LAW ........ 75

A. Plaintiffs' Takings Claims Are Ripe For Review ........ 77

B. ELIHPA And LIHPRHA Effected A Taking Of Plaintiffs' Right To Prepay Their HUD-Insured Mortgages On Their Twenty-Year Prepayment Dates ........ 79

a. The Government's Actions In Enacting ELIHPA And LIHPRHA Have The Character Of A Taking ........ 79

b. ELIHPA and LIHPRHA Caused Sufficiently Severe Economic Impact To Effect a Taking ........ 84

c. ELIHPA And LIHPRHA Frustrated Plaintiffs' Distinct, Reasonable, and Investment-Backed Expectations ........ 87

C. Plaintiffs Are Entitled To Just Compensation For The Taking Of Their Property ........ 91

a. Plaintiffs Are Entitled To Just Compensation For The Damages They Suffered From The Date Of The Taking Until The Date They Entered Into Use Agreements ........ 91

b. Plaintiffs Are Entitled To Just Compensation For The Damages They Suffered As A Result Of Their Use Agreements............................ 95

D. Plaintiffs Are Entitled To Compound Interest As A Component Of Just Compensation ........................................................................................... 98

CONCLUSION......................................................................................................... 98

# TABLE OF AUTHORITIES

**Page**

## CASES

*767 Third Ave. Assocs. v. United States*,
48 F.3d 1575 (Fed. Cir. 1995) .......... 97

*Am. Pelagic Fishing Co., L.P. v. United States*,
55 Fed. Cl. 575 (2003) .......... 93

*Armstrong v. United States*,
364 U.S. 40 (1960) .......... 79

*Bass Enters. Prod. Co. v. United States*,
48 Fed. Cl. 621 (2001) .......... 92

*CCA Assocs. v. United States*,
Slip Opinion (Fed. Cl. 2007) .......... passim

*Cienega Gardens v. United States*,
194 F.3d 1231 (Fed. Cir. 1998) .......... 2, 7

*Cienega Gardens v. United States*,
265 F.3d 1237 (Fed. Cir. 2001) .......... 2, 32, 77, 79

*Cienega Gardens v. United States*,
33 Fed. Cl. 196 (1995) .......... 1

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) .......... passim

*Cienega Gardens v. United States*,
37 Fed. Cl. 79 (1996) .......... 1

*Cienega Gardens v. United States*,
38 Fed. Cl. 64 (1997) .......... 2, 3, 4, 95

*Cienega Gardens v. United States*,
46 Fed. Cl. 506 (2000) .......... 2

*Cienega Gardens v. United States*,
67 Fed.Cl. 434 (2005) .......... passim

*Cienega Gardens v. United States*,
No. 94-1-C (Fed. Cl. Jan. 8, 2002) .......... 3

*City Line Joint Venture v. United States*,
71 Fed.Cl. 486 (2006) ........ 80

*Dist. Intown Props. Ltd. P'ship v. District of Columbia*,
198 F.3d 874 (D.C. Cir. 1999) ........ 85

*Dolan v. City of Tigard*,
512 U.S. 374 (1994) ........ 83

*Dynamics Corp. of Am. v. United States*,
766 F.2d 518 (Fed. Cir. 1985) ........ 100

*Gen. Motors*,
323 U.S. at 382 ........ 93

*Heydt v. United States*,
38 Fed. Cl. 286 (1997) ........ 97

*Hodel v. Irving*,
481 U.S. 704 (1987) ........ 83

*Independence Park Apartments v. United States*,
465 F.3d 1308 (Fed. Cir. 2006) ........ 5, 92

*Independence Park Apartments v. United States*,
61 Fed. Cl. 692 (2004) ........ passim

*Independence Park Apartments. v. United States*,
449 F.3d 1235 (Fed. Cir. 2006) ........ passim

*ITT Corp. v. United States*,
17 Cl. Ct. 199 (1989) ........ 101

*Kimball Laundry Co. v. United States*,
338 U.S. 1 (1949) ........ 81, 92, 93

*Kirby Forest Indus., Inc. v. United States*,
467 U.S. 1 (1984) ........ 99

*Lingle v. Chevron U.S.A., Inc.*,
544 U.S. 528 (2005) ........ 80

*Loveladies Harbor, Inc. v. United States*,
28 F.3d 1171 (Fed. Cir. 1994) ........ 80, 84, 87

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) ........ 79

*Maritrans v. United States*,
342 F.3d 1344 (Fed. Cir. 2003) ........ 87

*Nollan v. Cal. Coastal Comm'n*,
483 U.S. 825 (1987)........ 82

*Pa. Coal Co. v. Mahon*,
260 U.S. 393 (1922)........ 79

*Penn Cent. Transp. Co. v. New York City*,
438 U.S. 104 (1978)........ 79, 81, 84, 87

*Pennell v. City of San Jose*,
485 U.S. 1 (1988)........ 82

*Prudential Ins. Co. of Am. v. United States*,
801 F.2d 1295 (Fed. Cir. 1986) ........ 81

*Rose Acre Farms v. United States*,
373 F.3d. 1177 (Fed. Cir. 2004) ........ 85

*Shelden v. United States*,
34 Fed. Cl. 355 (1995)........ 97, 99

*Studiengesellschaft Kohle v. Dart Indus., Inc*.,
862 F.2d 1564 (Fed. Cir. 1988) ........ 99

*United States v. Commodities Trading Corp.*,
339 U.S. 121 (1950)........ 92

*United States v. Gen. Motors Corp.*,
323 U.S. 373 ........ 92-93

*United States v. Miller*,
317 U.S. 369 (1943)........ 91, 95

*United States v. Petty Motor Co.*,
327 U.S. 372 (1946)........ 92

*Vaizburd v. United States*,
67 Fed. Cl. 257 (2005)........ 100

*Whitney Benefits, Inc. v. United States*,
30 Fed. Cl. 411 (1994)........ 101-102

*Yancey v. United States*,
915 F.2d 1534 (Fed. Cir. 1990) ........ 84

**STATUTES**

12 U.S.C. § 1715*l* ..... passim

12 U.S.C. § 4101 ..... 1

12 U.S.C. § 4108 ..... 24, 26, 77

12 U.S.C. § 4108(a) ..... 26

12 U.S.C. § 4108(a)(1)(A) ..... 26

12 U.S.C. § 4108(c) ..... 27

12 U.S.C. § 4110(b)-(c) ..... 27

12 U.S.C. § 4111(b)-(c) ..... 27

12 U.S.C. § 4112(a)(2)(A) ..... 26

12 U.S.C. § 4114(a)(1)(A) ..... 27

12 U.S.C. § 4114(a)(1)(B)-(2) ..... 27

12 U.S.C. § 4117(c) ..... 26

12 U.S.C. § 4121 ..... 35

42 U.S.C. § 1437f ..... 34

42 U.S.C. § 1437f(c)(8) ..... 23

L.A. Mun. Code § 151.02 ..... passim

L.A. Mun. Code § 151.06 ..... 41, 94, 95

**RULES**

24 C.F.R. § 207.14 ..... 13

24 C.F.R. § 207.253(a)(2) ..... 13

24 C.F.R. § 221.524(a) ..... 13

24 C.F.R. § 221.524(a)(1)(ii) ..... 88

24 C.F.R. § 236.30 ..... 13, 88

24 C.F.R. § 248.141(a)(1) ..... 24, 77

24 C.F.R. § 248.141(e) ..... 27

24 C.F.R. § 248.213(b) ........................................ 24

24 C.F.R. §§ 248.1 to 248.319 ........................................ 26

24 C.F.R. §§ 248.101 to 248.261 ........................................ 23

**OTHER AUTHORITIES**

Housing Act of 1954, Pub. L. No. 83, 68 Stat. 590 (1954) ........................................ passim

Housing Act of 1961, Pub. L. No. 87-70,
tit. I, § 101(a)(6), 75 Stat. 149 (1961) ........................................ 11

Housing and Urban Development Act of 1965, § 101 ........................................ 16

Housing and Urban Development Act of 1968,
Pub. L. No. 90-448, tit. II, § 201, 82 Stat. 476, 498-501 (1968) ........................................ 11

Housing Opportunity Program Extension Act,
Pub. L. No. 104, 110 Stat. 834 (1996) ........................................ passim

National Housing Act, Pub. L. No. 73-479, § 1, 48 Stat. 1246 (1934) ........................................ 10

Pub. L. No. 104, 110 Stat. 834 (1996) ........................................ 38

Pub.L. No. 101-402, § 1, 104 Stat. 866 (Oct. 1, 1990) ........................................ 25

Pub.L. No. 101-494, 104 Stat. 1185 (Oct. 31, 1990) ........................................ 25

S. Rep. No. 101-316 (1990) ........................................ 32, 78

S. Rep. No. 87-281 (1961) ........................................ 11

# I. INTRODUCTION

## A. Relevant History Of The Case

On January 3, 1994, twenty-one property owners filed suit against the United States in the U.S. Court of Federal Claims ("COFC"). The Complaint alleged that, by enacting ELIHPA[1] and LIHPRHA,[2] the government (i) breached a contractual promise to the owners that it would allow them to prepay their mortgages after 20 years; (ii) effected both a *per se* and regulatory taking requiring just compensation; and (iii) violated statutory and administrative requirements. *See* Compl. ¶¶ 30-38. By order dated March 27, 1995, Judge Robinson granted plaintiffs' motion for partial summary judgment on their breach of contract claims, dismissed plaintiffs' statutory and administrative claims, and found the record insufficient to rule on their regulatory takings claims. *Cienega Gardens v. United States*, 33 Fed. Cl. 196 (1995) ("*Cienega I*"). On April 1, 1996, 21 similarly-situated plaintiffs were added to the lawsuit. *Cienega Gardens v. United States*, No. 94-1 (Fed. Cl. Apr. 1, 1996) (Order). These plaintiffs moved for summary judgment on their breach of contract claim only, and on December 11, 1996, the COFC granted that motion. *Cienega Gardens v. United States*, 37 Fed. Cl. 79 (1996) ("*Cienega II*"). These 21 plaintiffs, in combination with the original 21 plaintiffs, are jointly referred to herein as "Owners".

---

[1] "ELIHPA" is the Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, § 202(a)(1), 101 Stat. 1877 (1988) (codified as amended at 12 U.S.C. § 1715*l* note). ELIHPA is also referred to as "Title II."

[2] "LIHPRHA" is the Low Income Housing Preservation and Residential Homeownership Act of 1990, Pub. L. No. 101-625, § 601, 104 Stat. 4079, 4249, *codified at* 12 U.S.C. § 4101 *et seq*. LIHPRHA is also referred to as "Title VI."

Judge Robinson then conducted a trial that focused on the breach-of-contract damages for four "Model Plaintiffs[3]" that were chosen jointly by Owners and the government. At the conclusion of the trial, Judge Robinson adopted Owners' damages model and concluded that ELIHPA and LIHPRHA caused Model Plaintiffs an aggregate loss of $3,061,107 on their four properties, which represented the economic loss that resulted from being forced to continue operating their properties under the U.S. Department of Housing and Urban Development ("HUD") restrictions instead of being allowed to prepay their HUD-insured mortgages, exit the federal low-income housing programs, and raise their rents to market rates. *Cienega Gardens v. United States*, 38 Fed. Cl. 64, 85-89 (1997) ("*Cienega III*"). The U.S. Court of Appeals for the Federal Circuit ("Court of Appeals") reversed the contract liability holding and remanded. *Cienega Gardens v. United States*, 194 F.3d 1231 (Fed. Cir. 1998) ("*Cienega IV*"). On remand, Model Plaintiffs and the government filed cross-motions for summary judgment on the takings claims, based largely on the record developed in the earlier damages trial. *See Cienega Gardens v. United States*, 46 Fed. Cl. 506 (2000) (Hodges, J.) ("*Cienega V*"). Judge Hodges dismissed Model Plaintiffs' regulatory takings claims on ripeness grounds, concluding that Owners were required preliminarily to apply to HUD for permission to prepay, regardless of whether HUD had the statutory discretion to allow prepayment on the particular properties at issue, and granted summary judgment against Owners' *per se* takings claims. *See id.*

The Court of Appeals affirmed the ruling against Model Plaintiffs' *per se* takings claims, but vacated the judgment dismissing Owners' regulatory takings claims. *See Cienega Gardens v. United States*, 265 F.3d 1237 (Fed. Cir. 2001) ("*Cienega VI*"). Because the record conclusively established that HUD had no discretion to permit Model Plaintiffs to prepay their

---

[3] The four Model Plaintiffs were the owners of the Sherman Park Apartment, St. Andrews Garden, Independence Park Apartments, and Pico Plaza Apartments properties.

mortgages, the Court of Appeals held that any request by Model Plaintiffs for an exemption from the statutory prepayment ban would have been futile. *Id.* at 1244–48. The court also agreed with Model Plaintiffs that Judge Hodges erred in dismissing the claims of the remaining 38 plaintiffs who had not yet had any opportunity to prove futility and thus remanded to permit the remaining 38 plaintiffs to develop a record to prove that any request by them for an exemption from the statutory prepayment ban would have been futile. *Id.* at 1248–49.

On remand, without further briefing or oral argument, Judge Hodges directed the entry of judgment against Model Plaintiffs' regulatory takings claims, holding as a matter of law that low-income housing developers' contractual prepayment rights were not property interests compensable under the Fifth Amendment, and that these developers could not satisfy the "investment-backed-expectations" and "character of governmental action" prongs of the *Penn Central* regulatory-takings analysis. *Cienega Gardens v. United States*, No. 94-1-C (Fed. Cl. Jan. 8, 2002) (order granting summary judgment).

The Court of Appeals again reversed. *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) ("*Cienega VIII*"). It remanded the 38 non-Model Plaintiffs' takings claims to allow the parties to develop an appropriate record for the COFC to rule on liability, and if liability was found, also on just compensation. *Id.* at 1354. For Model Plaintiffs, the Court of Appeals held that LIHPRHA and ELIHPA effected a temporary regulatory taking of Model Plaintiffs' vested property interests. The Court relied upon Judge Robinson's factual findings with respect to Model Plaintiffs' contract damages in *Cienega III* as well as other numbers derived directly from Owners' expert report on damages to assess ELIHPA and LIHPRHA's economic impact. *Id.* at 1341-45. The evidence showed that Model Plaintiffs earned a 0.3% rate of return. *Id.* at 1342-43. Based on this evidence, the Court of Appeals found that the

prohibition against prepayment and conversion to market-based rentals reduced Model Plaintiffs' return on equity by 96%. *Id.* at 1343. That, according to the Court of Appeals, is, "even under the most conservative view, a 'serious financial loss.'" *Id.*

The Court of Appeals further concluded that the government's actions in enacting ELIHPA and LIHPRHA and abrogating Model Plaintiffs' prepayment rights had the character of a taking, in part because "Congress' objective in passing ELIHPA and LIHPRHA … is the kind of expense shifting to a few persons that amounts to a taking." *Id*. at 1338-39. In fact, the court found that "the enactment of ELIHPA and LIHPRHA could fairly be characterized as akin to [a] type of physical invasion." *Id.* at 1338. The Court of Appeals also found that Model Plaintiffs had reasonable investment-backed expectations because the undisputed evidence demonstrated that Model Plaintiffs expected to be able to prepay after 20 years, and their expectations were reasonable given the language of the mortgage note that HUD authorized and approved and the then-existing HUD regulations. *Id.*

The Court of Appeals directed this Court on remand to reinstate the contract damages award from *Cienega III* as just compensation for Model Plaintiffs' loss and to proceed in developing a factual record with regard to the remaining 38 plaintiffs. *Id.* at 1353-54. In its judgment, the Court of Appeals stated that "[o]n remand, the trial court may adjust the original damages award reinstated by this court if it is shown by either party not to compensate accurately for the regulatory taking, and may also determine whether interest is or is not due." *Cienega Gardens v. United States*, No. 94-CV-1 (Fed. Cir. Nov. 5, 2003) (Judgment).

Pursuant to the Court of Appeals's instruction, on remand, this Court severed the Model Plaintiffs' claims from the remaining 38 Plaintiffs' claims and conducted a week-long trial to

determine the appropriate amount of just compensation for their loss.[4] On August 27, 2004, this Court rejected the government's attempt to alter the prior findings of this Court and the Court of Appeals and, using Owners' damages model as the basis for the just compensation award, awarded Model Plaintiffs $3,424,040.90 plus compound interest calculated from the Use Agreement date or the date of prepayment under the Housing Opportunity Program Extension Act, Pub. L. No. 104-120, 110 Stat. 834 (1996), ("HOPE Act"), at the ten-year STRIPS rate.[5] As part of this decision, this Court held that the Los Angeles Rent Stabilization Ordinance, L.A. Mun. Code § 151.02 ("LARSO") does not affect Model Plaintiffs' takings claims or just compensation awards. *Id.* at 705. This Court also declined to include in two Model Plaintiffs' just compensation awards the damages they incurred as a result of their Use Agreements and, instead, only awarded just compensation for damages suffered prior to the HOPE Act.

On appeal, the Court of Appeals held that the just compensation awards for the two Model Plaintiffs who had executed Use Agreements should include the damages those Plaintiffs suffered, and will suffer, until the end of their Use Agreements because the Use Agreements require those Plaintiffs to continue operating under HUD restrictions until the termination of the agreements, thus making the HOPE Act irrelevant to them. *See Independence Park Apartments. v. United States*, 449 F.3d 1235, 1247 (Fed. Cir. 2006) ("*Independence Park III*"). The Court of Appeals also reversed this Court's holding regarding LARSO and remanded "for reconsideration of the quantum of damages in light of the effect of the Los Angeles rent control ordinance on the compensation due to the plaintiffs." *Id.* at 1238. The Court of Appeals further held that "[o]ur

[4] This Court restyled this phase as *Independence Park v. United States*, Case Number 94-1A-C.

[5] Pre-judgment interest from the date of the taking to either the date of the Use Agreement or the date of prepayment under the HOPE Act was included in the Court's underlying damages award. The Court calculated interest for this time period at 10%. *See Independence Park Apartments v. United States*, 61 Fed. Cl. 692, 717 (2004) ("*Independence Park I*").

decision …does not bar the trial court from considering [Plaintiffs' argument that HUD would have provided certificates that were exempt from LARSO] on remand." *Id.* The Government filed a petition for rehearing, and the Court of Appeals reiterated that, as to those Model Plaintiffs who had entered into Use Agreements, the just compensation award should include damages incurred until the end of the Use Agreement. *Independence Park Apartments v. United States*, 465 F.3d , 1308, 1311-12 (Fed. Cir. 2006) ("*Independence Park IV*").

With regard to the remaining 38 Owners, this Court ordered that discovery and trial of those plaintiffs' claims proceed in three additional sets: Set II, which was tried in November and December 2004 and is currently on appeal, consists of Blossom Hill, Cienega Gardens Apartments, Del Amo Gardens, Las Lomas, and Skyline View Apartments ("Set II Plaintiffs"); Set III, which is the subject of this trial, consists of Claremont Village Commons, Covina West Apartments, Del Vista Village, DeSoto Gardens Apartments, Kittridge Gardens I, Kittridge Gardens II, Oxford Park Apartments, Parthenia Townhouses, Pioneer Gardens Apartments, and Puente Park Apartments (collectively "Plaintiffs"); and Set IV, which consists of the remaining 23 Owners.

As noted previously, this Court conducted a trial regarding Set II Plaintiffs' temporary takings claims in November and December 2004. Set II Plaintiffs' claims were consolidated for purposes of trial with three similarly situated plaintiffs. *See Cienega Gardens v. United States*, 67 Fed.Cl. 434 (2005) (Lettow, J.) ("*Cienega IX*"). With regard to Set II Plaintiffs, this Court held that (1) Set II Plaintiffs' temporary taking claims were ripe for review; (2) the Use Agreements executed by several Set II Plaintiffs were not an accord and satisfaction of those plaintiffs' claims; and (3) ELIHPA and LIHPRHA effected a temporary taking of Set II Plaintiffs' properties for which Set II Plaintiffs were entitled to just compensation calculated

from their prepayment eligibility date through either the end of the Use Agreement, the sale of the property, or 60 days after prepayment under HOPE, depending on the plaintiff's circumstances. *See id.* Once again, this Court used Owners' damages model as the basis for the just compensation award.

B. **Issues To Be Tried**

The March 5, 2007, trial of Set III Plaintiffs' claims will address the ripeness of Plaintiffs' takings claims, whether ELIHPA and LIHPRHA effected a taking of Plaintiffs' vested property interests, and the appropriate amount of just compensation for that taking.

As a preliminary matter, the trial will involve the issue of the ripeness of Plaintiffs' takings claims. Although the issue of ripeness was addressed in *Cienega VI*, the Court of Appeals was unable to fully decide the issue with regard to Plaintiffs' takings claims due to the lack of a developed factual record. The Court of Appeals did hold however that Owners were not obligated to file futile claims and thus, to prove ripeness on remand, Owners need only prove that it would have been futile to apply to HUD for prepayment. *Cienega VI*, 265 F.3d at 1248. The Court further held that Model Plaintiffs' takings claims, for which there was a well-developed factual record, were ripe because the record evidence demonstrated that HUD lacked the discretion to grant prepayment. *Cienega VI*, 265 F.3d at 1246-47. The Court reasoned that Model Plaintiffs did not meet the statutorily-required criteria for prepayment under LIHPRHA as prepayment would have caused a rent increase of more than 10%, it would have materially affected the supply of low-income housing, and it would have displaced current tenants. *Id.* The Court therefore held that an application to prepay would have been futile and thus was not required. *Id.* Similar to Model Plaintiffs and Set II Plaintiffs, *see Cienega IX*, Plaintiffs will prove that they did not meet the statutorily-required criteria for prepayment under ELIHPA or LIHPRHA and therefore any application to prepay would have been futile.

The trial will also address the issue of whether the enactment of ELIHPA and LIHPRHA effected a taking of Plaintiffs' right to prepay their HUD-insured mortgages. The Court of Appeals has already determined that Plaintiffs had vested property interests both in the right to control the use of their properties and in the contractual right to prepay that were deliberately abrogated by ELIHPA and LIHPRHA, *see Cienega VIII*, 331 F.3d at 1353. Thus, the trial will only involve the determination of whether the government's actions in enacting ELIHPA and LIHPRHA have the character of a regulatory taking, whether ELIHPA and LIHPRHA caused sufficiently severe economic impact to effect a taking, and whether ELIHPA and LIHPRHA frustrated Plaintiffs' distinct, reasonable, and investment-backed expectations.

