**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CLAREMONT VILLAGE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 94-10002C; 94-10003C; 94-** |
| **v.** | ) | **10005C; 94-10006C; 94-10007C; 94-** |
| | ) | **10008; 94-10010C; 94-10020C; 94-** |
| **UNITED STATES,** | ) | **10030C; 94-10040C (consolidated)** |
| | ) | **Judge Lettow** |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFFS' POST-TRIAL MEMORANDUM OF PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW**

Everett C. Johnson
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Fax: (202) 637-2201

# TABLE OF CONTENTS

I. INTRODUCTION ....................1

II. PROPOSED FINDINGS OF FACT ....................1

A. Regulatory Background ....................1

B. Plaintiffs' Properties ....................7

C. ELIHPA and LIHPRHA ....................14

D. Plaintiffs' Use Agreements ....................21

E. Plaintiffs' Financial Losses Resulting From ELIHPA And LIHPRHA ....................28

F. Just Compensation ....................30

1. Los Angeles Rent Stabilization Ordinance ....................35

2. Interest on Just Compensation Award ....................38

III. PROPOSED CONCLUSIONS OF LAW ....................39

A. Plaintiffs' Takings Claims Are Ripe For Review Because Filing A Request For Prepayment Would Have Been Futile ....................39

B. ELIHPA And LIHPRHA Effected A Temporary Regulatory Taking Of Plaintiffs' Rights To Prepay Their HUD-Insured Mortgages On Their Twenty-Year Prepayment Eligibility Dates ....................41

1. ELIHPA And LIHPRHA Have The Character Of A Taking ....................42

a. Evidence Adduced At Trial Reinforces The Federal Circuit's Holding That The Government's Actions In Enacting ELIHPA And LIHPRHA Had The Character Of A Taking ....................42

b. The Government Adduced No Evidence That Undermines The Federal Circuit's And This Court's Conclusion That The Enactment Of ELIHPA And LIHPRHA Have The Character Of A Taking ....................46

2. ELIHPA And LIHPRHA Caused Sufficiently Severe Economic Impact To Effect A Taking ....................48

a. The Evidence Adduced By Plaintiffs Regarding Plaintiffs' Losses On Their Rates Of Return Is Sufficient As A Matter Of Law To Demonstrate Serious Financial Loss ..........................48

b. The Government Failed To Demonstrate That Plaintiffs' Economic Impact Analysis Is Not The Correct Method Of Measuring The Economic Impact Of ELIHPA And LIHPRHA On Plaintiffs..............................................................51

(1) The Government Fails To Demonstrate That The Return-On-Equity Measure Is Unsound ............................51

(2) The Sale Option Does Not Diminish Plaintiffs' Economic Impact ............................................................54

(3) LARSO Does Not Alter The Economic Impact Analysis..............................................................................57

c. Alternatively, Even If This Court Were To Apply A Change-In-Value Model, The Court Should Nevertheless Find Plaintiffs Suffered A Severe Economic Impact.....................59

d. Whether This Court Applies A Return-on-Equity or Change-in-Value Approach, The Court Should Nevertheless Find An Unconstitutional Taking As A Matter Of Law ..........................................................................60

3. ELIHPA And LIHPRHA Frustrated Plaintiffs' Distinct, Reasonable, and Investment-Backed Expectations..................................62

a. At All Times, Plaintiffs Expected To Exercise Their Prepayment Rights On The Twenty-Year Prepayment Eligibility Dates ..................................................................62

b. Plaintiffs' Expectations Of Exercising Their Prepayment Rights On The Twenty-Year Prepayment Eligibility Dates Were Objectively Reasonable......................................................66

C. Plaintiffs Are Entitled To Just Compensation For The Taking Of Their Property.............................................................................................68

1. Plaintiffs Are Entitled To Just Compensation For The Damages They Suffered From The Date Of The Taking Until The Date They Either Sold The Property Or The End Of The Use Agreement .................68

2. Plaintiffs Are Entitled To Compound Interest As A Component Of Just Compensation .........................................................................72

IV. CONCLUSION.............................................................................................75

## TABLE OF AUTHORITIES

### CASES

*Allenfield Associates v. United States*,
40 Fed. Cl. 471 (1998) ....................................................................................45

*America Federal Bank, FSB v. United States*,
72 Fed. Cl. 586 (2006) ....................................................................................54

*America Pelagic Fishing Co., L.P. v. United States*,
55 Fed. Cl. 575 (2003) ....................................................................................70

*Armstrong v. United States*,
364 U.S. 40 (1960)..........................................................................................42

*Asia N. America Eastbound Rate Agreement v. Pac. Champion Service Corp.*,
864 F. Supp. 195 (D.D.C. 1994) ....................................................................54

*Bass Enterprises Prod. Co. v. United States*,
48 Fed. Cl. 621 (2001) ....................................................................................69

*CCA Associates v. United States*,
75 Fed. Cl. 170 (2007) ..........................................................................49, 54, 67, 74

*Cienega Gardens v. United States*,
67 Fed. Cl. 434 (2005) .............................................................................. *passim*

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed Cir. 2003)...................................................................... *passim*

*Cienega Gardens v. United States*
265 F.3d 1237 (Fed Cir. 2001)..................................................................39, 40, 41

*City Line Joint Venture v. United States*,
71 Fed. Cl. 486 (2006) ....................................................................................43

*District Intown Properties Ltd. Partnership v. District of Columbia*,
198 F.3d 874 (D.C. Cir. 1999) ........................................................................48

*Hodel v. Irving*,
481 U.S. 704 (1987)..................................................................................... *passim*

*Independence Park Apartments v. United States*,
61 Fed. Cl. 692 (2004) ............................................................................... *passim*

*Independence Park Apartments v. United States*,
465 F.3d 1308 (Fed. Cir. 2006)....................1, 68

*Independence Park Apartments v. United States*,
449 F.3d 1235 (Fed. Cir. 2006)....................70

*ITT Corp. v. United States*,
17 Cl. Ct. 199 (1989)....................74

*Kimball Laundry Co. v. United States*,
338 U.S. 1 (1949)....................45, 68, 69, 70

*Kirby Forest Industrial, Inc. v. United States*,
467 U.S. 1 (1984)....................72

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992)....................42, 61

*Maritrans v. United States*,
342 F.3d 1344 (Fed. Cir. 2003)....................62

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001)....................42

*Penn Central Transport Co. v. City of New York*,
438 U.S. 104 (1978).................... *passim*

*Prudential Insurance Co. of America v. United States*,
801 F.2d 1295 (Fed. Cir. 1986)....................45

*Rose Acre Farms v. United States*,
75 Fed. Cl. 527 (2007)....................50

*Rose Acre Farms v. United States*,
373 F.3d 1177 (Fed. Cir. 2004)....................48, 50

*Shelden v. United States*,
34 Fed. Cl. 355 (1995)....................72

*Studiengesellschaft Kohle v. Dart Industrial, Inc.*,
862 F.2d 1564 (Fed. Cir. 1988)....................72

*Suitum v. Tahoe Reg'l Planning Agency*,
520 U.S. 725 (1997)....................55

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002).....53

*United States v. General Motors Corp.*,
323 U.S. 373 (1945).....45, 68, 69

*United States v. Miller*,
317 U.S. 369 (1943).....68, 72

*United States v. Petty Motor Co.*,
327 U.S. 372 (1946).....68, 69

*United States v. Pewee Coal Co.*,
341 U.S. 114 (1951).....45

*Whitney Benefits, Inc. v. United States*,
752 F.2d 1554 (Fed Cir. 1985).....54

*Whitney Benefits, Inc. v. United States*,
926 F.2d 1169 (Fed Cir. 1991).....54

*Whitney Benefits v. United States*,
30 Fed. Cl. 411 (1994).....73, 74, 75

*Yancey v. United States*,
915 F.2d 1534 (Fed. Cir. 1990).....48

**STATUTES AND REGULATIONS**

12 U.S.C. § 1715l.....2, 15

12 U.S.C. 1715*l* note..... *passim*

12 U.S.C. § 1715z-1.....2

12 U.S.C. § 4101..... *passim*

12 U.S.C. § 4108.....16, 40

12 U.S.C. § 4110.....55

24 C.F.R. § 221.524..... *passim*

24 C.F.R. § 226(b)(6).....27

24 C.F.R. § 236.30 ....................4, 67

24 C.F.R. §§ 248.101-261 (1991) ....................16

24 C.F.R. §§ 248.1-319 (1993) .................... *passim*

24 C.F.R. § 248.233(d)(3) (1990) ....................27

24 C.F.R. § 248.31 (1990) ....................27, 55

L.A. Mun. Code, ch. XV, §§ 151 et seq .................... *passim*

Housing Opportunity Program Extension Act of 1996,
Pub. L. No. 104-120, 110 Stat. 834 (1996) ....................27

**OTHER AUTHORITIES**

S. Rep. No. 87-281 (1961),
*reprinted in* 1961 U.S.C.C.A.N. 1923 ....................1

S. Rep. No. 101-316 (1990),
*reprinted in* 1990 U.S.C.C.A.N. 5763 ....................41, 67

H.R. Rep. No. 100-122(I) (1987),
*reprinted in* 1987 U.S.C.C.A.N. 3317 ....................25, 26

## I. INTRODUCTION

1. In *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed Cir. 2003) ("*Cienega VIII*"), the Federal Circuit reversed the granting of summary judgment for the government, finding that the very same statutes at issue in this case constituted a temporary regulatory taking. In *Independence Park Apartments v. United States*, 61 Fed. Cl. 692 (2004) ("*Independence Park I*"), *Cienega Gardens v. United States*, 67 Fed. Cl. 434 (2005) ("*Cienega IX*"), and *Independence Park Apartments v. United States*, 465 F.3d. 1308 (Fed. Cir. 2006) ("*Independence Park IV*"), this Court and the Federal Circuit confirmed the appropriate measure of just compensation. The evidence on liability in this case is consistent with, and in fact *exceeds*, that found sufficient by *Cienega VIII* and *Cienega IX* as a matter of law. The evidence on damages is consistent with the rulings in the *Independence Park* and *Cienega Gardens* litigation, and the government has not adduced any new evidence justifying a contrary result. Accordingly, Plaintiffs are entitled to damages incurred as a result of the government's temporary regulatory taking of their property in the amount of $100,803,400.

## II. PROPOSED FINDINGS OF FACT

### A. Regulatory Background

2. During the 1960s, Congress moved beyond its decades-long past practice of enacting federal low-income housing programs primarily with the participation of local public housing authorities and non-profit organizations, and created programs that for the first time fully utilized the private sector to develop and manage low-income housing. Congress sought to "enable private enterprise to participate to the maximum extent in meeting the housing needs of moderate-income families," and the "fullest practicable utilization of the resources and capabilities of private enterprise" in housing low-income and moderate-income families. S. Rep. No. 87-281, at 4 (1961), *reprinted in* 1961 U.S.C.C.A.N. 1923; 82 Stat. 476, 476 § 2 (1968).

Accordingly, in 1961 and 1968, Congress amended the National Housing Act to allow private developers to construct, own, and manage housing for low- and moderate-income families under Sections 221(d)(3) and 236, respectively. 12 U.S.C. § 1715l.

3. The government provided mortgage insurance and interest-rate subsidies to private developers under the Section 221(d)(3) and 236 programs (the "HUD programs"), which helped the developers obtain loans from private lenders. *See* 12 U.S.C. § 1715z-1. The developers, in turn, were required to rent to tenants who met government eligibility standards and to charge substantially below-market rents. Trial Transcript ("Tr.") 365:21-367:3 (Hirsch); PX 305, 309, 313-15, 317-19, 321, DX 61.

4. Between 1969 and 1972, Plaintiffs[1] agreed to develop and operate properties in accordance with these government programs. Jona Goldrich, Sol Kest, Robert Stern, Robert Hirsch, and Warren Breslow, or entities controlled by them or some combination thereof, ("General Partners") developed the properties and were the general partners in each of the ten partnerships during the time periods relevant to this action. General Partners were original investors in the partnerships and as general partners made the decisions for Plaintiffs to develop the subject properties under the HUD programs. Tr. 76:24-77:5 (Goldrich); Tr. 363:20-367:24 (Hirsch); PX 130-145, 148-152, 154-205.

---

[1] Plaintiffs are the partnerships that own the ten subject properties. Herein, the Claremont Village Commons partnership is referred to as "Claremont;" the Covina West Apartments partnership is referred to as "Covina West;" the Del Vista Village partnership is referred to as "Del Vista;" the DeSoto Gardens Apartments partnership is referred to as "DeSoto;" the Kittridge Gardens I partnership is referred to as "Kittridge I;" the Kittridge Gardens II partnership is referred to as "Kittridge II;" the Oxford Park Apartments partnership is referred to as "Oxford Park;" the Parthenia Townhouses partnership is referred to as "Parthenia;" the Pioneer Gardens Apartments partnership is referred to as "Pioneer;" and the Puente Park Apartments partnership is referred to as "Puente Park."

5. Plaintiffs executed a series of contemporaneous and interlocking contracts which memorialized the terms of their participation, including long-term Regulatory Agreements and either Deed of Trust Notes or Secured Notes. PX 98-103, 104-106, 115, 305, 309, 313-15, 317-19, 321; DX 61. The Regulatory Agreements severely restricted Plaintiffs' use of their properties. They required Plaintiffs to use the property only for housing low-income tenants at HUD-established rents; to grant HUD a security interest in the income arising from the property; to be limited to a maximum return of 6% of HUD's calculation of the original equity; to submit to HUD audits, inspections, and management reviews; and to maintain each project according to HUD standards. *Id.* The restrictions bound Plaintiffs while HUD insured Plaintiffs' mortgages. HUD's insurance obligations would terminate, and Plaintiffs' obligations under the Regulatory Agreements would expire, once Plaintiffs paid off the mortgages. *Id.*

6. Claremont, Covina West, Oxford Park, Pioneer, and Puente Park entered into HUD-endorsed Deed of Trust Notes ("Trust Notes") with private lenders.[2] PX 98-99, 103, 105-06. The Trust Notes were printed on forms HUD prepared and evidenced HUD's commitment to insure 40-year loans to Plaintiffs secured by mortgages on their properties. *Id.* Rider A to the Trust Notes (FHA Form 4104(e)), granted these five Plaintiffs the unfettered right to prepay the mortgages and exit the HUD program after 20 years without HUD or lender approval.[3] *Id.*

7. Del Vista, DeSoto, Kittridge I, Kittridge II, and Parthenia signed Secured Notes which evidenced a 40-year loan that the mortgagee was permitted to prepay after 20 years

---

[2] Both the Trust Notes and the Secured Notes discussed *infra* were endorsed by the Federal Housing Administration ("FHA"), which was then, and is now, part of HUD. FHA and HUD are therefore used interchangeably herein.

[3] Each Trust Note permitted prepayment if "the Maker is a limited distribution mortgagor which is not receiving payments from the Commissioner under a rent supplement contract pursuant to Section 101 of the Housing and Urban Development Act of 1965, and the prepayment occurs after the expiration of twenty (20) years from the date of final endorsement of this Note by the Commissioner." PX 98-99, 103, 105-06.

without HUD or lender approval. PX 100-102, 104, 115. The Secured Notes were printed on forms HUD designed, reviewed and endorsed.[4] *Id.*

8. At the time Plaintiffs executed their Regulatory Agreements and either Trust Notes or Secured Notes, HUD regulations provided that "[a] mortgage indebtedness may be prepaid in full and the Commissioner's controls terminated without the prior consent of the Commissioner where . . . the prepayment occurs after the expiration of 20 years from the date of final insurance endorsement of the mortgage . . . ." 24 C.F.R. § 236.30 (1970); *accord* 24 C.F.R. § 221.524(a)(1)(ii) (1970). Plaintiffs' Regulatory Agreements incorporated by reference HUD's then-existing regulations regarding prepayment of the Trust Notes and Secured Notes. PX 305, 309, 313-15, 317-19, 321; DX 61.

9. The 20-year unfettered prepayment right was an absolutely critical and material inducement to Plaintiffs; Plaintiffs would not have entered into the HUD programs if they knew they could not prepay in 20 years and cease using their properties for low-income housing. *See, e.g.*, Tr. 83:23-84:17 (Goldrich) (The right to prepay was "the most important thing because I would not have done all that work for only 6 percent, I would look to the future."); *see also* Tr. 86:14-87:6, 96:9-24 (Goldrich) (testifying he "would not have dealt with HUD if [he] did not think [he] could [prepay in 20 years]"); Tr. 392:9-393:17 (Hirsch) (testifying that he "would not have entered into the HUD programs with the income limitations and the rent restrictions if [he] knew that [he] could not prepay the loans after 20 years"). Plaintiffs intended and expected to exercise their rights to prepay their mortgages on their respective 20-year prepayment dates and convert to conventional market-rate properties, which Plaintiffs expected would yield "six, seven

---

4 The Secured Notes required HUD approval for prepayment except "a maker which is a limited dividend corporation may prepay without such approval after 20 years from the date of final endorsement of this Note by the Federal Housing Commissioner." PX 100-102, 104, 115.

or eight times as much [as the HUD rents]." Tr. 85:14-18 (Goldrich); Tr. 287:7-14, 290:10-292:14, 309:3-315:17, 877:2-8 (Glodney); Tr. 378:14-381:9 (Hirsch); PX 18-19, 27-31.

10. In reliance on the prepayment right, Plaintiffs intentionally developed properties that would increase in value and allow them, after 20 years, to attract market-rate tenants. In sharp contrast to most other low-income housing developers, Plaintiffs paid top-dollar premiums for sites in middle-class areas, constructed high-quality buildings, and always maintained the buildings with the same care as General Partners' market-rate apartments. Indeed, Plaintiffs *exceeded* the HUD building requirements and "did a number of things that added . . . cost" such as installing air-conditioning units, car ports, courtyards, and balconies, using superior plumbing materials, and adding an extra coat of paint to the subject properties. Tr. 371:19-373:19, 381:11-386:22 (Hirsch); *see also* Tr. 86:2-115:2 (Goldrich); Tr. 220:7-13, 222:16-223:12 (Glodney); Tr. 1725:8-15 (Crosson) (properties were well-maintained and did not have deferred maintenance at prepayment eligibility date); PDX 1-10.

11. Plaintiffs invested significant amounts of time and work, as well as additional monies for land, construction, and maintenance, because they "planned for good long-term benefit" after 20 years when they could realize the appreciation and increased rental rates of a market-rate apartment complex. Tr. 383:16-20 (Hirsch). Plaintiffs' investment strategy relied on long-term appreciation; from the beginning, Plaintiffs intended to own the properties for the long-term so they could realize significant gains upon exiting the HUD programs after 20 years. *See, e.g.*, Tr. 369:15-373:19 (Hirsch) ("We were looking at the benefit of long-term."); Tr. 193:17-21 (Goldrich) ("I go for the long run and I am a great believer that inflation will never stop and 20 years later, I will make a lot of money.").

12. Plaintiffs' expectations regarding their prepayment rights were based on the express language in their Trust Notes and Secured Notes, and on the HUD regulations incorporated into the Regulatory Agreements. PX 98-103, 104-106, 115, 305, 309, 313-15, 317-19, 321; DX 61.