Plaintiffs will argue that the Court of Appeals and this Court have already established that the government's actions in enacting ELIHPA and LIHPRHA have the character of a taking. Plaintiffs will prove that even if the character of the government's actions in enacting ELIHPA and LIHPRHA was not established in this Circuit, the government's actions in enacting ELIHPA and LIHPRHA have the character of a taking because, like a physical occupation, the statutes substantially interfered with Plaintiffs' rights to use, transfer, and exclude others from their properties. The government's actions compelled the physical occupation of Plaintiffs' properties exclusively by government-approved tenants and the restrictions imposed by these statutes were in no way analogous to traditional common law principles that implicitly limit all landowners' titles.

Additionally, Plaintiffs will argue that ELIHPA and LIHPRHA caused sufficiently severe economic impact to effect a taking. Indeed, Plaintiffs will prove that ELIHPA and LIHPRHA caused them to suffer an average diminution-in-investment return of 96.9%, which is, "even under the most conservative view, a serious financial loss." *Cienega VIII*, 331 F.3d at 1343.

The government will likely argue that DeSoto Gardens, Kittridge Gardens I, Kittridge Gardens II, Oxford Park Apartments, and Parthenia Townhouses ("Los Angeles Plaintiffs") did not suffer any negative economic consequences as a result of the enactment of ELIHPA and LIHPRHA because Los Angeles Municipal Code § 151.02 ("LARSO") would have prevented those Plaintiffs from raising their rents to market rates upon prepayment. Plaintiffs will show that LARSO would not have barred Los Angeles Plaintiffs from raising their rents to market upon prepayment and that LARSO would have had no effect on those Plaintiffs' average diminution-in-investment return. Plaintiffs will prove that, but for the enactment of ELIHPA and LIHPRHA, the Housing Authority of the City of Los Angeles would have provided the Los Angeles Plaintiffs with certificates at a market rent that were exempt from LARSO, as it did for tenants at prepaying properties after HOPE was enacted. Thus, Plaintiffs will demonstrate that Los Angeles Plaintiffs would have been able to raise rents immediately to market just as other prepaying properties were permitted to do. Additionally, Plaintiffs will prove that the sections of LARSO on which the government will likely rely did not apply to DeSoto Gardens and Kittridge Gardens I, as their prepayment eligibility dates preceded the effective date of those ordinances.

Plaintiffs will establish that ELIHPA and LIHPRHA frustrated their distinct, reasonable, and investment-backed expectations. Plaintiffs will prove that they reasonably expected to be able to prepay their mortgages on their twenty-year prepayment eligibility dates and entered into the HUD programs in reliance on those expectations. They will demonstrate that their expectations were based on the express language of the HUD-insured contracts, the then-existing HUD regulations, the federal government's longstanding practice of enacting new housing programs, and the fact that prepayment was a fundamental aspect of the HUD programs prior to the enactment of ELIHPA and LIHPRHA. Plaintiffs will also prove that their expectations were

objectively reasonable because a reasonable developer in Plaintiffs' position would have believed that the right to prepay was provided by the mortgage contracts (which were consistent with the then-existing HUD regulations), HUD's longstanding practices, and the fact that prepayment was a fundamental aspect of the HUD programs.

The government will likely argue that, because of LARSO, Los Angeles Plaintiffs would not have prepaid their mortgages on their twenty-year prepayment eligibility dates. Plaintiffs will prove however that Los Angeles Plaintiffs reasonably expected to prepay their mortgages on their prepayment eligibility dates.

The trial will also involve the determination of the appropriate amount of just compensation for the temporary regulatory taking of Plaintiffs' properties. Plaintiffs will show, as they and the other Owners have in previous stages of this litigation, that Dr. Peiser's model (as amended to account for certain of this Court and the Court of Appeals' findings in recent stages of this litigation) best quantifies just compensation, and thus should be applied here. Plaintiffs will also show that they are entitled to pre- and post-judgment compound interest on the just compensation award.

## II. CONTENTIONS OF FACT

### A. The Regulatory Agreements

1. During the 1930s, the federal government undertook a program to support low-income housing. *See* National Housing Act, Pub. L. No. 73-479, § 1, 48 Stat. 1246 (1934) (authorizing the creation of the Federal Housing Administration); § 207, 48 Stat. at 1252 (authorizing the insurance of mortgages for property owned by federal or state instrumentalities for the provision of low-income housing).

2. Until the 1960s, this program primarily subsidized projects of local public housing authorities that would develop, own, and manage housing. One such subsidy was

provided via Section 221(d)(3) of the Housing Act of 1954, Pub. L. No. 83-560, 68 Stat. 590, 601 (1954) (codified as amended at 12 U.S.C. § 1715*l*), which, as originally enacted, authorized mortgage insurance to private non-profit organizations and associations.

3. In 1961, in an effort to "enable private enterprise to participate to the maximum extent in meeting the housing needs of moderate-income families," Congress amended the National Housing Act to open the Section 221(d)(3) program to private investors. S. Rep. No. 87-281, at 4 (1961), *reprinted in* 1961 U.S.C.C.A.N. 1923, 1926; Housing Act of 1961, Pub. L. No. 87-70, tit. I, § 101(a)(6), 75 Stat. 149, 150-51 (1961) (codified as amended at 12 U.S.C. § 1715*l*). Section 221(d)(3) provided a combination of mortgage insurance and interest rate subsidies to non-profit and private owners.

4. In 1968, amendments made to the National Housing Act by the Housing and Urban Development Act of 1968, Pub. L. No. 90-448, tit. II, § 201, 82 Stat. 476, 498-501 (1968), added Section 236 programs, which provided a combination of mortgage insurance and interest-rate subsidies to public and private owners. Congress reiterated that it sought "the fullest practicable utilization of the resources and capabilities of private enterprise" in housing low-income and moderate-income families. § 2, 82 Stat. at 476.

5. In order to participate in the Section 221(d)(3) or Section 236 programs, owners were required to enter into Regulatory Agreements with HUD, pursuant to which the owners agreed to encumber their properties in several ways until their HUD-insured mortgages were paid off. Property owners were required to: (1) construct and maintain housing in accord with HUD specifications; (2) submit to extensive HUD audits, inspections, and management reviews; (3) rent only to tenants at a HUD-approved income level; (4) charge only HUD-approved rents, (5) grant HUD a security interest in the income arising from the project; (6)

make all payments due under its deed of trust or secured note; and (7) maintain cash reserves for certain maintenance purposes.

6. In addition, the programs restricted the investment return such that owners could not earn more than an annual return of 6% on the initial equity investment calculated by HUD. This amount did not change throughout the term of the encumbrance, regardless of the amount of equity built up in the properties. Even the 6% return was not guaranteed to be payable on an annual basis because owners could not draw out funds unless project finances permitted it. The 6% return was a severely below market return on equity.

7. In return for these encumbrances, owners in the Section 221(d)(3) Program received mortgage insurance and rent subsidies. Owners in the Section 236 program received mortgage insurance and interest rate subsidies.

8. Additionally, both programs provided incentives for private developers to enter the programs. One incentive owners were provided was mortgage insurance to facilitate private financing of 90% of the cost as determined under HUD regulations.

9. Another incentive provided to owners was the ability to leave the programs and convert the properties to market-rate rental projects after 20 years. More specifically, an owner had the ability to prepay the 40-year mortgage after 20 years without HUD approval and thus free itself from HUD restrictions on occupancy, rents, and use of rental housing. This incentive enabled property owners to provide low-income housing under the restrictions for 20 years, and then terminate the restrictions, charge market rates for the rentals, and make a long-term profit.

10. This prepayment right was made explicit in the mortgage notes executed for properties in these programs. The notes were printed on forms designed by HUD, were

reviewed by HUD, and endorsed by HUD in closely at HUD offices. Correlatively, the governing regulations provided that "[a] mortgage indebtedness may be prepaid in full and the Commissioner's controls terminated without the prior consent of the Commissioner where . . . the prepayment occurs after the expiration of 20 years from the date of final insurance endorsement of the mortgage . . . ." 24 C.F.R. § 236.30 (1970); *see also id.* § 221.524(a)(1)(ii). *Cf. id.* § 207.14 (requiring certain mortgages to contain a prepayment clause).

11. The 20-year prepayment right was one of the primary inducements offered to attract owners to the Section 221(d)(3) and 236 programs. *See Cienega VIII*, 331 F.3d at 1325-26. Industry experts considered this prepayment right to be a fundamental aspect of the program. *See Cienega IX,* 67 Fed. Cl. at 473 (quoting testimony of W. Dockser).

12. The restrictions under the Regulatory Agreements bound property owners only for as long as HUD insured their mortgages. HUD's insurance obligations would terminate, and the owner's obligations under the Regulatory Agreement therefore would expire, once the owner paid or prepaid the mortgage. *See, e.g.*, 24 C.F.R. § 207.253(a)(2) (1970); *Cienega VIII,* 331 F.3d at 1325-26.

B. **Plaintiffs' Properties**

13. The ten Plaintiffs here – Claremont Village Commons, Covina West Apartments, Del Vista Village, DeSoto Gardens Apartments, Kittridge Gardens I , Kittridge Gardens II, Oxford Park Apartments, Parthenia Townhouses, Pioneer Gardens Apartments, and Puente Park Apartments – are California real estate partnerships named for the principal property owned by the entity. Jona Goldrich, Sol Kest, Robert Stern, Robert Hirsch, and Warren Breslow, or some combination thereof ("Partners"), developed the properties and were general partners in each of the ten partnerships during the time periods relevant to this action.

14. Plaintiffs are small partnerships, similar in nature to closely-held corporations, that own the ten subject properties. Partners were the original investors in the partnerships and made the decision to develop the subject properties under the Section 221(d)(3) or 236 programs. The properties are multifamily apartment complexes.

15. Partners employed a "buy and hold" approach to real estate, whereby they purchased property and held it for future appreciation. Partners' ownership of such properties placed them among the largest providers of affordable housing units in California. In sharp contrast to developers of affordable housing in other cities, Partners paid a premium to purchase land in desirable middle-class areas where the potential for appreciation after prepayment was the highest. Partners ensured the properties were well-constructed and well-maintained in order to hold their value so they could be marketed as conventional properties after 20 years. Partners intended to prepay their mortgages after 20 years when they invested in their properties and intended to thereafter maintain those properties as conventional rental properties.

16. For many years, Partners have maintained a substantial fund, approximately $50 million, which allowed them to make payments for their properties, improvements, and escrows on an expedited basis such that they would not have to wait for the bank to give them a loan. Partners are reluctant to sell their properties unless purchasers are willing to pay far in excess of market value.

17. Two of the Partners also own G&K Management Co., Inc. ("G&K Management"), which manages (or managed) Plaintiffs' properties and provides those Partners with a management fee for providing management services. They formed G&K Management in order to ensure a high standard of maintenance and aesthetic appeal, and to sustain properties that would be attractive to tenants and that could be converted to conventional or market-rate

rentals at minimal or no cost to be competitive in the market after prepayment. Carole Glodney is the President of G&K Management.

18. Partners intended to prepay the mortgages on the properties in question after 20 years and convert them to market-rate properties, so that they could charge higher market rents after prepayment.

19. Partners would not have invested in the Plaintiffs' properties under the terms that they did but for the right to prepay the mortgages after 20 years.

20. Given the express language in the deed of trust and secured notes, HUD's then-existing regulations, and the federal government's longstanding practice of creating new low-income housing programs, Plaintiffs had no reason to suspect that the government would eliminate the unfettered right to prepay, which was one of the primary incentives for entering into the HUD programs.

***Claremont Village Commons***

21. The Claremont Village Commons property is a 150-unit garden-style family apartment complex located at 955 West Arrow Highway, Claremont, California, 91711. It consists of 95 two-bedroom, 53 three-bedroom, and 2 employee units. It is located in a middle-class neighborhood with several schools nearby and there are single-family homes across the street. The complex is gated, has a community recreation room and playgrounds for children, and has ample parking for tenants.

22. On December 1, 1970, the Claremont Village Commons partnership ("Claremont Village") entered into a Regulatory Agreement with HUD under Section 236. The Regulatory Agreement limited Claremont Village's maximum annual dividend to $16,936, 6% of its original equity investment as calculated by HUD.

23. Also on December 1, 1970, Claremont Village signed a Deed of Trust Note ("Note") with Union Bank for $2,547,800. Rider A to the Note permitted Claremont Village to prepay its mortgage without HUD approval after 20 years.[6] HUD issued its final endorsement of the Note on December 21, 1971. Thus, Claremont Village had a prepayment eligibility date of December 21, 1991.

***Covina West Apartments***

24. The Covina West Apartments property is a 158-unit garden-style family apartment complex located at 929 West Cameron Avenue, West Covina, California 91790. It consists of 42 one-bedroom, 59 two-bedroom, 47 three-bedroom, 8 four-bedroom, and 2 employee units. It is located in a middle-class neighborhood, is surrounded by conventional apartments, and has single-family homes, stores, and restaurants nearby. The complex has a community recreation room and playgrounds for children.

25. On June 1, 1970, the Covina West Apartments partnership ("Covina West") entered into a Regulatory Agreement with HUD under Section 236. The Regulatory Agreement limited Covina West's maximum annual dividend to $16,042, 6% of its original equity investment.

26. Also on June 1, 1970, Covina West signed a Note with Union Bank for $2,593,300. Rider A to the Note permitted Covina West to prepay its mortgage without HUD approval after 20 years. *See* n.6. HUD issued its final endorsement on the Note on May 26, 1971. Thus, Covina West had a prepayment eligibility date of May 26, 1991.

[6] Specifically, the Note permitted prepayment if "the Maker is a limited distribution mortgagor which is not receiving payments from the Commissioner under a rent supplement contract pursuant to Section 101 of the Housing and Urban Development Act of 1965, and the prepayment occurs after the expiration of twenty (20) years from the date of final endorsement of this Note by the Commissioner."

***Del Vista Village***

27. The Del Vista Village property is a 160-unit garden-style family apartment complex located at 976 Avinita Del Vista, Corona, California, 92882. It consists of 40 one-bedroom, 80 two-bedroom, 38 three-bedroom, and 2 employee units. It is located in a middle-class neighborhood, is surrounded by condominiums and conventional apartments, and is near a large residential area with single-family homes. It is next to an elementary school and near a high school. The complex is gated and has a community recreation room, picnic area, and large playgrounds for children. A pool was added to the complex recently.

28. On December 1, 1970, the Del Vista Village partnership ("Del Vista") entered into a Regulatory Agreement with HUD under Section 221(d)(3). The Regulatory Agreement limited Del Vista to a maximum annual dividend of $15,644, 6% of its original equity investment as determined by HUD.

29. Also on December 1, 1970, Del Vista signed a Secured Note with Union Bank for $2,355,300. The Secured Note permitted Del Vista to prepay its mortgage without HUD approval after 20 years.[7] HUD endorsed the Secured Note on April 7, 1972. Thus, Del Vista had a prepayment eligibility date of April 7, 1992.

***DeSoto Gardens***

30. The DeSoto Gardens property is a 248-unit garden-style family apartment complex located in the Canoga Park area of Los Angeles, California. The address is 8722 DeSoto Avenue, Canoga Park, California, 91304. It consists of 248 units, including 24 one-bedroom, 124 two-bedroom, 98 three-bedroom, and 2 employee units. It is located in a middle-

[7] Specifically, the Secured Note required HUD approval for prepayment except "a maker which is a limited distribution mortgagor may prepay without such approval after twenty (20) years from the date of final endorsement of this Note by the Commissioner."

class neighborhood in the same general area as Independence Park Apartments (a property involved in Set I of this litigation which has operated as a market rate complex since its owners prepaid the HUD-insured mortgage in 1996) and is surrounded by a large number of conventional market-rate apartment complexes and condominiums. The complex is gated and has a community recreation room and playgrounds for children. A pool was added to the complex recently.

31. On May 15, 1969, the DeSoto Gardens partnership ("DeSoto") entered into a Regulatory Agreement with HUD under Section 221(d)(3). The Regulatory Agreement limited DeSoto's maximum annual dividend to $29,559, 6% of the owners' original equity investment as calculated by HUD.

32. Also on May 15, 1969, DeSoto signed a Secured Note with United California Bank for $3,494,500. The Secured Note permitted DeSoto to prepay its mortgage without HUD approval after 20 years. *See* n.7. HUD issued its final endorsement of the Secured Note on November 2, 1970. Thus, DeSoto had a prepayment eligibility date of November 2, 1990.

***Kittridge Gardens I***

33. The Kittridge Gardens I property is a 128-unit garden-style family apartment complex located in the Reseda area of Los Angeles, California. The address is 6540 Wilbur Avenue, Reseda, California, 91335. The property has 32 one-bedroom, 64 two-bedroom, and 31 three-bedroom units, as well as 1 employee unit. It is located in a middle-class neighborhood and has conventional market-rate apartment complexes and condominiums across the street. The complex is located near a park and has shopping and schools within one mile. The complex is located next door to Kittridge Gardens II, which is owned by the same partners.

Kittridge Garden I has a community recreation room, a barbeque area, and large playground areas for children.

34. On June 1, 1968, the Kittridge Gardens I partnership ("Kittridge I") entered into a Regulatory Agreement with HUD under Section 221(d)(3). The Regulatory Agreement limited Kittridge I to a maximum annual dividend to $9,949, 6% of the owners' original equity investment as calculated by HUD.

35. Also on June 1, 1968, Kittridge I signed a Secured Note with United California Bank for $1,507,000. The Secured Note permitted Kittridge I to prepay its mortgage without HUD approval after 20 years. *See* n.7. HUD issued its final endorsement on the Secured Note on September 17, 1969. Thus, Kittridge I had a prepayment eligibility date of September 17, 1989.

***Kittridge Gardens II***

36. The Kittridge Gardens II property is an 80-unit garden-style family apartment complex located in Los Angeles, California. The address is 6540 Wilbur Avenue, Reseda, California, 91335. It consists of 7 two-story apartment complex structures, which together contain 32 two-bedroom, 16 three-bedroom, and 32 four-bedroom units. The property has 97 open parking spaces and a laundry room. It is located in a middle-class neighborhood near a park and has shopping and schools within one mile. The property has a community recreation room, a barbeque area, and large playground areas for children. It is located next door to the Kittridge Gardens I property, which is also owned by Partners.

37. On February 16, 1970, the Kittridge Gardens II partnership ("Kittridge II") entered into a Regulatory Agreement with HUD under Section 221(d)(3). The Regulatory

Agreement limited Kittridge II to a maximum annual dividend of $10,420, 6% of its original equity investment as calculated by HUD.

38. Also on February 16, 1970, Kittridge II signed a Note with Security Pacific National Bank for $1,441,300. Rider A to the Note permitted Kittridge II to prepay its mortgage without HUD approval after 20 years. *See* n.6. HUD issued its final endorsement on the Note on April 14, 1971. Thus, Kittridge II had a prepayment eligibility date of April 14, 1991.

***Oxford Park Apartments***

39. The Oxford Park Apartments property is a 3-story, 109-unit senior apartment complex located at 1920 South Oxford Street, Los Angeles, California, 90018. All of the units are one-bedroom units and the complex has two elevators and underground parking. Oxford Park is located in a middle-class neighborhood with single-family homes with historic mansion architecture next door and across the street. The complex has a large community recreation room and a gazebo in the courtyard.

40. On November 2, 1970, the Oxford Park Apartments partnership ("Oxford Park") entered into a Regulatory Agreement with HUD under Section 221(d)(3). The Regulatory Agreement limited Oxford Park to a maximum annual dividend of $9,691, 6% of the owners' original equity investment as calculated by HUD.

41. Also on November 2, 1970, Oxford Park signed a Note with Security Pacific National Bank for $1,519,800. Rider A to the Note permitted Oxford Park to prepay its mortgage without HUD approval after 20 years. *See* n.6. HUD issued its final endorsement on the Note on October 6, 1972. Thus, Oxford Park had a prepayment eligibility date of October 6, 1992.

***Parthenia Townhouses***

42. The Parthenia Townhouses property is a 24-unit garden-style family apartment complex located in the Canoga Park area of Los Angeles, California. The address is 21218 Parthenia Street, Canoga Park, California, 91304. It consists of 16 two-bedroom, and 7 three-bedroom units, as well as one employee unit. It is located in a middle-class neighborhood in the same general area as the DeSoto and Independence Park properties. It has a common barbeque area and a playground for children.

43. On April 1, 1971, the Parthenia Townhouses partnership ("Parthenia") entered into a Regulatory Agreement with HUD under Section 221(d)(3). The Regulatory Agreement limited Parthenia to a maximum annual dividend of $2,455, 6% of the owners' original equity investment as calculated by HUD.

44. Also on April 1, 1971, Parthenia signed a Secured Note with Prestige Mortgage Corporation for $368,000. The Secured Note permitted Parthenia to prepay its mortgage without HUD approval after 20 years. *See* n.7. HUD issued its final endorsement on the Secured Note on December 17, 1971. Thus, Parthenia had a prepayment eligibility date of December 17, 1991.

***Pioneer Gardens Apartments***

45. The Pioneer Gardens Apartments property is a 141-unit garden-style family apartment complex located at 9039 Pioneer Boulevard, Santa Fe Springs, California, 90670. It consists of 16 one-bedroom, 63 two-bedroom, 37 three-bedroom, 23 four-bedroom, and 2 employee units. It is located in a middle-class neighborhood and there are single-family homes nearby. Placita Park Apartments, a property involved in Set IV of this litigation and

which prepaid its mortgage and is operating conventionally, is located two blocks away. The complex is gated and has a community recreation room and playgrounds for children.

46. On June 1, 1970, the Pioneer Gardens Apartments partnership ("Pioneer") entered into a Regulatory Agreement with HUD under Section 236. The Regulatory Agreement limited Pioneer's maximum annual dividend of $15,374, 6% of the owners' original equity investment as calculated by HUD.