13. Two of the General Partners also own G&K Management Co., Inc. ("G&K"), which, for a fee, currently manages seven of Plaintiffs' properties.[5] Tr. 374:25-378:3 (Hirsch). These General Partners formed G&K to ensure a high standard of maintenance and aesthetic appeal to keep the properties attractive to tenants, and to maintain the properties so they could convert to conventional rentals at minimal or no cost and be competitive in the market after prepayment. *Id.*; Tr. 190:3-191:10, 200:4-10 (Goldrich). Carole Glodney is the President of G&K. Tr. 214:9-16 (Glodney).

14. The HUD programs allowed Plaintiffs to borrow only up to 90% of HUD's *allowable cost* for a project—not what the project actually cost Plaintiffs to build. Tr. 386:23-389:6 (Hirsch). For example, Plaintiffs bore the extra costs of improved amenities or better construction. Tr. 385:16-19 (Hirsch). It was also common for construction costs to exceed HUD's allowable cost for a project. Tr. 386:23-389:7 (Hirsch). Because of the amount of time (often two years) it took to process the Regulatory Agreements, Plaintiffs frequently paid more for the land because the original option to buy the land expired and the seller increased the price. *Id.* (testifying a landowner might want $25,000 more for an additional six months). Plaintiffs were never allowed to borrow these increased costs. *Id.* As a result, Plaintiffs often invested more than 10% of the project cost in cash and sweat equity. *Id.*

---

[5] G&K does not currently manage the Claremont, Covina West, or Pioneer properties; however it managed them until approximately one year after they were sold. Tr. 218:11-219:9 (Glodney).

15. Plaintiffs would have prepaid their HUD mortgages had they been permitted. *See, e.g.*, Tr. 104:15-113:14 (Goldrich). Even if a rent control statute might have prevented Plaintiffs from raising their rents for a few years, they would still have prepaid. Tr. 389:8-391:7, 475:20-483:17 (Hirsch); Tr. 117:14-118:24 (Goldrich); *see also* Tr. 2275:6-23 (Hamm) (testifying there are circumstances in which it would be economically beneficial to prepay even where rent control would limit rate of rental increases).

16. At the time Plaintiffs entered the HUD programs and invested significant resources in reliance on the right to prepay (given the express language in the Trust Notes, Secured Notes, and HUD regulations) they did not anticipate—and had no reason to believe that—Congress would unilaterally rescind the unfettered 20-year prepayment right in order to remedy a low-income housing shortage Congress caused by failing to fund new and replacement affordable housing programs. Tr. 803:19-806:9 (Glodney); Tr. 380:15-19 (Hirsch); Tr. 1961:13-1962:18 (Vitek); Tr. 1351:13-20 (Peiser).

**B. Plaintiffs' Properties**

17. DeSoto, Kittridge I, Kittridge II, Oxford Park, and Parthenia have owned their subject properties at all times. PX 130-145, 148-205; DX 92A. Some partnership interests in these Plaintiffs have changed over time, but the partnerships have never dissolved. *Id.* Claremont, Covina West, Del Vista, Pioneer, and Puente Park developed their subject properties and owned and operated them until they were sold to HUD-approved purchasers on April 26, 2001, August 2, 2002, March 12, 2004, April 26, 2001, and November 29, 2001, respectively.[6] Tr. 616:20-21, 714:19-20 (Glodney); PX 459, 472, 494, 497, 621-22, 634.

---

[6] The properties were sold while subject to Use Agreements but were not sold pursuant to ELIHPA or LIHPRHA. PX 459, 472, 494, 497, 621-22, 634.

18. The properties are multifamily apartment complexes, and thus are income-producing properties. PX 458-461, 463, 465, 467, 469, 471-472D.

***Claremont Village Commons***

19. The Claremont Village Commons property is a 150-unit garden-style family apartment complex located at 955 West Arrow Highway, Claremont, California, 91711. It consists of 95 two-bedroom, 53 three-bedroom, and 2 employee units. It is located in a residential middle-class neighborhood with several schools nearby and single-family homes across the street. Tr. 248:23-251:9 (Glodney). The complex is gated, has a community recreation room, playgrounds for children, and ample parking for tenants. PDX 1.

20. On December 1, 1970, Claremont entered into a Regulatory Agreement with HUD under Section 236. PX 305. The Regulatory Agreement limited Claremont's maximum annual dividend to $16,936, 6% of the original equity investment as calculated by HUD. *Id.*

21. Also on December 1, 1970, Claremont signed a Trust Note with Union Bank for $2,547,800. PX 98. Rider A to the Trust Note permitted Claremont to prepay its mortgage without HUD or lender approval after 20 years. *Id.* HUD issued its final endorsement of the Trust Note on December 21, 1971. *Id.* Thus, Claremont's prepayment eligibility date was December 21, 1991.

***Covina West Apartments***

22. Covina West Apartments property is a 158-unit garden-style family apartment complex located at 929 West Cameron Avenue, West Covina, California 91790. It consists of 42 one-bedroom, 59 two-bedroom, 47 three-bedroom, 8 four-bedroom, and 2 employee units. It is located in a residential middle-class neighborhood, is surrounded by conventional apartments,

and has single-family homes, stores, and restaurants nearby. Tr. 251:10-252:14 (Glodney). The complex has a community recreation room and playgrounds for children. PDX 2.

23. On June 1, 1970, Covina West entered into a Regulatory Agreement with HUD under Section 236. PX 309. The Regulatory Agreement limited Covina West's maximum annual dividend to $16,042, 6% of the original equity investment as calculated by HUD. *Id.*

24. Also on June 1, 1970, Covina West signed a Trust Note with Union Bank for $2,593,300. PX 99. Rider A to the Trust Note permitted Covina West to prepay its mortgage without HUD approval after 20 years. *Id.* HUD issued its final endorsement on the Trust Note on May 26, 1971. *Id.* Thus, Covina West's prepayment eligibility was May 26, 1991. *Id.*; Tr. 251:10-15 (Glodney).

***Del Vista Village***

25. The Del Vista Village property is a 160-unit garden-style complex located at 976 Avenida Del Vista, Corona, California, 92882. It consists of 40 one-bedroom, 80 two-bedroom, 38 three-bedroom, and 2 employee units. It is located in a middle-class neighborhood, is surrounded by condominiums and conventional apartments, is near a large residential area with single-family homes, and is next to an elementary school and near a high school. Tr. 252:23-253:22 (Glodney). The complex is gated, has a picnic area and large playgrounds for children, and a pool and a community recreation room were added to the complex recently. *Id.*; PDX 3.

26. On December 1, 1970, Del Vista entered into a Regulatory Agreement with HUD under Section 221(d)(3). DX 61. The Regulatory Agreement limited Del Vista to a maximum annual dividend of $15,644, 6% of its original equity investment as determined by HUD. *Id.*

27. Also on December 1, 1970, Del Vista signed a Secured Note with Union Bank for $2,355,300. PX 100. The Secured Note permitted Del Vista to prepay its mortgage without

HUD approval after 20 years. *Id.* HUD endorsed the Secured Note on April 7, 1972. *Id.* Thus, Del Vista had a prepayment eligibility date of April 7, 1992. *Id.*; Tr. 252:16-19 (Glodney).

***DeSoto Gardens***

28. The DeSoto Gardens property is a 248-unit garden-style family apartment complex located in the Canoga Park area of Los Angeles at 8722 DeSoto Avenue, Canoga Park, California, 91304. It consists of 248 units, including 24 one-bedroom, 124 two-bedroom, 98 three-bedroom, and 2 employee units. It is located in a middle-class neighborhood surrounded by a large number of conventional market-rate apartment complexes and condominiums in the same general area as Independence Park Apartments—a property involved in Set I of this litigation which has operated as a market-rate complex since its owners prepaid the HUD-insured mortgage in 1996. Tr. 260:2-261:22 (Glodney). The complex is gated and has a community recreation room and playgrounds for children, and a recently-added pool. *Id.*; PDX 6.

29. On May 15, 1969, DeSoto entered into a Regulatory Agreement with HUD under Section 221(d)(3). PX 313. The Regulatory Agreement limited DeSoto's maximum annual dividend to $29,559, 6% of the original equity investment as calculated by HUD. *Id.*

30. Also on May 15, 1969, DeSoto signed a Secured Note with United California Bank for $3,494,500. PX 101. The Secured Note permitted DeSoto to prepay its mortgage without HUD approval after 20 years. *Id.* HUD issued its final endorsement of the Secured Note on November 2, 1970. *Id.* Thus, DeSoto had a prepayment eligibility date of November 2, 1990. *Id.*; Tr. 260:2-6 (Glodney).

***Kittridge Gardens I***

31. The Kittridge Gardens I property is a 128-unit garden-style family apartment complex located in Los Angeles at 6540 Wilbur Avenue, Reseda, California, 91335. The

property has 32 one-bedroom, 64 two-bedroom, and 31 three-bedroom units, as well as one employee unit. It is located in a middle-class neighborhood with conventional apartment complexes and condominiums across the street. The complex is near a park and a police station, and has shopping and several schools within one mile. Tr. 261:23-263:4 (Glodney). The property has a recreation room, barbeque area, and large playground areas. *Id.*; PDX 7.

32. On June 1, 1968, Kittridge I entered into a Regulatory Agreement with HUD under Section 221(d)(3). PX 314. This agreement limited Kittridge I to a maximum annual dividend of $9,949, 6% of the original equity investment as calculated by HUD. *Id.*

33. Also on June 1, 1968, Kittridge I signed a Secured Note with United California Bank for $1,491,400. PX 115. The Secured Note permitted Kittridge I to prepay its mortgage without HUD approval after 20 years. *Id.* HUD issued its final endorsement on the Secured Note on September 17, 1969. *Id.* Thus, Kittridge I's prepayment eligibility date was September 17, 1989. *Id.*; Tr. 261:23-262:2 (Glodney).

***Kittridge Gardens II***

34. The Kittridge Gardens II property is a 2-story, 80-unit garden-style family apartment complex located in Los Angeles at 6540 Wilbur Avenue, Reseda, California, 91335. It contains 32 two-bedroom, 16 three-bedroom, and 32 four-bedroom units. It is located next door to the Kittridge I property in a middle-class neighborhood near a park and a police station, with several schools and shopping within one mile. Tr. 264:11-265:11 (Glodney). The property has a recreation room, barbeque area, and playground areas. *Id.*; PDX 8.

35. On February 16, 1970, Kittridge II entered into a Regulatory Agreement with HUD under Section 221(d)(3). PX 313. This agreement limited Kittridge II to a maximum annual dividend of $10,420, 6% of the original equity investment as calculated by HUD. *Id.*

36. Also on February 16, 1970, Kittridge II signed a Trust Note with Security Pacific National Bank for $1,441,300. PX 102. Rider A to the Trust Note permitted Kittridge II to prepay its mortgage without HUD approval after 20 years. *Id.* HUD issued its final endorsement on the Note on April 14, 1971. *Id.* Thus, Kittridge II's prepayment eligibility date was April 14, 1991. *Id.*; Tr. 264:11-16 (Glodney).

***Oxford Park Apartments***

37. The Oxford Park Apartments property is a 3-story, 109-unit senior apartment complex located at 1920 South Oxford Street, Los Angeles, California, 90018. All of the units are one-bedroom units and the complex has two elevators and underground parking. Oxford Park is located in a middle-class neighborhood with single-family homes with historic mansion architecture next door and across the street. Tr. 265:12-267:12 (Glodney). The complex has a large community recreation room and a recently-added gazebo in the courtyard. *Id.*; PDX 9.

38. On November 2, 1970, Oxford Park entered into a Regulatory Agreement with HUD under Section 221(d)(3). PX 317. This agreement limited Oxford Park to a $9,691 maximum annual dividend, 6% of the original equity investment as calculated by HUD. *Id.*

39. Also on November 2, 1970, Oxford Park signed a Trust Note with Security Pacific National Bank for $1,519,800. PX 103. Rider A to the Trust Note permitted Oxford Park to prepay its mortgage without HUD approval after 20 years. *Id.* HUD issued its final endorsement on the Note on October 6, 1972. *Id.* Thus, Oxford Park's prepayment eligibility date was October 6, 1992. *Id.*; Tr. 265:12-17 (Glodney).

***Parthenia Townhouses***

40. The Parthenia Townhouses property is a 24-unit garden-style apartment complex located in the Canoga Park area of Los Angeles at 21218 Parthenia Street, Canoga Park,

California, 91304. It consists of 16 two-bedroom and 7 three-bedroom units, as well as one employee unit. It is located in a middle-class neighborhood with condominiums nearby, and is in the same area as the DeSoto and Independence Park properties. Tr. 267:18-268:9 (Glodney). It has a barbeque area and a playground for children. *Id.*; PDX 10.

41. On April 1, 1971, Parthenia entered into a Regulatory Agreement with HUD under Section 221(d)(3). PX 318. This agreement limited Parthenia to a maximum annual dividend of $2,455, 6% of the original equity investment as calculated by HUD. *Id.*

42. Also on April 1, 1971, Parthenia signed a Secured Note with Prestige Mortgage Corporation for $368,000. PX 104. The Secured Note permitted Parthenia to prepay its mortgage without HUD approval after 20 years. *Id.* HUD issued its final endorsement on the Secured Note on December 17, 1971. *Id.* Thus, Parthenia had a prepayment eligibility date of December 17, 1991. *Id.*; Tr. 267:13-17 (Glodney).

***Pioneer Gardens Apartments***

43. The Pioneer Gardens Apartments property is a 141-unit garden-style family apartment complex located at 9039 Pioneer Boulevard, Santa Fe Springs, California, 90670. It consists of 16 one-bedroom, 63 two-bedroom, 37 three-bedroom, 23 four-bedroom, and 2 employee units. It is in a middle-class neighborhood with single-family homes, a park, and a community center. Tr. 253:23-255:7 (Glodney). Placita Park Apartments, a property in Set IV of this litigation that prepaid its mortgage and is operating conventionally, is two blocks away. Pioneer is gated and has a community recreation room and playgrounds for children. *Id.*; PX 4.

44. On June 1, 1970, Pioneer entered into a Regulatory Agreement with HUD under Section 236. PX 319. The Regulatory Agreement limited Pioneer's maximum annual dividend to $15,374, 6% of the original equity investment as calculated by HUD. *Id.*

45. Also on June 1, 1970, Pioneer signed a Trust Note with Union Bank for $2,448,500. PX 105. Rider A to the Trust Note permitted Pioneer to prepay its mortgage without HUD approval after 20 years. *Id.* On May 26, 1971, HUD issued its final endorsement on the Trust Note. Thus, Pioneer's prepayment eligibility date was May 26, 1991. Tr. 253:23-3 (Glodney).

***Puente Park Apartments***

46. The Puente Park Apartments property is a 132-unit garden-style family apartment complex located at 14714 East Prichard Street, La Puente, California, 91744. It consists of 8 one-bedroom, 87 two-bedroom, 35 three-bedroom, and 2 employee units. It is located on a quiet street in a middle-class neighborhood of single family homes and a school. Tr. 255:13-256:6 (Glodney). It is gated and has a community recreation room and playgrounds. *Id.*; PDX 5.

47. On September 10, 1969, Puente Park entered into a Regulatory Agreement with HUD under Section 236. PX 321. The Regulatory Agreement limited Puente Park's maximum annual dividend to $12,692, 6% of the original equity investment as calculated by HUD. *Id.*

48. Also on September 10, 1969, Puente Park signed a Trust Note with Union Bank for $1,947,500. PX 106. Rider A to the Trust Note permitted Puente Park to prepay its mortgage without HUD approval after 20 years. HUD issued its final endorsement on the Trust Note on August 31, 1970. *Id.* Thus, Puente Park's prepayment eligibility date was August 31, 1990. Tr. 255:8-12 (Glodney).

**C. ELIHPA and LIHPRHA**

49. In the 1980s, the government substantially decreased its funding of new affordable housing programs, which exacerbated the existing problem of a severely inadequate supply of affordable housing. Tr. 1961:13-1962:18 (Vitek). Thus, as owners approached their 20-year prepayment dates, "it became clear to Congress that large numbers of owners would

prepay their mortgages and remove their properties from the federally-assisted low-income housing pool." *Cienega VIII*, 331 F.3d at 1326 & n.13 (quoting H.R. Conf. Rep. No. 100-426, at 192 (1987)) ("[Findings] indicate that almost 950,000 low-income housing units could soon be lost through mortgage prepayments").

50. In an attempt to limit the exacerbation of the nation's low-income housing shortage, Congress passed emergency legislation on February 5, 1988, the Emergency Low Income Housing Preservation Act of 1987, 12 U.S.C. § 1715l (1988) ("ELIHPA" or "Title II"), which temporarily rescinded the unfettered prepayment rights of owners of properties in the HUD programs (including those of Plaintiffs), forcing them to keep their properties in the HUD programs. 12 U.S.C. § 1715l; Tr. 1921:23-1922:11, 1961:13-1962:18 (Vitek).

51. On November 28, 1990, Congress enacted the Low Income Housing Preservation and Residential Homeownership Act of 1990, 12 U.S.C. § 4101 et seq. ("LIHPRHA or "Title VI"), which *permanently* prohibited owners of properties operating under the HUD programs (including Plaintiffs) from prepaying their HUD-insured mortgages, converting to conventional apartments, and raising their rents to market levels.

52. By enacting ELIHPA and LIHPRHA, Congress shifted the expenses of a severe national low-income housing shortage from all taxpayers to just the owners of properties in the HUD programs. *See* Tr. 1961:13-1962:18 (Vitek).

53. ELIHPA and LIHPRHA substantially interfered with Plaintiffs' rights to use, transfer, and exclude others from their properties by preventing Plaintiffs from prepaying their mortgages and exiting the HUD programs in accordance with the Trust Notes and Secured Notes and compelling the physical occupation of Plaintiffs' properties exclusively by government-approved tenants at the below-market rents. 12 U.S.C. § 1715l; 12 U.S.C. § 4101 et seq.