47. On the same day as the Regulatory Agreement was signed, Pioneer signed a Note with Union Bank for $2,448,500. Rider A to the Note permitted Pioneer to prepay its mortgage without HUD approval after 20 years. *See* n.7. HUD issued its final endorsement on the Note on May 26, 1971. Thus, Pioneer had a prepayment eligibility date of May 26, 1991.

***Puente Park Apartments***

48. The Puente Park Apartments property is a 132-unit garden-style family apartment complex located at 14714 East Prichard Street, La Puente, California, 91744. It consists of 8 one-bedroom, 87 two-bedroom, 35 three-bedroom, and two employee units. It is located on a quiet street in a middle-class neighborhood of single family homes. The complex is gated and has a community recreation room and playgrounds for children.

49. On September 10, 1969, the Puente Park Apartments partnership ("Puente Park") entered into a Regulatory Agreement with HUD under Section 236. The Regulatory Agreement limited Puente Park's maximum annual dividend to $12,692, 6% of its original equity investment as calculated by HUD.

50. Also on September 10, 1969, Puente Park signed a Note with Union Bank for $1,947,500. Rider A to the Note permitted Puente Park to prepay its mortgage without HUD approval after 20 years. *See* n.7. The Note was initially endorsed by HUD on September 11,

1969, and HUD issued its final endorsement on August 31, 1970. Thus, Puente Park had a prepayment eligibility date of August 31, 1990.

C. **ELIHPA and LIHPRHA**

51. By the mid-1980s, at a time the federal government began to cut back on housing programs, Congress realized that "in the next 15 years, more than 330,000 low income housing units insured or assisted under Sections 221(d)(3) and 236 of the National Housing Act could be lost as a result of the termination of low income affordability restrictions." ELIHPA, Pub. L. No. 100-242, § 202(a)(1), 101 Stat. 1877 (1988) (codified as amended at 12 U.S.C. § 1715*l* note).

52. In response to this impending low-income housing shortage, on February 5, 1988, Congress enacted ELIHPA which temporarily barred owners from prepaying their mortgages and freeing themselves from the restrictions on their properties. ELIHPA required private owners in the Section 221(d)(3) and 236 programs to obtain HUD approval prior to prepayment and set specific criteria for HUD's approval of prepayment. *Id.* § 221(a).

53. ELIHPA also placed additional restrictions on owners, such as requiring owners to provide tenants at least one year's advance notice of any termination of a Housing Assistance Payment ("HAP") contract. *Id.* § 262 (codified at 42 U.S.C. § 1437f(c)(8)).

54. HUD issued regulations implementing ELIHPA in September 1990, 31 months after the statute was passed. 24 C.F.R. §§ 248.101 to 248.261 (1991). Until those regulations were issued, owners could do nothing to change the restrictions on their properties.

55. Under ELIHPA, owners that sought to eliminate or change the new or old restrictions on their properties were required to file a notice of intent with the Secretary of HUD describing their intended action. ELIHPA, § 222, 12 U.S.C. § 1715*l* note. The only actions permitted by ELIHPA were: (1) prepaying under the stringent criteria set out in ELIHPA, (2)

agreeing to extend the affordability restrictions in exchange for certain financial incentives, (3) selling the property to a purchaser who would retain the affordability restrictions at a price determined through a statutorily-mandated process, or (4) continuing to operate under the restrictions mandated by the Regulatory Agreement for the remaining term of the HUD-insured mortgage. *Id.* §§ 224, 225, 12 U.S.C. § 1715*l* note. None of these options reimbursed owners for the cash flows they lost as a result of being prohibited from prepaying and converting to market rent levels on their original prepayment eligibility dates. 12 U.S.C. § 4108; 24 C.F.R. § 248.141(a)(1).

56. The owner was then required to file a plan of action. A plan of action was a more detailed document that described the state assistance that might be available to the owner, detailed the proposed changes to the low-income affordability restrictions, described any proposed changes in ownership, stated the effect of the proposed changes on existing tenants, provided an appraisal (if requesting incentives), and detailed the effect of the proposed changes on the community within which the housing is located (if requesting prepayment). 24 C.F.R. § 248.213(b), ELIHPA, § 223(b), 12 U.S.C. § 1715*l* note.

57. HUD was required to notify the owner in writing within 60 days if any deficiencies were found in a plan of action, and to describe alternative ways in which the plan could be revised appropriately. *Id.* § 227(a), 12 U.S.C. 1715*l* note. Within 180 days of the submission of a plan of action, or longer if the owner so requested, HUD was required to notify the owner of whether the plan of action was approved. If approval was withheld, HUD was to describe its reasons for not approving the plan, and what the owner could do to secure approval; it was also required to provide a reasonable opportunity to revise the plan. *Id.* § 227(b)(1)-(2). In practice, if often took many years for HUD to approve a plan of action.

58. Because the plan of action process was such a lengthy process and any delays in processing would force Plaintiffs to operate without the incentives offered by ELIHPA for a longer period of time, G&K Management frequently inquired about the status of the plans of action they submitted on behalf of the Plaintiff properties, made suggestions as to the content of the plans of action, and offered ways to expedite the processing.

59. If an owner requested to prepay in its plan of action, HUD was permitted to accept that request only if the Secretary of HUD made a written finding that such payment would not "materially increase economic hardship for current tenants and will not in any event" raise rents for current tenants by more than 10% or more than 30% of the tenant's income. ELIHPA, § 225(a), as amended by Pub.L. No. 101-402, § 1, 104 Stat. 866 (Oct. 1, 1990), & Pub.L. No. 101-494, 104 Stat. 1185 (Oct. 31, 1990), 12 U.S.C. § 1715*l* note.

60. The Secretary was also required to make a written finding that "the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect-- (i) the availability of decent, safe, and sanitary housing affordable to lower income and very low-income families or persons in the area that the housing could reasonably be expected to serve; (ii) the ability of lower income and very low-income families or persons to find affordable, decent, safe, and sanitary housing near employment opportunities; or (iii) the housing opportunities of minorities in the community within which the housing is located." *Id.*

61. In lieu of the tenant displacement findings, prepayment was also permitted if the prepayment plan had been approved by the appropriate state agency and any appropriate local government agency for the jurisdiction within which the housing was located as being in accordance with a State strategy approved by the Secretary of HUD under Section 226. *Id.* Section 226 of ELIHPA permitted the Secretary of HUD to approve a State strategy only if the

strategy met several criteria, including the requirement that a tenant's monthly rent payment not exceed 30% of his or her income, except in certain limited circumstances, and that "not less than 60% of the units in any one project" would remain affordable for low-income and very low-income tenants. *Id.* § 226, 12 U.S.C. § 1715*l* note.

62. HUD was statutorily prohibited from approving a request for prepayment that did not meet these criteria. *See* 12 U.S.C. § 4108; ELIHPA § 225(a).

63. On November 28, 1990, Congress enacted LIHPRHA, which permanently prevented Plaintiffs from prepaying their HUD-insured mortgages, converting to conventional apartments, and raising their rents to market levels. HUD issued regulations implementing LIHPHRA in April 1992, sixteen months after the statute was passed. 24 C.F.R. §§ 248.1 to 248.319 (1993). Until the regulations were implemented, Plaintiffs could not ease the restrictions under LIHPRHA.

64. LIHPHRA was similar to ELIHPA, but differed in several important respects. Generally, the incentives and accompanying restrictions under LIHPHRA were less favorable to owners than those provided under ELIHPA. For example, instead of agreeing to extend the restrictions for the remainder of the mortgage, as was the case under Title II, under LIHPRHA, owners were required to agree to retain affordable housing for 50 years or the remaining useful life of the property, whichever was longer. 12 U.S.C. § 4112(a)(2)(A); *see also CCA Assocs. v. United States*, Slip Op. at 7-9 (Fed. Cl. 2007) (describing differences).

65. Prepayment under LIHPRHA was more stringent than prepayment under ELIHPA.[8] Additionally, Title VI did not permit prepayment under a plan approved by a state

[8] For example, ELIHPA only qualified the term "materially increase economic hardship," whereas LIHPRHA defined it to mean: a monthly rental increase of over 10% or over 30% of a tenant's monthly adjusted income, whichever was lower, or, for tenants already paying more

agency, *compare* ELIHPA §§ 225(a), 226, 12 U.S.C. § 1715*l* note, *with* 12 U.S.C. §§ 4108(a), 4117(c), but, until July 1, 1996, LIHPRHA did permit prepayment, with costly restrictions, if the Secretary of HUD approved a plan of action to accept incentives, but the incentives remained unfunded during the 15-month period beginning on the date of approval. *See* 12 U.S.C. § 4114(a)(1)(A). Similarly, a property owner could prepay if the Secretary of HUD approved a plan of action to sell the property, but there were no bids from qualified purchasers after 15 months or HUD failed to provide the necessary assistance. *Id.* § 4114(a)(1)(B)-(2); §§ 4110(b)-(c), 4111(b)-(c).

66. If HUD denied an owner's request for prepayment under either ELIHPA or LIHPRHA, the owner's original notice of intent was rendered void and the owner had to start the process all over again in order to apply for "incentives" under LIHPRHA or ELIHPA. 12 U.S.C. § 4108(c); 24 C.F.R. § 248.141(e). Thus, filing a futile request for a prepayment exemption would delay—and possibly eliminate—the owners' receipt of sorely needed incentive funds.

67. Plaintiffs did not meet the statutorily-required criteria for prepayment under LIHPRHA or ELIHPA. Conversion of Plaintiffs' properties would have caused the current tenants' rents to increase by more than 10%, it would have materially affected the supply of low income housing, and it would have displaced current tenants. HUD was thus statutorily prohibited from granting Plaintiffs prepayment exceptions.

68. For example, as of Claremont Village's original prepayment eligibility date, December 12, 1991, the pre-existing HUD-mandated rents at Claremont Village were $559

---

than such percentages, monthly rental increases exceeding 10% or the increase in the Consumer Price Index. 12 U.S.C. § 4108(a)(1)(A); *see also CCA Assocs. v. United States*, Slip Op. at 8 (Fed. Cl. 2007). The Secretary of HUD was statutorily restricted from approving prepayment if it would result in increases above those thresholds. *Id.*

for two-bedroom, and $658 for three-bedroom units and the rents remained at those rates until Claremont Village's Use Agreement rents became effective on June 1, 1995. Shortly after its original prepayment eligibility date, Claremont Village submitted a plan of action seeking incentives under ELIHPA. As part of the plan of action process, HUD determined the "Fair Market Rents[9]" for two- and three-bedroom units at Claremont as of January 4, 1994, to be $705 and $820, respectively. Therefore, HUD's own data demonstrates that the market rents for two- and three-bedroom units at Claremont Village were 26.1% and 24.6% higher, respectively, than the HUD-restricted rents Claremont Village was permitted to collect at the time.

69. On Covina West's original prepayment eligibility date, May 26, 1991, the pre-existing HUD rents at Covina West were $288 for one-bedroom, $384 for two-bedroom, $442 for three-bedroom, and $490 for four-bedroom units. Shortly after its original prepayment eligibility date, Covina West submitted a plan of action seeking incentives under ELIHPA. As part of the plan of action process, HUD determined the "Fair Market Rents" for one-, two-, three-, and four-bedroom units at Covina West as of January 3, 1994, to be $560, $670, $770 or $795 (size-dependant), and $890, respectively. Therefore, HUD's own data demonstrates that the market rents for one-, two-, three-, and four-bedroom units at Covina West were 94.4%, 74.5%, 74.2% or 79.9% (size-dependant), and 81.6% higher, respectively, than the HUD-restricted rents Covina West was permitted to collect at the time.

70. On Del Vista's original prepayment eligibility date, April 7, 1992, the pre-existing HUD rents at Del Vista were $357 for one-bedroom, $411 for two-bedroom, and $473 for three-bedroom units. Shortly after its original prepayment eligibility date, Del Vista

---

[9] "Fair market rent" is a term of art used in connection with plans of action. The "fair market rent" is a rent amount determined using HUD appraisal guidelines that approximates but does not equal market rent.

submitted a plan of action seeking incentives under ELIHPA. As part of the plan of action process, HUD determined the "Fair Market Rents" for one-, two-, and three-bedroom units at Del Vista as of November 9, 1993, to be $500, $600, and $720, respectively. By that date, the HUD-approved rents had increased to $394, $453, and $521, respectively. Therefore, HUD's own data demonstrates that the market rents for one-, two-, and three-bedroom units at Del Vista were 26.9%, 32.5%, and 38.2% higher, respectively, than the HUD-restricted rents Del Vista was permitted to collect at the time.

71. On DeSoto's original prepayment eligibility date, November 2, 1990, the pre-existing HUD rents at DeSoto were $285 for one-bedroom, $341 for two-bedroom, and $395 for three-bedroom units. Shortly after its original prepayment eligibility date, DeSoto submitted a plan of action seeking incentives under ELIHPA. As part of the plan of action process, on November 5, 1993, HUD determined the "Fair Market Rents" for one-, two-, and three-bedroom apartments at DeSoto to be $575, $685, and $800, respectively. By that date, the HUD-approved rents had increased to $351 for one-bedroom, $421 for two-bedroom, and $486 for three-bedroom units. Therefore, HUD's own data demonstrates that the market rents for one-, two-, and three-bedroom units at DeSoto were 63.8%, 62.7%, and 64.6% higher, respectively, than the HUD-restricted rents DeSoto was permitted to collect at the time.

72. On Kittridge I's original prepayment eligibility date, September 17, 1989, the pre-existing HUD rents at Kittridge I were $253 for one-bedroom, $302 for two-bedroom, and $358 for three-bedroom units. Shortly after its original prepayment eligibility date, Kittridge I submitted a plan of action seeking incentives under ELIHPA. As part of the plan of action process, HUD determined the "Fair Market Rents" for one-, two-, and three-bedroom units at Kittridge I as of September 9, 1993, to be $575, $720, and $825, respectively. By that date, the

HUD-approved rents had increased to $305 for one-bedroom, $364 for two-bedroom, and $432 for three-bedroom units. Therefore, HUD's own data demonstrates that the market rents for one-, two-, and three-bedroom units at Kittridge I were 88.5%, 97.8%, and 90.9% higher, respectively, than the HUD-restricted rents Kittridge I was permitted to collect at the time.

73. On Kittridge II's original prepayment eligibility date, April 14, 1991, the pre-existing HUD rents at Kittridge II were $491 for two-bedroom, $583 for three-bedroom, and $639 for four-bedroom units. Kittridge II's Use Agreement rents became effective on June 1, 1995. Shortly after its original prepayment eligibility date, Kittridge II submitted a plan of action seeking incentives under ELIHPA. As part of the plan of action process, on September 10, 1993, HUD determined the "Fair Market Rents" for two-, three-, and four-bedroom units at Kittridge II as of to be $750, $850, and $1025, respectively. Therefore, HUD's own data demonstrates that the market rents for two-, three-, and four-bedroom units at Kittridge II were 52.7%, 45.8%, and 60.4% higher, respectively, than the HUD-restricted rents Kittridge II was permitted to collect at the time.

74. On Oxford Park's original prepayment eligibility date, October 8, 1992, the pre-existing HUD rents at Oxford Park were $455 for one-bedroom units and the rents remained at those rates until Oxford Park's Use Agreement rents became effective on June 1, 1995. Shortly after its original prepayment eligibility date, Oxford Park submitted a plan of action seeking incentives under ELIHPA. As part of the plan of action process, HUD determined the "Fair Market Rents" for one-bedroom apartments at Oxford Park to be $625. Therefore, HUD's own data demonstrates that the market rent for units at Oxford Park was 37.4% higher than the HUD-restricted rent Oxford Park was permitted to collect.

75. On Parthenia's original prepayment eligibility date, December 17, 1991, the pre-existing HUD rents at Parthenia were $484 for two-bedroom and $550 for three-bedroom units, and the rents remained at those rates until Parthenia's Use Agreement became effective on June 1, 1995. Shortly after its original prepayment eligibility date, Parthenia submitted a plan of action seeking incentives under ELIHPA. As part of the plan of action process, HUD determined the "Fair Market Rents" for two- and three-bedroom units at Parthenia on October 23, 1993, to be $780 and $900, respectively. Therefore, HUD's own data demonstrates that the market rents for two- and three-bedroom units at Parthenia were 61.2% and 63.6% higher, respectively, than the HUD-restricted rents Parthenia was permitted to collect at the time.

76. On Pioneer's original prepayment eligibility date, May 26, 1991, the pre-existing HUD rents at Pioneer were $331 for one-bedroom, $441 for two-bedroom, $508 for three-bedroom, and $558 for four-bedroom units. Shortly after its original prepayment eligibility date, Pioneer submitted a plan of action seeking incentives under ELIHPA. As part of the plan of action process, HUD determined the "Fair Market Rents" for one-, two-, three-, and four-bedroom units at Pioneer as of March 18, 1994, to be $580, $670, $830, and $925, respectively. As of that date, the HUD-approved rents had increased to $405 for one-bedroom, $539 for two-bedroom, $622 for three-bedroom, and $683 for four-bedroom units. Therefore, HUD's own data demonstrates that the market rents for one-, two-, three-, and four-bedroom apartments at Pioneer were 43.2%, 24.3%, 33.4%, and 35.4% higher, respectively, than the HUD-restricted rents Pioneer was permitted to collect at the time.

77. On Puente Park's original prepayment eligibility date, August 31, 1990, the pre-existing HUD rents at Puente Park were $355 for one-bedroom, $419 for two-bedroom, and $519 for three-bedroom units, and the rents remained at those rates until Puente Park's Use

Agreement rents became effective on July 1, 1993. Shortly after its original prepayment eligibility date, Puente Park submitted a plan of action seeking incentives under ELIHPA. As part of the plan of action process, HUD determined the “Fair Market Rents” for one-, two-, and three-bedroom units at Puente Park as of February 26, 1992, to be $610, $695, and $800, respectively. Therefore, HUD’s own data demonstrates that the market rents for one-, two-, and three-bedroom units at Puente Park were 71.8%, 65.9%, and 54.1% higher, respectively, than the HUD-restricted rents Puente Park was permitted to collect at the time.

78. Additionally, if Plaintiffs prepaid these properties’ mortgages and converted to conventional apartments, it would have materially affected the supply of low-income housing and displaced current tenants. At the time of the properties’ original prepayment eligibility dates, each of the properties was operating at full occupancy and had a waiting list, as did other low-income properties in the vicinity of these properties. The properties were located in low-vacancy areas which lacked a supply of affordable housing sufficient to accommodate displaced tenants.

79. Even HUD administrators acknowledged that, given the shortage of low-income housing in California, properties in California would not even arguably meet the requirements for approval of prepayment. *Cienega VI*, 265 F.3d at 1243. In fact, HUD did not approve any prepayment requests in the geographic areas of Plaintiffs’ properties. HUD administrators made it clear in meetings and through conversations with owners of low-income housing in California that any request to prepay would be denied and thus the owner would be required to start the plan of action process all over again. In particular, HUD representatives advised G&K Management not to submit prepayment plans as no such plans would be approved.

80. Congress likewise recognized the shortage of low-income housing in California and stated that "[t]he loss of units in such markets would be devastating to families and communities." S. Rep. No. 101-316, at 107 (1990), *reprinted in* 1990 U.S.C.C.A.N. 5763, 5869.

81. Because HUD was statutorily prohibited from permitting Plaintiffs to prepay, Plaintiffs did not file requests with HUD for approval to prepay under ELIHPA or LIHPRHA, as such requests would have been futile and further delayed the plan of action process.

82. But for ELIHPA and LIHPRHA, Plaintiffs would have prepaid their mortgages on their original prepayment eligibility dates and raised their rents to market rates at that time. ELIHPA and LIHPRHA thus caused Plaintiffs severe economic harm by preventing them from raising their rents to market rates on their 20-year prepayment eligibility dates. Plaintiffs experienced an average diminution-in investment-return of 96.9%: Claremont Village, 96.4%; Covina West, 96.7%; Del Vista, 96.6%; DeSoto, 96.5%; Kittridge I, 98.1%; Kittridge II, 97.1%; Oxford Park, 97.2%; Parthenia, 97.8%; Pioneer, 94.9%; and Puente Park, 97.5% [10] as a result of the enactment of ELIHPA and LIHPRHA.

83. By enacting ELIHPA and LIHPRHA, Congress shifted the expenses of the low-income housing crisis from all taxpayers to the owners of properties in the Section 221(d)(3) and 236 programs. *See Cienega VIII*, 331 F.3d at 1338-39. Congress determined that requiring existing low-income housing providers to bear the majority of the burden of low-income housing

[10] These percentages reflect percent return reduction of the return on investment in the HUD-Restricted Scenario (using the 6% limited dividend on original equity as permitted by HUD) from the expected return on investment under a Market Scenario (using an expected 8.5% return on the Preservation Equity Values for Plaintiff properties as was done with respect to Model Plaintiffs in *Cienega VIII* and Set II Plaintiffs in *Cienega IX*). *See Cienega VIII*, 331 F.3d at 1342-43; *Cienega IX*, 67 Fed. Cl. at 476, 486.

by preserving existing inventory for such use was "the most cost-effective strategy available to the government" to resolve the housing problem. *Id.*

84. Prior to 1983 or 1984, the supply of low-income housing had been increased by, among other things, the new-construction program under Section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f, which provided housing subsidies for the construction of new units. During the early 1980s, however, the federal government decided "'that the Section 8 new construction program was expensive, that it was a burden to the budget,' and terminated its funding." *Cienega IX*, 67 Fed. Cl. at 466 (citing testimony of HUD financial analyst Thomas Vitek). Therefore, the federal government did not reinvest in low-income housing programs that would replace the housing units that would become eligible for prepayment and an exit from the low-income housing programs.

85. Additionally, by preventing Plaintiffs from prepaying their mortgages and exiting the HUD program, ELIHPA and LIHPRHA substantially interfered with Plaintiffs' rights to use, transfer, and exclude others from their properties, as it compelled the physical occupation of Plaintiffs' properties exclusively by government-approved tenants.

D. **Preservation Benefits**

86. If an owner could not qualify for the prepayment exemption but wanted to mitigate the damages caused by ELIHPA and LIHRPHA, the owner had to either seek preservation benefits via a Use Agreement or sell the property under the stringent regulations governing sales under Title II or Title VI, which would result in a sales price substantially lower than fair market-value.