54. Title II and Title VI, and the regulations promulgated thereunder, gave owners in the HUD programs three options to mitigate damages caused by the taking of their prepayment right: an owner could (1) sign a "Use Agreement" after a significant delay, under which it agreed to maintain the property as affordable housing in exchange for possible HUD-approved financial incentives; (2) sell the property after a significant delay—not at fair-market value but at a HUD-approved price determined by HUD regulations and set years before an actual sale could occur—to a HUD-approved and HUD-subsidized purchaser who agreed to maintain the property's low-income affordability restrictions; or (3) prepay the mortgage if the owners could demonstrate that prepayment would not negatively impact the affordable housing supply or raise rents more than 10%. Tr. 1927:18-1928:13 (Vitek); *see also* 12 U.S.C. § 4108; 24 C.F.R. § 248.141(a)(1). None of these options reimbursed Plaintiffs for the cash flows they lost as a result of the prohibition on prepaying and converting to market rent levels on the original prepayment eligibility dates. 12 U.S.C. § 4108; 24 C.F.R. § 248.141(a)(1). Owners who did not pursue one of the three options were forced to continue to operate under the original Regulatory Agreements' highly restrictive terms, under which they could only receive, at most, a 6% annual return on the HUD-derived original equity for the remainder of their 40-year mortgages. Tr. 1927:18-14 (Vitek).[7]

---

[7] HUD did not issue final regulations implementing ELIHPA until October 22, 1990, almost 33 months after ELIHPA passed. 24 C.F.R. §§ 248.101-261 (1991). And HUD issued final regulations implementing LIHPRHA on May 8, 1992, almost 18 months after LIHPRHA passed. 24 C.F.R. §§ 248.1-319 (1993). No owners could proceed under Title II or Title VI until after their the statute's respective regulations were implemented. PX 552; Tr. 325:9-327:7 (Glodney). Nor could owners make an election between proceeding under ELIHPA or LIHPRHA until after these regulations were enacted, because they did not know what the Title VI "incentives" would be. Tr. 325:9-327:7 (Glodney). Further, HUD did not want to process "plans of action," the documents in which owners requested financial incentives from HUD in exchange for a commitment to continue charging below-market rents, until it knew under which guidelines to process them. Tr. 325:9-327:7 (Glodney); *see also* Tr. 1928:3-7 (Vitek).

55. Plaintiffs could not have met the statutorily-required criteria for prepayment under Title II or Title VI because Plaintiffs were located in areas with low HUD-vacancy rates and thus prepayment would have materially affected the supply of low-income housing and resulted in annual rental increases of more than 10%. Tr. 526:9-527:8, 537:14-25 (Glodney); Tr. 1962:15-1965:13 (Vitek). *Compare* PX 322, 327, 337, 348, 359, 362-63, 375, 375A, 387, 392-93 *with* PX 422-23, 452-457, 615. HUD was thus statutorily prohibited from permitting Plaintiffs to prepay. *Id.* In fact, HUD told Plaintiffs' representatives that it would be futile for Plaintiffs to apply for prepayment because Plaintiffs could not meet the statutory criteria for prepayment. Tr. 532:12-533:8, 812:3-820:18, 828:8-12 (Glodney). The government has judicially admitted that HUD did not approve any prepayments in California pursuant to the relevant prepayment provisions (Section 225(a)(1) of Title II or Section 218(a) of Title VI). PX 632.

56. Accordingly, while Plaintiffs filed notices of intent to prepay, PX 18-19, 28-32A, Plaintiffs did not ultimately file requests with HUD for approval to prepay under ELIHPA or LIHPRHA because such requests would have been futile and would have further delayed the plan of action process. *Id.*; Tr. 532:12-533:8, 812:3-820:18, 828:8-12 (Glodney); Tr. 1962-1965:13 (Vitek) (testifying that he was not aware of any owners in California who were able to meet the prepayment standard due to the lack of available affordable housing).

57. If an owner could not qualify for prepayment but wanted to mitigate the damages ELIHPA and LIHPRHA caused, the owner had to either seek incentives through a plan of action via a Use Agreement or pursue a sale that was both unlikely to occur and would require a sale at a price set by HUD to a HUD-approved and HUD-subsidized buyer. *See* Tr. 2038:24-2039:25 (Matthews); Tr. 1931:19-1936:15, 1985:3-8 (Vitek).

58. Participation in a Title II Use Agreement required the extension of the affordability restrictions for the remainder of the original 40-year mortgage, and enabled owners to request distributions based on the property's income rather than on a HUD-established rate of return. Tr. 322:19-323:19 (Glodney). In contrast, participation in a Title VI Use Agreement required that the owner agree to continue the affordability restrictions for the longer of 50 years or the property's remaining useful life, in exchange for a limited 8% return for that period. *Id.*

59. Plaintiffs proceeded under Title II because they believed "the incentives offered under Title II were more beneficial to the partnership." Tr. 323:4-6, 323:20-324:4 (Glodney). Pursuing incentives under Title II was a more rational choice, indeed "something that probably just about all owners would prefer." Tr. 2852:10-24 (Vitek).[8]

60. The Title II "sale option" was itself a severe limitation on Plaintiffs' property rights. Tr. 2222:3-21 (Hamm) (acknowledging that the sale option restrained Plaintiffs' ability to sell to a buyer of their choice in the open market). Prior to Title II's enactment, Plaintiffs possessed the right, upon prepayment, to sell their properties free of restrictions to the highest bidders on the open market. Tr. 2206:1-2 (Hamm). Although Plaintiffs intended to hold their properties for the long-term and earn the anticipated benefits of operating the properties conventionally after 20 years, the unrestricted ability to sell their properties in a free-market sale after 20 years was clearly a valuable property right. Tr. 86:6-13, 200:25-201:4 (Goldrich)

[8] If an owner filed a notice of intent prior to January 1, 1991, the owner could elect to seek incentives under *either* Title II and Title VI; otherwise the owner would be limited to Title VI incentives. *See* 12 U.S.C. 4101l note, § 604(a). Plaintiffs were eligible for Title II incentives because they filed notices of intent to prepay prior to January 1, 1991. PX 18, 19-32A. Within 30 days of the effective date of the regulations governing Title VI, owners were required to file a notice of election to proceed under either Title II or Title VI (HUD Form 9610). PX 39; Tr. 507:2-15, 513:22-516:16 (Glodney).

(noting willingness to sell after prepayment if Plaintiffs would have made a greater profit on the sale than on operating the property conventionally).

61. Under ELIHPA, however, owners could only sell their properties to qualified HUD-approved purchasers at a price set by HUD. The price was often set years before any actual sale could take place, was not updated to reflect appreciation during the period of delay, and did not reflect the lost income during the delay period (between prepayment date and sale date).[9] Tr. 534:25-535:20 (Glodney); Tr. 1984:15-1985:8 (Vitek). To consummate a sale, owners were required to submit a plan of action, which had to include an appraisal. 24 C.F.R. 248.213. The property's value was then determined by HUD through a review of the owner-submitted independent third-party appraisal, yielding the HUD "as is" value. 24 C.F.R. § 248.213; PX 619; *see also* PX 255-57, 422-23, 452-57, 615. According to HUD officials, the "appraisal review process for Title II [was] a long and arduous task," which included an audit of the appraisal review process, a Preservation Capital Needs Assessment ("PCNA"), an additional limited review, and a re-review phase. PX 250. Owners could not select a buyer of their choice; to qualify as a HUD-approved purchaser under Title II, a purchaser had to (1) be "a qualified nonprofit organization, limited equity tenant cooperative, public agency, or other entity acceptable to the Secretary," and (2) agree to maintain the low-income affordability restrictions.

---

[9] HUD valued Plaintiffs' properties significantly lower than Plaintiffs' independent appraiser. For example, Plaintiffs' independent appraiser valued Claremont Village at $9,294,200, while HUD agreed to an "as-is" value of only $7,976,000. *Compare* PX 409 *with* PX 452. HUD deflated each one of Plaintiffs' appraisals to a similar degree (with the exception of Oxford Park, for which HUD agreed with the owner-submitted appraisal). Plaintiffs' independent appraiser valued Covina, Del Vista, DeSoto, Kittridge II, Oxford Park, Parthenia, Pioneer, and Puente Park at $10,000,000, $8,800,000, $13,500,000, $6,200,000, $5,350,000, $1,785,000, $8,600,000, and $9,575,000, respectively. PX 410-412, 415-418, 420. By contrast, the HUD "as-is" values for these same properties were $8,342,000, $6,400,000, $12,750,000, $5,700,000, $5,350,000, $1,576,600, $6,124,000, and $7,650,000. PX 422-23, 453-54, 455A, 456-57, 615.

12 U.S.C. 1715*l* note, § 224(7). Even by the Government's account, sales under Title II were not the equivalent of what the property would have sold for at an unrestricted sale. Tr. 2184:9-25 (Hamm) (testifying that a fair market transaction requires a willing buyer and a willing seller); Tr. 2043:15-2044:3 (Matthews) (testifying that buyers had to meet HUD qualifications).

62. The testimony also established that the Title II sale process took much longer than the process of seeking incentives under a Title II Use Agreement, Tr. 1984:15-1985:8 (Vitek), and therefore entailed more risk, delay, and loss, than the Use Agreement option.[10]

63. Furthermore, the majority of owners that attempted to sell their properties were unable to do so. *See* Tr. 2038:24-2039:25 (Matthews) (testifying that less than half of owners who chose to sell their properties under Title II and Title VI were able to sell them); Tr. 2608:6-2610:7 (Hamm) (same). Further, unlike Title VI, Title II did not give an owner who was unable to consummate a sale the option of then prepaying; rather, the owner's only option was to submit an entirely new plan of action seeking incentives under Title II. *See* 12 U.S.C. 1715*l* note.[11]

64. When given the choice, Plaintiffs viewed the option to lose their properties forever in a non-fair market Title II sale as highly unappealing. Plaintiffs' only other viable option under Title II was to pursue "incentives" by signing the Use Agreements Congress provided for in Title II. Tr. 315:22-324:4 (Glodney). The Use Agreements were statutorily-imposed measures which Plaintiffs were required to accept if they wished to retain any

---

[10] Although the government's HUD witness testified that a Title II sale would in fact take longer than seeking Use Agreement incentives under Title II, Tr. 1984:15-1985:8 (Vitek), the government did not offer *any* evidence concerning the Title II sales process or even that a Title II sale ever occurred.

[11] Plaintiffs' so-called "choice" between a Title II and Title VI sale as a practical matter did not exist because the Title VI regulations were not promulgated until May 8, 1992—after the prepayment dates of all but just one of the properties (Oxford Park). Thus, although Plaintiffs could start the prepayment process up to one year before their prepayment date, Plaintiffs that chose to do so were only able to proceed under Title II in the absence of any Title VI regulations. *See supra* note 7.

ownership interest in their properties and mitigate the financial losses Title II and Title VI imposed. The HUD-mandated recitation in Plaintiffs' Use Agreements that owners agreed to extend their affordability restrictions in exchange for incentives was not actual consideration. PX 50-57, 58, DX 181. Plaintiffs did not have the power to bargain away their prepayment right, as Congress had already taken that right through Title II and Title VI. Tr. 537:14-25 (Glodney).

65. Plaintiffs' decision to accept the "incentives" prescribed by Title II Use Agreements mitigated their damages, thus benefiting the government. PX 50-57, 58, DX 181. Use Agreements were the best mitigation available. *See* Tr. 2820:2-2821:8 (Malek) (testifying that continued operation is better than a sale); Tr. 2248:1-9, 2265:25-2266:15, 2620:25-2621:16 (Hamm) (testifying that Plaintiffs were rational, analyzed the options, and concluded that entering into Use Agreements offered risk-adjusted benefits that were superior to a sale).

**D. Plaintiffs' Use Agreements**

66. To obtain Title II "incentives," Plaintiffs were required to agree to extend the affordability restrictions on their properties for the remaining term of the HUD-insured mortgages. Tr. 1972:11-15 (Vitek); Tr. 537:7-25 (Glodney). The Use Agreements limited the rents Plaintiffs could charge and limited to whom the properties could be rented until the expiration of the properties' 40-year mortgages. PX 50-57, 58, DX 181.

67. To obtain Title II incentives, Plaintiffs were required to arrange for an independent third-party appraisal (via the same process as if seeking a sale or transfer of the property, as described *supra*), prepare a plan of action, and submit the plan of action and appraisal to HUD for each of their properties. 12 U.S.C. 1715*l* note, § 223; 24 C.F.R. 248.213; Tr. 603:10-21 (Glodney). Through the plan of action, Plaintiffs could seek either budget-based rent increases with limited distributions to owners or annual rent increases with unlimited distributions to owners. Tr. 539:12-540:12 (Glodney).

68. Preparing and obtaining HUD's approval of a plan of action was extremely time-consuming and fraught with delays by HUD officials. First, under Title II, HUD would not accept any notices of intent prior to one year before the prepayment date. Indeed, while Plaintiffs attempted to file notices of intent in February 1990, more than a year before their prepayment dates, HUD rejected and returned these notices of intent, stating they were submitted too early. *See, e.g*, PX 27; Tr. 295:11-297:17 (Glodney). Second, when owners requested financial incentives other than those set out in the regulations (including retroactive incentives to make up for lost income between the prepayment dates and the effective dates of the Use Agreements), HUD rejected those requests and instead, because of those requests, issued deficiency notices which required owners to submit entirely new plans of action, thereby continuing to delay the process. Tr. 334:18-335:13, 520:10-25, 522:17-525:1 (Glodney); PX 563; 24 C.F.R. § 248.15, 17-18. This process resulted in substantial delays in processing Plaintiffs' plans of action. Tr. 538:1-540:12 (Glodney); Tr. 1970:14-1978:22 (Vitek).

69. Third, delays in approving Plaintiffs' plans of action were also due in large part to numerous changes in HUD's requirements, including new requirements to file a notice of election to proceed, and to perform a PCNA,[12] lead-based testing, and a limited appraisal review in accordance with appraisal guidelines. Tr. 507:7-15, 516:7-16, 615:5-616:12 (Glodney). For example, according to HUD officials, the "appraisal review process for Title II [was] a long and arduous task," which included an audit of the appraisal review process, an additional "limited review," and a re-review phase. PX 250.

---

[12] During the processing of Plaintiffs' plans of action, HUD informed Plaintiffs and other properties that were already engaged in Title II processing that they were now required to submit to a PCNA. In the PCNA, HUD determined whether, in its opinion, the property needed repairs or rehabilitation, thus further delaying the plan of action process. Tr. 615:5-20 (Glodney).

70. Delays were particularly egregious in the Los Angeles HUD office, where Plaintiffs' plans of action were submitted and initially processed. Tr. 337:15-338:5, 589:4-592:24, 696:8-14 (Glodney); Tr. 1965:14-1968:1 (Vitek). According to Plaintiffs' representative, Ms. Glodney, HUD officials acknowledged that "we just don't have staff to get [the plans of action] done." Tr. 592:15-18 (Glodney). Plaintiffs pressed HUD to process their plans of action expeditiously so they could receive Title II incentives. Plaintiffs wrote several letters and "constantly call[ed]" HUD to seek explanations for the delays, request faster processing, and express their dissatisfaction. Tr. 591:13-592:24, 724:8-761:4 (Glodney); PX 238A, 240, 246-48, 250-51, 254. After languishing in the Los Angeles office, some of Plaintiffs' plans of action were eventually transferred to the HUD San Francisco office for processing. However, at different stages, the plans of action were sent back to Los Angeles for approval, which further delayed the process. Tr. 750:7-755:1 (Glodney); PX 260, 262A-B. A Los Angeles HUD official told Ms. Glodney that if Plaintiffs continued to complain about delays, their plans of action "would be put at the bottom of the pile." Tr. 591:24-592:4 (Glodney).

71. Due to the numerous administrative and regulatory delays, the negotiation and processing of Plaintiffs' plans of action took, on average, five-and-a-half years. *See* Tr. 1969:10-14 (Vitek) (testifying he was "not surprised" that Plaintiffs' plans of action took so long to process). Kittridge I's plan of action took nearly seven years to process. PX 18, 53. Pioneer, Del Vista, Kittridge II, DeSoto, Covina West, Oxford Park, and Claremont's plans of action each took approximately five-and-a-half years. PX 19, 50-53, 55-56, 58. For Parthenia, the period was approximately four-and-a-half years, while Puente Park took close to three-and-a-half years. PX 28, 31, 57; DX 181.

72. HUD's extensive delays harmed Plaintiffs because they were bound by the maximum 6% limited return and other restrictions in their Regulatory Agreements during the delay period, and could not receive retroactive benefits to compensate them for the losses they suffered during the period between the submission of their plan of action and its approval. Tr. 334:18-335:13, 520:10-25, 522:17-525:1 (Glodney); PX 563. Plaintiffs did not begin receiving incentives under Title II until their respective Use Agreements were signed. *Id.*

73. HUD utilized the valuation from the appraisal submitted by the owner—as adjusted by HUD—to determine rents the owner could charge under its Use Agreement. PX 422-23, 452-457, 615. If the owner disagreed with the rents HUD set, the owner could meet with HUD; but never once in this process did HUD adjust Plaintiffs' rents or values upwards. Tr. 620:8-14 (Glodney). If Plaintiffs wanted Title II incentives, they were compelled to agree with these values (the "as-is" or "agreed-upon" rents or values which would later, under Title VI, be called "preservation" value). *See* Tr. 1927:18-1928:13 (Vitek) (testifying that the only other option was to continue to own and operate properties under the HUD programs' original terms). Once approved, neither the owner nor HUD could change the initial rent amounts an owner could charge under a Use Agreement. PX 50-57, 58, DX 181.

74. The rents Plaintiffs were permitted to charge under their Use Agreements did not keep up with the conventional market rents because they were based on an annual adjustment factor "that had no relationship in total to the market." Tr. 773:18-25 (Glodney). The Use Agreement rents were not adjusted to account for market increases between the rent determination date and the time the agreed-upon rents became effective (the first day of the month after the execution of the Use Agreement). These rents increasingly fell below the market rate over time. Tr. 773:18-25 (Glodney); Tr. 2244:9-25, 2603:24-2604:8 (Hamm) (testifying that

an appraisal that is three years old is not a reliable way of arriving at a property's fair market value price, and that Title II appraisals may not be a reasonable approximation of fair market values at a time other than when the appraisal was performed, particularly if market values in the area were "on the rise"). For some of the Plaintiffs, more than four years elapsed between the dates the appraisals were performed and the date the "agreed-upon" rents became effective. *Compare* PX 409-412, 415-420 *with* PX 50-57, 58, 422-23, 452-457, 615; DX 181.

75. Five Plaintiffs, DeSoto, Kittridge I, Kittridge II, Pioneer, and Puente Park, had existing project-based Section 8 Housing Assistance Payment ("HAP") contracts that were renewed between 1986-87. These HAP contracts had terms that extended between 8 and 24 months beyond the properties' respective prepayment eligibility dates. Tr. 779:1-787:7 (Glodney); DX 94, 97-99, 103A.

76. At the time these five Plaintiffs entered into these HAP contracts, Congress was aware of the crisis in low-income housing, had enacted moratoria on prepayments in the Section 515 program,[13] and was considering additional steps to prevent the loss of existing low-income housing. Tr. 786:23-787:7 (Glodney). While Plaintiffs attempted to negotiate shorter terms for their HAP contracts at the time, given Congressional concern and legislation, HUD refused. *Id.* Otherwise, Plaintiffs "would have extended the contract [only] through the prepayment date and then prepaid and increased the rents to market." Tr. 780:16-20 (Glodney).