87. Prior to the enactment of ELIHPA and LIHPRHA, Plaintiffs possessed the right, upon prepayment, to sell their properties to the highest bidder. Although Plaintiffs always intended to hold their properties for the long-term and earn the anticipated benefits of operating

the properties conventionally after 20 years, the unrestricted ability to sell their properties in a free market sale after 20 years was clearly a valuable property right. Thus, the "sale option" offered under Title II and Title VI was a serious limitation on Plaintiffs' property rights.

88. Indeed, Title II and Title VI permitted owners to sell their properties only to "qualified purchasers" at an artificially low price (the "transfer preservation value") determined by HUD through a valuation process delineated by the statutes and regulations and ultimately subject to HUD approval. "Qualified purchasers," as defined in the statutes, had to agree to maintain the property as affordable housing. 12 U.S.C. § 4121; Transcript of Record, *Cienega IX*, at 1368:23-1369:4 (Test. of C. Glodney).

89. Plaintiffs chose not to lose their properties forever through government regulations sales in which HUD determined the potential buyers and would approve only substantially below-market value sale prices.

90. Plaintiffs' only remaining option under Title II and Title VI was to pursue "preservation benefits" under a Use Agreement. Title II and Title VI required an owner seeking preservation benefits to agree to extend the affordability restrictions on its property for the remaining term of the HUD-insured mortgage (under Title II) or 50 years or the remaining useful life of the property, whichever was longer (under Title VI). As with most of the terms of the Use Agreement, the extension of the affordability restrictions was non-negotiable.

91. Years before Plaintiffs were able to enter into their Use Agreements with HUD, Plaintiffs' prepayment rights had already been taken by Title II and Title VI. Thus, at the time Plaintiffs entered into their respective Use Agreements, they were already required by LIHRPHA to maintain affordability restrictions on their properties for the remaining terms of their HUD-insured mortgages. The HUD-mandated recitation in Plaintiffs' Use Agreements that

the owners agreed to extend their affordability restrictions in exchange for incentives under Title II thus did not reflect actual consideration. Plaintiffs did not have the power to bargain away their right to immediately convert to market, as that right had already been taken by Congress. The Use Agreements accordingly do not reflect arms-length negotiations. Rather, they are statutorily-imposed measures which Plaintiffs had no choice but to accept if they wished to retain any ownership interest in their properties and in any way mitigate the financial losses inflicted upon them by Title II and Title VI.

92. The incentives offered under Title II and Title VI Use Agreements differed. Properties with original prepayment eligibility dates before Title VI was passed could pursue incentives under either Title II or Title VI. Under Title II Use Agreements, which required the extension of the affordability restrictions for the remainder of the original 40-year mortgage, owners could request distributions based on the income of the property — either unlimited distributions or budget-based returns. In contrast, under the mandatory terms of Title VI Use Agreements, affordability restrictions continued for the longer of 50 years or the remaining useful life of the property, and owners were limited to an 8% return for that period. Plaintiffs found the Title II incentives less damaging and thus Plaintiffs proceeded pursuant to Title II.

93. Under Title II, after an initial notice of intent was filed, an owner would arrange for an appraisal to be conducted under HUD's appraisal guidelines. The owner would then file a notice of election to proceed, prepare a plan of action and submit the plan of action along with the appraisal to HUD. Through the plan of action, owners could seek either budget-based rent increases with limited annual returns or annual adjustment factor rent increases and unlimited distributions of excess cash to owners. Requests by owners for financial incentives

other than those delineated by the regulations were rejected by HUD and resulted in deficiency notices and delays in the processing of the owner's plan of action.

94. The negotiation and processing of the Title II Use Agreements took a significant period of time for each Plaintiff and, during this time, Plaintiffs' properties continued to be bound by the below-market limited dividend on original equity required by their original Regulatory Agreements entered into many years earlier.

95. It would have taken even longer to complete sales to qualified purchasers than to complete extensions of participation through Use Agreements. Plans of action seeking sales of properties generally required at least two years for processing, which could not even commence until 1992, when HUD finally enacted Title VI regulations. In the case of properties dealing with HUD's Los Angeles office, the process would have taken even longer. Moreover, there were significant restrictions and uncertainties (including limitations on price and buyer) as well as the loss of property through sale, which made the sale option extremely unattractive to Plaintiffs.

96. Plaintiffs pushed HUD to process their plans of action as quickly as possible so that they could start receiving incentives under Title II. However, there were numerous administrative and regulatory delays. Indeed, the negotiation and processing of the plans of action for Kittridge I took nearly seven years, from September 30, 1988, to June 22, 1995. For Pioneer, the negotiation and processing took five and a half years, from February 8, 1990, to May 1, 1995; Del Vista also took five and half years, from February 8, 1990, to June 22, 1995; Kittridge II took five and a half years, from February 8, 1990, to June 1, 1995; DeSoto and Covina West took five and a half years, from February 8, 1990, to May 26, 1995; and Oxford Park and Claremont also took about five and a half years, from February 8, 1990, to May 27,

1995, For Parthenia, the period was approximately four and half years, from December 26, 1990, to May 26, 1995, while for Puente Park, the negotiation and processing took close to three and a half years, from March 20, 1990, to July 1, 1993. Plaintiffs did not begin receiving preservation benefits under Title II until their respective Use Agreements were signed.

97. HUD paid each of the Plaintiffs' preservation benefits under the Use Agreements via project-based Section 8 contracts. Therefore, to mitigate damages and receive preservation benefits, Plaintiffs were required to extend their Section 8 contracts beyond their original prepayment eligibility dates. But for ELIHPA and LIHPRHA, Plaintiffs would not have entered into Section 8 contracts that extended beyond their original prepayment eligibility dates. Instead, Plaintiffs would have negotiated short-term Section 8 contracts with expiration dates that coincided with their original prepayment eligibility dates. HUD officials have acknowledged that short-term Section 8 contracts could have been negotiated by Plaintiffs. *See Cienega IX*, 67 Fed. Cl. at 485 (citing the testimony of Michael Winiarski).

E. **The HOPE Act**

98. In 1996, Congress enacted the HOPE Act, which permitted owners to prepay their HUD endorsed mortgages. *See* Pub. L. No. 104-120, 110 Stat. 834 (1996). However, the prepayment right that was granted by the HOPE Act is not identical to the right that was taken by ELIHPA and LIHPRHA. Under the HOPE Act, owners that prepay face more restrictions on their property than they would have faced if ELIHPA and LIHPRHA had never been enacted. Additionally, the restoration of the prepayment right did not reinstate the stream of income owners lost as a result of being prohibited from prepaying and converting to market-rate units on owners' original prepayment eligibility dates.

99. At the time Plaintiffs entered into Use Agreements, they had no way to mitigate their losses from the abrogation of their prepayment rights other than to accept one of

the options dictated by LIHPRHA, ELIPHA, and the HUD regulations promulgated there under. If owners desired to retain any ownership interest in their properties after the expiration of the 40-year mortgage, they had no option but to extend the HUD-imposed affordability restrictions for the remaining 20 years of their HUD mortgages.

100. At the time Plaintiffs entered into the Use Agreements in between the years 1993 and 1995, they did not know or have reason to believe that Congress would reinstate a prepayment right in 1996 through the enactment of the HOPE Act. Plaintiffs would not have entered into Use Agreements if they had known that the Hope Act would be enacted, granting Plaintiffs a new, albeit less valuable, prepayment right.

101. Immediately after the HOPE Act was enacted in 1996, Plaintiffs asked HUD to release them from their Use Agreements so they could prepay their mortgages and exit the HUD program but HUD refused. Plaintiffs thus had no option but to continue to operate under the Use Agreements for the full term of those agreements.

102. Plaintiffs continue to suffer damages related to the taking that are attributable to their Use Agreements. The rents under the Use Agreements, though originally set at, or close to, market, have failed to keep pace with market rents. The rents under the Use Agreements have fallen, and continue to fall to a larger extent each year, significantly below the returns Plaintiffs could have received had they been permitted to prepay and convert to conventional market units on their original prepayment eligibility dates (or after a prepayment right was restored via federal statute had HUD allowed Plaintiffs to exercise that right and free themselves of HUD restrictions).

F. **Just Compensation**

103. As a result of the enactment of ELIHPA and LIHPRHA, and Plaintiffs resulting inability to prepay their mortgages and convert to conventional market-rent units on

their original prepayment eligibility dates, Plaintiffs will suffer damages of $100,803,400, representing $6,962,833 for Claremont Village, $14,392,306 for Covina West, $10,089,067 for Del Vista, $23,351,704 for DeSoto, $13,733,366 for Kittridge I, $6,802,951 for Kittridge II, $7,791,461 for Oxford Park, $2,547,870 for Parthenia, $7,545,584 for Pioneer, and $8,486,258 for Puente Park.

104. Plaintiffs' damages are the difference between the cash flows Plaintiffs would have received had they been allowed to prepay their HUD-endorsed mortgages on their original prepayment eligibility dates and operate the properties as conventional apartment complexes ("the Market Scenario"), and the cash flows and other benefits and/or losses Plaintiffs actually received and those they can expect to receive in future years from operating the properties as HUD-restricted properties (the "HUD-restricted Scenario"). The cash flows in this calculation should take into account rental income, vacancy costs, other operating income, operating expenses, conversion costs, prepayment penalties, debt service (on the mortgage and any other loans Plaintiffs might have obtained), and cash distributions to Plaintiffs. For Claremont Village, Covina West, Del Vista, Pioneer, and Puente Park, the damages calculation should take into account the difference in value these Plaintiffs actually received from selling their properties while encumbered by Use Agreements as opposed to what they could have received had they been able to sell the property free of HUD restrictions.

105. The Market Scenario cash flows can be calculated reliably using data from reliable industry sources (RealFacts and IREM) and from G&K Management's actual experience with other properties it manages (including Owners' other properties). The Market Scenario rents can be conservatively estimated using the market rents agreed upon by HUD and Plaintiffs

during the plan of action process. The market rents can be reliably projected before and after the plan of action using the annual percentage increase in market rents derived from RealFacts data.

106. The projected increases in the market rents for Los Angeles Plaintiffs' properties are limited by LARSO (with conservative assumptions regarding periodic increases to market level when each unit is voluntarily vacated by the current tenant).

107. Where applicable and during the time LARSO has been in effect, LARSO has restricted rent increases for existing tenants to between 3% and 13% per year, depending on the year (and rent increases can be higher if certain utilities are paid by the property). LARSO contains a vacancy decontrol provision that permits landlords to raise the rent for a unit to market level after the tenant voluntarily vacates the unit or the landlord evicts the tenant for certain delineated reasons. *Id.* § 151.06.

108. LARSO was initially adopted in 1979 and exempted from its purview units that were governed by a federal housing program. The statute was amended on November 22, 1990 to provide that "[w]here a rental unit was exempt from the provisions of this chapter ... the maximum rent shall be the amount of rent last charged for the rental unit while it was exempt." L.A. Mun. Code § 151.02. The statute was further amended on November 22, 1990 to provide that vacancy decontrol is not applicable "[i]f a rental unit is vacant as a result of the termination of the regulation of the unit under any local, state or federal program." *Id*. § 151.06.

109. Although the projected increases in the market rents for Los Angeles Plaintiffs' properties are limited by LARSO, the initial rents Los Angeles Plaintiffs would have been able to charge upon prepayment are not affected by LARSO for several reasons.

110. First, DeSoto and Kittridge I would have prepaid their mortgages and raised their rents to market rates prior to the November 22, 1990, amendments to LARSO (on

November 2, 1990, and September 17, 1989, respectively) and therefore, these amendments (which limited initial rents and excluded formerly exempt units from vacancy decontrol) would not have applied to those properties.

111. Second, the Housing Authority of the City of Los Angeles would have provided LARSO-exempt Section 8 certificates at market rents to all low-income and very low-income tenants at Los Angeles Plaintiffs' properties, as they did when Plaintiffs' other Los Angeles properties were permitted to prepay under HOPE in 1996. Therefore, Los Angeles Plaintiffs would have received market rents immediately upon prepayment regardless of LARSO. Indeed, this is precisely what occurred in 1996 after HOPE was enacted.

112. Therefore, LARSO would not have affected the initial rent Los Angeles Plaintiffs would have been able to charge upon prepayment, and Los Angeles Plaintiffs would have raised their rents to market immediately upon prepayment.

113. The actual cash distributions Plaintiffs received from these properties can be used reliably to determine the cash flows for the HUD-Restricted Scenario. HUD cash flows can be reasonably predicted into the future by trending forward historical changes in revenue, expenses, and debt service.

114. The cash flows must take into account the time value of money, which can be accomplished by bringing forward past cash flows using a 10% rate and discounting future cash flows using a 10% discount rate during the time period takings damages accrued. The 10% rate should be used to adjust cash flows for both the HUD-restricted Scenario and the Market Scenario because any difference in risk is minimal (given Partners' vast experience operating conventional apartments and the regulatory risk associated with operating HUD properties) and already taken into account in the underlying cash flows. Moreover, the 10% rate should be used

for both compounding and discounting because the proceedings are now in the middle of the damages period and thus symmetry in the rates is essential to an accurate determination of just compensation.

115. It is appropriate to use 10% as the compounding and discount rate because it will place Plaintiffs in as good a position pecuniarily as they would have occupied if the payment of just compensation had coincided with the appropriation of their property. Additionally, it fully reflects Plaintiffs' lost opportunities. Plaintiffs' ability to conduct their business depends on their access to capital. The funds taken by the government over the past 18 years – almost two decades – represent a significant loss of capital which Plaintiffs require to reinvest in other income-producing properties as part of conducting their business. Contrary to the assumptions embedded in the use of lower rates, Plaintiffs could not simply have replaced these funds by borrowing at a risk-free rate. Therefore, it is necessary to use 10% as the compounding and discount rate to place Plaintiffs in as good a position pecuniarily as they would have occupied if not for the taking of their prepayment rights.

***Claremont Village Commons***

116. On February 8, 1990, Claremont Village filed its notice of intent to prepay its mortgage, seeking to prepay "twenty years from final endorsement or as soon as reasonably possible thereafter" and stating its reason for prepayment as its "[c]ontractual right to prepay mortgage." After the passage of LIHPRHA, Claremont Village re-filed its notice of intent to prepay its mortgage on December 26, 1990. This correspondence reflected the partnership's continuing intent to prepay. However, because of ELIHPA and LIHPRHA, Claremont Village no longer had its contractual right to prepay without HUD approval on its prepayment eligibility date of December 21, 1991.

117. Because it was virtually impossible for properties in California to meet LIHPRHA's stringent requirements for prepayment, on June 3, 1992, immediately after HUD enacted regulations implementing Title VI, Claremont Village filed a notice of election to proceed, seeking incentives under Title II. Claremont Village filed this Notice to avoid wasting time on an application for prepayment that would have been rejected because, per federal statutes, HUD lacked the authorization to grant the request.[11]

118. On behalf of Claremont Village, G&K Management sought to receive incentives retroactive to Claremont Village's prepayment eligibility date. However, HUD stated that it found no provision in Title II, Title VI, or the implementing regulations for either statute that would allow incentives to be provided retroactive to the prepayment eligibility date and thus rejected the request (as it did in response to G&K Management's requests for retroactive incentives for all of Owners' properties). Accordingly, Claremont Village was unable to receive incentives until after date of its Use Agreement.

119. On May 27, 1995, Claremont Village entered into a Title II Use Agreement with HUD to mitigate the damages it was suffering as a result of the taking of its property (which Claremont Village reasonably believed would continue until the expiration of its HUD-endorsed mortgage). Under the Use Agreement, Claremont Village is required to use its property for low-income housing until the end of the original 40-year term on its HUD-insured mortgage, thus binding Claremont Village until August 1, 2012.

120. In exchange for maintaining these restrictions, Claremont Village received an increased possible return on equity of 7.5% of the equity investment defined in the plan of action, with such right being cumulative (meaning that if the property did not have enough

---

[11] Plaintiffs waited to file notices of election to proceed until the Title VI regulations were implemented, in order to assess the incentives offered under Title VI.

surplus cash in one year, the unpaid dividend could be carried forward and paid in a future year). The plan of action defined the equity investment as $5,761,792. The Use Agreement also permitted certain limited, budget-based rent adjustments, and provided Section 8 assistance to 144 of the 150 units in the project. Additionally, the owners were allowed to take out a 241(f) equity loan, which they did on August 1, 1995, in the amount of $4,842,700.

121. On Claremont Village's prepayment eligibility date, the balances of its first and second mortgages were $2,149,058 and $128,982 (an air conditioning loan of $140,000 taken on March 1, 1981), respectively, and the balance of its HUD-restricted funds was $173,977, which consisted of $173,977 in replacement reserve funds.

122. As part of the plan of action process, Claremont Village had an appraisal of the property conducted pursuant to the HUD-mandated appraisal guidelines. The appraisal valued the property at $9,294,500. Upon its review of the appraisal, HUD valued the property at $7,976,000. For purposes of the plan of action, Claremont Village and HUD reached an agreed-upon value for the Claremont Village property of $7,976,000, which calculates to a preservation equity of $5,697,960. The agreed upon-rents were $705 and $820 for the one- and two-bedroom units, respectively.

123. Claremont Village paid off its mortgage on April 26, 2001, in conjunction with the sale of the property to a "qualified purchaser." The sale price was $10,583,000. G&K Management managed Claremont Village for a short time after it was sold, but no longer manages the property.

124. As of December 31, 2006, Claremont Village has suffered $6,962,833 in damages as a result of the government's temporary taking of its prepayment right. The damages Claremont Village incurred include the following: 1) damages incurred from Claremont

Village's original prepayment eligibility date until the date its Use Agreement rents became effective (December 21, 1991, to May 31, 1995[12]); 2) damages incurred from the date of the Use Agreement to the date of the sale of the property to a HUD-approved purchaser (June 1, 1995, to April 26, 2001); and 3) reduced sales price resulting from the continuing restrictions on the property.

125. From December 21, 1991, to May 31, 1995, Claremont Village received no distributions while it was forced to operate under its original Regulatory Agreement. Had Claremont Village been allowed to prepay its HUD-insured mortgage on its 20-year prepayment eligibility date, exit the federal low-income housing program, and raise its rent to market levels at that time, Claremont Village would have earned $1,470,221 in cash flows during that time period. Therefore, Claremont Village suffered $1,470,221 in nominal in damages from December 21, 1991, to May 31, 1995, as a result of the taking of its prepayment right.

126. From June 1, 1995, to April 26, 2001, Claremont Village received $4,732,879 in distributions under its Use Agreement. The rents Claremont Village was permitted to charge under the Use Agreement did not increase at the same rate as the rents that Claremont Village could have charged had it been allowed to prepay and convert to a market rate property. Had Claremont Village not been subject to the restrictions of its Use Agreement, Claremont Village would have earned $6,044,666 in cash flows from June 1, 1995, to April 26, 2001. Claremont Village thus suffered nominal damages of $1,311,787 from June 1, 1995, to April 26, 2001 as a result of its Use Agreement.

127. Claremont Village suffered additional damages when it sold the property on April 26, 2001, while the property remained under HUD restrictions. Claremont Village

---

[12] Claremont Village signed its Use Agreement on May 27, 1995, but did not receive the increased rents provided for in the agreement until June 1, 1995.

received $10,583,000 for the property. Had the property been free of its Use Agreement, the owners would have received $13,146,994. Subtracting the purchase price actually received from the purchase price the owners could have received had the property been free of HUD restrictions results in nominal damages of $2,563,994.

***Covina West***

128. On February 8, 1990, Covina West filed its notice of intent to prepay its mortgage, seeking to prepay "twenty years from final endorsement or as soon as reasonably possible thereafter" and stating its reason for prepayment as its "[c]ontractual right to prepay mortgage." Covina West re-filed its notice of intent to prepay its mortgage on July 16, 1990. After the passage of LIHPRHA, on December 27, 1990, Covina West reiterated to HUD that it had filed a notice of intent to prepay its mortgage. This correspondence reflected the partnership's continuing intent to prepay. However, because of ELIHPA and LIHPRHA, Covina West no longer had its contractual right to prepay without HUD approval on its prepayment eligibility date of May 26, 1991.

129. Covina West filed a notice of election to proceed on June 3, 1992, immediately after HUD enacted regulations implementing Title VI, seeking incentives under Title II. Covina West filed this Notice instead of filing a request to prepay its mortgage under LIHPRHA to avoid wasting time on a futile application for prepayment.

130. On behalf of Covina West, G&K Management sought to receive incentives retroactive to Covina West's prepayment eligibility date but HUD rejected the request. Thus, Covina West was unable to receive incentives until the effective date of its Use Agreement.

131. On May 26, 1995, Covina West entered into a Title II Use Agreement with HUD to mitigate the damages it was suffering as a result of the taking of its property (which Covina West reasonably believed would continue until the expiration of its HUD-endorsed mortgage). Under the Use Agreement, Covina West is required to use its property for low-income housing until the end of the original 40-year term of its HUD-insured mortgage, thus binding Covina West until November 1, 2011.

132. In exchange for maintaining these affordability restrictions, HUD removed the limitation on Covina West's annual dividend.[13] Covina West also received phased-in rent increases, access to its reserve-for-replacements account (provided it maintained a minimum balance equivalent to one month's maximum gross rent potential), and Section 8 assistance for 113 of the 158 units in the project, among other incentives.

133. On Covina West's prepayment eligibility date, the balances of its first and second mortgages were $2,051,099 and $362,039 (an air conditioning loan of $374,000 taken on July 1, 1982), respectively, and the balance of its HUD-restricted funds was $45,228 (consisting of a $36,086 replacement reserve, a $8,420 painting reserve, and $722 in residual receipts). Covina West did not take out a 241(f) equity loan.

134. As part of the plan of action process, the owners had an appraisal of the property conducted pursuant to the HUD-mandated appraisal guidelines. The appraisal valued the property at $10,000,000. Upon review of the appraisal, HUD valued the property at $8,175,000. For purposes of the plan of action, Covina West and HUD reached an agreed-upon value of the Covina West property of $8,342,000, which calculates to a preservation equity of

[13] G&K Management tried to negotiate a monthly distribution of the annual dividend but HUD would only agree to an annual or semi-annual distribution.