77. Indeed, in the real world, when prepayment was allowed after 1996, Plaintiffs were able to negotiate shorter-term HAP contracts with HUD. Tr. 783:16-785:10 (Glodney); *see also* Tr. 1124:15-25 (Winiarski) (the duration of a HAP agreement "depends on the

---

[13] From 1986 to 1988, Congress enacted several moratoria on loan prepayments under the Section 515 loan programs for rural housing. *See* H.R. Rep. No. 100-122(I) at 55 (1987), *reprinted in* 1987 U.S.C.C.A.N. 3317.

circumstances of a particular property and the conditions under which the property is operating"). In the hypothetical world of no Title II and Title VI, these Plaintiffs would have renegotiated their HAP contracts with HUD prior to their prepayment eligibility dates such that the end of the contracts would have coincided with Plaintiffs' prepayment eligibility dates. Tr. 2587:15-2591:15 (Hamm) (agreeing that Plaintiffs would have had leverage and would have been able to re-negotiate); Tr. 783:16-785:10 (Glodney); Tr. 1124:15-25 (Winiarski). Moreover, had Plaintiffs not been able to negotiate contracts terminating on their prepayment dates, they would have still had the option to not renew their HAP contracts. Tr. 778:5-779:18 (Glodney).

78. To prevent tenant displacement, HUD would have provided tenant-based Section 8 certificates or vouchers to tenants at properties with expiring HAP contracts. Tr. 780:24-783:1 (Glodney). In order to incentivize owners to accept a certificate or voucher, HUD would have issued certificates or vouchers at market rents. *Id.* Indeed, property owners were not required to accept Section 8 certificates or vouchers, *see* Tr. 2570:23-2571:7 (Hamm), as it was an owner's responsibility to obtain the assistance for eligible tenants. Tr. 792:13-794:8 (Glodney); Tr. 1903:14-1904:2 (Ortega). In the General Partners' experience, HUD has always issued tenant-based Section 8 assistance when properties do not renew HAP contracts. Tr. 787:13-789:11 (Glodney). In the City of Los Angeles, HUD issued, and indeed encouraged, certificates over vouchers because certificates were exempt from rent control and would be more attractive to owners. *See* Tr. 792:13-794:8 (Glodney); Tr. 1903:14-1904:2 (Ortega).

79. At the time of Plaintiffs' prepayment eligibility dates, it was the federal government's policy to provide Section 8 assistance where necessary in order to not displace tenants. HUD regulations set forth HUD's intent to issue Section 8 assistance when approving plans of action that allow for prepayment under ELIHPA, so that "current tenants will not be

involuntarily displaced." 24 C.F.R. § 248.233(d)(3); 55 Fed. Reg. 38949 (1990) (noting that "the Department [HUD] fully intends to provide [Section 8] assistance where necessary"); *see also* Tr. 1234:17-1236:17 (Peiser) (testifying that President's 1992 biannual housing report reflected policy to not displace low-income tenants); 24 C.F.R. § 226(b)(6).

80. After ELIHPA and LIHPRHA were enacted, Claremont and Oxford Park extended their then-existing Section 8 contracts beyond their prepayment eligibility dates. DX 130, 345. They would not have entered into HAP contracts that extended beyond their prepayment eligibility dates if the right to prepay had not already been taken "[b]ecause it was always the intent to prepay." Tr. 779:9-23 (Glodney). Instead, they would have negotiated short-term HAP contracts with expiration dates that coincided with their prepayment eligibility dates or renegotiated their HAP contracts with HUD prior to their prepayment eligibility dates. Tr. 783:16-785:10 (Glodney); Tr. 1124:15-25 (Winiarski); Tr. 2587:15-2591:15 (Hamm).

81. When Plaintiffs entered into Use Agreements, they were not aware that a new, albeit less valuable, prepayment right might be enacted.[14] Tr. 803:19-806:9 (Glodney). Had Plaintiffs known the HOPE Act would be enacted, they would not have signed Use Agreements that restricted their properties' use for the remaining life of their mortgages because it was always their intention to prepay the mortgages. *See, e.g.*, Tr. 806:10-20 (Glodney).

---

[14] On March 28, 1996, Congress enacted the Housing Opportunity Program Extension Act of 1996, Pub. L. No. 104-120, 110 Stat. 834 (1996), ("the HOPE Act") which permitted owners to prepay their HUD-endorsed mortgages. However, the prepayment right that was granted by the HOPE Act is not identical to the right that was taken by ELIHPA and LIHPRHA. Under the HOPE Act, owners that prepay face more restrictions on their properties than they would have faced if they had prepaid on their prepayment eligibility dates but for ELIHPA and LIHPRHA. *Id.* Additionally, the HOPE Act did not reinstate the stream of income Plaintiffs lost as a result of being prohibited from prepaying and converting to market-rate units on their original prepayment eligibility dates. *Id.*

82. After the HOPE Act passed, Plaintiffs asked HUD to release them from their Use Agreements so that they could prepay their HUD-insured mortgages and raise their rents to market levels, but HUD refused. Tr. 807:2-15 (Glodney).

**E. Plaintiffs' Financial Losses Resulting From ELIHPA And LIHPRHA**

83. Plaintiffs suffered a serious financial loss as a result of the enactment of ELIHPA and LIHPRHA. Plaintiffs' expert, Dr. Peiser, the Michael D. Spear Professor of Real Estate Development at Harvard University, accurately measures the economic impact of these statutes under *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978), as the percentage diminution in expected investment return to the owners. PX 1. Dr. Peiser follows the Federal Circuit's and this Court's methodology from *Cienega VIII* and *Cienega IX* and compares Plaintiffs' return on their investments allowed as of the original prepayment eligibility dates ("HUD Scenario") with the expected return on their investments under a market scenario ("Market Scenario"), which he estimates as 8.5% of the "as is" value or preservation equity agreed to by HUD and Plaintiffs in the plan of action process. *Id.*; Tr. 1176:5-1177:10 (Peiser). In other words, Dr. Peiser analyzes what Plaintiffs earned as a percentage of their current equity as of the date of the taking and compares it to what Plaintiffs could have earned on their equity had they been permitted to place it in Fannie Mae bonds earning an extremely conservative rate of 8.5%. Tr. 1336:12-21 (Peiser); PX 1. While the analysis looks at numbers as of the original prepayment date, this analysis covers the takings period, as the return on equity (absent Use Agreement benefits) remains static during this time period.

84. Dr. Peiser's economic impact analysis correctly does not take into account the value of the "incentives" offered by ELIHPA and LIHPRHA, which are properly considered under the just compensation prong of the *Penn Central* test. Tr. 1332:22-1333:15 (Peiser).

85. Dr. Peiser's calculations show that ELIHPA and LIHPRHA caused Plaintiffs to experience severe financial losses during the periods of the taking, and that the diminution in expected returns caused by the taking of Plaintiffs' prepayment right is, on average, a diminution-in-investment return of 96.9%. PX 1. Individually, Plaintiffs suffered the following diminution-in-investment returns: Claremont Village, 96.4%; Covina West, 96.7%; Del Vista, 96.6%; DeSoto, 96.5%; Kittridge I, 98.1%; Kittridge II, 97.1%; Oxford Park, 97.2%; Parthenia, 97.8%; Pioneer, 94.9%; and Puente Park, 97.5%. *Id.*; Tr. 1308:11-1311:23 (Peiser).

86. The government's assertion that Plaintiffs have not suffered a serious financial loss is not credible, as it is based on calculations that do not measure the economic impact during the period of the temporary taking. Indeed, as Dr. Hamm acknowledged, his methodology for calculating the economic impact suffered by Plaintiffs addresses the economic impact of the regulations over the entire life of the property, rather than during the period of the taking. Tr. 2563:24-2565:11 (Hamm). Because Dr. Hamm attempts to measure the economic impact of the regulations on the value of the property without regard to the temporal limitations of the regulations' impact, the economic impact Dr. Hamm measures is directly proportionate to the length of the taking. Tr. 2568:12-15 (Hamm). Using Dr. Hamm's analysis, the government could purposefully take 100% of an owner's income on real property for many years and yet the owner likely could not demonstrate sufficient economic injury to prove a compensable taking. *See id.* As Dr. Hamm explained, his analysis would allow the government to pass a regulation on a property with a 20-year useful life and expected cash flow of $100,000 a year, evenly distributed in each of those 20 years, that reduces the property's cash flow to zero for 9 out of the 20 years without takings liability. Tr. 2567:2-2568:25 (Hamm).

87. Dr. Hamm's methods of measuring economic impact are fundamentally different from the method upheld in *Cienega VIII* and *Cienega IX*. His economic impact analyses will not assist the Court should it continue to follow the Federal Circuit's and this Court's precedent.

**F. Just Compensation**

88. As a result of the enactment of ELIHPA and LIHPRHA, and Plaintiffs' resulting inability to prepay their mortgages and convert to conventional market-rent units on their original prepayment eligibility dates, Plaintiffs have suffered just compensation damages as of December 31, 2006, totaling $100,803,400. PX 1; Tr. 1322:22-1324:6 (Peiser).

89. Plaintiffs' damages are properly measured using Dr. Peiser's model, which measures the income stream lost by Plaintiffs as a result of ELIHPA and LIHPRHA, because it attempts to place Plaintiffs in the position they would have been in had their property not been taken by the government. Dr. Peiser appropriately recognizes that what was taken from Plaintiffs was the right to prepay their mortgages after 20 years (and convert to market at prepayment) and what was returned to Plaintiffs was of less value (as it did not reinstate the lost stream of income or ease the Use Agreement restrictions). PX 1; Tr. 1176:8-21 (Peiser).

90. Based on Plaintiffs' undisputed testimony, Dr. Peiser reasonably assumed that Plaintiffs would have prepaid their mortgages on their prepayment eligibility dates if not for ELIHPA and LIHPRHA. Tr. 1341:8-1342:15 (Peiser); PX 18-19, 28-32A; Tr. 83:23-84:17, Tr. 86:14-87:6 (Goldrich); Tr. 378:14-381:9, 392:9-393:17 (Hirsch). Also, based on the testimony of Ms. Glodney and HUD's Deputy Director of Organizational Policy, Planning and Analysis Division, Mr. Winiarski, Dr. Peiser assumed that Plaintiffs would not have extended their HAP contracts beyond their prepayment eligibility dates and instead would have negotiated shorter-term HAP contracts with expiration dates that coincided with their prepayment eligibility dates. Tr. 1358:11-1359:8 (Peiser); Tr. 783:16-785:10 (Glodney); Tr. 1124:15-25 (Winiarski).

91. Since all of the Plaintiffs signed Title II Use Agreements and were not permitted to exit those Agreements after the HOPE Act was enacted, Dr. Peiser's model measures Plaintiffs' just compensation damages beginning at their original prepayment eligibility dates and continuing either until the expiration of those Use Agreements or, for five of the Plaintiffs, until their properties were sold. Tr. 1176:5-1177:10 (Peiser); PX 1.

92. Dr. Peiser's model includes the economic losses Plaintiffs suffered, and will continue to suffer, as a result of ELIHPA and LIHPRHA even after the enactment of the HOPE Act because, regardless of when the damages accrue, they are directly attributable to ELIHPA and LIHPRHA and the Use Agreements, which were statutorily prescribed as a means of mitigating Plaintiffs' losses. PX 1; *see also* Tr. 2525:16-2528:10 (Hamm) (agreeing that in order to make a person whole, one must take *ex post* facts into account).

93. To calculate the Market Scenario cash flows, Dr. Peiser uses data from G&K's actual experience with Plaintiffs' properties and other properties it manages, as well as data from reliable industry data sources (RealFacts and Institute of Real Estate Management ("IREM")). Tr. 1150:3-23 (Peiser); PX 1; Tr. 1687:23-1689:14, 1702:13-1704:5 (Crosson) (acknowledging that data sources used by Dr. Peiser are reliable). To quantify the cash flows Plaintiffs actually received in the HUD-Restricted scenario, Dr. Peiser uses the audited financial statements and other official records maintained by G&K that track the actual cash distributions Plaintiffs received from these properties. Tr. 1150:3-23 (Peiser); PX 1-13. When actual data are not available, Dr. Peiser conservatively predicts the HUD cash flows by trending forward historical changes in revenue, expenses, and debt service. *Id*.

94. To estimate the rents for the Market Scenario, Dr. Peiser conservatively uses the agreed-upon values established by HUD during the plan of action process and projects those

values before and after the plan of action using the annual percentage change in market rents derived from RealFacts data. Tr. 1189:23-1190:9 (Peiser).

95. The testimony of the government's own appraisal expert demonstrates the conservative nature of Dr. Peiser's analysis. While Dr. Peiser relies on the HUD agreed-upon values, Mr. Crosson retrospectively values the subject properties as of their prepayment dates at values, in all but one case, *above* the HUD agreed-upon values. DX 400-02, 403B, 403C, 404-09. Therefore, to the extent Mr. Crosson's valuations are provided any weight, they simply serve to reinforce the conservatism of Dr. Peiser's model. Tr. 1229:17-1230:14 (Peiser).

96. The government argues that Dr. Peiser's model is flawed because it relies on *ex post* information. The government's argument is without merit, is contradicted by its own expert witness, Dr. Hamm, and has been repeatedly rejected by this Court. In fact, Dr. Hamm admitted that it is appropriate to take *ex post* information into account in an *ex ante* analysis. Tr. 2525:16-2528:10 (testifying that a purely *ex ante* approach would provide a $10 million award for a $200,000 actual loss). Dr. Hamm also admitted that he took into account the significant *ex post* fact that the HOPE Act was enacted in 1996 in his analysis. Tr. 2525:2-7; *see also Independence Park I*, 61 Fed.Cl. at 710 n.16; *Cienega IX*, 67 Fed.Cl. at 490 n.75 (rejecting the government's criticism of the use of *ex post* information and holding that "the events during the temporary takings period are relevant not just to delineate the period itself but also to provide an objective, non-speculative basis for assessing value").

97. Dr. Peiser's model appropriately takes into account the time value of money in both the Market Scenario and the HUD-Restricted Scenario by "bringing forward" past cash flows from the beginning of the damages period to December 31, 2006, using a 10% compounding rate and "discounting back" projected future cash flows from December 31, 2006,

to the damages termination date using a 10% discount rate. Tr. 1200:9-25 (Peiser); PX 1. Dr. Peiser believes that 11% is the optimum discount rate for both sets of cash flows but employs a 10% rate in accordance with the Court's opinion in *Independence Park I*. *Id*.; *see also Independence Park I*, 61 Fed. Cl. at 711; *Cienega IX*, 67 Fed.Cl. at 491.

98. The 10% rate is appropriate because it conservatively represents Plaintiffs' lost opportunity costs during the period of the taking. Tr. 1338:23-1340:16 (Peiser). Plaintiffs' ability to conduct their business depends on their access to capital. The funds taken by the government over the past 18 years—almost two decades—represent a significant loss of capital which Plaintiffs require to reinvest in other income-producing properties as part of conducting their business. Tr. 1464:11-16 (Peiser). Plaintiffs could not simply have replaced these funds by borrowing at a risk-free rate. *Id.* Thus, the only way to make Plaintiffs whole is to apply an interest rate that reflects the owners' cost of capital. *Id.*; PX 1.

99. Ten percent should be used for both compounding and discounting because the proceedings are now in the middle of the damages period for some Plaintiffs and consistency in the rates is essential to an accurate determination of just compensation. Tr. 1177:11-1179:3, 1200:9-25 (Peiser); PX 1. Moreover, the rate used to discount future cash flows should be the same rate that is used to bring past damages forward because had the General Partners received the cash flows when they were earned, they would have reinvested them at their opportunity cost (10%, their cost of capital). *Id*. Thus, the cost of capital (10%) is the appropriate rate. *Id*. Therefore, in the interest of fairness, applying an identical compounding rate and discount rate (the concept of symmetry) is equitable and will eliminate the incentive for the government to continue to drag this case out and not pay Plaintiffs the just compensation it owes. Tr. 1200:9-25 (Peiser); PX 1.

100. To make Plaintiffs whole, the 10% must be compounded annually because Plaintiffs' properties are income-producing. *See* Tr. 1586:20-1587:5 (Peiser). Plaintiffs would have received compound interest on the cash flows had they not been taken. *Id.* Simple interest will not place Plaintiffs in the same position they would have occupied but for the taking. *Id.*

101. The government criticizes the 10% discount rate but fails to offer a reasonable alternative. Instead, the government's expert advocated differential discount rates for the HUD-Restricted Scenario and the Market Scenario because he believes risk and return go together, and that Plaintiffs encountered almost no risk. Tr. 2463:9-2467:5 (Hamm); DDX 678.[15] The assumption that Plaintiffs encountered little risk is inconsistent with the facts; it appears to conflate Mr. Goldrich's testimony that there was a reduced vacancy risk in HUD properties with the false assumption that there was little overall risk in investing in HUD properties. Tr. 78:6-21 (Goldrich); Tr. 386:23-389:7, 386:23-389:7 (Hirsch) (describing significant risks Plaintiffs faced). Hamm's false assumption thus undercuts his rationale for differential discount rates.

102. The 10% discount rate should be used to discount the cash flows in both the HUD-Restricted Scenario and the Market Scenario because there is no significant difference in the risk associated with operating HUD-restricted properties and conventional properties in the California market. Tr. 1340:17-1341:7 (Peiser); PX 1. In fact, the HUD-restricted income stream is as risky, if not more risky, than the market-income stream due to the significant regulatory risk associated with participating in the HUD programs. *Id.* Ms. Glodney testified that Plaintiffs have experienced several of the regulatory risk factors associated with the HUD programs, including significant red tape, the risk that the government will enact legislation

---

[15] Moreover, the government's other expert, Mr. Malek, contradicts Dr. Hamm on this point, offering (deeply flawed) discount rates between 100% and 200%. *See* Tr. 1396:10-1402:5 (Peiser); PX 14. Mr. Malek's methodology is nonsensical, as, among other things, he does not monetize Partners' investments during the developmental stage. *See* PX 14.

changing fundamental terms of the program, and changes in HUD regulations imposing additional non-reimbursable cost burdens (such as criminal background checks, notice and form requirements, translation expenses, inspection requirements, and special disability-related requirements, among others). Tr. 243:8-244:23 (Glodney). Further, to the extent that there are differences in the risks associated with the Market Scenario and the HUD-Restricted Scenario, Dr. Peiser accurately accounts for those risks in the underlying cash flows, thus eliminating the need to use differential discount rates to account for risk. PX 1; Tr. 1338:23-1341:8 (Peiser).

103. The government also inappropriately advocates the use of a risk-free rate for bringing forward the just compensation award during the period of the taking. Tr. 2377:1-20 (Hamm); DDX 652. A risk-free rate would only be appropriate if Plaintiffs had unlimited access to capital at a risk-free rate and had suffered no other injuries, such as uncertainty of payment date and decades of costly litigation. Here, a risk-free rate is inappropriate because Plaintiffs bear the risk of uncertainty regarding when and if they will ever be paid for the taking of their property. *See* PX 1; Tr. 1340:17-1341:7 (Peiser). If a risk-free rate is used, Plaintiffs will not be placed in the same pecuniary position they would have occupied if the payment of just compensation had coincided with the duration of the taking of their property.

**1. Los Angeles Rent Stabilization Ordinance**

104. DeSoto, Kittridge I, Kittridge II, Oxford Park, and Parthenia ("Los Angeles Plaintiffs") are located within the City of Los Angeles and thus are governed by the Los Angeles Rent Stabilization Ordinance, L.A. Mun. Code §§ 151 et seq. ("LARSO"). Plaintiffs demonstrated that LARSO would not have impeded Los Angeles Plaintiffs from raising their rents to market rates had their right to prepay not been taken because HUD

105. Amendments enacted on November 22, 1990, fundamentally changed LARSO in two ways. *See* L.A. Mun. Code §§ 151.02, 151.06 (as amended by L.A. Ord. No. 166,320) (eff.