$5,928,862. The agreed-upon rents were $560, $670, $770, $795, and $890 for the one-, two-, smaller three-, larger three-, and four-bedroom apartments respectively.

135. Covina West paid off its mortgage on August 8, 2002, in conjunction with the sale of the property to a "qualified purchaser." G&K Management did not manage the property after it was sold.

136. Covina West has suffered $13,492,306 in damages as of December 31, 2006, as a result of the government's temporary taking of its prepayment right.[14] The damages Covina West incurred include: 1) damages incurred from Covina West's original prepayment eligibility date until the date its Use Agreement rents became effective (May 26, 1991, to May 31, 1995[15]); 2) damages incurred from the effective date of the Use Agreement to the date of the sale of the property to a HUD-approved purchaser (June 1, 1995, to August 8, 2002); and 3) damages incurred as a result of the reduction in the market value of the property at the time of the sale that resulting from the continuing restrictions on the property.

137. From May 26, 1991, to May 31, 1995, Covina West received $112,294 in distributions under the restrictions required by its original Regulatory Agreement. Had Covina West been allowed to prepay its HUD-insured mortgage on its 20-year prepayment eligibility date, exit the federal low-income housing program, and raise its rent to market levels at that time, Covina West would have earned $1,587,031 in cash flows during that time period. Therefore, Covina West suffered nominal damages of $1,474,737 from May 26, 1991, to May 31, 1995, as a result of the taking of its prepayment right.

---

[14] Claremont Village's, Covina West's, Del Vista's, Pioneer's, and Puente Park's damages include prejudgment interest calculated at the 20-year STRIPS rate from the date of sale until December 31, 2006.

[15] Covina West signed its Use Agreement on May 26, 1995, but Covina West did not receive the increased rents provided for in the agreement until June 1, 1995.

138. From June 1, 1995, to August 8, 2002, Covina West received $112,849 in distributions under its Use Agreement. Had Covina West not been restricted by its Use Agreement, it would have earned $5,285,259 in cash flows during that time period. Covina West thus suffered nominal damages of $5,172,410 from June 1, 1995, to August 8, 2002, as a result of ELIHPA and LIHPRHA.

139. Covina West suffered additional damages when it sold the property on August 8, 2002, while the property remained under its Use Agreement. Covina West received $13,200,000 for the property. Had the property been free of HUD restrictions, Covina West would have received $17,506,734. Subtracting the purchase price actually received from the purchase price the owners could have received had the property been free of HUD restrictions results in nominal damages of $4,306,734.

***Del Vista Village***

140. Notwithstanding the enactment of ELIHPA, on February 8, 1990, Del Vista filed its notice of intent to prepay its mortgage, seeking to prepay "twenty years from final endorsement or as soon as reasonably possible thereafter" and stating its reason for prepayment as its "[c]ontractual right to prepay mortgage." After the passage of LIHPRHA, on December 27, 1990, Del Vista re-filed its notice of intent to prepay its mortgage. This correspondence reflected the partnership's continuing intent to prepay. However, because of ELIHPA and LIHPRHA, Del Vista no longer had its contractual right to prepay without HUD approval on its prepayment eligibility date of April 7, 1992.

141. On June 3, 1992, immediately after HUD enacted regulations implementing Title VI, Del Vista filed a notice of election to proceed seeking incentives under Title II. Del Vista filed this Notice to avoid wasting time on a futile application for prepayment.

142. On behalf of Del Vista, G&K Management sought to receive Title II incentives retroactive to Del Vista's prepayment eligibility date but HUD refused the request. Accordingly, Del Vista did not receive incentives until the date of its Use Agreement.

143. To mitigate the damages Del Vista was suffering as a result of the taking of its property (which Del Vista reasonably believed would continue until the expiration of its HUD-endorsed mortgage), Del Vista entered into a Title II Use Agreement with HUD on June 22, 1995. Under the Use Agreement, Del Vista is required to use its property for low-income housing until the expiration of its Use Agreement, thus binding Del Vista until February 1, 2012.

144. In exchange for maintaining these restrictions, Del Vista received an increased possible return on equity of 5.1% of the equity investment defined in the plan of action, $5,820,460 with such right being cumulative. Under the Use Agreement, HUD also granted Del Vista certain limited, budget-based rent adjustments and provided Section 8 assistance to 76 of the 160 units in the project. Additionally, the owners were allowed to take out a 241(f) equity loan, which they did on August 1, 1995, in the amount of $3,565,700.

145. On Del Vista's prepayment eligibility date, the balances of its first and second mortgages were $1,494,202 and $72,651 (an air conditioning loan of $82,000 taken on August 1, 1979), respectively, and the balance of its HUD-restricted funds was $260,884 (consisting of $214,055 in reserves for replacement and $46,829 in painting reserves).

146. As part of the plan of action process, Del Vista had an appraisal of the property conducted pursuant to the HUD-mandated appraisal guidelines. The appraisal valued the property at $8,800,000. Upon review of the appraisal, HUD valued the property at $7,222,000. For purposes of the plan of action, Del Vista and HUD reached an agreed-upon value of the Del Vista property of $7,222,000, which calculates to a preservation equity of

$5,655,147. The agreed-upon rents were $500, $600, and $720 for one-, two-, and three-bedroom units.

147. Del Vista paid off its mortgage on March 12, 2004, in conjunction with the sale of the property to a "qualified purchaser." The property was sold for $15,200,000. G&K Management continues to manage the property.

148. As of December 31, 2006, Del Vista has suffered $10,089,067 in damages as a result of the government's temporary taking of its prepayment right. These damages include: 1) damages incurred from Del Vista's original prepayment eligibility date until the date its Use Agreement rents became effective (April 7, 1992, to June 30, 1995[16]); 2) damages incurred from the date the Use Agreement became effective to the date the property was sold to a HUD-approved purchaser (July 1, 1995, to March 12, 2004); and 3) damages incurred as a result of the reduction in the property's market value at the time of the sale caused by the continuing restrictions on the property.

149. From April 7, 1992 to June 30, 1995, Del Vista received $36,910 in distributions due to the restrictions required by its Regulatory Agreement. Had Del Vista been allowed to prepay its HUD-insured mortgage on its 20-year prepayment eligibility date, exit the federal low-income housing program, and raise its rent to market levels at that time, Del Vista would have earned $1,308,129 in cash flows during that time period. Therefore, Del Vista suffered nominal damages of $1,271,219 from April 7, 1992, to June 30, 1995, as a result of the taking of its prepayment right.

150. From July 1, 1995, to March 12, 2004, Del Vista received $4,436,443 in distributions under the restrictions mandated in its Use Agreement. The rents that Del Vista

---

[16] Del Vista signed its Use Agreement on June 22, 1995, but Del Vista did not receive the increased rents provided for in the Use Agreement until July 1, 1995.

received under the Use Agreement during this time did not increase at the same rate as the rents that Del Vista could have charged had it been free from the affordability restrictions in its Use Agreement. Had Del Vista been free from the restrictions of its Use Agreement, it would have earned $7,435,870 in cash flows during that time. Del Vista thus suffered nominal damages of $2,999,427 from July 1, 1995, to March 12, 2004, as a result of ELIHPA and LIHPRHA.

151. Del Vista suffered additional damages when it sold the property for $15,200,000 on March 12, 2004, while the property was encumbered by its Use Agreement. Had the property been free of HUD restrictions, Del Vista would have received $17,111,879 in the sale. Subtracting the purchase price actually received from the purchase price the owners could have received had the property been free of HUD restrictions results in nominal damages of $1,911,879.

***DeSoto Gardens***

152. On February 8, 1990, DeSoto filed its notice of intent to prepay its mortgage, seeking to prepay "twenty years from final endorsement or as soon as reasonably possible thereafter" and stating its reason for prepayment as its "[c]ontractual right to prepay mortgage." After the passage of LIHPRHA, on December 27, 1990, DeSoto reiterated to HUD that it had filed a notice of intent to prepay its mortgage. This correspondence reflected the partnership's continuing intent to prepay. However, because of ELIHPA and LIHPRHA, DeSoto no longer had its contractual right to prepay without HUD approval on its prepayment eligibility date of November 2, 1990.

153. DeSoto filed a notice of election to proceed, seeking incentives under Title II on June 3, 1992, immediately after HUD enacted regulations implementing Title VI, DeSoto filed this Notice to avoid wasting time on a futile application for prepayment.

154. On behalf of DeSoto, G&K Management sought Title II incentives retroactive to DeSoto's prepayment eligibility date but HUD refused. Accordingly, DeSoto was unable to receive incentives until the effective date of its Use Agreement.

155. On May 26, 1995, DeSoto signed a Title II Use Agreement to mitigate the damages it was suffering as a result of the taking of its property (which DeSoto reasonably believed would continue until the expiration of its HUD-endorsed mortgage). Under the Use Agreement, DeSoto is required to use its property for low-income housing until the expiration of its Use Agreement, thus binding DeSoto until January 1, 2011.

156. In exchange for maintaining these affordability restrictions, DeSoto received an increased possible return on equity of 8% of the equity investment defined in the plan of action, with such right being cumulative. The plan of action defined the equity investment as $10,552,525. Through the Use Agreement, HUD also granted certain limited, budget-based rent adjustments and provided Section 8 assistance to 214 of the 248 units in the project. Additionally, DeSoto was allowed to take out a 241(f) equity loan, which it did on August 1, 1995, in the amount of $9,055,600.

157. The balances on DeSoto's first and second mortgages were $2,265,894 and $231,863 (an air conditioning loan taken on July 1, 1978), respectively, on the prepayment eligibility date, and DeSoto's HUD-restricted funds balance was $240,668 (consisting of $97,720 in replacement reserve funds and $142,948 in painting reserves).

158. As part of the plan of action process, DeSoto had an appraisal of the property conducted pursuant to the HUD-mandated appraisal guidelines. The appraisal valued the property at $13,500,000. Upon review of the appraisal, HUD valued the property at $12,750,000. For purposes of the plan of action, DeSoto and HUD reached an agreed-upon

value for the DeSoto property of $12,750,000, which calculates to a preservation equity of $10,252,244. The agreed-upon rents were $575, $685, and $800 for one-, two-, and three-bedroom units, respectively.

159. DeSoto suffered damages of $23,351,704 as a result of the government's temporary taking of its prepayment right. DeSoto's damages include: 1) damages incurred from DeSoto's original prepayment eligibility date until the date its Use Agreement rents were effective (November 2, 1990 to May 31, 1995[17]); 2) damages incurred from the date of the Use Agreement to December 31, 2006 (June 1, 1995, to December 31, 2006); and 3) damages that will be incurred from January 1, 2007 until the Use Agreement expires and the HUD-imposed restrictions are scheduled to terminate (January 1, 2007, to January 1, 2011).

160. From November 2, 1990, to May 31, 1995, DeSoto received $70,274 in distributions under the restrictions required by its Regulatory Agreement. Had DeSoto been allowed to prepay its HUD-insured mortgage on its 20-year prepayment eligibility date, DeSoto would have realized $3,340,319 in cash flows during that time. Subtracting the income DeSoto actually received under HUD restrictions from the projected cash flow under market conditions, taking into account the factors listed in ¶¶ 105-14, demonstrates that DeSoto suffered $3,270,45 in nominal damages from November 2, 1990, to May 31, 1995, as a result of the prohibition against prepayment.

161. From June 1, 1995, to December 31, 2006, DeSoto received distributions of $10,293,441 under the restrictions required by the Use Agreement. The rents DeSoto receives under the Use Agreement have not increased at the same rate as the rents that DeSoto could have charged had it been free from HUD restrictions. Had DeSoto not been encumbered by a Use

[17] DeSoto entered into a Use Agreement on May 26, 1995, but it did not receive the increased rents provided for by the Use Agreement until June 1, 1995.

Agreement that limited its rents, DeSoto would have earned $16,700,151 during that time. DeSoto thus suffered nominal damages of $6,406,710 from June 1, 1995, to December 31, 2006, as a result of ELIHPA and LIHPRHA.

162. From January 1, 2007, to January 1, 2011, DeSoto is projected to realize $614,578 in distributions under the restrictions required by its Use Agreement. If DeSoto had been permitted to prepay its HUD-insured mortgage on its 20-year prepayment eligibility date, DeSoto is projected to have earned $7,774,450 during that time. Subtracting the income projected to be earned under HUD restrictions from the projected cash flows under market conditions results in $7,159,872 in nominal damages from January 1, 2007, to January 1, 2011.

***Kittridge Gardens I***

163. On September 30, 1988, Kittridge I filed its notice of intent to prepay its mortgage, seeking to prepay "twenty years from final endorsement or as soon as reasonably possible thereafter" and stating its reason for prepayment as its "[c]ontractual right to prepay mortgage." After the passage of LIHPRHA, on December 27, 1990, Kittridge I reiterated to HUD that it had filed a notice of intent to prepay its mortgage. This correspondence reflected the partnership's continuing intent to prepay. However, because of ELIHPA and LIHPRHA, Kittridge I no longer had its contractual right to prepay without HUD approval on its prepayment eligibility date of September 17, 1989.

164. Instead of filing an application for prepayment that would have been rejected, Kittridge I submitted its initial plan of action to HUD on June 12, 1991, stating "based upon current law, the possibility of [prepayment] occurring appears to be non-existent." Then, on June 3, 1992, immediately after HUD enacted regulations implementing Title VI, Kittridge I filed a notice of election to proceed, seeking incentives under Title II.

165. On behalf of Kittridge I, G&K Management sought Title II incentives retroactive to Kittridge I's prepayment eligibility date but HUD refused. Accordingly, Kittridge I was unable to receive incentives until the effective date of its Use Agreement.

166. On June 22, 1995, Kittridge I signed a Title II Use Agreement with HUD to mitigate the damages it was suffering as a result of the taking of its property (which Kittridge I reasonably believed would continue until the expiration of its HUD-endorsed mortgage). Under the Use Agreement, Kittridge I is required to use its property for low-income housing until the end of is Use Agreement, thus binding Kittridge I until August 1, 2009.

167. In exchange for maintaining these restrictions, the Use Agreement provided for the removal of the limitation on the owners' annual dividend.[18] The Use Agreement also provided for phased-in increases in rents, access to the reserve-for-replacements account (provided Kittridge I maintained a minimum balance equivalent to one month's maximum gross rent potential), and Section 8 assistance for all 128 units in the project, among other incentives. Kittridge I was also permitted to take out a 241(f) equity loan, which it did on November 1, 1995, in the amount of $5,801,200, and to refinance that loan under Section 223(a), which Kittridge I did on August 1, 2005, in the amount of $5,606,400.

168. The balance of Kittridge I's mortgage on the prepayment eligibility date was $941,307 and its balance of HUD-restricted funds was $240,699 (consisting of $168,589 in reserve for replacement, $65,644 in painting reserves, and $6,466 in residual receipts).

169. As part of the plan of action process, Kittridge I had an appraisal of the property performed pursuant to the HUD-mandated appraisal guidelines. The appraisal valued the property at $7,700,000. Upon review of the appraisal, HUD valued the property at

---

[18] Although G&K Management tried to negotiate a monthly distribution, HUD only agreed to an annual or semi-annual distribution.

$7,365,000. For purposes of the plan of action, Kittridge I and HUD reached an agreed-upon value for the Kittridge I property of $7,365,000, which calculates to a preservation equity of $6,423,693. The agreed-upon rents were $575, $720, and $825 for one-, two-, and three-bedroom units, respectively.

170. Kittridge I suffered damages of $13,733,366 as a result of the government's temporary taking of its prepayment right. Kittridge I's damages include: 1) damages incurred from Kittridge I's original prepayment eligibility date until the date its Use Agreement rents became effective (September 17, 1989, to June 30, 1995[19]); 2) damages incurred from the effective date of its Use Agreement to December 31, 2006 (July 1, 1995, to December 31, 2006) ; and 3) damages Kittridge I will suffer from January 1, 2007, until the Use Agreement expires and the HUD-imposed restrictions are scheduled to terminate (January 1, 2007 to August 1, 2009).

171. From September 17, 1989, to June 30, 1995, Kittridge I received $38,734 in distributions while forced to operate under the restrictions required by its Regulatory Agreement. Had Kittridge I been allowed to prepay its HUD-insured mortgage on its 20-year prepayment eligibility date, exit the federal low-income housing program, and raise its rent to market rates at that time, Kittridge I would have realized $2,400,458 in cash flows during that time. Subtracting the income Kittridge I actually received under HUD restrictions from the projected cash flow under market conditions, taking into account the factors listed in ¶¶ 105-14, demonstrates that Kittridge I suffered $2,361,724 in nominal damages from September 17, 1989, to June 30, 1995, as a result of the prohibition against prepayment.

---

[19] Kittridge I signed its Use Agreement on June 22, 1995, but did not receive the increased rents provided for in the agreement until July 1, 1995.

172. From July 1, 1995, to December 31, 2006, Kittridge I received $7,127,049 under the restrictions required by the Use Agreement. The rents that Kittridge I receives under the Use Agreement have not increased at the same rate as the rents that Kittridge I could have charged had it been allowed to prepay its HUD-insured mortgage on its 20-year prepayment eligibility date and raise its rent to market rates at that time. Had Kittridge I been free of the restrictions of its Use Agreement, Kittridge I would have earned $9,130,672 in cash flows during that time period. Kittridge I thus suffered nominal damages of $2,003,623 from July 1, 1995, to December 31, 2006, as a result of the taking of its prepayment right.

173. From January 1, 2007 to August 1, 2009, Kittridge I is projected to realize $740,504 in distributions under the restrictions required by its Use Agreement. If Kittridge I had been permitted prepay its HUD-insured mortgage on its 20-year prepayment eligibility date, Kittridge I is projected to have earned $2,033,540 in cash flows during that time period. Subtracting the income projected to be earned under HUD restrictions from the projected cash flows under market conditions results in $1,292,946 in nominal damages from January 1, 2007, to August 1, 2009.

***Kittridge Gardens II***

174. On February 8, 1990, Kittridge II filed its notice of intent to prepay its mortgage, seeking to prepay "twenty years from final endorsement or as soon as reasonably possible thereafter" and stating its reason for prepayment as its "[c]ontractual right to prepay mortgage." Kittridge II re-filed its notice of intent to prepay its mortgage on July 16, 1990. After the passage of LIHPRHA, on December 27, 1990, Kittridge II reiterated to HUD that it had filed a notice of intent to prepay its mortgage. This correspondence reflected the partnership's continuing intent to prepay. However, because of ELIHPA and LIHPRHA, Kittridge II no

longer had its contractual right to prepay without HUD approval on its prepayment eligibility date of April 14, 1991.

175. Because it was virtually impossible for properties in California to meet LIHPRHA's stringent requirements for prepayment, on June 12, 1991, Kittridge II submitted its initial plan of action to HUD, stating "based upon current law, the possibility of [prepayment] occurring appears to be non-existent." On June 3, 1992, immediately after HUD enacted regulations implementing Title VI, Kittridge II filed a notice of election to proceed, seeking incentives under Title II.

176. On behalf of Kittridge II, G&K Management sought Title II incentives retroactive to Kittridge II's prepayment eligibility date. HUD rejected this request. Accordingly, Kittridge II was unable to receive incentives until the date of its Use Agreement.

177. On June 1, 1995, Kittridge II entered into a Title II Use Agreement with HUD in order to mitigate the damages it was suffering as a result of the taking of its property (which Kittridge II reasonably believed would continue until the expiration of its HUD-endorsed mortgage). Under the Use Agreement, Kittridge II is required to use its property for low-income housing until the end of the original 40-year term on its HUD-insured mortgage, thus binding it until April 1, 2011.

178. In exchange for maintaining these restrictions, HUD removed the limitation on Kittridge II's annual dividend. Although G&K Management tried to negotiate a monthly distribution, HUD only agreed to an annual or semi-annual distribution. Among the other incentives Kittridge II received as a result of its Use Agreement were phased-in increases in rents, access to its reserve-for-replacements account (provided it maintained a minimum balance equivalent to one month's maximum gross rent potential), and Section 8 assistance for

78 of the 80 units in the project. Additionally, Kittridge II was allowed to take out a 241(f) equity loan, which it did on November 1, 1995, in the amount of $2,772,600, and to refinance that loan under Section 223(a), which Kittridge II did on July 1, 2005, in the amount of $2,823,900.

179. The balances of Kittridge II's first and second mortgages were $930,337 and 428,669 (an air conditioning loan of $500,100 taken out on September 1, 1980), respectively, on its prepayment eligibility date and the balance of its HUD-restricted funds was $209,784 (consisting of $157,374 in reserve for replacement and $52,410 in painting reserves).

180. As part of the plan of action process, Kittridge II had an appraisal of the property conducted pursuant to the HUD-mandated appraisal guidelines. The appraisal valued the property at $6,200,000. Upon review of the appraisal, HUD valued the property at $5,700,000. For purposes of the plan of action, Kittridge II and HUD reached an agreed-upon value for the Kittridge II property $5,700,000, which calculates to a preservation equity of $4,340,993. The agreed-upon rents were $750, $850, and $1,025 for two-, three-, and four-bedroom units respectively.

181. Kittridge II suffered damages of $6,802,951 as a result of the government's temporary taking of its prepayment right. Kittridge II's damages include: 1) damages incurred from Kittridge II's original prepayment eligibility date to the date its Use Agreement rents became effective (April 14, 1991, to May 31, 1995); 2) damages incurred from the date of its Use Agreement rents became effective to December 31, 2006 (June 1, 1995, to December 31, 2006); and 3) damages from January 1, 2007, until the Use Agreement expires and the HUD-imposed restrictions are scheduled to terminate (January 1, 2007, to April 1, 2011).

182. From April 14, 1991, to May 31, 1995, Kittridge II received $84,804 in distributions while forced to continue operating under its Regulatory Agreement. Had Kittridge II been allowed to prepay its HUD-insured mortgage on its 20-year prepayment eligibility date, Kittridge II would have realized $1,040,338 in cash flows during that time. Subtracting the income Kittridge II actually received under HUD restrictions from the projected cash flow under market conditions, taking into account the factors listed in ¶¶ 105-14, demonstrates that Kittridge II suffered $955,534 in nominal damages from April 14, 1991, to May 31, 1995, as a result of the prohibition against prepayment.