Nov. 22, 1990). First, they limited the amount by which an owner could increase the rent on a unit when that unit was no longer regulated under a local, state, or federal program. Under those circumstances, the starting rent under LARSO would be the last rental amount charged while exempt from LARSO (due to its regulation by a local, state, or federal program) plus any allowable LARSO increase. *Id.* Second, they prohibited the operation of "vacancy decontrol" (which removes rent control restrictions when a tenant moves out) where a rental unit was vacated as a result of the termination of participation in such local, state or federal program. *Id.*

106. The evidence demonstrated that LARSO would not have prevented Los Angeles Plaintiffs from raising their rents to market rates upon prepayment because, at that time, HUD and the Housing Authority of the City of Los Angeles ("HACLA") would have provided LARSO-exempt Section 8 certificates at market rents to all low-income and very low-income tenants at Los Angeles Plaintiffs' properties (which were the vast majority of tenants at these properties on the prepayment eligibility dates). Tr. 301:9-309:2, 800:8-11 (Glodney); PX 543; Tr. 1903:3-7 (Ortega) (testifying that units in which prepaying tenants received a Section 8 certificate would not be subject to the 1990 LARSO amendments).

107. The Section 8 certificate and voucher programs were tenant-based programs, and were intended to allow tenants to choose where to live. Tr. 774:10-18 (Glodney). There was no other program available to HUD except the tenant-based Section 8 program to prevent tenant displacement. Tr. 791:6-792:22 (Glodney). In Los Angeles, certificates were issued (not vouchers) because certificates were exempt from rent control. Tr. 792:13-794:8 (Glodney). HUD encouraged certificates over vouchers in Los Angeles for this reason. *Id.*; Tr. 1903:14-1904:2 (Ortega). It was an owners' decision to accept certificates or vouchers, as it was the owner's responsibility to obtain the certificates for eligible tenants. Tr. 791:6-792:22 (Glodney).

Tenant-based certificates were also issued at, and never below, market rate. Tr. 789:1-4 (Glodney).

108. In fact, this is precisely what occurred after the HOPE Act was enacted—eligible tenants at prepaying properties were issued Section 8 assistance. When Independence Park and Beck Park, Los Angeles properties managed by G&K, prepaid their mortgages after the HOPE Act became effective, HUD and HACLA issued LARSO-exempt Section 8 certificates to qualified tenants at those properties. Tr. 797:14-799:16 (Glodney). As a result, the properties immediately raised their rents to market rates. *Id.*

109. If HUD and HACLA did not issue LARSO-exempt Section 8 certificates to tenants upon prepayment (which is unlikely given what actually occurred in 1996), there were nonetheless several ways Los Angeles Plaintiffs could have raised their rents directly to market rates upon prepayment under LARSO. For example, Los Angeles Plaintiffs could have applied for a "just and reasonable" rent increase pursuant to LARSO, received a "class rent increase" under LARSO, or provided residents with compensation as an incentive to move such that the units would be subject to vacancy decontrol. *See* Tr. 799:17-803:18 (Glodney); Tr. 117:14-118:24 (Goldrich); *see also* Tr. 1901:6-1904:2 (Ortega) (testifying the City of Los Angeles approves 80% or more of "just and reasonable" rent increases and approved a class rent increase to make renting to low-income tenants "more attractive to landlords").

110. Importantly, the 1990 amendments to LARSO are not applicable to DeSoto and Kittridge I, as their prepayment eligibility dates preceded the amendments' effective dates. *See id.*; PX 101, 115; Tr. 1264:15-22 (Peiser). Therefore, LARSO would not have prevented DeSoto and Kittridge I from prepaying their mortgages and raising their rents to market rates on their prepayment eligibility dates (November 2, 1990, and September 17, 1989 respectively). *Id.*

111. Finally, the government's own records establish that LARSO would not have inhibited Plaintiffs' ability to raise rents to the levels assumed by Plaintiffs' models. As a par tof the Title II plan of action process, Plaintiffs conducted appraisals which, by regulation, "reflect[ed] the effect rent control would have on the unsubsidized fair market value." PX 619; *see also* Tr. 562:24-564:2, 569:1-14 (Glodney). As discussed *supra*, HUD used those appraisals to determine an "as-is" value for each property. In determining that value, "HUD Legal Division" "reviewed" the application of LARSO to the subject property and HUD determined that the as-is value "took into consideration the future effect of the ordinance." PX 255-57; *see also* DX 190; Tr. 2558:7-14 (Hamm) (acknowledging that if HUD took LARSO into account, it would be reflected in the preservation equity value). The "as-is" value, and its concomitant assumptions about rental income, was the value used by Dr. Peiser in his damages model.

112. Finally, even assuming certificates would not have been issued to all eligible low-income and very low-income tenants, LARSO would not have prohibited the conversion to market-rate units, it only would have delayed the conversion (units would have gone to market over a period of 3-4 years as opposed to immediately). Tr. 389:8-391:7, 475:20-483:17 (Hirsch); Tr. 117:14-118:24 (Goldrich); 1262:23-1272:16 (Peiser); PX 630; *see also infra* note 24.

**2. Interest on Just Compensation Award**

113. Plaintiffs are entitled to pre-judgment interest on any just compensation award, calculated from the end of the takings period until the date the government pays damages, at the 20-year U.S. Treasury STRIPS rate ("20-year rate") to reflect the long delay in payment. The takings period ended for Claremont Village, Covina West, Del Vista, Pioneer, and Puente Park when they sold their properties; for these Plaintiffs, interest should be calculated from the date of the sale of the property until the date the damages are paid by the government at the 20-year rate.

114. While Plaintiffs believe only a 10% compounded pre-judgment interest rate will make them whole, they understand that the Court has previously ruled that a 10-year STRIPS rate is the appropriate pre-judgment interest rate. *Cienega IX*, 67 Fed. Cl. at 492-44. Dr. Peiser testified that if a STRIPS rate is used, a 20-year STRIPS rate would be more appropriate given Plaintiffs' lost opportunity costs and the uncertainty surrounding when Plaintiffs will be compensated by the government for the taking of their property. *See, e.g.*, Tr. 1200:9-25 (Peiser). Indeed, Plaintiffs have been waiting almost 18 years already, and it is not at all clear when the government finally will pay Plaintiffs just compensation, even after an award of damages in the present proceeding.[16] Tr. 1177:11-17, 1296:25-1297:8 (Peiser); PX 3A.

115. Including interest calculated at the 20-year STRIPS rate for Claremont Village, Covina West, Del Vista, Pioneer, and Puente Park, the value of damages as of December 31, 2006, is $100,803,400, representing $6,962,833 for Claremont Village, $13,492,306 for Covina West, $10,089,067 for Del Vista, $23,351,704 for DeSoto, $13,733,366 for Kittridge I, $6,802,951 for Kittridge II, $7,791,461 for Oxford Park, $2,547,870 for Parthenia, $7,545,584 for Pioneer, and $8,486,258 for Puente Park. This total has increased since December 31, 2006, and will continue to do so until the date damages are paid by the government.

## III. PROPOSED CONCLUSIONS OF LAW

### A. Plaintiffs' Takings Claims Are Ripe For Review Because Filing A Request For Prepayment Would Have Been Futile

116. In *Cienega VI*, the Federal Circuit held that owners were not obligated to file futile requests for prepayment in order to make their takings claims ripe. *Cienega Gardens v.*

---

[16] For DeSoto, Kittridge I, Kittridge II, Oxford Park, and Parthenia, pre-judgment interest is taken into account in the underlying damages amount because of the discounting/bringing forward calculations. *See, e.g.*, Tr. 1200:9-25 (Peiser). This interest should also be calculated at 10%.

*United States* ("*Cienega VI*"), 265 F.3d 1237, 1248 (Fed Cir. 2001). Thus, to demonstrate ripeness, which the government does not concede, *see* Tr. 35:18-21, Plaintiffs need only prove that it would have been futile to apply to HUD for permission to prepay their HUD-insured mortgages. *See id.; Cienega VI*, 265 F.3d at 1248. Under both the mandate rule and binding precedent, Plaintiffs' takings claims are ripe unless this Court determines Plaintiffs could have satisfied *each* of the following statutorily-required criteria for prepayment under ELIHPA or LIHPRHA: (1) prepayment would not cause a rent increase of more than 10%; (2) prepayment would not materially affect the supply of low-income housing; and (3) prepayment would not displace current tenants. *See Cienega IX*, 67 Fed. Cl. at 460 n.33 (2005) (acknowledging that the legal analysis regarding ripeness is binding precedent); *see also* 12 U.S.C. § 4108 (LIHPRHA); 24 C.F.R. § 248.141(a)(1); 12 U.S.C. § 1715*l* note § 225.

117. Here, because Plaintiffs could not have satisfied *any* of ELIHPA or LIHPRHA's stringent prepayment requirements—let alone all of them—HUD lacked discretion to permit them to prepay. *First*, prepayment of Plaintiffs' HUD-insured mortgages would have caused the rents at Plaintiffs' properties to increase by more than 10%. Tr. 526:9-527:8, 537:14-25 (Glodney); Tr. 1962:15-1965:13 (Vitek). In fact, HUD's own data demonstrates that prepayment would have caused rent increases ranging from 26.1% to 24.6% at Claremont Village; 74.2% to 94.4% at Covina West; 26.9% to 38.2% at Del Vista; 62.7% to 64.6% at DeSoto; 88.5% to 97.8% at Kittridge I; 52.5% to 67.4% at Kittridge II; 61.2% to 63.6% at Parthenia; 24.3% to 43.2% at Pioneer; and 54.1% to 71.8% at Puente Park. *Compare* PX 322, 327, 337, 348, 359, 362-63, 375, 375A, 387, 392-93 *with* PX 422-23, 452-457, 615.

118. *Second,* Plaintiffs' prepayment would have materially affected the supply of low-income housing. At the time of Plaintiffs' prepayment eligibility dates, not only was each

property operating at full occupancy with a waiting list, *see* Tr. 928:3-9 (Glodney); Tr. 78:10-15 (Goldrich) ("people were standing in line to rent" HUD units), but Plaintiffs' properties were located in low-vacancy areas which lacked a supply of affordable housing sufficient to accommodate displaced tenants. Tr. 1962:16-1965:13 (Vitek). Tellingly, as a result of the shortage of low-income housing in California, HUD did not approve prepayments in any of the geographic locations where Plaintiffs' had properties. *Id.*; PX 632. Even Congress recognized the shortage of low-income housing in California and stated that "[t]he loss of units in such markets would be devastating to families and communities." S. Rep. No. 101-316, at 107 (1990), *reprinted in* 1990 U.S.C.C.A.N. 5763, 5869; *see also Cienega IX*, 67 Fed. Cl. at 460-61 (holding that prepayment "would adversely affect the supply of housing for low-income tenants" and noting government expert's testimony that in California, "[i]t was so hard to prove that [prepayment] would not adversely affect the supply of affordable housing," and government counsel's concession that in California, "prepayment [under Section 4108] was unlikely").

119. *Third*, if Plaintiffs were permitted to prepay their HUD-insured mortgages and raise their rents to market rates, current tenants who could not afford the increase in rents would be displaced. Tr. 1236:6-17 (Peiser) (discussing government's concern with tenant displacement). In sum, because it would have been futile for Plaintiffs to apply to HUD for prepayment, Plaintiffs' claims are ripe for review. *See, e.g.*, *Cienega VI*, 265 F.3d at 1248; *Cienega IX*, 67 Fed. Cl. at 459-62.

**B. ELIHPA And LIHPRHA Effected A Temporary Regulatory Taking Of Plaintiffs' Rights To Prepay Their HUD-Insured Mortgages On Their Twenty-Year Prepayment Eligibility Dates**

120. In *Cienega VIII*, the Federal Circuit held that plaintiffs had two "vested property interests at the time of the passage of ELIHPA and LIHPRHA": (1) a property right to prepayment (derived from the plaintiffs' real property interest in their land), and (2) a contractual

right to prepayment (derived from the contract itself). *Cienega VIII*, 331 F.3d at 1328-1330; *see also Cienega Cienega IX*, 67 Fed. Cl. at 465-66 (noting *Cienega VIII*'s holding that ELIHPA and LIHPRHA implicate two property rights).

121. To determine whether ELIHPA and LIHPRHA constituted a regulatory taking of these property interests, this court must weigh the three *Penn Central* factors (a) the character of the governmental regulation, (b) its economic impact, and (c) its interference with the owner's distinct investment-backed expectations. *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). None of these factors are dispositive. *See, e.g., Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015 (1992) (noting the determination of whether a regulation has "go[ne] 'too far'" and effects a taking is an "essentially ad hoc, factual inquir[y]"); *Palazzolo v. Rhode Island,* 533 U.S. 606, 635-36 (2001) (O'Connor, J., concurring). Instead, in weighing the factors, the touchstone of the inquiry is whether the government has "forc[ed] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

### 1. ELIHPA And LIHPRHA Have The Character Of A Taking

#### a. Evidence Adduced At Trial Reinforces The Federal Circuit's Holding That The Government's Actions In Enacting ELIHPA And LIHPRHA Had The Character Of A Taking

122. In *Cienega VIII*, the Federal Circuit held "as a matter of law" that ELIHPA and LIHPRHA's abrogation of the Model Plaintiffs' prepayment rights "had a character that supports a holding of a compensable taking." 331 F.3d at 1340. In so holding, the Federal Circuit focused on three factors that it found determinative. It found that the statutes (1) unfairly burdened certain providers of low-income housing with the societal cost of maintaining future low-income housing; (2) forced Plaintiffs to suffer a physical occupation of their properties by government-approved tenants, depriving Plaintiffs of the core property rights of possession and

control; and (3) greatly impaired Plaintiffs' core right to transfer or convey their properties at will. *See Cienega VIII*, 331 F.3d at 1338-39. As the Court of Federal Claims recently observed, *Cienega VIII*'s holding was not based on "facts unique to the parties . . . or facts that might vary from case to case." *City Line Joint Venture v. United States*, 71 Fed. Cl. 486, 493 (2006).[17] The record in this case provides this Court with a strong basis for making those same findings here.

123. *First*, the evidence shows that ELIHPA and LIHPRHA's elimination of Plaintiffs' ability to exit the HUD programs after 20 years, regain ownership rights, and realize their properties' unrestricted market value disproportionately imposed upon them the costs of the nation's low-income housing shortage. ELIHPA and LIHPRHA's stated purpose was to force property owners to continue to offer below-market rents to low-income individuals.[18] By prohibiting prepayment and thereby requiring Plaintiffs to accept below-market rents mandated by the Regulatory Agreements, ELIHPA and LIHPRHA singled out Plaintiffs (and similarly-situated owners) to pay the costs of housing the nation's poor—a societal problem which, as the government's own HUD witness explained, Plaintiffs did not create and, indeed, agreed to help remedy for 20 years. *See Cienega IX*, 67 Fed. Cl. at 466.

124. At trial, the government's own witness underscored this intent. Mr. Vitek testified clearly that Congress chose not to fund new low-income housing construction programs

---

17 Rather, the *City Line* court noted that *Cienega VIII* was based on the Federal Circuit's analysis of "legislative facts"—"facts of universal application to cases of the instant sort, specifically, facts identifying Congress's purpose in enacting ELIHPA and LIHPRHA and facts identifying the class of individuals on whom the burden of those enactments fell." *City Line Joint Venture v. United States*, 71 Fed. Cl. 486, 493 (2006). It also found that *Cienega VIII*'s holding that ELIHPA and LIHPRHA had the character of a taking was similar in controlling cases. *Id.*

18 Indeed, the stated goal of ELIHPA was "to preserve and retain to the maximum extent practicable as housing affordable to low-income families or persons those privately owned dwelling units that were produced for such purpose with Federal assistance," ELIHPA § 202(b)(1), 12 U.S.C. § 1715*l* note, *i.e.*, to compel the current providers of low-income housing to continue providing it and suffer the resulting economic losses.

and was cognizant of the resulting detrimental effect on the nation's low-income housing supply. Tr. 1961:13-1962:18 (Vitek) (testifying about the detrimental effect of the cessation of funding for new affordable housing programs).[19] As Mr. Vitek acknowledged, when a crisis appeared imminent, the government shifted the massive expense of the affordable housing problem on to a few private property owners by extinguishing their unfettered prepayment rights.

125. *Second*, the evidence demonstrates that ELIHPA and LIHPRHA forced Plaintiffs to suffer a physical occupation of their properties. As the Supreme Court held in *Penn Central*, "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." 438 U.S. at 124 (citation omitted).

126. When the government extinguished Plaintiffs' prepayment rights under ELIHPA and LIHPRHA, it prevented Plaintiffs from exiting the Regulatory Agreements and, instead, forced Plaintiffs to choose from three options that would preserve the property for low-income use: (1) operating under the original Regulatory Agreements with terms that (among other things) constrained Plaintiffs' ability to choose tenants and charge market rents; (2) entering into new Use Agreements with HUD that also contained tenant and affordability restrictions for the life of the mortgage; and (3) the selling the property to a HUD-approved purchaser at a rate set by HUD. Tr. 1927:18-1928:13 (Vitek); *see also* 12 U.S.C. § 4108; 24 C.F.R. § 248.141(a)(1).

---

[19] This Court has likewise found that Congress terminated funding for supply-side Section 8 new construction programs in the early 1980s because Congress and the administration were of the opinion that the "Section 8 new construction program was expensive [and] a burden to the U.S. budget" and therefore terminated its funding. *Cienega IX*, 67 Fed. Cl. at 466 (citing testimony of Mr. Vitek).

127. By compelling Plaintiffs to rent their property to low-income tenants (or orchestrating a transaction that would compensate Plaintiffs with cents on the dollar to sell the property to someone that would), ELIHPA and LIHPRHA's core character is analogous to that of a holdover tenancy created when the federal government refuses to vacate property upon the expiration of a lease. The Supreme Court has uniformly held that such holdover tendencies require just compensation. *See United States v. Pewee Coal Co.*, 341 U.S. 114 (1951) (upholding award of just compensation to owner of a coal mine the government had occupied and operated for over five months); *United States v. General Motors Corp.*, 323 U.S. 373, 375 (1945) (lessors have a claim under the Takings Clause when the government is a holdover tenant); *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1300 n.13 (Fed. Cir. 1986) (citing *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949)) (same); *Allenfield Assocs. v. United States*, 40 Fed. Cl. 471, 487 (1998) (same).