183. From June 1, 1995, to December 31, 2006, Kittridge II received $4,882,165 in distributions under the restrictions required by the Use Agreement. The rents Kittridge II receives under the Use Agreement have not increased at the same rate as the rents it could have charged had it been allowed to free itself of HUD restrictions. Thus, had Kittridge II not been encumbered by a Use Agreement that limited its rents, Kittridge II would have earned $6,236,908 during that time. Kittridge II thus suffered nominal damages of $1,354,743 from June 1, 1995, to December 31, 2006 as a result of ELIHPA and LIHPRHA.

184. From January 1, 2007, to April 1, 2011, Kittridge II is projected to realize $1,058,452 in distributions under the restrictions required by its Use Agreement. If Kittridge II were not restricted by its Use Agreement, Kittridge II is projected to have earned $2,459,812 during that time. Subtracting the income projected to be earned under HUD restrictions from the projected cash flows under market conditions results in $1,401,360 in nominal damages from January 1, 2007, to April 1, 2011.

***Oxford Park***

185. On February 8, 1990, Oxford Park filed its notice of intent to prepay its mortgage, seeking to prepay "twenty years from final endorsement or as soon as reasonably possible thereafter" and stating its reason for prepayment as its "[c]ontractual right to prepay mortgage." After the passage of LIHPRHA, Oxford Park re-filed its notice of intent to prepay its mortgage on December 26, 1990. This correspondence reflected the partnership's continuing intent to prepay. However, because of ELIHPA and LIHPRHA, Oxford Park no longer had its contractual right to prepay without HUD approval on its prepayment eligibility date of October 6, 1992.

186. On June 3, 1992, immediately after HUD enacted regulations implementing Title VI, Oxford Park filed a notice of election to proceed, seeking incentives under Title II. Oxford Park filed this Notice instead of requesting prepayment in order to avoid wasting time on an application for prepayment that HUD was statutorily prohibited from granting.

187. On behalf of Oxford Park, G&K Management sought Title II incentives retroactive to Oxford Park's prepayment eligibility date but HUD rejected this request. Accordingly, Oxford Park was not able to receive incentives until the date of the Use Agreement.

188. On May 27, 1995, Oxford Park entered into a Title II Use Agreement with HUD to mitigate the damages it was suffering as a result of the taking of its property (which Oxford Park reasonably believed would continue until the expiration of its HUD-endorsed mortgage). Under the Use Agreement, Oxford Park is required to use its property for low-income housing until the end of the original 40-year term on its HUD-insured mortgage, thus binding Oxford Park until April 1, 2012.

189. In exchange for maintaining the restrictions, HUD removed the limitation on Oxford Park's annual dividend. Although G&K Management tried to negotiate a monthly distribution, HUD only agreed to an annual or semi-annual distribution. Oxford Park also received phased-in rent increases, access to its reserve-for-replacements account (provided it maintained a minimum balance equivalent to one month's maximum gross rent potential), and Section 8 assistance for all of the units in the project, among other incentives. These additional incentives included the ability to take out a 241(f) equity loan, which Oxford Park did on July 1, 1995, in the amount of $2,863,200, and to refinance that loan under Section 223(a), which Oxford Park did on August 1, 2004, in the amount of $2,823,900.

190. On Oxford Park's prepayment eligibility date, the balance of its mortgage was $1,215,715 and the balance of its HUD-restricted funds was $151,833 (consisting of $78,787 in replacement reserves, $74,764 in painting reserves, and $282 in residual receipts).

191. As part of the plan of action process, Oxford Park had an appraisal of the property conducted pursuant to the HUD-mandated appraisal guidelines. The appraisal valued the property at $5,350,000. Upon its review of the appraisal, HUD agreed with that value. Thus, the agreed-upon value of the Oxford Park property in the plan of action was $5,350,000, which calculates to a preservation equity of $4,134,285. The agreed-upon rents were $625 for the property's one-bedroom units.

192. Oxford Park suffered damages of $7,791,461 as a result of the government's temporary taking of its prepayment right. Oxford Park's damages include: 1) damages incurred from Oxford Park's original prepayment eligibility date until the date its Use

Agreement rents became effective (October 6, 1992, to May 31, 1995[20]); 2) damages incurred from the date the Use Agreement rents became effective to December 31, 2006 (June 1, 1995, to December 31, 2006); and 3) damages Oxford Park will suffer from January 1, 2007, until the Use Agreement expires and the HUD-imposed restrictions are scheduled to terminate (January 1, 2007, to April 1, 2012).

193. From October 6, 1992 to May 31, 1995, Oxford Park received $38,569 in distributions while it was forced to continue operating under its Regulatory Agreement. Had Oxford Park to been allowed to prepay its HUD-insured mortgage on its 20-year prepayment eligibility date, exit the federal low-income housing program, and raise its rent to market rates at that time, Oxford Park would have realized $653,468 in cash flows during that time. Subtracting the income Oxford Park actually received under HUD restrictions from the projected cash flow under market conditions, taking into account the factors listed in ¶¶ 105-14, demonstrates that Oxford Park suffered $614,899 in nominal damages from October 6, 1992, to May 31, 1995, as a result of the prohibition against prepayment.

194. From June 1, 1995, to December 31, 2006, Oxford Park received $4,126,965 in distributions under the restrictions required by its Use Agreement. The rents that Oxford Park has been receiving under the Use Agreement have not increased at the same rate as the rents that Oxford Park could have charged had it been free of HUD restrictions. Had Oxford Park been free from the restrictions of its Use Agreement, Oxford Park would have earned $6,400,990 in cash flows during that time. Oxford Park thus suffered $2,274,025 in nominal damages from June 1, 19965, to December 31, 2006, as a result of ELIHPA and LIHPRHA.

[20] Oxford Park signed its Use Agreement on May 27, 1995 but did not receive the increased rents provided for by the Use Agreement until June 1, 1995.

195. From January 1, 2007 to April 1, 2012, Oxford Park is projected to realize $1,132,684 in distributions under the restrictions required by its Use Agreement. If Oxford Park had been permitted prepay its HUD-insured mortgage on its 20-year prepayment eligibility date, Oxford Park is projected to have earned $4,671,546 in cash flows during that time. Subtracting the income projected to be earned under HUD restrictions from the projected cash flows under market conditions results in $3,538,862 in nominal damages from January 1, 2007, to April 1, 2012.

***Parthenia Townhouse***

196. On December 26, 1990, Parthenia filed its notice of intent to prepay its mortgage, seeking to prepay “twenty years from final endorsement or as soon as reasonably possible thereafter” and stating its reason for prepayment as its “[c]ontractual right to prepay mortgage.” This correspondence reflected the partnership’s continuing intent to prepay. However, because of ELIHPA and LIHPRHA, Parthenia no longer had its contractual right to prepay without HUD approval on its prepayment eligibility date of December 17, 1991.

197. On June 3, 1992, immediately after HUD enacted regulations implementing Title VI, Parthenia filed a notice of election to proceed, seeking incentives under Title II. Parthenia filed this Notice rather than applying for prepayment to avoid wasting time on a futile application for prepayment.

198. G&K Management sought Title II incentives retroactive to the prepayment eligibility dates on behalf of Parthenia but HUD rejected this request. Accordingly, Parthenia was unable to receive incentives until the date of its Use Agreement.

199. On May 26, 1995, Parthenia entered into a Title II Use Agreement with HUD to mitigate the damages it was suffering as a result of the taking of its property (which

Parthenia reasonably believed would continue until the expiration of its HUD-endorsed mortgage). Under the Use Agreement, Parthenia is required to use its property for low-income housing until the end of the original 40-year term on its HUD-insured mortgage, thus binding Parthenia until March 1, 2012.

200. In exchange for maintaining these restrictions, HUD removed the limitation on Parthenia's annual dividend. However, HUD would only agree to an annual or semi-annual distribution of the dividend even though G&K Management tried to negotiate a monthly distribution. Parthenia also received phased-in rent increases, access to its reserve-for-replacements account (provided it maintained a minimum balance equivalent to one month's maximum gross rent potential), and Section 8 assistance for 11 of the 24 units in the project, among other incentives. These other incentives included the ability to take out a 241(f) equity loan, which Parthenia did on July 1, 1995, in the amount of $679,100

201. On Parthenia's prepayment eligibility date, the balance of its mortgage was $238,612 and the balance of its HUD-restricted funds was $81,804 (consisting of $70,614 in replacement reserves and, $11,190 in painting reserves).

202. As part of the plan of action process, the owners had an appraisal of the property conducted pursuant to the HUD-mandated appraisal guidelines. The appraisal valued the property at $1,785,000. Upon review of the appraisal, HUD valued the property at $1,576,600. For purposes of the plan of action, Parthenia and HUD reached an agreed-upon value for the Parthenia property of $1,576,600, which calculates to a preservation equity of $1,337,968. The agreed-upon rents were $780 and $900 for two- and three-bedroom units, respectively.

203. Parthenia suffered damages of $2,547,870 as a result of the government's temporary taking of its prepayment right. Parthenia's damages include: 1) damages incurred from Parthenia's original prepayment eligibility date until the effective date of its Use Agreement rents (December 17, 1991, to May 31, 1995[21]); 2) damages incurred from the date its Use Agreement rents became effective to December 31, 2006 (June 1, 1995, to December 31, 2006); and 3) damages it will suffer from January 1, 2007 until its Use Agreement expires and the HUD-imposed restrictions are scheduled to terminate (January 1, 2007, to March 1, 2012).

204. From December 17, 1991 to May 31, 1995, Parthenia earned $7,812 in distributions while it was forced to continue operating under the restrictions in its Regulatory Agreement. Had Parthenia been allowed to prepay its HUD-insured mortgage on its 20-year prepayment eligibility date, exit the federal low-income housing program, and raise its rent to market rates at that time, Parthenia would have realized $165,791 in cash flows during that time. Subtracting the income Parthenia actually received under HUD restrictions from the projected cash flow under market conditions, taking into account the factors listed in ¶¶ 105-14, demonstrates that Parthenia suffered $157,979 in nominal damages from December 17, 1991, to May 31, 1995, as a result of the prohibition against prepayment.

205. From June 1, 1995 to December 31, 2006, Parthenia earned distributions of $740,945 under the restrictions required by the Use Agreement. The rents that Parthenia received under the Use Agreement have not increased at the same rate as the rents that Parthenia could have charged had it been allowed to free itself of HUD restrictions. Had Parthenia not been subject to a Use Agreement that limited its rents, Parthenia would have earned $1,430,804

[21] Parthenia signed its Use Agreement on May 26, 1995 but did not receive the increased rents provided for by the Use Agreement until June 1, 1995.

in cash flows during that time. Parthenia thus suffered nominal damages of $689,859 from June 1, 1995, to December 31, 2006, as a result of its Use Agreement.

206. From January 1, 2007, to March 1, 2012, Parthenia is projected to realize $27,580 in distributions under the restrictions required by its Use Agreement. If Parthenia had been permitted prepay its HUD-insured mortgage on its 20-year prepayment eligibility date, Parthenia is projected to have earned $677,033 in cash flows during that time. Subtracting the income projected to be earned under HUD restrictions from the projected cash flows under market conditions results in $649,453 in nominal damages from January 1, 2007, to March 1, 2012.

***Pioneer Gardens***

207. On February 8, 1990, Pioneer filed its notice of intent to prepay its mortgage, seeking to prepay "twenty years from final endorsement or as soon as reasonably possible thereafter" and stating its reason for prepayment as its "[c]ontractual right to prepay mortgage." Pioneer re-filed its notice of intent to prepay its mortgage on July 16, 1990. After the passage of LIHPRHA, on December 27, 1990, Pioneer reiterated to HUD that it had filed a notice of intent to prepay its mortgage. This correspondence reflected the partnership's continuing intent to prepay. However, because of ELIHPA and LIHPRHA, Pioneer no longer had its contractual right to prepay without HUD approval on its prepayment eligibility date of May 26, 1991.

208. On June 3, 1992, immediately after HUD enacted regulations implementing Title VI, Pioneer filed a notice of election to proceed, seeking incentives under Title II. Pioneer filed this Notice instead of applying to prepay to avoid wasting time on an application for prepayment that HUD was statutorily prohibited from granting.

209. On behalf of Pioneer, G&K Management sought incentives retroactive to its prepayment eligibility date but HUD rejected that request. Accordingly, Pioneer was unable to receive incentives until the date of the Use Agreement.

210. On May 1, 1995, Pioneer entered into a Title II Use Agreement with HUD to mitigate the damages Pioneer was suffering as a result of the taking of its property (which Pioneer reasonably believed would continue until the expiration of its HUD-endorsed mortgage). Under the Use Agreement, Pioneer is required to use its property for low-income housing until the end of the original 40-year term on its HUD-insured mortgage, thus binding Pioneer until November 1, 2011.

211. In exchange for maintaining these restrictions, Pioneer received an increased possible return on equity of 8.6% of the equity investment defined in the plan of action, with such right being cumulative. The plan of action defined the equity investment as $3,872,173. Pioneer was also given certain limited, budget-based rent adjustments, HUD provided Section 8 assistance to 135 of the 141 units in the project, and Pioneer was allowed to take out a 241(f) equity loan, which it did on December 1, 1995, in the amount of $3,271,800.

212. The balances on Pioneer's first and second mortgages were $1,965,584 and $436,404 (an air conditioning loan of $451,400 taken on October 1, 1986), respectively, on its prepayment eligibility date. The balance of its HUD-restricted funds was $280,746 (consisting of $151,677 in replacement reserves, $93,527 in painting reserves and $35,542 in residual receipts).

213. As part of the plan of action process, Pioneer had an appraisal of the property conducted pursuant to the HUD-mandated appraisal guidelines. The appraisal valued the property at $8,600,000. Upon its review of the appraisal, HUD valued the property at

$4,523,000. For purposes of the plan of action, Pioneer and HUD reached an agreed-upon value for the Pioneer Gardens property of $6,124,000, which calculates to a preservation equity of $3,722,013. The agreed upon rents were $580, $670, $830, and $925 for one-, two-, three-, and four-bedroom units, respectively.

214. Pioneer paid off its mortgage on April 26, 2001, in conjunction with the sale of the property to a "qualified purchaser." The sale price was $10,133,000. G&K Management managed Pioneer for a short time after it was sold, but no longer manages the property.

215. Pioneer has suffered $7,545,584 in damages as of December 31, 2006, as a result of the government's temporary taking of its prepayment right. The damages Pioneer incurred include: 1) damages incurred from Pioneer's original prepayment eligibility date until the date its Use Agreement rents became effective (May 26, 1991, to June 30, 1995[22]); 2) damages incurred from the date the Use Agreement rents became effective to the date of the sale of the property to a HUD-approved purchaser (July 1, 1995, to April 26, 2001); and 3) damages incurred as a result of the property's reduced market value at the time of the sale due to the continuing restrictions on the property.

216. From May 26, 1991, to June 30, 1995, Pioneer received $64,970 in distributions while it was forced to continue operating under the restrictions required by its Regulatory Agreement. Had Pioneer been allowed to prepay its HUD-insured mortgage on its 20-year prepayment eligibility date, exit the federal low-income housing program, and raise its rent to market levels at that time, Pioneer would have earned $1,572,641 during that time.

[22] Pioneer signed its Use Agreement on May 1, 1995 but did not receive the increased rents provided for by the Use Agreement until July 1, 1995.

Therefore, Pioneer suffered damages nominal damages of $1,507,671 from May 26, 1991, to June 30, 1995, as a result of the taking of its prepayment right.

217. From July 1, 1995, to April 26, 2001, Pioneer received $3,160,374 in distributions under the restrictions required by its Use Agreement. The benefits Pioneer received under the Use Agreement did not increase at the same rate as the rents Pioneer could have charged had it been allowed to free itself of HUD restrictions. Had Pioneer been allowed to prepay its HUD-endorsed mortgage on its 20-year prepayment eligibility date, exit the federal low-income housing program, and raise its rent to market at that time, Pioneer would have earned $4,812,826 in cash flows during that time. Pioneer thus suffered nominal damages of $1,652,452 from July 1, 1995, to April 26, 2001, as a result of ELIHPA and LIHPRHA.

218. Pioneer suffered additional damages when it sold the property on April 26, 2001, while the property remained under HUD restrictions. Pioneer received $10,133,000 for the property. Had the property been free of its Use Agreement, Pioneer would have received $11,461,666. Subtracting the purchase price actually received from the purchase price Pioneer could have received had the property been free of HUD restrictions results in damages of $1,328,666.

***Puente Park***

219. On March 20, 1990, Puente Park filed its notice of intent to prepay its mortgage, seeking to prepay "twenty years from final endorsement or as soon as reasonably possible thereafter" and stating its reason for prepayment as its "[c]ontractual right to prepay mortgage." However, because of ELIHPA and LIHPRHA, Puente Park no longer had its contractual right to prepay without HUD approval on its prepayment eligibility date of August 31, 1990.

220. On June 3, 1992, immediately after HUD enacted regulations implementing Title VI, Puente Park filed a notice of election to proceed, seeking incentives under Title II. Puente Park filed this Notice instead of filing an application to prepay to avoid wasting time on a futile application for prepayment.

221. On behalf of Puente Park, G&K Management sought Title II incentives retroactive to Puente Park's prepayment eligibility date but HUD rejected the request. Accordingly, Puente Park was unable to receive incentives until the date of the Use Agreement.

222. On July 1, 1993, Puente Park signed a Title II Use Agreement to mitigate the damages it was suffering as a result of the taking of its property (which Puente Park reasonably believed would continue until the expiration of its HUD-endorsed mortgage). Under the Use Agreement, Puente Park is required to use its property for low-income housing until the end of the original 40-year term on its HUD-insured mortgage, thus binding Puente Park until May 1, 2011.

223. In exchange for maintaining these restrictions, HUD removed the limitation on the Puente Park's annual dividend but would only agree to an annual or semi-annual distribution, regardless of G&K Management's attempts to negotiate a monthly distribution. Puente Park also received phased-in rent increases, access to its reserve-for-replacements account (provided it maintained a minimum balance equivalent to one month's maximum gross rent potential), and Section 8 assistance for all 132 units in the project, among other incentives. The other incentives included the opportunity to take out a 241(f) equity loan, which Puente Park did on October 1, 1994, in the amount of $5,326,300.

224. On Puente Park's prepayment eligibility date, the balance of its first mortgage was $1,579,342 and the balance of its HUD-restricted funds was $257,372 (consisting

of $145,025 in replacement reserves, $96,627 in painting reserves, and $15,720 in residual receipts).

225. As part of the plan of action process, Puente Park had an appraisal of the property conducted pursuant to the HUD-mandated appraisal guidelines. The appraisal valued the property at $9,575,000. Upon its review of the appraisal, HUD valued the property at $7,650,000. For purposes of the plan of action, Puente Park and HUD reached an agreed-upon value for the Puente Park property of $7,650,000, which calculates to a preservation equity of $6,070,658. The agreed-upon rents were $610, $695, and $800 for one-, two-, and three-bedroom units.

226. Puente Park paid off its mortgage on November 29, 2001, in conjunction with the sale of the property to a “qualified purchaser” for $9,900,938. G&K Management continues to manage Puente Park.

227. Puente Park has suffered $8,486,258 in damages as of December 31, 2006, as a result of the government’s temporary taking of its prepayment right. The damages Puente Park incurred include: 1) damages incurred from Puente Park’s original prepayment eligibility date until the date its Use Agreement rents were effective (August 31, 1990, to June 30, 1993); 2) damages incurred from the date of the Use Agreement to the date of the sale of the property to a HUD-approved purchaser (July 1, 1993, to November 29, 2001); and 3) damages incurred as a result of the reduced market value of the property at the time of the sale due to the continuing HUD restrictions on the property.

228. From August 31, 1990, to June 30, 1993, Puente Park received $72,211 in distributions while it was forced to continue operating under the restrictions required by its Regulatory Agreement. Had Puente Park been allowed to prepay its HUD-insured mortgage on

its 20-year prepayment eligibility date, exit the federal low-income housing program, and raise its rent to market levels at that time, Puente Park would have earned $1,256,923 in cash flows during that time. Therefore, Puente Park suffered $1,184,712 in nominal damages from August 31, 1990, to June 30, 1993, as a result of the taking of its prepayment right.

229. From July 1, 1993, to November 29, 2001, Puente Park received $5,915,964 in distributions under its Use Agreement. The benefits Puente Park received under the Use Agreement did not increase at the same rate as the rents Puente Park could have charged had it been allowed to free itself of HUD affordability restrictions. Had Puente Park been allowed to prepay its HUD-endorsed mortgage on its 20-year prepayment eligibility date, exit the federal low-income housing program, and raise its rent to market at that time, Puente Park would have earned $6,131,863 in cash flows during that time. Puente Park thus suffered nominal damages of $215,899 from July 1, 1993, to November 29, 2001, as a result of its Use Agreement.

230. Puente Park suffered additional damages when it sold the property on November 29, 2001, while the property remained under its Use Agreement. Puente Park received $9,900,938 for the property. Had the property been free of HUD restrictions, Puente Park would have received $12,077,054. Subtracting the purchase price actually received from the purchase price Puente Park could have received had the property been free of HUD restrictions results in nominal damages of $2,176,116.

G. **Interest on Just Compensation Award**

231. Plaintiffs are entitled to pre-judgment interest on any just compensation award. For Claremont Village, Covina West, Del Vista, Pioneer, and Puente Park (the sold properties), interest should be calculated from the end of the takings period (the date of the sale

of the property) until the date the damages are paid by the government at 10% to reflect the lost opportunity cost imposed on those Plaintiffs and the delay in payment.[23]

232. Ten percent is the appropriate rate to use to calculate interest from the date of the sale of the property until the date the damages judgment is paid by the government because it takes into account Plaintiffs' lost opportunity cost and the uncertainty surrounding when Plaintiffs will be compensated by the government for the taking of their property. Indeed, Plaintiffs have been waiting almost 18 years already, and it is not at all clear when the government finally will pay Plaintiffs just compensation, even after an award of damages in the present proceeding.[24]

233. Plaintiffs understand however that this Court has ruled that a Treasury STRIPS rate is the appropriate rate to use when calculating pre-judgment interest for similarly situated Plaintiffs. If the Court adopts a Treasury STRIPS rate in this case, the 20-year STRIPS rate is the appropriate measure given the fact that Plaintiffs will likely not be paid any just compensation until well over 20 years from the original date of the taking.