128. *Third*, Plaintiffs demonstrated that ELIHPA and LIHPRHA usurped Plaintiffs' right to transfer or convey their property, another fundamental element of property ownership. *See General Motors*, 323 U.S. at 377–78 (noting that "the right to . . . dispose of it" is among the "the group of rights inhering in the citizen's relation to the physical thing"). Under the options to do nothing or sign a Use Agreement, Plaintiffs were barred from alienating their property in the free market. And the so-called "sale option" was no better—both the government's own expert Dr. Hamm and HUD representative Mr. Matthews admitted that ELIHPA's restricted sale option was itself a drastic limitation on Plaintiffs' rights to transfer their properties.[20] Tr. 2222:3-21

[20] The statutory scheme at issue provided Plaintiffs with the choice of either proceeding under either ELIHPA or LIHPRHA, or remaining bound by their original Regulatory Agreements for 40 years. 12 U.S.C. 4101l note, § 604(a). Plaintiffs chose to proceed under ELIHPA, and therefore only the options ELIHPA offered are relevant here. Tr. 323:4-324:4 (Glodney); Tr. 2852:10-24 (Vitek).

(Hamm); Tr. 2043:15-2044:3 (Matthews). That admission is not surprising. Under these regulatory schemes, owners could *only* sell to HUD-approved purchasers (a resident group or non-profit that would agree to maintain affordability restrictions), at a price HUD set. *Id.*; *see also* Tr. 1929:25-1930:22 (Vitek); Tr. 534:25-535:20 (Glodney).

129. ELIHPA and LIHPRHA's elimination of Plaintiffs' ability to transfer their properties, except on government-approved terms to government-approved tenants, constitutes an "extraordinary" impairment of Plaintiffs' fundamental property rights and requires the finding of a taking. *See Hodel v. Irving*, 481 U.S. 704, 715-16 (1987) (holding that a statute abrogating the common-law right to devise to one's heirs even a small portion of a property interest was nevertheless a taking because the character of the government regulation was "extraordinary").

**b. The Government Adduced No Evidence That Undermines The Federal Circuit's And This Court's Conclusion That The Enactment Of ELIHPA And LIHPRHA Have The Character Of A Taking**

130. The government is unable to prove that the facts that were determinative in *Cienega VIII* are not present here so it instead claims that incentives that were provided to diminish Plaintiffs' damages after the taking—the option to sign Use Agreements or sell the property—necessitate a finding that the government's actions do not have the character of a taking. That argument proves too much. Even if this Court finds that Plaintiffs proved every fact *Cienega VIII* required on the character prong, it should nonetheless further find that the government's provision of these options in no way diminishes the broad rights the government took, including Plaintiffs' prepayment right, right to use the property, and right to exclude others.

131. *First*, as discussed *infra*, it is unclear as to whether the so-called sale "option" under ELIHPA was even a legitimate option—the government adduced no credible proof that a Title II sale ever occurred. Notwithstanding that fact, to the extent a sale was an option, that

option constituted an extraordinary limitation on Plaintiffs' property rights, further underscoring that the government's action in enacting ELIHPA and LIHPRHA had the character of a taking. The Title II sale "option" required that owners sell only to HUD-approved and HUD-subsidized buyers at a HUD-approved price. Tr. 1985:3-8 (Vitek). As Dr. Hamm noted, such a transaction is certainly not an "open market" sale. Tr. 2222:3-21 (Hamm). Rather, the sale "option" was akin to a transfer of property by eminent domain, without assurance of just compensation.

132. *Second*, ELIHPA's offer to Plaintiffs to enter into Use Agreements—thereby extending the duration of the taking and falling far short of just compensation—does not change the character of the government's action. As discussed *supra*, the statutory "incentives" that HUD could offer Plaintiffs under Use Agreements did not *justly* compensate Plaintiffs. Thus, the existence of such "incentives" does not alter the character of the government's action in enacting the statutes for purposes of the *Penn Central* analysis.[21]

133. As the Federal Circuit concluded in *Cienega VIII*, in "abrogating the Owners' contractual prepayment rights, the statutes intentionally defeated the Owners' real property rights to sole and exclusive possession after twenty years and to convey or encumber their properties after twenty years." 331 F.3d at 1328. "The character of the government's action is that of a taking of a property interest, albeit temporarily." *Id*. at 1338. For the reasons above, and as the Federal Circuit and this Court have found, the government's enactment of ELIHPA and

[21] There were two additional options which the government cannot seriously claim prevent this Court from finding that ELIHPA and LIHPRHA had the character of a taking. First, the option to do nothing did not ameliorate the statutes' unfairness, but rather merely offered Plaintiffs the "opportunity" to continue operating under the restrictions imposed by the original Regulatory Agreements, including limited annual dividends and tenant-occupation restrictions, as well as regulatory requirements and substantial administrative red-tape. ELIHPA and LIHPRHA took Plaintiffs' right to finally extricate themselves from these restrictions; therefore the do-nothing option was just that: nothing. Second, the prepayment "option" indisputably did not exist for Plaintiffs. *See supra* Section II.C.

LIHPRHA has the character of a taking. *See Hodel*, 481 U.S. at 715-16 (holding the "extraordinary" nature of the character of the taking required a finding of a taking where plaintiffs otherwise failed to meet the other *Penn Central* prongs).

**2. ELIHPA And LIHPRHA Caused Sufficiently Severe Economic Impact To Effect A Taking**

134. Under *Penn Central*'s second factor, Plaintiffs must "show 'serious financial loss' from the regulatory imposition in order to merit compensation." *Cienega VIII*, 331 F.3d at 1340. There is no "automatic numerical barrier preventing compensation." *Yancey v. United States*, 915 F.2d 1534, 1541 (Fed. Cir. 1990). Instead, a court must "weigh[] all the relevant considerations" to determine whether the economic impact is sufficiently severe to constitute a regulatory taking. *Id.* The evidence adduced at trial demonstrates that ELIHPA and LIHPRHA's economic impact were indeed sufficiently "severe" to constitute a taking.

**a. The Evidence Adduced By Plaintiffs Regarding Plaintiffs' Losses On Their Rates Of Return Is Sufficient As A Matter Of Law To Demonstrate Serious Financial Loss**

135. The choice of a particular method of valuing the economic impact of a taking is left to the trial court's discretion. *Rose Acre Farms v. United States*, 373 F.3d. 1177, 1190 (Fed. Cir. 2004). This Court has recognized that there are various "optional means of addressing economic impact," including (1) "meas[uring] the claimant's return on equity against the return on equity the claimant would have received but for the taking," (2) "measuring . . . the claimant's recoupment of its capital," and (3) "compar[ing] . . . the value taken from the property with the value remaining in the property." *Cienega IX,* 67 Fed. Cl. at 474-75; *see also Dist. Intown Props. Ltd. P'ship v. District of Columbia*, 198 F.3d 874, 879 (D.C. Cir. 1999) (a "regulation's economic effect upon the claimant may be measured in several different ways" including both change in "market value" and "reasonable rate of return") (emphasis omitted).

136. Recognizing the availability of three methods of calculating economic impact for a temporary taking, this Court should find that the return-on-equity method best fits the facts and circumstances of this case, and further follow *Cienega VIII* which chose to measure the economic impact of ELIHPA and LIHPRHA's abrogation of similarly-situated plaintiffs' prepayment rights by applying a return-on-equity method that examines the percentage loss of plaintiffs' possible rates of return during the time of the taking. *See Cienega VIII*, 331 F.3d at 1343 (holding that, as a result of LIHPRHA, Model Plaintiffs "earned a return that was about 96% less than what they could have earned by investing their money elsewhere"); *Cienega IX*, 67 Fed. Cl. at 475 ("in the present case, the return-on-equity approach best measures the impact of ELIHPA and LIHPRHA on the plaintiffs."); *CCA Assocs. v. United States*, 75 Fed. Cl. 170, 197-98 (2007) (holding, in a case involving a temporary taking similar in all respects to the taking at issue here, that "the return-on-equity approach provides the most appropriate measure of economic impact in this temporary taking case of an income-producing property.").

137. This Court recognized that the return-on-equity approach avoids the unfairness of using a change-in-value approach for income-producing properties. *See Cienega IX*, 67 Fed. Cl. at 476 (explaining that using the change-in-value method to measure the economic impact on an income-producing property would improperly allow the government to "use the duration of the taking as a means to allow the capture of all value or return from a property for a period of a few years"); *CCA Assocs.*, 75 Fed. Cl. at 196-97 ("In the context of the preservation statutes, measuring the economic impact by assessing the change in fair market value runs the risk of substantially understating the effect on the owner's property interest" in part because it "tends to disregard the loss of the full income stream for a substantial period of time.").

138. That position is consistent with the Federal Circuit's suggestion in *Rose Acre Farms v. United States*, 373 F.3d 1177, 1188-89 (Fed. Cir. 2004)—a case that had nothing to do with ELIHPA or LIHPRHA—that a diminution-in-value approach is "less appropriate" in cases "concern[ing] the economic impact, albeit temporary, of government regulations of an ongoing business." *See Rose Acre Farms v. United States*, 75 Fed. Cl. 527, 533 (2007) (holding, on remand, that in a temporary regulatory takings case, a diminution-in-return (or lost profits) approach is the best measure of economic impact).

139. Thus, in *Cienega VIII* and *Cienega IX*, the Federal Circuit and this Court measured the economic impact of ELIHPA and LIHPRHA by comparing the annual return-on-equity permitted under ELIHPA and LIHPRHA (aggregate annual earnings divided by aggregate equity in the properties shortly after the prepayment eligibility date) with the return on the low-risk 30-year Fannie Mae bonds. 331 F. 3d at 1343; 67 Fed. Cl. at 475-76.

140. Plaintiffs in this case rely upon precisely the same model, by the same expert with special knowledge of the Los Angeles multifamily housing market, to demonstrate that ELIHPA and LIHPRHA forced them into accepting rates of return well below what they would have earned had the government not taken over their land. PX 1. Plaintiffs' model demonstrates that ELIHPA and LIHPRHA caused Plaintiffs to experience severe financial losses; on average, a diminution-in-investment return of 96.9%. *Id.* Individually, Plaintiffs suffered the following diminution-in-investment returns: Claremont Village, 96.4%; Covina West, 96.7%; Del Vista, 96.6%; DeSoto, 96.5%; Kittridge I, 98.1%; Kittridge II, 97.1%; Oxford Park, 97.2%; Parthenia, 97.8%; Pioneer, 94.9%; and Puente Park, 97.5%. *Id.*; Tr. 1308:11-1311:23 (Peiser).

141. The Federal Circuit held in *Cienega VIII*, the "loss of 96% of the possible rate of return on the investment is, even under the most conservative view, a 'serious financial loss.'"

*Cienega VIII*, 331 F.3d at 1343. Therefore, because ELIHPA and LIHPRHA caused Plaintiffs severe economic harm by preventing Plaintiffs from raising their rents to market rates at their 20-year prepayment eligibility dates, Plaintiffs have carried their burden to show the evidence is insufficient to demonstrate economic impact.

**b. The Government Failed To Demonstrate That Plaintiffs' Economic Impact Analysis Is Not The Correct Method Of Measuring The Economic Impact Of ELIHPA And LIHPRHA On Plaintiffs**

142. The government does not and cannot argue that Dr. Peiser did not accurately apply the measure of economic impact using a model upheld by in *Cienega VIII* and *Cienega IX*. Instead, the government offers several criticisms of Plaintiffs' economic impact analysis in its attempt to persuade this Court again to depart from these decisions. None have any merit.

**(1) The Government Fails To Demonstrate That The Return-On-Equity Measure Is Unsound**

143. The government argues that Plaintiffs' model is unsound because it is a "snapshot" look at ELIHPA and LIHPRHA's economic impact and yields the same measure of severity regardless of whether the taking is permanent or temporary. This argument is barred by the Court's holding in *Cienega VIII*. 331 F.3d at 1343.

144. Even if the issue of valuation method was still open, this Court must reject the government's position because it is not the appropriate measure of the right that ELIHPA and LIHPRHA took from Plaintiffs. The government's models seek to make insignificant the stream of income it took when Congress abrogated the prepayment right by evaluating the impact of that taking against the value of the property over its entire life, rather than over the takings period.[22]

---

[22] The right to prepay was not simply any random "stick in the bundle" of Plaintiffs' property rights, but rather was the "stick" on which Plaintiffs placed so much value that when they entered the Regulatory Agreements, they specifically conditioned their participation in the HUD programs on the right to prepay. *See* PX 98-103, 104-106, 115 (Trust Notes and Secured

The government's economic impact calculations illustrate why Dr. Peiser's approach is the optimal measure of economic impact in this case—if the economic impact of ELIHPA and LIHPRHA was measured over the life of the property, the impact of the government's action would be so diluted that it would license—indeed, incentivize—confiscatory conduct by the government. The rule the government promotes would immunize wholly confiscatory regulations so long as they last less than half the useful life of a property. Under that rule, the government could deprive private property owners of all productive uses of their real property for decades (indeed the rest of an owner's natural life) without paying just compensation.

145. Testimony by the government's own expert underscores the absurdity of its view. The government asserted under its method of calculating economic impact that an owner would only suffer a 49% diminution in expected returns if the government enacted a statute that took 100% of an owner's annual cash flows for 9 out of 20 years on a property with a 20-year useful life. Tr. 2567:2-2568:25 (Hamm). If, as the government contends, the law required proof of a 50% diminution in value, that owner, who suffered a cumulative loss of $900,000 out of his expected $2 million profit, could not demonstrate a severe enough economic harm to prove a compensable taking. *Id.* The Fifth Amendment cannot be read to permit such conduct.

146. In deciding between Dr. Peiser's method of analyzing economic impact and a method that measures economic impact over the property's life, the Court should be guided by

---

Notes including HUD's endorsement creating the prepayment right). *See Hodel*, 481 U.S. at 718 (Brennan, J., concurring) (concurring in the Court's finding of a taking of the right to devise even absent a finding of impact or reasonable investment backed expectations because of the "unique negotiations giving rise to the property rights and expectations at issue"). Moreover, *Cienega VIII*'s holding that plaintiffs had "vested property interests at the time of the passage of ELIHPA and LIHPRHA" in the *contractual right to prepayment* (in contrast to the property interest in the land itself), *Cienega VIII*, 331 F.3d at 1328-1330, thus requires that this Court apply a valuation model that focuses on the value of the prepayment right itself (i.e., the value of the market income stream), rather than changes in valuation in the land.

the "the concepts of 'fairness and justice' that underlie the Takings Clause." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 336 (2002) (citation omitted). Fairness and justice are not achieved by a model that calculates impact outside of the takings period. To be sure, this Court also can and should consider the temporary nature of a regulation in determining whether a regulation effects a taking as part of its ad hoc analysis of all three *Penn Central* factors. The investment-backed expectations and character prongs are also appropriate places to account for a regulation's temporary nature because, even if a regulation causes an owner serious financial loss during the period of the taking, the duration of the regulation may determine whether the regulation frustrates the distinct investment-backed expectations of the owner and may impact the character of the government's action. *See* Tr. 2546:9-2547:6 (Hamm) (agreeing that the duration of the taking may properly be accounted for under the expectations prong). For example, a temporary zoning moratorium on development may deprive an owner of 100% of its return for a short period of time but not conflict with the owner's reasonable investment-backed expectations. Evaluating a regulation in light of all three *Penn Central* factors ensures that the government is not unduly limited in its ability to govern, but nevertheless requires compensation where all of the *Penn Central* factors—balanced together—demonstrate that a taking occurred.

147. In applying the concepts of justice and fairness, this Court can also—within its economic impact analysis—determine whether the economic impact is substantial given the facts of the particular case. *See, e.g., Hodel*, 481 U.S. at 715-16 (1987) (where Plaintiffs showed minimal economic impact and it was "dubious" whether Plaintiffs had reasonable investment backed expectations, a statute abrogating the common-law right to devise to one's heirs even a

small portion of a property interest was nevertheless a taking because the character of the government regulation was "extraordinary").

**(2) The Sale Option Does Not Diminish Plaintiffs' Economic Impact**

148. The government also argues that Dr. Peiser's methodology is flawed because it ignores the fact Plaintiffs were given the option to sell their property. The government contends that the opportunity to recoup what it took through the sale process ameliorates the presence of a taking in the first place. DX 426. That argument fails for two reasons.

149. *First*, as a matter of law, the option to offer the properties for a HUD-regulated sale was effectively a proffer of offsetting compensation that should not be considered in determining whether the abrogation of prepayment rights caused a taking. *CCA Assocs.*, 75 Fed. Cl. at 198 (holding the sale option has no place in the economic impact calculus); *Cienega IX*, 67 Fed. Cl. at 478 (reasoning that the sale option was "available only as an extrinsic benefit").[23]

150. Excluding the sale option from the economic impact calculus follows from the Federal Circuit's decisions in the *Whitney Benefits* litigation. There, the Federal Circuit held that a provision facilitating property owners' exchange of their land (on which the federal government banned strip mining) for land where mining was permissible was relevant only in measuring the compensation the government owed plaintiffs for the taking of their coal mining rights, *but not to determining the ban's economic impact*. *Whitney Benefits, Inc. v. United States*, 926 F.2d 1169 (Fed Cir. 1991); *see also Whitney Benefits, Inc. v. United States,* 752 F.2d

[23] To the extent the government argues that Plaintiffs had a duty to mitigate their losses by selling their properties, the burden falls on the government to prove that Plaintiffs did not follow a reasonable course of action. *Am. Fed. Bank, FSB v. United States*, 72 Fed. Cl. 586, 605 (2006) (citing cases); *see also Asia N. Am. Eastbound Rate Agreement v. Pac. Champion Service Corp.* 864 F.Supp. 195, 202 (D.D.C. 1994) (recognizing the "well-settled" rule that the defendant bears the burden of proving losses could have been prevented). The government's failure to adduce evidence on whether Title II sales took place and, if so, whether Plaintiffs would have suffered less damages as a result, *see infra* ¶¶ 149-53, is fatal to the government's argument.

1554, 1555-56 (Fed Cir. 1985) (defining coal exchange). As the Court observed, "[a]n offer to pay would make no sense if nothing were taken." *Id.* at 1176. The *Whitney Benefits* conclusion is even more applicable here, where the government offered *cash* compensation via Use Agreements and subsidized sales for the losses it caused. As Justice Scalia recognized, "a cash payment from the government would not relate to whether the regulation "goes too far" (i.e., restricts use of the land so severely as to constitute a taking), but rather to whether there has been adequate compensation for the taking." *Suitum v. Tahoe Reg'l Planning Agency,* 520 U.S. 725, 747 (1997) (Scalia, J., concurring). The government's contrary rule would permit the government to evade the constitutional command of the Fifth Amendment.

151. *Second*, even if the sale option should be considered in determining whether Plaintiffs suffered any economic impact, the record does not support the government's suggestion that a sale was even a viable option, let alone one that would have made Plaintiffs whole. The dearth of proof the government offered on a Title II sale underscores the extent to which any argument involving the viability of a Title II sale is, at best, speculative. Unlike Title VI (and its regulations) which included a detailed description of the sale process, *see* 12 U.S.C. § 4110, ELIHIPA notes only that HUD could "facilitate a transfer or sale of the project to a qualified nonprofit organization, limited equity tenant cooperative, public agency, or other entity acceptable to the Secretary." 12 U.S.C. § 1715*l* note (Sec. 224(b)(7)). The Title II regulations are similarly vague. 24 C.F.R. § 248.31 (1990) (same).