234. Including interest calculated at the 20-year STRIPS rate for Claremont Village, Covina West, Del Vista, Pioneer, and Puente Park, the present value of the damages award as of December 31, 2006, is $100,803,400, representing $6,962,833 for Claremont Village, $13,492,306 for Covina West, $10,089,067 for Del Vista, $23,351,704 for DeSoto, $13,733,366 for Kittridge I, $6,802,951 for Kittridge II, $7,791,461 for Oxford Park, $2,547,870 for Parthenia, $7,545,584 for Pioneer, and $8,486,258 for Puente Park. This total has increased

[23] Pre-judgment interest from the date of the taking to the date of the sale of the property is taken into account in the underlying damages amount because of the discounting/ bringing forward calculations. This interest should also be calculated at 10%.

[24] For DeSoto, Kittridge I, Kittridge II, Oxford Park, and Parthenia, pre-judgment interest is taken into account in the underlying damages amount because of the discounting/ bringing forward calculations. This interest should be calculated at 10%.

since December 31, 2006, and will continue to do so until the date damages are paid by the government.

## III. CONTENTIONS OF LAW

### A. Plaintiffs' Takings Claims Are Ripe For Review

235. In *Cienega VI*, the Court of Appeals held that Owners were not obligated to file futile requests for prepayment in order to ripen their takings claims. Therefore, the 38 non-Model Plaintiffs (of which Plaintiffs are a part) need only prove that it would have been futile to apply to HUD for permission to prepay their HUD-insured mortgages to prove ripeness. *Cienega VI*, 265 F.3d at 1248. Under both the rule of the mandate and binding precedent, Plaintiffs' takings claims are ripe for review unless this Court determines Plaintiffs could have satisfied ***each*** of the following statutorily-required criteria for prepayment under ELIHPA or LIHPRHA: (1) prepayment would not cause a rent increase of more than 10%; (2) prepayment would not materially affect the supply of low-income housing; and (3) prepayment would not displace current tenants. *See Cienega IX*, 67 Fed. Cl. at 460, n. 33 (acknowledging that the legal analysis regarding ripeness is binding precedent and law of the case for Set II Plaintiffs); *see also* 12 U.S.C. § 4108 (LIHPRHA); 24 C.F.R. § 248.141(a)(1); *compare* ELIHPA § 225, 12 U.S.C. § 1715*l* note.

236. Plaintiffs could not have satisfied ELIHPA or LIHPRHA's stringent requirements for prepayment and thus HUD lacked discretion to permit them to prepay. Indeed, Plaintiffs could not have satisfied ***any*** of the prepayment criteria required by ELIHPA or LIHPRHA, let alone all of them, because prepayment would have caused an increase in rent of over 10%, materially affected the supply of low-income housing, and displaced current tenants. *See* ¶¶ 67-81.

237. First, prepayment of Plaintiffs' HUD-insured mortgages would have caused the rents at Plaintiffs' properties to increase by more than 10%. In fact, HUD's own data demonstrates that prepayment would have caused rent increases ranging from 26.1% to 24.6% at Claremont Village; 74.2% to 94.4% at Covina West; 26.9% to 38.2% at Del Vista; 62.7% to 64.6% at DeSoto; 88.5% to 97.8% at Kittridge I; 52.5% to 67.4% at Kittridge II; 61.2% to 63.6% at Parthenia; 24.3% to 43.2% at Pioneer; and 54.1% to 71.8% at Puente Park.

238. Second, prepayment of Plaintiffs' HUD-insured mortgages would have materially affected the supply of low-income housing. This is evidenced by the fact that at the time of Plaintiffs' prepayment eligibility dates, each of the properties was operating at full occupancy and had a waiting list, as did other affordable housing in the vicinity of these properties. Furthermore, Plaintiffs' properties were located in low-vacancy areas which lacked a supply of affordable housing sufficient to accommodate displaced tenants. Indeed, the shortage of low-income housing in California was widely recognized and, as such, no prepayments were approved in any of the geographic locations where Plaintiffs' properties were located. Even Congress recognized the shortage of low-income housing in California and stated that "[t]he loss of units in such markets would be devastating to families and communities." S. Rep. No. 101-316, at 107 (1990), *reprinted in* 1990 U.S.C.C.A.N. 5763, 5869; *see also Cienega IX,* 67 Fed. Cl. at 460 (noting that the government's expert testified that in California, "[i]t was so hard to prove that [prepayment] would not adversely affect the supply of affordable housing," and that government counsel conceded that in California, "prepayment [under Section 4108] was unlikely," and thus holding that prepayment "would adversely affect the supply of housing for low-income tenants"). *Id.* at 461.

239. Third, if Plaintiffs were permitted to prepay their HUD-insured mortgages and raise their rents to market rates, current tenants who were unable to afford the increase in rents would be displaced.

240. Therefore, it would have been futile for Plaintiffs to apply to HUD for prepayment. Plaintiffs' claims are thus ripe for review. *See, e.g.*, *Cienega VI*, 265 F.3d at 1248; *Cienega IX*, 67 Fed. Cl. at 459-62.

**B. ELIHPA And LIHPRHA Effected A Taking Of Plaintiffs' Right To Prepay Their HUD-Insured Mortgages On Their Twenty-Year Prepayment Dates**

241. The government routinely regulates property interests, and it often may do so without affording compensation. However, "if regulation goes too far it will be recognized as a taking." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

242. Whether a regulation has "go[ne] 'too far'" and effects a taking is an "'essentially ad hoc factual inquir[y],'" *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (citation omitted), but the touchstone of the inquiry is whether the government has "forc[ed] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

243. In performing this inquiry, the Court must consider (i) the character of the governmental regulation, (ii) its economic impact, and (iii) the interference such regulation generates with the owner's distinct investment-backed expectations. *See Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978).

a. The Government's Actions In Enacting ELIHPA And LIHPRHA Have The Character Of A Taking

244. The first criterion of the *Penn Central* analysis "'requires that a reviewing court consider the purpose and importance of the public interest reflected in the regulatory imposition. In effect, a court [must] balance the liberty interest of the private property owner

against the Government's need to protect the public interest through imposition of the restraint.'" *Cienega VIII*, 331 F.3d at 1337-38 (quoting *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1176 (Fed. Cir. 1994)) (alteration in original); *see also Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 543 (2005) ("[T]he Takings Clause presupposes that the government has acted in pursuit of a valid public purpose.").

245. In *Cienega VIII*, the Court of Appeals held "as a matter of law," that ELIHPA's and LIHPRHA's abrogation of Model Plaintiffs' prepayment rights "had a character that supports a holding of a compensable taking." 331 F.3d at 1340. It explained:

> [t]he character of the government's action [in enacting ELIHPA and LIHPRHA] is that of a taking of a property interest, albeit temporarily … Unquestionably, Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing), but just as clearly, the expense was placed disproportionately on a few private property owners. Congress' objective in passing ELIHPA and LIHPRHA—preserving low-income housing—and method—forcing some owners to keep accepting below-market rents—is the kind of expense shifting to a few persons that amounts to a taking.

*Cienega VIII*, 331 F.3d at 1338-39 (footnote omitted).

246. *Cienega VIII*'s holding was not based on "facts unique to the parties . . . or facts that might vary from case to case." *City Line Joint Venture v. United States*, 71 Fed.Cl. 486, 493 (2006). Rather, it was based on the Court of Appeal's analysis of "facts of universal application"—namely, Congress's intent and the group upon whom the burden of the statutes fell. *Id.* Therefore, the character of the government's actions in enacting ELIHPA and LIHPRHA and appropriating owners' prepayment rights is settled law in this Circuit.

247. Even if the character of the government's action in enacting ELIHPA and LIHPRHA and appropriating owners' prepayment rights was not decided in this Circuit, the character is unquestionably that of a taking because the statutes (1) forced Plaintiffs to suffer a

physical occupation of their properties by government-approved tenants, depriving Plaintiffs of the core property rights of possession and control; (2) unfairly burdened certain providers of low-income housing with the societal cost of maintaining future low-income housing; and (3) greatly impaired Plaintiffs' core right to transfer or convey their properties at will. *See Cienega VIII*, 331 F.3d at 1338-39.

248. First, as the Supreme Court held in *Penn Central*, "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when the interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124 (citation omitted). By preventing Plaintiffs from prepaying their HUD-insured mortgages and requiring Plaintiffs to rent their properties at below-market rents only to government-approved low-income tenants, the core character of the government's actions in enacting ELIHPA and LIHPRHA was essentially of the same kind as a physical invasion of Plaintiffs' properties. The character of the governmental action in this case is practically identical to that of a holdover tenancy created when the federal government, usually acting through the Government Services Administration, refuses to vacate the property upon the expiration of a lease, conduct which has long been recognized to require just compensation. *See Cienega VIII*, 331 F.3d at 1338 ("We agree that the enactment of ELIHPA and LIHPRHA could fairly be characterized as akin to this type of physical invasion."); *see also Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986) (lessors have a claim under the Takings Clause when the government is a holdover tenant) (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949)).

249. Second, the statutes made no attempt to spread the costs of addressing the inability of substantial segments of the population to pay reasonable market-based rents across

the tax-paying public as a whole. Instead, they imposed these costs on a narrow category of landlords, requiring those landlords, and those landlords alone, to charge below-market rents. *See Cienega VIII*, 331 F.3d at 1338-39 (concluding that "forcing some owners to keep accepting below-market rents" to achieve the public purpose of maintaining the supply of low-income housing "is the kind of expense-shifting to a few persons that amounts to a taking."). Indeed, the stated goal of ELIHPA was "to preserve and retain to the maximum extent practicable as housing affordable to low income families or persons those privately owned dwelling units that were produced for such purpose with Federal assistance," ELIHPA § 202(b)(1), 12 U.S.C. § 1715*l* note, *i.e.*, to compel the current providers of low-income housing to continue providing it. The Takings Clause "was designed to bar Government from 'forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.'" *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 835 n.4 (1987) (citation omitted); *see also Cienega IX*, 67 Fed.Cl. at 466-68 (the statutes "target[ed] specific property owners . . . not all owners of rental properties or all taxpayers" and thus raised a concern under the Takings Clause).

250. Further, Plaintiffs did not cause or contribute to the social problem ELIHPA and LIHPRHA were enacted to address and therefore the statutes' substantial effects on Plaintiffs require just compensation. To ensure that government regulation does not unfairly impose public burdens on individual property owners, the courts have required a demonstration of a "cause-and-effect relationship between the property use restricted by the regulation and the social evil that the regulation seeks to remedy." *Pennell v. City of San Jose*, 485 U.S. 1, 20 (1988) (Scalia, J. concurring in part and dissenting in part). Where the property that the government seeks to regulate did not cause or contribute to the social problem, the regulation may be legitimately within the government's power, but its substantial effects on the property

require just compensation. *See, e.g.*, *Nollan*, 483 U.S. at 838 (holding that the imposition of an easement as a condition of issuance of a construction permit constituted a taking because the purpose was not reasonably related to a "public need or burden that the Nollans' new house create[d] or to which it contribute[d]"); *Dolan v. City of Tigard*, 512 U.S. 374, 392–95 (1994) (holding that the city could impose an easement on the petitioner's property for a public greenway, but, absent a showing that her proposed development "somehow encroached on existing greenway space in the city," the city would have to compensate her for the easement).

251. ELIHPA and LIHPRHA were designed to address the fact that the federal government was cutting back dramatically on its longstanding practice of funding new low-income housing programs. Therefore, the statutes were enacted to address a social problem caused by the federal government and its failure to fund programs to replace the affordable housing units that would be exiting the Section 221(d)(3) and 236 programs after 20 years. *See Cienega IX*, 67 Fed. Cl. at 466 (noting that the government's decision to terminate the Section 8 new construction program because it "was a burden to the budget" meant that new low-income housing was not being built to replace the Sections 221(d)(3) and 236 projects that would soon be eligible to exit the HUD programs). The government chose to address the social problem that resulted from its affirmative choice not to fund new supply-side housing programs by enacting ELIHPA and LIHPRHA, the net effect of which was to shift the financial cost of funding affordable housing to Plaintiffs and other private owners of Section 221(d)(3) and 236 properties.

252. Third, the character of the governmental action in enacting ELIHPA and LIHPRHA is that of a taking because the statutes drastically curtailed Plaintiffs' right to transfer or convey their properties, a fundamental indicum of ownership. In *Hodel v. Irving*, the Supreme Court found that a statute abrogating the common-law right to devise to one's heirs even a small

portion of a property interest was a taking—even absent a showing of economic harm or interference with investment-backed expectations—because the character of the government regulation was "extraordinary." 481 U.S. 704, 715–16 (1987). ELIHPA and LIHPRHA's elimination of Plaintiffs' ability to transfer their properties, except on government-approved terms to government-approved purchasers, constitutes a similarly extraordinary impairment of Plaintiffs' fundamental property rights. *See Cienega VIII*, 331 F.3d at 1338 (agreeing with this characterization of the statutes and holding that "[t]he character of the government's action is that of a taking of a property interest, albeit temporarily, and not an example of government regulation under common law nuisance or other similar doctrines, which we would treat differently"); *Cienega IX*, 67 Fed.Cl. at 467-68 (finding that the purpose and effect of the statutes was to impair the ability to convey property at will).

b. ELIHPA and LIHPRHA Caused Sufficiently Severe Economic Impact To Effect a Taking

253. The second criterion of the *Penn Central* analysis, the "economic impact of the regulation on the claimant, was intended to ensure that not every restraint imposed by government to adjust the competing demands of private owners would result in a takings claim." *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1176 (Fed. Cir. 1994). It is a "threshold requirement that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation." *Cienega VIII*, 331 F.3d at 1340 (quoting *Loveladies*, 28 F.3d at 1177).

254. There is no "an automatic numerical barrier preventing compensation . . . ." *Yancey v. United States*, 915 F.2d 1534, 1541 (Fed. Cir. 1990). Instead, a court must weigh *all* of the relevant considerations to determine whether the economic impact is sufficiently severe to constitute a regulatory taking. *Id.* (emphasis added).

255. The choice of a particular method of valuation is left to the discretion of the trial court. *Rose Acre Farms v. United States*, 373 F.3d.1177, 1190 (Fed. Cir. 2004). This Court has recognized that there are various "optional means of addressing economic impact, including (1) meas[uring] the claimant's return on equity against the return on equity the claimant would have received but for the taking," (2) "measuring . . . the claimant's recoupment of its capital," and (3) "compar[ing] . . . the value taken from the property with the value remaining in the property." *Cienega IX*, 67 Fed. Cl. at 474-75; *see also Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 879 (D.C. Cir. 1999) (a "regulation's economic effect upon the claimant may be measured in several different ways" including both change in "market value" and "reasonable rate of return") (emphasis omitted).

256. Notwithstanding the availability of three methods of calculating economic impact for a temporary taking, the Court of Appeals and this Court have both chosen to measure the economic impact of ELIHPA and LIHPHRA's abrogation of similarly situated plaintiffs' prepayment rights by calculating plaintiffs' percentage loss on their possible rates of return. *See Cienega VIII*, 331 F.3d at 1343 (holding that, as a result of LIHPRHA, Model Plaintiffs "earned a return that was about 96% less than what they could have earned by investing their money elsewhere" and that a loss "loss of 96% of the possible rate of return on the investment is, even under the most conservative view, a 'serious financial loss.'"); *Cienega IX*, 67 Fed. Cl. at 475 ("in the present case, the return-on-equity approach best measures the impact of ELIHPA and LIHPRHA on the plaintiffs."); *CCA Assocs. v. United States*, Slip Op. at 36 (holding, in a case involving a temporary taking similar in all respects to the taking at issue here, that "the return on equity approach provides the most appropriate measure of economic impact in this temporary taking case of an income-producing property.").

257. Indeed, after discussing the various possible means of evaluating the economic impact of a temporary taking nearly indistinguishable from the taking here, this Court held that the return-on-equity approach "best measure[d] the impact of ELIHPA and LIHPRHA on the plaintiffs." *Cienega IX*, 67 Fed.Cl. at 475-76. The Court explained that the return on equity approach avoids the unfairness that would result from using a change-in-value approach for income-producing properties. *Id.* at 476 (explaining that using the change-in-value method to measure the economic impact of a statute on an income producing property would improperly allow the government to "use the duration of the taking as a means to allow the capture of all value or return from a property for a period of a few years"). *See also, CCA Assocs.*, Slip Op. at 34, 36 (2007) ("[i]n the context of the preservation statutes, measuring the economic impact by assessing the change in fair market value runs the risk of substantially understating the effect on the owner's property interest" in part because it "tends to disregard the loss of the full income stream for a substantial period of time.").

258. In *Cienega VIII* and *Cienega IX*, respectively, the Court of Appeals and this Court measured the economic impact of ELIHPA and LIHPRHA using Owners' expert's model (the very same expert and model Plaintiffs rely on here) to determine the annual return on equity that plaintiffs were permitted under LIHPRHA (aggregate annual earnings divided by aggregate equity in the properties shortly after the prepayment eligibility date) and then compared that return to the return on the low-risk 30-year Fannie Mae bonds. 331 F. 3d at 1343; 67 Fed. Cl. at 475-76. The Court should evaluate the economic impact of ELIHPA and LIHPRHA using Owners' model here as well.

259. This model demonstrates that ELIHPA and LIHPRHA caused Plaintiffs to experience severe financial losses; on average, a diminution-in-investment return of 96.9%.

Individually, Plaintiffs suffered the following diminution-in-investment returns: Claremont Village, 96.4%; Covina West, 97.7%; Del Vista, 96.6%; DeSoto, 96.5%; Kittridge I, 98.1%; Kittridge II, 97.1%; Oxford Park, 97.2%; Parthenia, 98.1%; Pioneer, 94.9%; and Puente Park, 97.5%. As the Court of Appeals held in *Cienega VIII*, the "loss of 96% of the possible rate of return on the investment is, even under the most conservative view, a 'serious financial loss.'" *Cienega VIII*, 331 F.3d at 1343. Therefore, ELIHPA and LIHPRHA caused Plaintiffs severe economic harm by preventing Plaintiffs from raising their rents to market rates at their 20-year prepayment eligibility dates.

c. ELIHPA And LIHPRHA Frustrated Plaintiffs' Distinct, Reasonable, and Investment-Backed Expectations

260. The third prong of the *Penn Central* test is intended to "limit recoveries to property owners who can demonstrate that 'they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.'" *Cienega VIII*, 331 F.3d at 1345-46 (quoting *Loveladies*, 28 F.3d at 1177). The critical question in this analysis is "whether a reasonable developer confronted with the particular circumstances facing the Owners would have expected the government to nullify the twentieth-year prepayment right in the mortgage contract and in the regulations." *Id*. at 1346. The Court must consider both subjective and objective expectations.

261. It is well-settled that if Plaintiffs invested "in reliance on a state of affairs that did not include the challenged regulatory regime," they satisfy the subjective element of *Penn Central*'s reasonable investment-backed expectations standard. *Maritrans v. United States*, 342 F.3d 1344, 1358 (Fed. Cir. 2003) (citation omitted). That is the case here.

262. At the time Plaintiffs entered into the Section 221(d)(3) and 236 programs, Plaintiffs expected to be able to – and intended to – prepay their mortgages on their 20-year

prepayment eligibility dates without HUD approval. Plaintiffs would not entered into these programs but for the right to prepay the mortgages after 20 years. Consistent with this expectation and intention, Plaintiffs developed high-quality properties in high-quality neighborhoods that would, upon prepayment after 20 years, attract tenants who would pay market rents that far exceeded the HUD-regulated below-market rents Plaintiffs were obligated to charge for the first 20 years. Plaintiffs paid premiums for property sites in middle-class areas, constructed high-quality buildings, and maintained their properties with the same care as the market-rate apartments the Partners also owned so they could realize the appreciation and increased rental rates after the 20 years they were obligated to remain in the HUD program. Plaintiffs intended to own their properties on and after their prepayment eligibility dates, to prepay their loans after 20 years, and to convert their properties to conventional apartment complexes at that time.

263. Plaintiffs' expectations regarding their rights to prepay their mortgages were based in part on the express language in their Notes, which were printed on HUD forms, reviewed by HUD, and endorsed by HUD, and provided that Plaintiffs could prepay their mortgages after 20 years without HUD approval. Plaintiffs' expectations were also based on HUD's then-existing regulations which were incorporated by reference into the Regulatory Agreements and expressly permitted prepayment after 20 years. *See* 24 C.F.R. § 236.30 (1970); *accord* 24 C.F.R. § 221.524(a)(1)(ii) (1970).

264. Additionally, Plaintiffs' expectations were based on the fact that prepayment was a fundamental aspect of the Section 221(d)(3) and 236 programs. Although Plaintiffs anticipated minor regulatory changes in the programs, Plaintiffs did not expect that the programs would be fundamentally altered such that one of the primary incentives offered to

induce them (and other developers) to enter into these programs would be completely stripped away.

265. Moreover, Plaintiffs expected that their properties would be replaced by new low-income housing funded by new federal government housing programs. Indeed, at the time Plaintiffs entered into their Regulatory Agreements, it was the federal government's normal practice to enact new housing programs to replace older low-income housing programs.

266. Therefore, Plaintiffs "are the type of landowners who bought their property and entered into contracts in reliance on a different regulatory regime." *Cienega VIII*, 331 F.3d at 1347; *see also Cienega IX*, 67 Fed.Cl. at 471 (finding that Set II Plaintiffs "expected to prepay when they invested in their properties").

267. Plaintiffs' subjective expectations regarding their 20-year prepayment rights were objectively reasonable. Indeed, a reasonable developer in Plaintiffs' circumstances would have believed that the prepayment right was guaranteed by the mortgage contracts because the contracts – which were prepared, reviewed, and approved by HUD – expressly provided for an unfettered right to prepay the mortgages after 20 years. Moreover, the prepayment right provided in the contracts was consistent with the then-existing HUD regulations that expressly granted developers the right to prepay their mortgages after 20 years. The Court of Appeals has held that a prepayment term in a mortgage contract that "[gives] the duration of a business arrangement with limited profit" and "[is] consistent with (and identical to) the relevant regulation, if not also explicitly prescribed by the agency, is one that gives rise to *reasonable* expectations of fulfillment of the contract term." *Cienega VIII*, 331 F.3d at 1348-49 (emphasis added). *See also*, *Cienega IX*, 67 Fed. Cl. at 474 (holding that plaintiffs' expectations of prepaying their mortgages were "reasonable given the deed of trust notes, the existing

regulations, the type of properties involved, the location of the properties, and the importance of an exit strategy in entering such a program."); *CCA Assocs.*, Slip Op. at 31 (same).