152. The testimony of the government's own witnesses underscores the extent to which it is unclear whether Title II sales ever took place. First, the government's witness Mr. Vitek admitted he did not know how the Title II appraisal process even worked. Tr. 1982:7-13 (admitting he "could be wrong" in his assertion that Title II involved two appraisals). And while

Mr. Vitek testified that it was not difficult "to find *potential* purchasers under Title II," Tr. 1931:19-21 (emphasis added), he provided *no testimony* on whether a Title II sale ever took place. Second, the government relied on Mr. Matthews who testified that (1) "99 percent" of his duties in the HUD Los Angeles office related to Title VI properties, Tr. 2002:17-20; (2) he was not familiar with any of the owners who proceeded under Title II after Title VI's passage, Tr. 2012:10-14; and (3) he lacked "personal knowledge of policies or procedures pursuant to Title II . . . prior to March 1994." Tr. 2031:14-18. Taken together, Mr. Vitek's and Mr. Matthews' testimony does *not* demonstrate that a Title II sale was a viable option.

153. Moreover, even if a Title II sale was an "option," the evidence does not show that Title II sales ever provided anything approaching fair market value. There is *no evidence* of the price a buyer paid in the case of any Title II sale. Nor can the government point to Title II or the Title II regulations to show that the Title II sale process would have yielded a sale for fair market value. Under Title II, after the owner submitted an independent third-party appraisal, the property's value was determined *by HUD*. 24 C.F.R. § 248.213; PX 619; *see also* PX 255-57, 422-23, 452-57, 615. After HUD's initial review, Plaintiffs' appraisals withstood an audit of the appraisal process, a PCNA, an additional "limited review," and a re-review phase before HUD finally agreed to an "as-is" value. *Id.*; PX 250. In this process, if HUD derived a different value than an owner's appraiser, HUD *presumed* that its review was more accurate than the independent third party's appraisal. PX 619 at CVC 026622.

154. Moreover, to the extent the government's claim is that the Title II sale process mirrored the Title VI process, those processes bore no similarity to a free market sale and were fraught with substantial administrative delays. Tr. 1984:15-1985:8 (Vitek) (testifying that a sale took substantially longer than seeking other incentives under a Use Agreement); Tr. 1977:12-14

(Vitek) (testifying there were deficiencies in 100% of plans of action submitted under Title II and Title VI). As Mr. Vitek conceded, under ELIHPA, it was HUD's practice not to update the sale price to reflect delays in processing. Tr. 1984:25-1985:2. Finally, there was enormous risk attending an owner's decision to elect a Title II sale: in contrast to Title VI which permitted the owner to prepay the mortgage at the end of the sale process if the owner attempted and failed at a sale, *see* 24 C.F.R. § 248.157(l)(4), Title II provided Plaintiffs with no similar protection. Owners that elected but failed to consummate a sale were thus placed in the costly position of filing a new plan of action and starting the process for receiving incentives over again.

155. At bottom, the government's argument is that, to prevail on their claim, Plaintiffs were required to choose an option that no one else pursued and that, according to the government's expert, was less prudent that the option Plaintiffs did choose. *See* Tr. 2820:2-2821:8 (Malek) (admitting that the continued operation of an income-producing property may be "wiser" than selling it). That cannot be the law. This Court should ignore the government's invitation to create law that incentivizes plaintiffs to engage in such economic waste.

**(3) LARSO Does Not Alter The Economic Impact Analysis**

156. Finally, the government incorrectly asserts that Dr. Peiser's economic impact calculation does not properly consider the fact that LARSO would have prevented the Los Angeles Plaintiffs' from charging market rents had they prepaid. Relying on G&K's experience with those Los Angeles properties that did prepay following the HOPE Act, Dr. Peiser's damages calculation for the Los Angeles Plaintiffs assumed that, upon prepayment, HUD would provide Plaintiffs' low- and very-low-income tenants with Section 8 certificates, under which (1) Plaintiffs could raise their rents to market, (2) tenants would pay what they were able to cover, and (3) HUD would makeup the difference. PX 1. Thus, because Section 8 certificates were exempt from LARSO, Los Angeles Plaintiffs would have charged market rents.

157. Moreover, HUD has already acknowledged that LARSO would not have inhibited Plaintiffs' ability to raise rents to the levels assumed by Plaintiffs' models. When preparing plans of action under Title II, Plaintiffs' conducted appraisals which, by regulation, "reflect[ed] the effect rent control would have on the unsubsidized fair market value." PX 619; *see also* Tr. 562:24-564:2, 569:1-14 (Glodney). HUD used those appraisals to determine an "as-is" value for each property. In determining that value, "HUD Legal Division" "reviewed" the application of LARSO to the subject property and HUD determined that the as-is value "took into consideration the future effect of the ordinance." PX 255-57; *see also* DX 190; Tr. 2558:7-14 (Hamm) (acknowledging that if HUD took LARSO into account, it would be reflected in the preservation equity value). The "as-is" value, and its concomitant assumptions about rental income, was the value used by Plaintiffs in their economic impact and damages models in this litigation. Having endorsed Plaintiffs' appraisals as consistent with LARSO previously, the government cannot now tell this Court the contrary.[24]

[24] Even if LARSO was not taken into account in the HUD agreed-upon value and their tenants did not receive certificates upon prepayment, the economic impact would still be significant. Dr. Peiser assumed that units affected by LARSO would turnover at a rate of 30% annually. Tr. 1262:2-5 (Peiser). It is undisputed that under LARSO once a tenant voluntarily vacated, the unit was subject to vacancy decontrol such that LARSO allowed owners to increase rates as high as owners desired. At the end of the first year alone, then, Los Angeles Plaintiffs could have rented 30% of the units at market rate; at the end of second year, 51% of the units at market rate; at the end of the third year, 66% at market rate; and by the end of the fourth year, 76% of the units would be at market rate. Moreover, LARSO itself allowed Plaintiffs to petition for additional rent increases (and to appeal if such increases were denied) whenever the regulated rates fail to provide a "just and reasonable return." L.A. Municip. Code, ch. XV, § 151.07(B). According to Ms. Ortega, at least 80% of properties that applied for rent increases under LARSO's "just and reasonable" provision received them. Tr. 1901:8-11. Thus, had LARSO applied, Plaintiffs would have petitioned for rent increases because the HUD-regulated rental rates were well below market and thus not "just and reasonable." Tr. 801:23-802:9 (Glodney). Those requests very likely would have been granted. The government's suggestion that LARSO would have prevented Plaintiffs from charging market rents is therefore factually inaccurate.

158. Ultimately, the government's criticisms of Dr. Peiser's economic impact calculus fail to demonstrate that Dr. Peiser's method is flawed or that there exists a more optimal method of measuring the economic impact of ELIHPA and LIHPRHA on Plaintiffs. The Court should thus employ Plaintiffs' method of determining economic impact and find that Plaintiffs suffered a serious financial loss.

**c. Alternatively, Even If This Court Were To Apply A Change-In-Value Model, The Court Should Nevertheless Find Plaintiffs Suffered A Severe Economic Impact**

159. As explained, a return-on-equity measure is the most appropriate measure for this case. Even if this Court were also to consider a change-in-value methodology, however, the properties' substantial change in value as a result of the government's actions confirms that Plaintiffs suffered a severe economic impact.

160. The government's expert, Mr. Crosson, submitted figures estimating the sale value of the properties on the date of the taking both with and without HUD regulations. While Mr. Crosson made various assumptions with which the parties may disagree (such as using asymmetrical discounting of HUD and market income streams), the government is hardly free to disavow its own expert's calculations.[25] Dividing Mr. Crosson's HUD restricted values by his market values demonstrates a significant economic impact. For example, using Mr. Crosson's appraisals, Del Vista's unrestricted (market) value at the prepayment date was $7,230,000 and Del Vista's HUD-restricted value at that same date was $2,290,000. *See* Tr. 1823:10-1834:17 (Crosson). Thus, as a result of the HUD restrictions, when Del Vista was supposed to prepay its

---

[25] In particular, in his HUD-restricted numbers, Mr. Crosson assumed that the properties would remain bound by HUD regulations in perpetuity. *See* 400-402, 403B, 403C, 404-409. He also applied asymmetrical discounting rates. *Id.* In any event, if this Court were to consider the additional income generated by raising rents to market after the mortgage was fully paid, those numbers would not change the analysis dramatically, because they would be subject to 20 years of discounting.

suffered a 68.3% diminution in value. Using this same rough measure, the other properties generally suffered similar diminutions in value.[26]

161. It is well-established that, when the government's action has the character of a taking and has substantially interfered with reasonable investment-backed expectations, an economic impact of this magnitude may constitute a taking requiring just compensation. *Hodel*, 481 U.S. at 715 (noting an economic impact of just 32%). But more importantly, these computations verify the severe financial impacts demonstrated by the return-on-equity method. Should this Court thus elect, as the government has sometimes suggested, to consider *both* methods, this Court should find that the economic impact is substantial.

162. In sum, even the retrospective appraisal values generated by *the government's appraisal expert* demonstrate that Plaintiffs suffered an economic impact of, on average, 66% under the government's preferred change-in-value methodology. This reinforces the conclusion that Plaintiffs suffered a taking.

#### d. Whether This Court Applies A Return-on-Equity or Change-in-Value Approach, The Court Should Nevertheless Find An Unconstitutional Taking As A Matter Of Law

163. The model this Court applies to assess economic impact should not be dispositive of the *Penn Central* analysis. The Supreme Court has repeatedly held there is no "'set formula' for determining when 'justice and fairness' require that economic injuries caused by public action be compensated by the government, rather than remain disproportionately concentrated on a few persons," *Penn Central*, 438 U.S. at 124, and that the presence or absence of a prong is *not*

---

[26] Applying the methodology noted above based on Mr. Crosson's numbers, the economic impact on the remaining properties would be as follows: Claremont—29.5%, DeSoto—83.7%, Kittridge I—98.7%; Kittridge II—55.7%, Oxford Park—26.8%, Parthenia—63.5%, Pioneer Gardens—61.0%, and Puente Park—65.8%. *See* Tr. 1823:10-1834:17 (Crosson); PX 14.

determinative. *See, e.g.*, *Lucas v. S.C. Coastal Council*, 505 U.S. at 1015 (whether a regulation effects a taking is an "'essentially ad hoc factual inquir[y]'").

164. The Court has thus recognized that even a relatively small economic impact is sufficient to support a taking where, as here (1) the "relative economic impact" upon a particular plaintiff of taking a particular property interest is "substantial," even though the actual economic impact is quite low, *see Hodel*, 481 U.S. at 715 (noting an economic impact of just 32%), and (2) the character of the taking is "extraordinary." *Id.* at 715-16 (finding the evidence of reasonable-investment backed expectations is "dubious" but that the character of the government's actions nonetheless warranted a taking).

165. Plaintiffs indisputably satisfy those factors. First, as the impact measured by the return-on-equity model makes clear, the taking of Plaintiffs' ability to prepay (and generate income by charging market rates) was "substantial." Any doubt on that score is resolved by the fact that when the government enacted ELIHPA and LIHPRHA, it eviscerated "one of the most essential sticks in the bundle of rights that are commonly characterized as property—the right to exclude others." *Hodel*, 481 U.S. at 716 (quoting *Kaiser Aetna* v. *United States*, 444 U.S. 164, 176 (1979)). Second, the government's decision to effectively occupy Plaintiffs' property for the duration of the taking by mandating that Plaintiffs rent to government-selected tenants was so "extraordinary" that the Federal Circuit has itself characterized the government's actions as "akin to" a "holdover tenant." *Cienega VIII*, 331 F.3d at 1338. The government's further taking of Plaintiffs' rights to transfer their property underscores the "extraordinary" nature of that holdover tenancy. *Id.* Moreover, as discussed *supra*, the evidence of Plaintiffs' reasonable investment-backed expectations is not dubious—indeed, *at the time Plaintiffs entered into the Regulatory Agreements*, they specifically conditioned their participation in the HUD program on prepayment

right. *E.g.*, PX 98-103, 104-06, 115 (Trust Notes and Secured Notes including HUD's endorsement creating the prepayment right). The government did not simply take *any* property right, but the property right Plaintiffs protected in contract. *See Hodel*, 481 U.S. at 718 (Brennan, J., concurring). Thus, even if this Court were to apply the government's "change in value" model and use the government's numbers, the "substantial" nature of the taking coupled with the "extraordinary" character of the taking require a finding of a taking.

**3. ELIHPA And LIHPRHA Frustrated Plaintiffs' Distinct, Reasonable, and Investment-Backed Expectations**

166. *Penn Central*'s third prong is intended to "limit recoveries to property owners who can demonstrate that 'they bought their property in reliance on a state of affairs that did not include the challenged regulatory regime.'" *Cienega VIII*, 331 F.3d at 1345-46 (quoting *Loveladies Harbor, Inc. v. United States*, 28 F.3d 1171, 1177 (Fed. Cir. 1994)). In evaluating the reasonable investment-backed expectations prong, the Court should consider both the Owners' *subjective* expectations at the time they invested in their property and whether those expectations were *objectively* reasonable. As shown below, Plaintiffs easily satisfied both parts of this test.

**a. At All Times, Plaintiffs Expected To Exercise Their Prepayment Rights On The Twenty-Year Prepayment Eligibility Dates**

167. It is settled law that if Plaintiffs invested "in reliance on a state of affairs that did not include the challenged regulatory regime," they satisfy the subjective element of *Penn Central*'s reasonable investment-backed expectations standard. *Maritrans v. United States*, 342 F.3d 1344, 1358 (Fed. Cir. 2003) (citation omitted). That is the case here.

168. As two of the General Partners testified, the right to prepay after 20 years and convert to conventional units was "the most important thing" for Plaintiffs. Tr. 86:14-87:6 (Goldrich); *see also* Tr. 83:23-84:17, 96:9-24 (Goldrich) (testifying he "would not have dealt

with HUD if [he] did not think [he] could [prepay in 20 years]"); Tr. 392:9-393:17 (Hirsch) (testifying that he "would not have entered into the HUD programs with the income limitations and the rent restrictions if [he] knew that [he] could not prepay the loans after 20 years"). Mr. Goldrich testified that due to the limited dividends and the morass of red-tape in the HUD programs, Plaintiffs earned very little while bound by the original Regulatory Agreements and believed that the ability to command market-rate rents after 20 years was the most important benefit to be derived from their HUD projects. Tr. 85:14-18, 96:9-24 (Goldrich). The testimony of Mr. Hirsch corroborates that view. He testified that, in reliance on the 20-year prepayment right in the Trust Notes and Secured Notes, Plaintiffs planned, upon prepayment, to refinance and borrow against the highly desirable properties in order to earn "great equity and value and a long-term hold for my children and later grandchildren." Tr. 373:2-14 (Hirsch). To that end, Plaintiffs implemented a "buy and hold" investment approach that was premised on keeping their property for the long term and refused to sell in the absence of a seller willing to overpay. *See, e.g.*, Tr. 369:15-373:19 (Hirsch); Tr. 193:17-21, 86:6-13, 200:25-201:4 (Goldrich).

169. In addition to live testimony, the properties' locations, quality of construction, and high level of maintenance provides contemporaneous evidence of Plaintiffs' actual intentions to convert the properties to conventional properties and command market-rate rents upon exercise of their 20-year prepayment rights. In *Cienega VIII*, the Federal Circuit found the selection of prime locations and the construction of high-quality buildings to be "revealing" evidence that "showed [the owners'] expectation that they would be able to prepay and exit the HUD programs after twenty years." *Cienega VIII*, 331 F.3d at 1347. In this trial, Mr. Goldrich explained that Plaintiffs selected locations based upon their intention to prepay and charge market rents as soon as possible; thus, Plaintiffs' properties were in "very good neighborhood[s]". . . and "choice

location[s].” *See* Tr. 103:20-105:12 (Goldrich). Mr. Hirsch likewise testified that, because Plaintiffs intended to enter the private market at the earliest possible date, Plaintiffs spent considerable extra money and constructed high-quality buildings that surpassed HUD construction requirements and always maintained the properties in the same excellent manner as General Partners’ market-rate properties. Tr. 371:19-373:19, 381:11-386:22 (Hirsch); *see also* Tr. 86:2-115:2 (Goldrich); Tr. 220:7-13, 222:16-223:12 (Glodney); Tr. 1725:8-15 (Crosson).

170. Although this evidence is analogous to evidence the Federal Circuit found determinative on this prong in *Cienega VIII*, 331 F.3d at 1347, the government disputes this evidence by arguing that Plaintiffs’ actual initial investments in the property were insignificant. The government’s argument turns on Mr. Malek’s testimony. In calculating the baseline amount of Plaintiffs’ initial investment, Mr. Malek subtracted the Builders and Sponsor’s Profit and Risk Allowance (“BSPRA”) amount—the HUD-approved profit that G&K Construction[27] earned for building the project, from Plaintiffs’ original investment. That was error.

171. For each property in this case, the BSPRA was paid to one partnership, G&K Construction, and a separate partnership reinvested the monies in the property. Tr. 127:13-128:1 (Goldrich). As Mr. Malek himself acknowledges, general contractors expect to earn a profit on their work, which requires hiring employees, paying salaries, and assuming liability; and in earning this profit, general contractors assume a substantial risk—for example, the subcontractors may not show up to work. Tr. 2788:5-2790:19 (Malek). Thus, it is nonsensical to subtract the BSPRA from the amount of Plaintiffs’ original investment because the BSPRA reflects a profit G&K Construction *earned* for constructing the building and for assuming substantial risks (hence the term Builders and Sponsor’s *Profit* and *Risk* Allowance), which

[27] G&K Construction, a partnership owned by Mr. Goldrich and Mr. Kest, provided the construction services for Plaintiffs’ properties. Tr. 127:13-128:1 (Goldrich).

Plaintiffs (separate partnerships from G&K construction) then reinvested in the Partners' projects by choice. That neither HUD nor the lender wrote a check for G&K Construction's contracting services, and instead allowed the funds to be reinvested directly in Plaintiffs' projects, does not change the fact that the BSPRA was earned income which Plaintiffs reinvested.

172. The government also attempted to demonstrate that tax benefits were the primary motivator for Plaintiffs' investments in the HUD programs. However, the evidence demonstrated otherwise. First, Plaintiffs in this case are the partnerships, not the limited partners. *Cienega IX*, 67 Fed. Cl. at 474; *Cienega VIII*, 331 F.3d at 1345-46. General Partners, whose expectations controlled those of the partnerships because they "retained control of the partnership," *Cienega IX*, 67 Fed. Cl. at 474, testified as to their expectations. As Mr. Hirsch explained, "as a young, growing businessman, without a substantial income of any kind, frankly the tax advantages did not have any great lure to us." Tr. 401:16-19 (Hirsch). The evidence further demonstrated that the accelerated depreciation upon which the government relies—which generated phantom losses that could be deducted—was complete as of approximately the twentieth year of the mortgage. Tr. 2818:24-2819:18 (Malek). Thereafter, Plaintiffs received "phantom income"—i.e., imputed income without actual cash flow on which they nonetheless paid taxes. *Id.* As this Court has found, the tax consequences of this scheme made "the prepayment right . . . even more important," in order to generate an actual income stream to compensate for the tax losses they would be sustaining. *Cienega IX*, 67 Fed. Cl. at 473. For this reason, Mr. Malek confirmed that under this tax scheme, it would be wiser for an owner to convert their properties to higher-income producing properties than to sell them—precisely what Plaintiffs sought to do by prepaying their mortgages. Tr. 2820:2-2821:8 (Malek). Finally, accelerated depreciation was equally available for investments in conventional housing. *See* Tr.