268. Further, when Plaintiffs entered into the Section 221(d)(3) and 236 programs the government gave no indication that it intended to abrogate the right to prepay. Instead, the government touted the right to prepay as a fundamental aspect of the HUD programs. A reasonable developer would therefore not have expected the government to abrogate the prepayment right which was a fundamental aspect of the Section 221(d)(3) and 236 programs and was one of the government's primary means of attracting developers to the programs.

269. Indeed, this Court has found that numerous reasonable developers believed that they would be able to prepay their HUD insured mortgages on their 20-year prepayment eligibility dates. *See, e.g., Cienega IX*, 67 Fed. Cl. at 472 (holding that the Chancellor Manor Plaintiffs reasonably believed they would be able to prepay after 20 years); *CCA Assocs*., Slip Op. at 28-33 (holding that the plaintiff, a developer and owner of a Section 221(d)(3) property, reasonably expected to be able to prepay its mortgage on its 20-year prepayment eligibility date).

270. Reasonable prudent investors would require and rely on an exit date so that they could calculate the benefits of entering into the program. As the Court of Appeals observed in *Cienega VIII*, "by fixing an exit date from participation in the programs, the prepayment right would be a significant factor in the calculation of the total profit that could be expected over the lifetime of the investment in the property." 331 F.3d at 1349.

271. Moreover, a reasonable developer would have believed that, consistent with the federal government's long-established practice of enacting new federal housing

programs, HUD would replace the aging Section 221(d)(3) and 236 housing stock with new housing programs. Nothing in the overall state of the law at the time Plaintiffs entered their original mortgage contracts would suggest a contrary result.

272. A developer's otherwise reasonable expectations regarding prepayment would not be made unreasonable because of the possibility of regulatory change. A prepayment term in a contract that fixes an end date from participation in a HUD program is a

> significant factor in the calculation of the total profit that could be expected over the lifetime of the investment in the property. The prepayment right specifies at what year revenue from the property could potentially be increased through higher rental rates, sale or refinancing. This total profit calculation would, in turn, determine whether a developer decided to participate in the program in the first place. Because without the prepayment right the developers might have earned more profit investing elsewhere and therefore have declined to enter the programs, abrogation of this right would not reasonably be expected simply because the regulations were amendable or subject to legislative alteration.

*Id*. at 1349.

273. Therefore, Plaintiffs' expectations that the government would respect their contractual rights to prepay their mortgages after 20 years and exit the HUD program were both reasonable and investment-backed.

### C. Plaintiffs Are Entitled To Just Compensation For The Taking Of Their Property

#### a. Plaintiffs Are Entitled To Just Compensation For The Damages They Suffered From The Date Of The Taking Until The Date They Entered Into Use Agreements

274. Just compensation under the Fifth Amendment is "the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken." *United States v. Miller*, 317 U.S. 369, 373 (1943) (footnote omitted). The proper measure of just compensation for a temporary taking of rental property is the fair market rent that the landowner could have

earned on the property during the takings period. *See, e.g., United States v. Petty Motor Co.,* 327 U.S. 372, 381 (1946); *United States v. Gen. Motors Corp.*, 323 U.S. 373, 379 (1945); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5-7 (1949).

275. Determination of a market rent is a speculative endeavor because there is often no ready market for the type of property taken by the government. *See Independence Park IV*, 465 F.3d at 1311 (citing *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950)) ("As the Supreme Court has recognized, the task of measuring just compensation can be difficult in certain instances and is not amenable to a rigid formula."). Market rent is nonetheless the proper measure of just compensation for a temporary taking. *See Kimball Laundry*, 338 U.S. at 6 ("[S]ince a transfer brought about by eminent domain is not a voluntary exchange, this amount can be determined only by a guess, as well informed as possible, as to what the equivalent would probably have been had a voluntary exchange taken place.").

276. The rental value can "'be measured in various ways depending upon the circumstances of each case and … no general formula should be used for the purpose.'" *Bass Enters. Prod. Co. v. United States*, 48 Fed. Cl. 621, 624 (2001) (quoting *United States v. Miller*, 317 U.S. 369, 373-74 (1943)). Therefore, courts determine the fair market rental value using whatever method will make the plaintiff whole. *See, e.g., Independence Park I,* 61 Fed. Cl. at 706-08 (holding that the proper measure of the fair market rent for Model Plaintiffs' right to prepay their mortgages and free themselves from HUD restrictions is the difference between the rents Model Plaintiffs received under the HUD programs and the rents they could have received had they been permitted to prepay their HUD-insured mortgages and raise their rents to market rates on their prepayment eligibility dates); *Petty Motor*, 327 U.S. at 381 (holding that the appropriate measure of the fair market rent for the plaintiff's leasehold interest in a building

where it was operating its business is the difference between "the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew … less the agreed rent which the tenant would pay for such use and occupancy"); *Gen. Motors*, 323 U.S. at 382 (holding that the fair market rent for General Motor's right, pursuant to a long-term lease agreement, to occupy a building that was equipped for its business is "the market rental value of such a building on a lease by the long-term tenant to the temporary occupier").

277. The fair market rental value of the property taken from Plaintiffs is the rental income they lost as a result of their inability to prepay their loans on their prepayment eligibility dates and free themselves of the HUD-imposed restrictions on rents. *See, e.g.*, *Independence Park I*, 61 Fed. Cl. at 708 (holding that "plaintiffs' foregone rent increases are the best available indicator for determining just compensation"); *Kimball Laundry*, 338 U.S. at 9 ("The market value of land as a business site tends to be as high as the reasonably probable earnings of a business there situated would justify …."); *Am. Pelagic Fishing Co., L.P. v. United States*, 55 Fed. Cl. 575, 594 (2003) (holding that "[i]n a competitive market, the revenue stream that [the plaintiff's fishing vessel] probably could have achieved is equivalent to the amount that a potential lessee would have been willing to pay in order to rent the vessel"), *vacated on other grounds*, 379 F.3d 1363 (Fed. Cir. 2004).

278. As described in ¶¶ 104-15 *supra*, Dr. Peiser's model conservatively measures the rental income Plaintiffs lost from the date of the taking until the date they entered into Use Agreements by subtracting the net rental income that Plaintiffs received in the HUD-Restricted Scenario from the rental income Plaintiffs would have received in the Market Scenario. Dr. Peiser's model measures the rental value that a hypothetical lease would have paid

for Plaintiffs' right to prepay their mortgages and convert to conventional properties on their prepayment eligibility dates.

279. As described in ¶¶ 106-12 *supra*, LARSO would not have barred Los Angeles Plaintiffs from raising their rents to market upon prepayment and therefore LARSO would not have had a significant effect on what Los Angeles Plaintiffs' would have earned in the Market Scenario (or, ultimately, Los Angeles Plaintiffs' damages). *See Independence Park III,* 449 F.3d at 1242 ("[i]n order to determine the degree of the loss caused by LIHPRHA, it is necessary to look to . . . whether LARSO would have prevented the plaintiffs from raising the rents in their rental properties even if they had been free to prepay their mortgages."). As evidenced by what actually happened after the HOPE Act was enacted in 1996, the Housing Authority of the City of Los Angeles, in order to prevent massive tenant displacement, would have provided Section 8 certificates at market rates to the tenants at properties that were prepaying their HUD-insured mortgages and exiting the HUD programs. These certificates were exempt from LARSO. Thus, the initial rent bump from below-market HUD rents to near conventional market rents (as assumed in Dr. Peiser's model) would have been exempt from LARSO restrictions. Dr. Peiser's model also fully takes into account the effect of LARSO on units occupied by tenants who would not have qualified for Section 8 certificates. For these tenants, LARSO would restrict rent increases until such time as the tenant voluntarily vacated the unit, at which time the rent would go to market. Thus, Dr. Peiser's model fully takes into account the effects of LARSO on Los Angeles Plaintiffs.

280. Additionally, the sections of LARSO on which the government will likely rely in arguing that LARSO would have prevented Los Angeles Plaintiffs from raising their rents to market upon prepayment (§§ 151.02 and 151.06) did not apply to DeSoto and Kittridge I, as

their prepayment eligibility dates preceded the relevant amendments to those sections. If not for ELIHPA and LIHPRHA, DeSoto would prepaid its mortgage and raised its rents to market on November 2, 1990, and Kittridge I would have done so on January 22, 1989. The relevant amendments to LARSO §§ 151.02 and 151.06 (which limited initial rents and excluded formerly exempt units from vacancy decontrol) were not effective until November 22, 1990, and therefore, those sections, as amended, would not have applied to DeSoto or Kittridge I. Therefore, even if the Housing Authority of the City of Los Angeles did not issue LARSO-exempt certificates (which is unlikely), LARSO would not have prevented either DeSoto or Kittridge I from raising their rents to market rates upon prepayment.

281. Dr. Peiser's model thus accurately measures the "full and perfect equivalent in money of the property taken." *Miller*, 317 U.S. at 373. The Court of Appeals and this Court relied on Dr. Peiser's model in *Cienega VIII*, *Cienega III*, *Independence Park I*, and *Cienega IX* and this Court should do so here as well.

b. Plaintiffs Are Entitled To Just Compensation For The Damages They Suffered As A Result Of Their Use Agreements

282. It is settled in this Circuit that owners of Section 221(d)(3) and 236 properties who entered into Use Agreements prior to the enactment of the HOPE Act are entitled to just compensation for the damages they suffered (and continue to suffer) as a result of their Use Agreements. In *Independence Park III*, the Court of Appeals held that "the calculation of damages [for the taking of the plaintiffs' prepayment right] should … treat the ban on prepayment as lasting as long as the use agreements provided for, with the amount of the damages adjusted to account for any benefits [plaintiffs] obtained as a result of the use agreements." 449 F.3d at 1248. The government challenged the Court of Appeals's holding in this regard on rehearing, arguing that plaintiffs "voluntarily" entered into the Use Agreements

and therefore, the existence of Use Agreements cannot extend plaintiffs' damages past the enactment of the HOPE Act. The Court of Appeals emphatically rejected the government's challenge and reiterated its prior holding. *Independence Park III*, 449 F.3d at 1247. The Court stated that "[o]nce the plaintiffs had signed the use agreements…the passage of the HOPE Act was irrelevant to them" and that "the effect of the use agreements was to ensure that the taking of the prepayment right would remain in effect." *Id.* at 1248

283. Additionally, this Court held that similarly-situated property owners who entered into Use Agreements prior to the enactment of the HOPE Act are entitled to compensation for the damages they suffered as a result of those Use Agreements. *See Cienega IX*, 67 Fed. Cl. at 483.

284. Similar to the plaintiffs in *Independence Park* and *Cienega IX*, Plaintiffs entered into Use Agreements prior to the enactment of the HOPE Act. At the time Plaintiffs entered into their Use Agreements, they were prohibited from prepaying their mortgages by ELIHPA and LIHPRHA. As the Court of Appeals has noted with regard to similarly situated plaintiffs,

> [d]eclining to enter the use agreements … would not have left [plaintiffs] free to prepay their mortgages and leave the low-income housing program. In fact…if [plaintiffs] had not entered into the use agreements but had continued to litigate their takings claims – and the HOPE Act had never been enacted – the government would likely have been able to argue that the plaintiffs were not entitled to the full measure of their damages in the takings case because they had failed to mitigate their damages by accepting the benefits of the use agreements. Once the plaintiffs entered into the use agreements, which locked them into the low-income housing program, any subsequent lifting of the statutory ban on prepayment of mortgages became irrelevant to them.

*Independence Park IV*, 465 F.3d at 1310. Because Plaintiffs faced a statutory ban on prepayment that dictated the only options (and mitigation measures) available to Plaintiffs, Plaintiffs entered into Use Agreements under which they have (and continue to) suffer damages.

285. Plaintiffs did not know that Congress was considering granting owners a new, albeit less valuable, prepayment right at the time they entered into their Use Agreements. Thus, they reasonably believed that if they wanted to retain ownership of their properties, they would be forced to either operate under the restrictions of their Regulatory Agreements for the remaining life of the 40-year mortgage or enter into Use Agreements, under which they could receive increased (but not market) returns.[25]

286. As noted in ¶¶ 81-82 the government refused to allow Plaintiffs to terminate their Use Agreements and prepay their mortgages after the HOPE Act was enacted. The existence of the Use Agreements and the government's refusal to release Plaintiffs from those agreements after the HOPE Act was enacted meant that the enactment of the HOPE Act was irrelevant to Plaintiffs, and to any calculation of just compensation to which they are due. *See Independence Park III*, 449 F.3d at 1247-1248 (holding that "[o]nce the plaintiffs had signed the use agreements…the passage of the HOPE Act was irrelevant to them" and that "the effect of

---

[25] Because Plaintiffs wanted to recover the full measure of damages caused by the taking of their prepayment rights, Plaintiffs had to enter into Use Agreements because "a plaintiff seeking just compensation from the Government has the duty to mitigate his damages." *Heydt v. United States*, 38 Fed. Cl. 286, 310 (1997). *See also 767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1584 (Fed. Cir. 1995) (reasoning that the plaintiff's failure to explore all possible uses of its property during the relevant period "serves to bar any regulatory taking claim"); *Shelden v. United States*, 34 Fed. Cl. 355, 373 (1995) (holding that plaintiffs could not recover late charges associated with the government's taking of their property because the plaintiffs "had an obligation to mitigate damages by paying on time"). Therefore, Plaintiffs were obligated to enter into Use Agreements whose non-negotiable terms required Plaintiffs to continue in the low-income housing program for the remaining terms of their mortgages.

the use agreements was to ensure that the taking of the prepayment right would remain in effect.").

287. The damages Plaintiffs suffered (and continue to suffer) beyond their prepayment eligibility dates are a direct result of their Use Agreements, as those damages are (and continue to be) the difference between the conventional rents Plaintiffs could have received had they been permitted to prepay and the below-market rents they actually received (and continue to receive) under the Use Agreements.

288. Claremont Village, Covina West, Del Vista, Pioneer, and Puente Park suffered additional damages as a result of their Use Agreements when they sold the properties while the properties were still encumbered by Use Agreements. When these partnerships sold their respective properties, the existence of the Use Agreements (and the accompanying HUD restrictions on the properties) depressed the properties' market values. Because Claremont Village, Covina West, Del Vista, Pioneer, and Puente Park's entry into Use Agreements was a direct result of the government's taking, the damages these plaintiffs suffered as a result of the depressed sales price flow directly from the taking. Therefore, in order to put these Plaintiffs in the position they would have been but for the taking, these damages should be included in the just compensation award.

### D. Plaintiffs Are Entitled To Compound Interest As A Component Of Just Compensation

289. As a component of just compensation, Plaintiffs are entitled to pre- and post-judgment interest on the just compensation award.[26] When the government takes an

---

[26] For DeSoto, Kittridge I, Kittridge II, Oxford Park, and Parthenia, pre-judgment interest is taken into account in the underlying damages amount because of the discounting / bringing forward calculations. As discussed in ¶¶ 231-34, *supra*, this interest during the takings period should be calculated at 10%. And, for Claremont Village, Covina West, Del Vista, Pioneer, and

individual's property and does not compensate the property owner at the time of the taking, "the owner is entitled to interest [on the compensation] sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 10 (1984). "Owners of property taken by the government are entitled to interest from the date the taking became effective until paid by the government." *Shelden v. United States*, 34 Fed. Cl. 355, 378 (1995). The determination of the proper interest rate is a matter for the trier of fact. *See Studiengesellschaft Kohle v. Dart Indus., Inc*., 862 F.2d 1564, 1580 (Fed. Cir. 1988).

290. Claremont Village, Covina West, Del Vista, Pioneer, and Puente Park (the sold properties) should be awarded interest from the end of the takings period (date of the sale) until the date the damages are paid by the government at 10%, compounded annually. Ten percent is the appropriate rate to use to calculate interest because it reflects Plaintiffs' lost opportunity cost. Plaintiffs are small partnerships of individuals and their ability to conduct business depends on their access to capital, which has been materially impacted by the government's taking. The funds taken by the government represent a significant loss of capital which Plaintiffs require in order to conduct their business. As a result of the government's taking, Plaintiffs lost the opportunity to reinvest the funds in other income-producing properties. Plaintiffs could not have replaced those funds by borrowing at a risk-free rate.

291. Additionally, a 10% rate compensates Plaintiffs for the uncertainty surrounding when they will be paid damages by the government for the taking of their property. Indeed, Plaintiffs have been waiting nearly two decades already, and it is not at all clear when

---

Puente Park, pre-judgment interest from the original prepayment eligibility date to the end of the takings period (the date of the sale of the property) is taken into account in the underlying damages amount because of the discounting / bringing forward calculations. As discussed in ¶¶ 231-34, *supra*, this interest should also be calculated at 10%.

the government will finally pay Plaintiffs their just compensation, even after damages are awarded in the present proceeding.

292. Plaintiffs acknowledge that this Court has ruled that a Treasury STRIPS rate is the appropriate rate to use when calculating pre-and post-judgment interest following the takings period for similarly situated Plaintiffs. *Cienega IX*, 67 Fed. Cl. at 492-44. If the Court adopts a Treasury STRIPS rate for the calculation of interest from the date of the sale until the date of judgment for Claremont Village, Covina West, Del Vista, Pioneer, and Puente Park, the 20-year STRIPS rate is the appropriate measure because Plaintiffs will likely not be paid any just compensation until well over 20 years from the original date of the taking. Similarly, and for the very same reasons, the 20-year STRIPS rate is the appropriate post-judgment interest rate to be applied to all Plaintiffs' judgments until the date they are ultimately paid by the government.

The interest should be compounded annually to properly compensate Plaintiffs for the delay in the payment of just compensation. As the Court of Appeals has held, "based on the facts and circumstances in a particular case, compound interest may more nearly fit with the policy 'to accomplish complete justice as between the plaintiff and the United States' under the just compensation clause of the Fifth Amendment." *Dynamics Corp. of Am. v. United States*, 766 F.2d 518, 520 (Fed. Cir. 1985) (footnote and citation omitted). Compounding is "a routine means by which a reasonable person would protect [himself or herself], over an extended period of time, from erosion of [his or her] investment." *Vaizburd v. United States*, 61 Fed. Cl. 257, 263 (2005).

This Court has repeatedly held that when payment of an award is delayed for a long period of time, compound interest is required to fully compensate the owner. *See, e.g.*, *Independence Park I*, 61 Fed. Cl. at 717-18 (holding that a delay in excess of a decade requires

the award of compound interest); *CCA Assocs.*, Slip. Op. at 48 (awarding plaintiff compound interest because of the "lengthy passage of time since of the end of the taking" and because, "had the government properly compensated [plaintiff on its prepayment eligibility date], [plaintiff] would have reinvested that money"); *see also Whitney Benefits, Inc. v. United States*, 30 Fed. Cl. 411, 415 (1994) (holding that "because of the long delay since the date of taking in this case, the award of compound interest is not only proper[,] but its denial would effectively undercut the protections of the fifth amendment to our Constitution"). Compound interest is necessary to compensate for the delay in payment, because

> [d]elay in payment entails more than delay in possession of the award. It also necessarily means delay in the use of the money. Full compensation, then, requires that a [property owner] whose award has been delayed be compensated for his inability to utilize his money. A [property owner] cannot reinvest the increased value of his property when he possesses neither his property nor its monetary worth.

*ITT Corp. v. United States*, 17 Cl. Ct. 199, 240 (1989); *see also Cienega IX*, 67 Fed. Cl. at 493 (holding plaintiffs "must be awarded compound interest to satisfy the constitutional requirements of just compensation").

Compound interest is particularly appropriate in this case because almost two decades have elapsed since the government took Plaintiffs' property. Failing to allow for compounding would "'retroactively reduce the value of just compensation'" due to Plaintiffs. *Whitney Benefits*, 30 Fed. Cl. at 415 (citation omitted).

Moreover, compound interest is necessary to adequately compensate Plaintiffs because Plaintiffs would have invested the funds that were taken from them and received compound interest on those investments. *See, e.g., Independence Park I*, 61 Fed. Cl. at 717 (holding that the "usage factor" supports an award of compound interest because plaintiffs "'have an ongoing business, and their business is driven by equity'" (citing transcript)); *Cienega*

*IX*, 67 F.3d at 493 (plaintiffs "would have reinvested the money in some manner had the government paid them at the end of the taking"). Additionally, the property taken from Plaintiffs was income-producing property and the taking of income-producing property necessitates the award of compound interest. *See, e.g.*, *Whitney Benefits*, 30 Fed. Cl. at 415-16 ("Income-producing property would generate an income stream that would be available for continual reinvestment, at compound rates. Just compensation requires the payment of compound interest to replace the investment opportunities plaintiffs lost when the government took their property."). Therefore, compound interest is necessary to place Plaintiffs in the same position pecuniarily that they would have occupied if not for the government's taking of their prepayment right.

**CONCLUSION**

For the foregoing reasons, Plaintiffs should be awarded damages in the amount of $100,803,400 representing (1) $6,962,833 for Claremont Village, $13,492,306 for Covina West, $10,089,067 for Del Vista, $7,545,584 for Pioneer, and $8,486,258 for Puente Park (plus compound interest calculated from December 31, 2006, to the date the judgment is paid by the government) and (2) $23,351,704 for DeSoto; $13,733,366 for Kittridge I; $6,802,951 for Kittridge II; $7,791,461 for Oxford Park; $2,547,870 for Parthenia (updated to the date of judgment and including compound interest until the judgment is paid); and other appropriate relief as determined by this Court, including attorneys' fees, expert fees, and expenses to be determined at a later date.

Dated: February 15, 2007

Respectfully submitted,

By s/ Everett C. Johnson, Jr.

Everett C. Johnson, Jr.
LATHAM & WATKINS
555 11th St., NW
Suite 1000
Washington, DC 20004
Tel (202) 637-2200
Fax (202) 637-2201

Attorneys for Set III Plaintiffs