1633:15-24 (Peiser). The tax benefits, therefore, could not have been the primary motivator for Plaintiffs to develop low-income housing.

173. In light of the abundant evidence offered at trial regarding Plaintiffs' actual expectations of exercising their prepayment rights, this Court should conclude, as the Federal Circuit did in *Cienega VIII*, that "it would be only normal business judgment under the circumstances for [the owners] to plan from the start to terminate their Regulatory Agreements as soon as possible to take advantage of more profitable opportunities." *Cienega VIII*, 331 F.3d at 1347. Indeed, the evidence adduced in this trial clearly supports the conclusion that Plaintiffs' "very participation in the program thus signifies their understanding that their option to exit the housing programs at twenty years would remain in effect." *Id.*

**b. Plaintiffs' Expectations Of Exercising Their Prepayment Rights On The Twenty-Year Prepayment Eligibility Dates Were Objectively Reasonable**

174. In *Cienega VIII*, the Federal Circuit concluded that it was objectively reasonable for owners to believe that "the twentieth-year prepayment right was guaranteed by the regulations and that HUD 'authorized' and endorsed mortgage contracts expressly including it." *Cienega VIII*, 331 F.3d at 1348. The Court started with the "assumption that a contract term that was both material, in that it gave the duration of a business arrangement with limited profit, and apparently justified, in that it was consistent with . . . the relevant regulation . . . is one that gives rise to reasonable expectations of fulfillment of the contract term." *Id.* The Court then considered whether there were facts or circumstances that should cause it to depart from that assumption. The Court found none—the same result should obtain here.

175. All of the factors that led the Federal Circuit to apply the assumption of reasonableness are present here. First, undisputed evidence at trial showed that Plaintiffs signed the Secured Notes and Trust Notes granting them a contractual right to prepayment after 20

years. Second, Plaintiffs demonstrated that the government's contractual promise was consistent with the then-existing regulations. *See* 24 C.F.R. § 236.30 (1970) (allowing prepayment without HUD's consent where "the prepayment occurs after the expiration of 20 years from the date of final insurance endorsement of the mortgage"); *id.* § 221.524(a)(ii). Third, it is well established that prudent investors would require both an entrance and exit strategy for the program—indeed, in *Cienega IX*, this Court found, "industry experts considered this prepayment right to be important." 67 Fed. Cl. at 473 & n.7 (relying on the testimony of Mr. Dockser, former Deputy Assistant Secretary of HUD and FHA Commissioner).[28]

176. This Court has found in analogous contexts, that where plaintiffs entered the same agreements, plaintiffs' expectations of exercising their prepayment rights on their 20-year prepayment eligibility dates were objectively reasonable. *Cienega IX*, 67 Fed. Cl. at 474 (holding that the expectations to prepay mortgages in the HUD programs were "reasonable given the deed of trust notes, the existing regulations, the type of properties involved, the location of the properties, and the importance of an exit strategy in entering such a program."); *CCA Assocs.*, 75 Fed. Cl. at 193-94 (same). For these reasons, this Court can therefore assume, consistent with *Cienega VIII*, that Plaintiffs had a reasonable expectation of prepayment.

177. The government cannot defeat the showing that the expectation to prepay was objectively reasonable by repeating its argument that preferential loans and tax benefits were also important. As noted *supra*, and as this Court explained in *Cienega IX*, 67 Fed. Cl. at 473, the tax consequences of Plaintiffs' investments—early tax benefits that later became tax

---

[28] Congress also recognized that the prepayment right was material to participants in the HUD programs. Congress explained: "Congress . . . recognized that because of an administrative decision to permit owners to withdraw from the programs after twenty years, some of the original sponsors or subsequent purchasers may have anticipated an opportunity to benefit from the residual value of the housing." 1990 U.S.C.C.A.N. 5763, 5867.

detriments—only reinforce the value of the prepayment right. "[T]his evidence regarding taxation does not undermine the reasonableness of plaintiffs' expectations to prepay, and the pre-1986 tax regime provided no specific incentive to sign a HUD Regulatory Agreement." *Id.*

### C. Plaintiffs Are Entitled To Just Compensation For The Taking Of Their Property

#### 1. Plaintiffs Are Entitled To Just Compensation For The Damages They Suffered From The Date Of The Taking Until The Date They Either Sold The Property Or The End Of The Use Agreement

178. Just compensation under the Fifth Amendment is "the full and perfect equivalent in money of the property taken. The owner is to be put in as good position pecuniarily as he would have occupied if his property had not been taken." *United States v. Miller*, 317 U.S. 369, 373 (1943) (footnotes omitted). The proper measure of just compensation for a temporary regulatory taking of rental property is the fair market rent that the landowner could have earned on the property during the takings period. *See, e.g., United States v. Petty Motor Co.*, 327 U.S. 372, 381 (1946); *United States v. Gen. Motors Corp.*, 323 U.S. 373, 379 (1945); *Kimball Laundry Co. v. United States*, 338 U.S. 1, 5-7 (1949).

179. Determination of a market rent is a speculative endeavor because there is often no ready market for the type of property taken by the government. *See Independence Park IV*, 465 F.3d. at 1311 (citing *United States v. Commodities Trading Corp.*, 339 U.S. 121, 123 (1950)) ("As the Supreme Court has recognized, the task of measuring just compensation can be difficult in certain instances and is not amenable to a rigid formula."). Market rent is nonetheless the proper measure of just compensation for a temporary taking. *See Kimball Laundry*, 338 U.S. at 6 ("[S]ince a transfer brought about by eminent domain is not a voluntary exchange, this amount can be determined only by a guess, as well informed as possible, as to what the equivalent would probably have been had a voluntary exchange taken place.").

180. The rental value can "'be measured in various ways depending upon the circumstances of each case and … no general formula should be used for the purpose.'" *Bass Enters. Prod. Co. v. United States*, 48 Fed. Cl. 621, 624 (2001) (quoting *United States v. Miller*, 317 U.S. 369, 373-74 (1943)). Therefore, courts determine the fair market rental value using the method that will make the plaintiff whole. *See, e.g.*, *Independence Park I*, 61 Fed. Cl. at 706-08 (holding that the proper measure of the fair market rent for Model Plaintiffs' right to prepay their mortgages and free themselves from HUD restrictions is the difference between the rents Model Plaintiffs received under the HUD programs and the rents they could have received had they been permitted to prepay their HUD-insured mortgages and raise their rents to market rates on their prepayment eligibility dates); *Petty Motor*, 327 U.S. at 381 (holding that the appropriate measure of the fair market rent for the plaintiff's leasehold interest in a building where it was operating its business is the difference between "the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew . . . less the agreed rent which the tenant would pay for such use and occupancy"); *Gen. Motors*, 323 U.S. at 382 (holding that the fair market rent for General Motor's right, pursuant to a long-term lease agreement, to occupy a building that was equipped for its business is "the market rental value of such a building on a lease by the long-term tenant to the temporary occupier").

181. The fair market rental value of the property taken from Plaintiffs is the rental income they lost as a result of their inability to prepay their loans on their prepayment eligibility dates and free themselves of the HUD-imposed restrictions on rents (among other restrictions). *See, e.g., Independence Park I*, 61 Fed. Cl. at 708 (holding that "plaintiffs' foregone rent increases are the best available indicator for determining just compensation"); *Kimball Laundry*, 338 U.S. at 9 ("The market value of land as a business site tends to be as high as the reasonably

probable earnings of a business there situated would justify . . . ."); *Am. Pelagic Fishing Co., L.P. v. United States*, 55 Fed. Cl. 575, 594 (2003) (holding that "[i]n a competitive market, the revenue stream that [the plaintiff's fishing vessel] probably could have achieved is equivalent to the amount that a potential lessee would have been willing to pay in order to rent the vessel"), *vacated on other grounds*, 379 F.3d 1363 (Fed. Cir. 2004).

182. As described *supra*, Dr. Peiser's model conservatively measures the rental income Plaintiffs lost from the taking date until the date they entered into Use Agreements by subtracting the net rental income Plaintiffs received in the HUD-Restricted Scenario from the net rental income that Plaintiffs would have received in the Market Scenario for this period. Dr. Peiser's model thus measures the rental value that a hypothetical lessee would have paid for Plaintiffs' right to prepay their mortgages and convert to conventional properties on their original prepayment dates. *See, e.g.*, *Kimball Laundry*, 338 U.S. at 8; *Am. Pelagic Fishing Co.*, 55 Fed. Cl. at 594. The government, for its part, offers no alternative damages model.

183. The government's argument that LARSO would have barred Plaintiffs from converting to conventional properties upon prepayment lacks merit. *See Independence Park Apartments v. United States*, 449 F.3d 1235, 1242 (Fed. Cir. 2006) ("[i]n order to determine the degree of the loss caused by LIHPRHA, it is necessary to look to . . . whether LARSO would have prevented the plaintiffs from raising the rents in their rental properties even if they had been free to prepay their mortgages."). As described in *supra*, LARSO would not have barred Los Angeles Plaintiffs from raising their rents to market upon prepayment and therefore LARSO would not have had a significant effect on what Los Angeles Plaintiffs' would have earned in the Market Scenario (or, ultimately, on Los Angeles Plaintiffs' damages).

184. As evidenced by what actually happened after the HOPE Act became effective, HUD and HACLA would have provided Section 8 certificates at market rates to the tenants at properties that were prepaying their HUD-insured mortgages and exiting the HUD programs in order to prevent massive tenant displacement. Tr. 797:14-799:16 (Glodney); Tr. 1234:17-1236:17 (Peiser); PX 630. These certificates were exempt from LARSO. Tr. 1895:21-1896:6 (Ortega). Thus, the initial rent increase from below-market HUD rents to near conventional market rents (as assumed in Dr. Peiser's model) would have been exempt from LARSO restrictions.[29] Dr. Peiser's model also fully takes into account the effect of LARSO on units occupied by tenants who would not have qualified for Section 8 certificates. Tr. 1179:18-1180:9 (Peiser). For these tenants, LARSO would restrict rent increases until such time as the tenant voluntarily vacated the unit, at which time the rent would go to market.[30] *Id.* Thus, Dr. Peiser's model fully takes into account the effects of LARSO on Los Angeles Plaintiffs.

185. Even if HUD and HACLA did not issue LARSO-exempt certificates (which is unlikely), LARSO would not have prevented either DeSoto or Kittridge I from raising their rents to market rates upon prepayment. The relevant amendments to LARSO sections 151.02 and 151.06 (on which the government relies in arguing LARSO would have prevented Los Angeles Plaintiffs from raising rents to market upon prepayment) did not apply to DeSoto and Kittridge I,

---

[29] Even if Plaintiffs did not receive Section 8 certificates, the evidence was that there were several mechanisms in place that would have allowed Plaintiffs' units to convert to market-rate, such as a "just and reasonable" increase or one-time class rent increases pursuant to LARSO. *See* Tr. 799:17-803:18 (Glodney); Tr. 117:14-118:24 (Goldrich); *see also* Tr. 1901:6-1904:1 (Ortega); Tr. 1344:21-1345:9 (Peiser); *see also supra* Section II.F.1.

[30] Even assuming certificates would not have been issued to all eligible low-income and very low-income tenants, LARSO would not have prohibited the increase to market-rate units, it only would have increased the time for units to convert to market-rate (units would have gone to market over a period of 3-4 years as opposed to immediately). *See, e.g.*, *infra* note 24.

as their prepayment eligibility dates preceded the amendments' effective date.[31] L.A. Mun. Code §§ 151.02, 151.06 (as amended by L.A. Ord. No. 166,320) (eff. Nov. 22, 1990); PX 101, 115.

186. Accordingly, Plaintiffs demonstrated that Dr. Peiser's model accurately measures "the full and perfect equivalent in money of the property taken." *Miller*, 317 U.S. at 373.

**2. Plaintiffs Are Entitled To Compound Interest As A Component Of Just Compensation**

187. Plaintiffs are entitled, as a component of just compensation, to pre- and post-judgment interest on the just compensation award. It is well established that when the government takes an individual's property and does not compensate the property owner at the time of the taking, "the owner is entitled to interest [on the compensation] sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Kirby Forest Indus., Inc. v. United States,* 467 U.S. 1, 10 (1984); *see also Shelden v. United States*, 34 Fed. Cl. 355, 378 (1995) ("Owners of property taken by the government are entitled to interest from the date the taking became effective until paid by the government."). The determination of the proper interest rate is a matter for the trier of fact. *See Studiengesellschaft Kohle v. Dart Indus., Inc*., 862 F.2d 1564, 1580 (Fed. Cir. 1988).

188. The 20-year U.S. Treasury STRIPS rate ("20-year rate) is the appropriate pre- and post-judgment interest rate to be applied to Plaintiffs' judgments until the date they are ultimately paid by the government. *Cienega IX*, 67 Fed. Cl. at 492-44 (holding that a U.S. Treasury STRIPS rate is the appropriate rate to use when calculating pre-and post-judgment interest following the takings period for similarly-situated plaintiffs). Claremont Village, Covina West, Del Vista, Pioneer, and Puente Park (partnerships that sold their properties) should be

---

[31] Nonetheless, to be conservative, Dr. Peiser assumed that DeSoto and Kittridge I were subject to LARSO for purposes of his damages computations. *See* Tr. 1271:9-1272:16 (Peiser).

awarded interest from the end of the takings period (date of the sale) until the date the damages are paid by the government at the 20-year rate, compounded annually. The Plaintiffs that did not sell their properties are entitled to post-judgment interest at the 20-year rate, from this Court's final judgment until the government pays the award. The 20-year rate is the appropriate measure because Plaintiffs likely will not be paid any just compensation until well over 20 years from their original prepayment dates. Tr. 1177:11-17, 1296:24-1297:8 (Peiser); PX 3A.

189. Compound interest is appropriate because it reflects Plaintiffs' lost opportunity costs, as Plaintiffs would have invested the taken funds and received compound interest on those investments. *See, e.g., Independence Park I*, 61 Fed. Cl. at 717 (holding that the "usage factor" supports an award of compound interest because plaintiffs "'have an ongoing business, and their business is driven by equity'" (citing transcript)); *Cienega IX*, 67 Fed. Cl. at 494 (plaintiffs "would have reinvested the money in some manner had the government paid them at the end of the taking"). Additionally, taking income-producing property necessitates a compound interest award. *See, e.g.*, *Whitney Benefits v. United States*, 30 Fed. Cl. 411 at 415-16 (1994) ("Income-producing property would generate an income stream that would be available for continual reinvestment, at compound rates. Just compensation requires the payment of compound interest to replace the investment opportunities plaintiffs lost when the government took their property.").

190. Plaintiffs are small partnerships of individuals and their ability to conduct business depends on their access to capital, which has been materially impacted by the government's taking. Tr. 1464:11-16 (Peiser). As a result of the taking, Plaintiffs lost the opportunity to reinvest the funds in other income producing properties, and could not have replaced those funds by borrowing at a risk-free rate. *Id*. Additionally, Plaintiffs' properties are

income-producing. PX 458-461, 463, 465, 467, 469, 471-472D. For these reasons, compound interest is necessary to place Plaintiffs in the same pecuniary position that they would have occupied but for the government's taking. Tr. 1464:11-16 (Peiser); PX 1.

191. Compound interest will compensate Plaintiffs for the uncertainty surrounding the date compensation will be paid by the government for the taking. This Court has repeatedly held that when payment of an award is delayed for a long period, compound interest is required to fully compensate the owner. *See, e.g., Independence Park I*, 61 Fed. Cl. at 717-18 (holding that a delay in excess of a decade requires the award of compound interest); *CCA Assocs*., 75 Fed. Cl. at 205 (awarding plaintiff compound interest because of the "lengthy passage of time since of the end of the taking" and because, "had the government properly compensated [plaintiff on its prepayment eligibility date], [plaintiff] would have reinvested that money"); *see also Whitney Benefits*, 30 Fed. Cl. at 415 (holding that "because of the long delay since the date of taking in this case, the award of compound interest is not only proper[,] but its denial would effectively undercut the protections of the fifth amendment to our Constitution"). In fact:

> [d]elay in payment entails more than delay in possession of the award. It also necessarily means delay in the use of the money. Full compensation, then, requires that a [property owner] whose award has been delayed be compensated for his inability to utilize his money. A [property owner] cannot reinvest the increased value of his property when he possesses neither his property nor its monetary worth.

*ITT Corp. v. United States*, 17 Cl. Ct. 199, 240 (1989); *see also Cienega IX*, 67 Fed. Cl. at 494 (holding plaintiffs "must be awarded compound interest to satisfy the constitutional requirements of just compensation"). Compound interest is particularly appropriate here because almost two decades have elapsed since the government initially took Plaintiffs' properties, and the date of ultimate payment is uncertain. Indeed, Plaintiffs have been waiting 18 years already, and it is not clear when the government will finally pay Plaintiffs, even after an award of damages in the

present proceeding. Failing to allow for compounding would "'retroactively reduce the value of just compensation'" due to Plaintiffs. *Whitney Benefits*, 30 Fed. Cl., at 415 (citation omitted).

192. The government argues that interest should be calculated using a risk-free rate. Tr. 2377:1-20, 2486:22-2487:1 (Hamm); DDX 652. The government advocates the use of the risk-free rate not only to calculate interest from the end of the takings period to the date the government pays Plaintiffs, but also argues that damages incurred during the takings period should be discounted back to the beginning of the takings period (using the differential rates proposed by Dr. Hamm) and brought forward at the risk-free rate. *See* Tr. 1338:23-1340:16 (Peiser). This argument disregards the Court's ruling in *Independence Park I* that "the valuation date, and thus the focus for discounting cash flows to obtain a present value, for a temporary taking should reflect the *end* of the relevant period." 61 Fed. Cl. at 710.

## IV. CONCLUSION

193. For the foregoing reasons, Plaintiffs should be awarded damages of $100,803,400 representing (1) $6,962,833 for Claremont Village, $13,492,306 for Covina West, $10,089,067 for Del Vista, $7,545,584 for Pioneer, and $8,486,258 for Puente Park (plus compound interest calculated from December 31, 2006, until judgment is paid) and (2) $23,351,704 for DeSoto; $13,733,366 for Kittridge I; $6,802,951 for Kittridge II; $7,791,461 for Oxford Park; $2,547,870 for Parthenia (updated to the date of judgment and including compound interest until the judgment is paid); and other appropriate relief as determined by this Court, including attorneys' fees, expert fees, and expenses to be determined at a later date.

Dated: May 4, 2007

Respectfully submitted,

By s/ Everett C. Johnson, Jr.

Everett C. Johnson, Jr.

LATHAM & WATKINS
555 11th St., NW
Suite 1000
Washington, DC 20004
Tel (202) 637-2200
Fax (202) 637-2201

Attorneys for Plaintiffs