Nos. 94-10002C, 94-10003C, 94-10005C, 94-10006C, 94-10007C, 94-10008C
94-10010C, 94-10020C, 94-10030C, 94-10040C
Judge Charles F. Lettow

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

CLAREMONT VILLAGE COMMONS, *et al.*,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S POST-TRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRIAN M. SIMKIN
Assistant Director

KENNETH M. DINTZER
Assistant Director
DAVID A. HARRINGTON
KENNETH D. WOODROW
TIMOTHY P. McILMAIL
SEAN DUNN
BONDURANT ELEY
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-0513

June 12, 2007

Attorneys for Defendant

# TABLE OF CONTENTS


STATEMENT OF FACTS DEFENDANT ESTABLISHED AT TRIAL . . . . . . . . . . . . . . . . . . 1

I. Statutory Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A. The Section 221(d)(3) And 236 Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B. Benefits Of Participating In The Section 221(d)(3) And Section 236 Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

1. Low-Risk, High Leverage Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

2. Tax Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3. Other Opportunities For Profit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

C. The Preservation Statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

1. ELIHPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

2. LIHPRHA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

D. Additional Legislation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

II. The Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

A. The Initial Deals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

1. Claremont Village Commons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2. Covina West Apartments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

3. Del Vista Village . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

4. De Soto Gardens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5. Kittridge Gardens I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

6. Kittridge Gardens II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

7. Oxford Park . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

8. Parthenia Townhomes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

9. Pioneer Gardens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

10. Puente Park Apartments . . . . . 14

B. Further Benefits . . . . . 15

C. The Properties Prior To Title II . . . . . 16

D. Plaintiffs Each Signed A Use Agreement . . . . . 18

E. Delays In Processing . . . . . 20

F. Prepayment . . . . . 21

G. Sales . . . . . 22

H. Los Angeles Rent Stabilization Ordinance . . . . . 22

I. Section 8 Assistance Following Prepayment . . . . . 25

DEFENDANT'S CONTENTIONS OF LAW . . . . . 25

I. The Los Angeles Plaintiffs' As-Applied Taking Claims Are Unripe . . . . . 25

A. As-Applied Taking Claims Do Not Ripen Until The Responsible Government Entity Provides A Final Decision Applying The Regulation At Issue To The Property . . . . . 25

B. The Los Angeles Plaintiffs' As-Applied Taking Claims Are Not Ripe Because They Failed To Apply To Prepay Under The Preservation Statutes . . . . . 27

II. The Preservation Statutes Did Not Effect A Regulatory Taking Under *Penn Central* . . . . . 31

A. Plaintiffs Have Not Established An "Extraordinary Delay In Governmental Decisionmaking" . . . . . 31

B. Plaintiffs Have Not Established That The Preservation Statutes, As Applied To Their Projects, Constitute A Regulatory Taking . . . . . 34

1. The Preservation Statutes Caused No Economic Impact . . . . . 35

a. Plaintiffs' Did Not Offer A Diminution In Value Measure Of Economic Impact . . . . . 35

b. Plaintiffs Assess The Economic Impact Of The Wrong Restrictions At The Wrong Time . . . . . 36

c. Plaintiffs' Measure Of Economic Impact Uses An Arbitrary Benchmark That Is Divorced From Plaintiffs' Claims Of Alleged Damages . . . . . . . . . . . . . . . . . . . 37

d. Even If The Court Were To Use Plaintiffs' Flawed Returns-Based Approach, The Economic Impact Of The Preservation Statues Would Be Minimal . . . . . . . . . . . . . . . 38

e. The Statutory Sale Option Eliminated Any Economic Impact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

2. The Preservation Statutes Do Not Have The Character Of A Taking . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

a. *Cienega VIII* Is Not Dispositive . . . . . . . . . . . . . . . . . . . . . . . . . 43

b. The Preservation Statutes Promoted Important, Long-Standing Government Objectives . . . . . . . . . . . . . . . . . . . 44

c. The Preservation Statutes Did Not Shift The Burden Of Providing Low-Income Housing On To Plaintiffs . . . . . . . . . 46

i. Taxpayers Bore the Burden Of Extending Benefits To Developers Under ELIPHA And LIHPRHA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

ii. The Preservation Statutes Are Akin To Rent Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

3. The Preservation Statutes Did Not Frustrate Investment-Backed Expectations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

a. Investment Backed Expectations Are Measured At The Initial Closing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

b. The Preservation Statutes Did Not Interfere With A Reasonable Partnerships' Primary Expectations . . . . . . . . . . . . . 51

i. Reasonable Investors Anticipated That The Principal Returns Would Be Obtained Through Tax Benefits . . . . . . . . . . . . . . . . . . . . . . . . . . 52

ii. The Preservation Statutes Did Not Frustrate The Expectations Of Reasonable Investors . . . . . . . . . . . 55

c. Plaintiffs Have Produced Insufficient Evidence Of The Respective Partnerships' Actual, Original Expectations . . . . . . . 56

III. Plaintiffs Are Owed No Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

A. The Los Angles Plaintiffs Are Not Entitled To Compensation Because They Would Not Have Prepaid Their Mortgages On Their Initial Eligibility Dates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

B. Plaintiffs' Model Does Not Properly Measure Just Compensation . . . . . . . . . . . 61

1. Plaintiffs Are Only Entitled To Nominal Damages . . . . . . . . . . . . . . . . . . 61

2. Plaintiffs' Damage Model Overstates Just Compensation . . . . . . . . . . . 62

a. Plaintiffs Incorrectly Assesses Compensation At The End Of The Alleged Taking Period Using *Ex Post* Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

b. At Most, Plaintiffs Would Be Entitled To Fair Rental Value . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

3. Plaintiffs' Lost-Profit Model Contains Numerous Errors . . . . . . . . . . . . 66

a. Dr. Peiser's Valuations For The Five Properties That Were Sold Is Inherently Speculative . . . . . . . . . . . . . . . . . . 66

b. Plaintiffs' Model Ignores HAP Contracts That Overlapped With The Prepayment Dates . . . . . . . . . . . . . . . . . . 70

c. Dr. Peiser Employs The Wrong Discount Rates . . . . . . . . . . . . . 72

d. Dr. Peiser Makes No Allowance For Phasing-In Market Rents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

e. Dr. Peiser Acknowledged That His Use Of The Annual Adjustment Factor Renders His Model Unreliable . . . . . . . . . . . 73

f. Dr. Peiser Incorrectly Assumes That Each Plaintiff Could Have Immediately Obtained Permanent Financing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

g. Dr. Peiser Adopts Incorrect Inflated Interest Rates . . . . . . . . . . . 74

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

## TABLE OF AUTHORITIES

**Cases:**

Almota Farmers Elevator & Warehouse Co. v. United States,
409 U.S. 470 (1973) . . . . . . . . . . 62

Am-Pro Protective Agency v. United States,
281 F.3d 1234 (Fed. Cir. 2005) . . . . . . . . . . 32

Appolo Fuels, Inc. v. United States,
381 F.3d 1338 (Fed. Cir. 2004) . . . . . . . . . . 32, 39

Bass Enterprises Production Co. v. United States,
54 Fed. Cl. 400 (2002),
aff'd, 381 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . 45, 65

Bass Enterprises Production Co. v. United States,
381 F.3d 1360 (Fed. Cir. 2004) . . . . . . . . . . 31, 32, 43, 44

Bayou des Familles Dev. Corp. v. United States,
130 F.3d 1034 (Fed. Cir. 1997) . . . . . . . . . . 26

Bluebonnet Sav. Bank, F.S.B. v. United States,
266 F.3d 1348 (Fed. Cir. 2001) . . . . . . . . . . 65

Bohbot v. Santa Monica Rent Control Bd.,
34 Cal. Rptr. 3d 827 (Cal. App. Dist. 2005) . . . . . . . . . . 48

Northern Helex Corp. v. United States,
524 F.2d 707 (Ct. Cl. 1975) . . . . . . . . . . 69

Chancellor Manor v. United States,
331 F.3d 891 (Fed. Cir. 2003) . . . . . . . . . . passim

Cienega Garden v. United States,
33 Fed. Cl. 196 (1995),
rev'd on other grounds, 194 F.3d 1231 (1998) . . . . . . . . . . 42

Cienega Gardens v. United States,
38 Fed. Cl. 64 (1997),
rev'd on other grounds, 194 F.3d 1231 (1998) . . . . . . . . . . 23, 58

Cienega Gardens v. United States,
265 F.3d 1237 (Fed. Cir. 2001) . . . . . . . . . . 58

Cienega Gardens v. United States,
331 F.3d 1319 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

City of Monterey v. Del Monte Dunes at Monterey, Ltd.,
526 U.S. 687 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Cooley v. United States,
324 F.3d 1297 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Data General Corp. v. Johnson,
78 F.3d 1556 (Fed. Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Daubert v. Merrell Dow Pharmaceutical, Inc.,
509 U.S. 579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67, 68

FCC v. Florida Power Corp.,
480 U.S. 245 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

First English Evangelical Lutheran Church v. County of Los Angeles,
482 U.S. 304 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62, 64

Forest Properties, Inc. v. United States,
177 F.3d 1360 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 55

Gargoyles, Inc. v. United States,
37 Fed. Cl. 95 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Gilbert v. City of Cambridge,
932 F.2d 51 (1st Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Glendale Fed. Bank, FSB v. United States,
239 F.3d 1374 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Greenbrier v. United States,
193 F.3d 1348 (Fed. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Hamilton Bank v. Williamson County Reg'l Planning Comm'n,
729 F.2d 402 (6th Cir. 1984),
rev'd on other grounds, 473 U.S. 172 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Howard W. Heck & Assoc. v. United States,
134 F.3d 1468 (Fed. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29, 30

Independence Park v. United States,
465 F.3d 1308 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Independence Park v. United States,
449 F.3d 1235 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Keystone Bituminous Coal Ass'n v. DeBenedictis,
480 U.S. 470 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 38

King v. United States,
504 F.2d 1138 (Ct. Cl. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Lingle v. Chevron U.S.A., Inc.,
544 U.S. 528 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 31

Loveladies Harbor, Inc. v. United States,
28 F.3d 1171 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

MacDonald, Sommer & Frates v. Yolo County,
477 U.S. 340 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

MacLeod v. County of Santa Clara,
749 F.2d 541 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Maritrans Inc. v. United States,
342 F.3d 1344 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35, 36

NRG Co. v. United States,
31 Fed. Cl. 659 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

Nemmers v. City of Dubuque,
764 F.2d 502 (8th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

Nippon Steel Corp. v. United States,
458 F.3d 1345 (Fed. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

North Star Alaska Hous. Corp. v. United States,
76 Fed. Cl. 158 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

Palazzolo v. Rhode Island,
533 U.S. 606 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

Parkridge Investors LP v. Farmers Home Admin.,
13 F.3d 1192 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Penn Cent. Transp. Co. v. New York City,
438 U.S. 104 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Pettro v. United States,
47 Fed. Cl. 136 (2000) . . . . . . . . . . 74

Resolution Trust Corp. v. Diamond,
18 F.3d 111 (2d Cir.),
rev'd on other grounds, 513 U.S. 801 (1994) . . . . . . . . . . 49

Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp.,
272 F.3d 1335 (Fed. Cir. 2001) . . . . . . . . . . 59

Rose Acre Farms, Inc. v. United States,
373 F.3d 1177 (Fed. Cir. 2004) . . . . . . . . . . 31, 36, 44

Rose Acre Farms v. United States,
55 Fed. Cl. 643 (2003),
rev'd on other grounds, 373 F.3d 1177 (Fed. Cir. 2004) . . . . . . . . . . 74

Ruckelshaus v. Monsanto Co.,
467 U.S. 986 (1984) . . . . . . . . . . 50

San Diego Gas & Elec. Co. v. City of San Diego,
450 U.S. 621 (1981) . . . . . . . . . . 65

Seiber v. United States,
364 F.3d 1356 (Fed. Cir. 2004) . . . . . . . . . . 35

Stearns Co. v. United States,
396 F.3d 1354 (Fed. Cir. 2005) . . . . . . . . . . 26, 27

Steinbergh v. City of Cambridge,
604 N.E.2d 1269 (Mass. 1992) . . . . . . . . . . 49

Suitum v. Tahoe Reg. Planning Agency,
520 U.S. 725 (1997) . . . . . . . . . . 42

Tabb Lakes, Ltd. v. United States,
10 F.3d 796 (Fed. Cir. 1993) . . . . . . . . . . 31, 32, 38, 62

Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,
535 U.S. 302 (2002) . . . . . . . . . . 31, 32

Terran v. Sec'y of Health & Human Servs.,
195 F.3d 1302 (Fed. Cir. 2000) . . . . . . . . . . 69

United States v. 50 Acres of Land,
469 U.S. 24 (1984) . . . . . . . . . . 62, 63

United States v. 564.54 Acres of Land,
441 U.S. 506 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

United States v. Dow,
357 U.S. 17 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

United States v. Gen. Motors Corp.,
323 U.S. 373 (1954) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

United States v. Mendoza,
464 U.S. 164 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 55

Wheeler v. City of Pleasant Grove,
833 F.2d 267 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 66

Whitney Benefits, Inc. v. United States,
752 F.2d 1554 (Fed. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Whitney Benefits, Inc. v. United States,
926 F.2d 1169 (Fed. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Williamson County Regional Planning Comm'n v.
Hamilton Bank of Johnson City,
473 U.S. 172 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 31, 33, 37

Wyatt v. United States,
271 F.3d 1090 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

Yancey v. United States,
915 F.2d 1534 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

Yee v. City of Escondido,
503 U.S. 519 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Yuba Natural Res., Inc. v. United States,
904 F.2d 1577 (Fed. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65, 69

**Statutes:**

12 U.S.C. § 1715l . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

12 U.S.C. § 1715z-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

12 U.S.C. § 4101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 25, 27

12 U.S.C. § 4102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

12 U.S.C. § 4103 . . . . . . . . . . passim

12 U.S.C. § 4108 . . . . . . . . . . passim

12 U.S.C. § 4109 . . . . . . . . . . passim

12 U.S.C. § 4110 . . . . . . . . . . passim

12 U.S.C. § 4114 . . . . . . . . . . passim

12 U.S.C. § 4115 . . . . . . . . . . 7, 34

12 U.S.C. § 4119 . . . . . . . . . . 7

ELIHPA § 202 . . . . . . . . . . 45

ELIHPA § 222 . . . . . . . . . . 5

ELIHPA § 223 . . . . . . . . . . 5

ELIHPA § 224 . . . . . . . . . . 45, 46

ELIHPA § 225 . . . . . . . . . . passim

ELIPHA § 230 . . . . . . . . . . 5, 6, 27, 49

City of Los Angeles Ordinance No. 166320 § 4 (Oct. 17, 1990) . . . . . . . . . . 23

Emergency Low Income Housing Preservation Act,
Pub. L. No. 100-242, 101 Stat. 1877-86 (1988) . . . . . . . . . . 4

Housing Opportunity Program Extension Act of 1996,
Pub. L. No. 104-120, 110 Stat. 834 (March 28, 1996) . . . . . . . . . . 8

L.A. Mun. Code § 151.02 . . . . . . . . . . 22, 23, 58

Low-Income Housing Preservation and Resident Homeownership Act,
Pub. L. No. 101-625, 104 Stat. 4249 (1990) . . . . . . . . . . 5

Pub. L. 104-34, Title I § 101(e), 110 Stat. 1321 (Apr. 26, 1996) . . . . . . . . . . 8, 25, 60

**<u>Other Authority</u>:**

24 C.F.R. § 882.219 (1990) . . . . . . . . . . 25, 29, 60

H. Rep. No. 100-122, reprinted in 1987 U.S.C.C.A.N. 3317 . . . . . . . . . . . . . . . . . . . . . . . . . . 45

H.R. Conf. Rep. No. 100-426 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

S. Rep. No. 101-316 (1990), reprinted in 1990 U.S.C.C.A.N. 5763 . . . . . . . . . . . . . . . . . . . . . . 45

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CLAREMONT VILLAGE COMMONS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Nos. 94-10002C, 94-10003C, |
| v. | ) | 94-10005C, 94-10006C, 94-10007C, |
| | ) | 94-10008C, 94-10010C, 94-10020C, |
| THE UNITED STATES, | ) | 94-10030C, 94-10040C |
| | ) | (Judge Charles F. Lettow) |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S POST-TRIAL MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

Pursuant to the Court's February 27, 2007 order, defendant, the United States, respectfully submits the following memorandum of contentions of fact and law regarding plaintiffs' claims in this action.

## STATEMENT OF FACTS DEFENDANT ESTABLISHED AT TRIAL

### I. Statutory Background

#### A. The Section 221(d)(3) And 236 Programs

In the 1960s, the Federal Government first enacted legislation to encourage the construction, ownership, and management of moderate- and low-income housing by private owners. In 1961, Congress amended the National Housing Act to establish the Section 221(d)(3) program, 12 U.S.C. § 1715l(d)(3). This program authorized the Federal Housing Administration, and subsequently the Department of Housing and Urban Development ("HUD") to provide mortgage insurance and to fund below-market interest rate loans to stimulate private development of moderate- and low-income housing. After 1968, owners received insured mortgages with an interest subsidy under the "Section 236" program. See 12 U.S.C. § 1715z-1.

To obtain a Government-insured mortgage and additional taxpayer-funded benefits, at "initial closing," the developer of a Section 221(d)(3) or Section 236 project entered into a

"regulatory agreement" with HUD whereby the owner accepted specific restrictions on the mortgaged property, including restrictions on tenant income, allowable rental rates, and cash distributions that could be received from the project. See generally Cienega Gardens v. United States, 331 F.3d 1319, 1234-35 (Fed. Cir. 2003). After initial closing, the project was built, the owners completed a cost certification process, and HUD provided a "final endorsement" on the mortgage note. The regulatory agreement remained in effect as long as the property was subject to the insured mortgage. The mortgage note prohibited prepayment of the mortgage without the Government's approval for 20 years after final endorsement. Thus, without Government approval, an owner could not prepay, dissolve the affordability restrictions, and realize residual value (i.e., equity) in the project for more than 20 years after executing the regulatory agreement.

**B. Benefits Of Participating In The Section 221(d)(3) And Section 236 Programs**

In the Section 221(d)(3) and 236 programs, Congress provided lucrative benefits to entice the construction and operation of moderate- and low-income housing. Most significantly, the programs provided highly-leveraged, low-risk, Government-insured financing, which, coupled with accelerated depreciation of the project, produced exceptional tax benefits. DX420.

**1. Low-Risk, High Leverage Financing**

The Section 221(d)(3) and 236 programs enabled participants to obtain low-risk, high-leverage financing that was far superior to that available for a conventional multi-family housing project. Tr. 121, 2670, 2758-59, 1509. Specifically, these programs provided Government-insured, non-recourse loans at below market interest rates. The loans were amortized over 40 years and financed a 90 percent of the project's replacement cost. Tr. 2656-58. In addition, participants were entitled to a Government credit called the Builder's and Sponsor's Profit and Risk Allowance ("BSPRA"). See, e.g., DX7E, DX7F, DX7I, DX7J, DX13B, DX24C, DX30B, DX33A, DX45B, DX47B, DX70B. The BSPRA further reduced the needed cash outlay to

between zero and 3.5 percent of the project's replacement cost. Id. By contrast, banks typically required a 20 to 25 percent downpayment to finance a comparable conventional project. Tr. 2656-58. Favorable financing was a principal reason that the private sector chose to participate in the Section 221(d)(3) and 236 programs. Tr. 2092, 2670, 2758-59.

**2. Tax Benefits**

The other principal reason to participate in the Section 221(d)(3) and 236 programs was tax benefits. Tr. 2661, 2663, 2676, 2686, 2778. Projects developed under these programs were entitled to use accelerated depreciation. Tr. 143, 1625. Accelerated depreciation, when coupled with the project's high leverage and long amortization, made Section 221(d)(3) and 236 projects particularly attractive as tax shelters. Tr. 1624, 2764-66, 2670. The combination of accelerated depreciation and high leverage produced many years of large paper losses, Tr. 1508, 1511, 2764, 2773-74, which were passed through to the project's individual owners, who would use them to offset profits from other investments. Id.

The original partners in a Section 221(d)(3) and 236 project had two ways to take advantage of the projects' tax benefits. First, if they had income from other sources, partners could retain their interest in the property and use the tax benefits to reduce their own tax burden. Tr. 2077, 2773-74. When partners kept tax benefits for their own use, they ordinarily recouped their initial investment within one or two years, depending upon their tax bracket, by sheltering outside income. Tr. 2773-74; DX420. Second, partners could sell shares in the partnership at a premium to private investors, who would in turn use the project's tax losses to shelter their own income. Tr. 2077-79, 1510-11. By monetizing the tax benefits in this manner, a project's original partners could obtain a substantial, almost immediate profit. Tr. 130-131, 133-36.

**3. Other Opportunities For Profit**

The 221(d)(3) and 236 programs provided owners with several other, albeit less

significant, opportunities to profit: cash distributions; management and other fees; and possible profits from the project's residual value. Tr. 191, 2079, 2658-61, 2746, 2754-67, 2772-74.

Under the Section 221(d)(3) and 236 programs, budget-based rents were set at a level that allowed annual cash distributions to the owners. Although the regulatory agreement limited distributions to 0.6 percent of the project's total value, Tr. 2658-59, because of the low initial cash investment, this provided a generous, double digit return (typically between 20 and 30 percent) on the owners' original investment. Tr. 2081-82. Owners also profited by selling services, such as property management and building maintenance, to their own projects. Tr. 1057-59, 2660. Finally, there existed a potential for profit from realizing the project's residual value (i.e., the owner's equity) after 20 plus years. Tr. 2660-61. The potential to realize residual value, however, paled in comparison to the value of tax and other benefits, and was not material to a reasonable investor. Tr. 121-2, 2079, 2076, 2663.

### C. The Preservation Statutes

In the late 1980s, as the 20-year anniversary approached for many Section 221(d)(3) and 236 properties, Congress became concerned that many owners would prepay their mortgages, triggering a substantial drop in the nation's supply of low-income housing. See, e.g., H.R. Conf. Rep. No. 100-426, at 192 (1987) (estimating almost 950,000 low-income housing units lost through mortgage prepayments); Tr. 1921-22. Consequently, in 1988 and 1990, Congress enacted and funded two statutes (collectively, the "Preservation Statutes") to preserve low-income housing.

#### 1. ELIHPA

In 1988, as a temporary measure, Congress enacted the Emergency Low Income Housing Preservation Act, Pub. L. No. 100-242, 101 Stat. 1877-86 (1988) ("ELIHPA" or "Title II"). The

statute instituted a complex permitting process under which owners interested in prepaying their mortgage were required to apply to HUD for approval. ELIHPA §§ 221-23. This enabled HUD, using the agency's knowledge and expertise, to assess whether a project warranted preservation as low-income housing. ELIHPA § 225(a).

As an alternative to prepayment, Congress authorized HUD to alter the project's regulatory structure "to provide a fair return [to] the owner." Id. §§ 224-25. Under ELIHPA, owners could obtain a Government-insured equity take out loan funded by increased rents, increased annual cash distributions, Section 8 housing assistance contracts, and financing for capital improvements. Id. §§ 224(b), 231; Tr. 1927-29. These benefits would be incorporated into a use agreement that amended the original regulatory agreement and provided a new regulatory regimen for operating the project. Id. § 225(b); see also DX182A. Congress also authorized HUD to provide assistance to facilitate a project's sale to a qualified nonprofit organization, tenant cooperative or public agency. Id. § 224(b). Under ELIHPA, interested owners submitted a notice of intent, obtained an appraisal, and provided a plan of action to HUD. Tr. 1932, 1935-36. Participation in the preservation process was voluntary. Tr. 1927-28.

Finally, to prevent prejudice to owners that chose to proceed under ELIHPA, Congress provided that owners could to switch to benefits authorized by any successor statute. ELIHPA § 230 (allowing owners to opt for a different course even after incentives under ELIHPA had been accepted); Tr. 1934.

**2. LIHPRHA**

In 1990, Congress replaced ELIHPA with the Low-Income Housing Preservation and Resident Homeownership Act, Pub. L. No. 101-625, 104 Stat. 4249 (1990) (codified at 12 U.S.C. § 4101 et seq.) ("LIHPRHA" or "Title VI"). Like its predecessor, LIHPRHA asserted HUD's

regulatory jurisdiction over prepayment, required owners to seek approval to prepay their HUD-insured mortgage, and provided opportunities to exit the program or alter the project's regulatory regimen in the event of a denial. 12 U.S.C. §§ 4101(a), 4108-10, 4114. Significantly, LIHPRHA authorized prepayment under two distinct avenues. 12 U.S.C. § 4101(a).

An owner interested in pursuing the options provided by LIHPRHA filed notices of intent, conducted appraisals, and then submitted plans of action. 12 U.S.C. § 4102(a); Tr. 1935-36. Further, owners with regulatory plans pending under ELIHPA were allowed to continue under that statute or switch to LIHPRHA. 12 U.S.C. § 4101 note; see also ELIHPA § 230. Participation in the preservation process under LIHPRHA was voluntary. Tr. 1933-34.

Pursuant to LIHPRHA, HUD could approve prepayment if prepayment would not cause a material hardship for current tenants or materially affect the availability of low-income housing in the area. 12 U.S.C. § 4108. As with ELIHPA, this provided HUD discretion to determine whether the project's preservation as low income housing was warranted. Id. (directing HUD to assess whether prepayment would "materially increase economic hardship for current tenants" or "materially affect . . . the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families").

LIHPRHA also allowed owners to sell their property to a "qualified purchaser" at the "fair market value of the housing based on the highest and best use of the property," i.e., the project's market value without HUD restrictions. 12 U.S.C. §§ 4103(b), 4110(b); Tr. 1936-37. To facilitate sales, which enabled the owner to realize equity and exit the program, HUD funded virtually all transaction costs, provided mortgage insurance, and paid consultants to assist the parties. 12 U.S.C. § 4110(d). HUD also provided loans and grants that enabled non-profit organizations to acquire the projects. Id. If an owner seeking to sell did not receive a bona fide

offer within specified time frames, did not receive financial assistance from HUD in connection with an approved offer, or was unable to consummate the transaction for any other reason, the owner would be allowed to prepay and exit the program. 12 U.S.C. § 4114(1)(B). Owners were free to reject offers. Tr. 1941.[1]

As in ELIHPA, LIHPRHA also permitted the owner to request changes to the regulatory structure in exchange for remaining in the program. 12 U.S.C. § 4109. HUD could authorize rent increases, an increased rate of return based upon the property's market value as conventional rental housing, access to project equity through a Government-insured loan, and financing for capital improvements. Id.; Tr. 1934-35. The agreed changes would be formalized in a use agreement that amended the project's original regulatory agreement. Tr. 537-38, 967, 993-94.

Finally, LIHPRHA sought to ensure that owners were not disadvantaged by delays in processing applications and providing funds. Thus, LIHPRHA permitted owners to submit a notice of intent two years before their original prepayment date to minimize any administrative delays after prepayment eligibility. 12 U.S.C. §§ 4102, 4119(1)(B). Additionally, Congress ordered HUD to review applications within 180 days and, if the review extended beyond that, to provide retroactive incentives and assistance to owners. 12 U.S.C. § 4115(c). Federal district courts were empowered to enforce these provisions. Id. Furthermore, if within a fixed period use agreement incentives were not provided, or a sale was not consummated, the owner was allowed to prepay the original mortgage and leave the program. 12 U.S.C. § 4114; Tr. 1942-43.

---

[1] California had its own preservation program, which required owners that wanted to prepay to offer the property for sale to qualified purchasers. DX152; Tr. 1038-41. Thus, Plaintiffs' claim that in the absence of the Preservation Statutes they would have been free to select a purchaser is inaccurate. See Pls.' Post-Trial Mem. of Proposed Findings of Fact and Conclusions of Law at 18 ("Br. __") (asserting that the sale option was a "severe limitation" on "the unrestricted ability to sell").

### D. Additional Legislation

The Preservation Statutes were subject to frequent criticism due to their generous provisions and excessive cost to the Government. In the mid-1990s, Congress commenced hearings to consider alternatives. HUD's Inspector General recommended, among other measures, that Congress "[d]iscontinue paying owners windfall profits for projects that threaten to prepay their mortgages and remove the low income character of the units." Hearing before the Subcommittee on VA, HUD, and Independent Agencies of the House Committee on Appropriations, 104th Cong., 1st Sess. (January 24, 1995). These concerns resulted in passage of the Housing Opportunity Program Extension Act of 1996 ("HOPE Act"), Pub. L. No. 104-120, 110 Stat. 834 (March 28, 1996). Although the HOPE Act did not expressly repeal LIHPRHA, it "restored the prepayment rights to owners" of moderate- and low-income housing. Chancellor Manor v. United States, 331 F.3d 891, 896 (Fed. Cir. 2003). Congress subsequently passed additional legislation that required HUD to offer some form of tenant-based Section 8 assistance to tenants displaced by prepayment. Pub. L. 104-34, Title I § 101(e), 110 Stat. 1321 (Apr. 26, 1996).

## II. The Plaintiffs

Plaintiffs are ten unrelated limited partnerships that were each established to construct and operate a single low-income housing project. PX130, PX137, PX138, PX144, PX156, PX159, PX168, PX177, PX189, PX194, PX201. The partnerships were formed at or just before the "initial closing" on each HUD project. Tr. 468. Although the owners of the respective partnerships varied, each partnership agreement stated that the BSPRA would be waived by the partnership's construction contractor and inure to the benefit of the partnership. E.g., Tr. 400; PX130, PX137, PX138, PX144, PX156, PX159, PX168, PX177, PX189, PX194, PX201. The

partnerships' projects were developed through either the Section 221(d)(3) or 236 program in the late 1960's or early 1970's. Br. 9-14.

The partnerships each executed a regulatory agreement, finalized the land acquisition, and committed to build and operate a moderate- or low-income housing project at the "initial closing" with HUD. Tr. 462-63, 468-69, 475. In return, HUD agreed to insure a loan for 90 percent of the project's estimated replacement cost and provide a credit (BSPRA) that would further reduce the partnerships' equity investment. Tr. 368, 400; PX13B, PX24C, PX30B PX33A, PX45B, PX47B, PX68B, PX70B. After the partnerships had constructed the projects, and HUD had certified the costs, the agency provided a final endorsement on the mortgage note. Tr. 469, 475. During this period, shares in partnerships were sold at a profit to new partners interested in taking advantage of tax benefits. Tr. 75-76, 402, 2072, 2076, 2078-79, 2094.

Only two of plaintiffs' original partners – Jona Goldrich and Robert Hirsch – testified at trial. Mr. Goldrich was an original partner in Claremont Village (17.5 percent), De Soto (28.5 percent), Del Vista (5 percent), Kittridge I (37.5 percent), Parthenia (33.3 percent), Pioneer (12.5 percent), and Puente Park (25 percent). DX494. Mr. Hirsch was an original partner in Claremont Village (15 percent), Covina West (25 percent), Del Vista (7.5 percent), Parthenia (33.3 percent), Puente Park (25 percent). DX494.

Mr. Goldrich invested in low-income housing because, based upon the funding structure, there was no risk in the investments. Tr. 77-78, 121-22, 175. The investments' structure permitted him to immediately profit and then collect dividends and other fees. Tr. 129-31, 136. Mr. Goldrich also knew of the tax benefits resulting from low-income housing and took advantage of those benefits directly or through syndication. Tr. 75-76, 139, 145, 2072; see also Tr. 2674-76. Even if prepayment had not been allowed, Mr. Goldrich would have developed

some projects in the HUD programs Tr. 2083. Mr. Hirsch testified that the low initial investment necessary was a key consideration. Tr. 368-70, 2092. He did not know if the availability of prepayment affected his decision to invest. Tr. 485. Certain corporations (i.e., G&K Construction, Active Cleaning) were also partners in some partnerships. DX494. The corporate partners invested to shelter income from their other activities. Tr. 2075, 2705-06. The original partners, who invested in plaintiffs' properties in the 1960's or 1970's, had no material investment-backed expectation regarding the property's market value over twenty years later. Tr. 2775; DX420. Rather, their primary investment-backed expectation was tax benefits. Tr. 139-45, 401, 2081, 2093-94, 2674, 2686.

**A. The Initial Deals**

The ten plaintiffs entered the HUD programs subject to certain terms. Under the 221(d)(3) and 236 programs, the partnerships were entitled to receive an insurable mortgage of 90 percent of the project's estimated replacement cost. Tr. 368. Additionally, the partnerships were entitled to the BSPRA equal to 10 percent of the "total estimated development cost," i.e., the estimated replacement cost, less land acquisition costs. Tr. 2657-58, 2670; DX68B. Finally, the deals provided below market interest rates to subsidize the projects. See, e.g., DX61.

**1. Claremont Village Commons**

The Claremont Village partnership built a 150 unit apartment in 1970 under the Section 236 loan program. DX322. The resulting mortgage of $2,547,800 accounted for most of the project's financing. DX68B. Due to the BSPRA ($236,272) and land appreciation, the partnership's actual cash investment was only $16,917. DX420 at 20. The Claremont Village partnership's total cash outlay, therefore, was only 0.60 percent of the estimated cost of the Claremont Village apartment project. DX420 at 21.

By January 1, 1971, before the project was completed, the partnership sold a 49 percent ownership stake in the partnership to Sam Mesler, so that he could utilize the property's tax benefits. DX494; Tr. 900, 2078. Mr. Mesler was a general partner and the partnership's largest shareholder. Id. The original partners made a profit on the sale to Mr. Mesler and utilized the remaining tax benefits themselves. Tr. 130-31, 140-41, 136, 900, 2072.

**2. Covina West Apartments**

The Covina West partnership built a 158 unit apartment in 1970 under the Section 236 loan program. DX322. The resulting $2,593,300 mortgage accounted for most of the project's financing. Tr. 368; DX33A. Due to the BSPRA ($220,770) and land appreciation, the partnership was required to make an actual cash investment of only $24,398. DX420 at 23-24. The Covina West partnership's total cash outlay, therefore, was only 0.85 percent of the estimated cost of the Covina West apartment project. Id.

By 1971, before the project was completed, the G&K partners sold 25 percent ownership in the partnership to Leslie Sugar, and an additional 25 percent ownership interest to Milton Gottlieb. Both Mr. Sugar and Mr. Gottlieb were general partners. DX494. The original partners also sold 10 percent interest to W.C. Backus and an additional 10 percent to Frank & Lynn Kirk. Id. These individuals purchased ownership shares in the partnership so that they could utilize the property's tax benefits. Tr. 2076. The original partners made a profit on the sales and utilized the remaining tax benefits themselves. Tr. 130-31, 136, 140-41, 2072. The original partners continued to own a minority interest in Covina West through 1999. Tr. 907.

**3. Del Vista Village**

The Del Vista partnership built a 160 unit apartment in 1971 under the Section 221(d)(3) loan program. DX322. The resulting mortgage of $2,355,300 accounted for most of the project's

financing. DX68C. Due to the BSPRA ($206,729) and land appreciation, the partnership was not required to make any actual cash investment in the project. DX420 at 26.

By December 7, 1970, before the project was completed, the original partners had sold a 50 percent ownership stake to Sam Mesler, so that he could utilize the property's tax benefits. Tr. 908-09, 2078. Mr. Mesler was a general partner and continued to own 50 percent of the interest in the property until 1981. Id. The original partners made a profit on the sale and utilized the remaining tax benefits themselves. Tr. 130-31, 136, 140-41, 2072.

**4. De Soto Gardens**

The De Soto partnership built a 248 unit apartment in 1969 under the Section 221(d)(3) loan program. DX322. The resulting mortgage of $3,494,500 accounted for most of the project's financing. DX14B. Due to the BSPRA ($283,840) and land appreciation, the partnership was not required to make any actual cash investment in the project. DX14B; DX420 at 30.

By March 1969, before the project was completed, the original partners sold 12.5 percent of the partnership to Richard Gunther and 12.5 percent to Stanford Tabb, both as general partners, so that they could utilize the property's tax benefits. DX494. The original partners made a profit on the sale and utilized the remaining tax benefits themselves. Tr. 130-31, 136.

**5. Kittridge Gardens I**

The Kittridge I partnership built a 128 unit apartment in 1968 under the Section 221(d)(3) loan program. DX322. The resulting mortgage of $1,507,000 accounted for most of the project's financing. DX7G at CVC021364. Due to the BSPRA ($123,336) and land appreciation, the partnership was required to make an actual cash investment of only $59,258. DX420 at 33. The partnership's total cash outlay, therefore, was only 3.5 percent of the estimated replacement cost

of the project. Id. The original partners utilized the tax benefits from Kittridge I themselves. Tr. 140-41, 2072.

**6. Kittridge Gardens II**

The Kittridge II partnership built an 80 unit apartment in 1968 under the Section 221(d)(3) loan program. DX322. The resulting mortgage of $1,441,300 accounted for most of the project's financing. DX24B. Due to the BSPRA ($122,812) and land appreciation, the partnership was not required to make any actual cash investment in the project. DX420 at 36. The original partners utilized the tax benefits in Kittridge II themselves. Tr. 140-41, 2072.

**7. Oxford Park**

The Oxford Park partnership built a 109 unit apartment in 1971 under the Section 221(d)(3) loan program. DX322. The resulting mortgage of $1,519,800 accounted for most of the project's financing. DX47B. Due to the BSPRA ($136,248) and land appreciation, the partnership was required to make an actual cash investment of only $32,675. DX420 at 38-39. The Oxford Park partnership's total cash outlay, therefore, was only 1.9 percent of the estimated cost of the Oxford Park apartment project. Id. The original partners utilized the tax benefits in Kittridge II themselves. Tr. 130-31, 136, 140-41, 2072; DX494.

**8. Parthenia Townhomes**

The Parthenia partnership built a 24 unit apartment in 1971 under the Section 221(d)(3) loan program. DX322. The resulting mortgage of $368,000 accounted for most of the project's financing. DX70C. Due to the BSPRA ($30,811) and land appreciation, the partnership was not required to make any actual cash investment in the project. The original partners utilized the tax benefits in Parthenia themselves. Tr. 140-41, 2072.

**9. <u>Pioneer Gardens</u>**

The Pioneer Gardens partnership built a 141 unit apartment in 1970 under the Section 236 loan program. DX322. The resulting mortgage of $2,446,500 accounted for most of the project's financing. DX30B. Due to the BSPRA ($227,414) and land appreciation, the partnership was required to make an actual cash investment of only $34,505. The Pioneer Gardens partnership's total cash outlay, therefore, was only 1.3 percent of the estimated cost of the Pioneer Gardens apartment project. DX420 at 46.

By June 1, 1971, and before the project was completed, the G&K partners sold 24 percent ownership in the partnership to David Pick and an additional 24 percent to Joseph Gorman, so that they could utilize the property's tax benefits. The original partners made a profit on the sale and utilized the remaining tax benefits themselves. Tr. 130-131, 136, 140-41, 2072.

**10. <u>Puente Park Apartments</u>**

The Puente Park partnership built a 132 unit apartment in 1969 under the Section 236 loan program. DX322. The resulting mortgage of $1,947,500 accounted for most of the project's financing. Due to the BSPRA ($170,169) and land appreciation, the partnership was not required to make *any* actual cash investment in the project. DX420 at 49.

By June 1, 1971, before the project was completed, the original partners sold 48 percent ownership in the partnership to Sam Mesler and 13 percent to Zyg Taube, so that they could utilize the property's tax benefits. Tr. 2078-79. Messrs. Mesler and Taube were general partners. The original partners made a profit on the sale and utilized the remaining tax benefits themselves. Tr. 130-131, 133-36, 140-41, 2072.

Puente Park has faced recent security issues. For approximately the past 18 months, the apartments have had a security service and added security cameras. Tr. 256. There was also

substantial gang activity in the city of La Puente, and the sheriff had to evict some of the gang members living in Puente Park. Tr. 257.

**B. Further Benefits**

The partners benefitted from the construction and management of the project. Tr. 2689-90. They contracted with an affiliated construction company – Goldrich and Kest Construction, Inc. – to build the apartments. Tr. 407. To manage the property, the apartment buildings contracted with G&K management – another affiliated company. Tr. 375, 407-08. The fees paid to these entities were funded almost entirely by the Federally-backed mortgages and rents.

By selling shares in the project at a profit, or using the tax benefits themselves, the partnerships would have been able to recoup their initial investment in one or two years. Tr. 130-31, 136, 2729-30, 2739.

Thus, in return for minimal cash outlays of between zero and 3.5 percent of the project's cost, the partnerships received (a) uniquely advantageous financing, (b) the ability to utilize the project's tax benefits, (c) the ability to receive distributions of cash from operations, and (d) profits for individual partners by awarding them contracts for construction and project management. DX420. Additionally, the partnerships were entitled to any profits generated by the sale or other disposition of the projects upon exiting the HUD program. Of course, at the time of project's development in the late 1960s and early 1970s, the residual value of the apartments would have depended upon interest rates, property values, the renters' market, and other variables existing more than 20 years in the future. See Tr. 2663. These variables would have been unknowable at the time of development.

### C. The Properties Prior To Title II

Although the HUD-insurance programs made low-income housing available, those programs did not provide any direct assistance for tenants to pay rents. Over time, HUD developed a number of programs to assist tenants in paying rent. One form of rental assistance was Housing Assistance Payment ("HAP" or "Section 8") contracts. Tr. 2053. The Government offered HAP contracts because some residents were unable to pay their rent, causing the buildings to default on their mortgages. Tr. 852, 1507-08. HAP contracts assisted the residents in place pay the rent. Id. These contracts, which were signed by apartment owners and HUD, covered a fixed number of units in a given building. See, e.g., DX93-100. HAP contracts were thus "project-based" assistance, meaning that the assistance ran with the building. Seven plaintiffs participated in the HAP program.[2] Id.

HAP contracts provided that "[p]repayment of the mortgage shall not, by itself, affect any rights of the Owner or HUD under this Contract." DX94 at 9, § 27(c). Thus, when an apartment building signed a Section 8 contract it agreed to adhere to the HUD restrictions even if the owner prepaid the mortgage. Id.

HAP contracts provided benefits to apartment owners with HUD-insured mortgages. Without a HAP contract, the owners had to find tenants able to pay the entire rent, regardless of what percentage it was of their income. Tr. 775, 852. With HAP, tenants only had to pay a set portion of their adjusted gross income as rent, with HUD paying the rest. Tr. 848; DX94. As HUD paid its portion of the rent in a lump sum at the first of the month, a HAP contract reduced the apartment owner's credit risk, i.e, the risk that rent would not be paid. Tr. 1061-62. Owners also received the benefit of a reliable source of income through HAP contracts. Tr. 853.

---

[2] Claremont Village, De Soto, Kittridge I, Kittridge II, Oxford Park, Pioneer Gardens, and Puente Park. DX426.

HAP contracts reduced the likelihood that a unit would be empty ("vacancy risk"). For HUD properties, there are generally waiting lists of individuals who have applied to the property for housing. Tr. 243-44. Conventional properties typically do not have such lists. Tr. 244. Not only did HAP contracts reduce vacancy risk by enlarging the pool of eligible tenants, it also provided subsidies for vacant units. Of course, owners never had to rent a unit if they did not want to do so, and could have chosen to leave a unit empty at any time. Tr. 856, 930-31. The Government never selected the plaintiffs' tenants. Tr. 856, 928-31.

Prior to 1996, HAP contracts were only renewed in five-year increments. Tr. 871. Before ELIHPA, Claremont Village, De Soto, Kittridge I and II, Oxford Park, Pioneer Gardens, and Puente Park each signed five-year HAP contracts that overlapped with their initial prepayment dates. Tr. 870-71. Although the owners asked for shorter HAP contracts, HUD refused their request. Tr. 865-66.[3] These properties would therefore have continued to be subject to affordability restrictions even if they had prepaid their HUD-insured mortgages.

In the absence of the Preservation Statutes, these plaintiffs would have faced a choice: forego HAP assistance before the prepayment date or renew the HAP contract for five years despite the fact that it would limit the rents chargeable upon prepayment. Indeed, five plaintiffs did face this choice prior to ELIHPA and elected to enter HAP contracts that effectively extended

---

[3] The properties had the following prepayment eligibility dates and expiration dates for their HAP contracts: Claremont Village, December 21, 1991 initial prepayment date, July 31, 1991 HAP expiration date; De Soto, November 2, 1990 initial prepayment date, June 30, 1991 HAP expiration date; Kittridge I, September 17, 1989 initial prepayment date, September 30, 1991 HAP expiration date; Kittridge II, April 14, 1991 initial prepayment date, September 30, 1991 HAP expiration date; Oxford Park, October 6, 1992 initial prepayment date, August 31, 1997 HAP expiration date; Pioneer Gardens, May 26, 1991 initial prepayment date, October 31, 1992 HAP expiration date; Puente Park, August 31, 1990 initial prepayment date, June 30, 1991 HAP expiration date. Tr. 857-60, 865, 867, 869-70; PX102, PX103, PX115, DX97, DX98, DX99, DX103A, DX130, DX345.

the project's affordability restrictions. Tr. 870-71; DX94, 97-99, 103A. Even if the other two plaintiffs had chosen to forgo HAP contracts, and plaintiffs give no reason to believe they would have acted differently, the properties would have suffered substantial financial losses as a result and potentially faced foreclosure.

**D. Plaintiffs Each Signed A Use Agreement**

Plaintiffs were free to choose among the options available under the Preservation Statutes. Tr. 1927-28, 1933-34. Each plaintiff chose not to sell its property through the preservation process, although it could have extracted the entire fair market value of its equity. Tr. 1936-37, 1941, 2203. Had plaintiffs wished to sell their property to a non-profit organization for its appraised fair market value, there would have been a willing buyer available. Tr. 1046-1049, 1053, 1931, 1943. Several nonprofit organizations contacted the G&K partners, seeking to acquire apartment buildings under the preservation process. Tr. 1053. If, for some reason, plaintiffs did not receive a bona fide offer, plaintiffs could have prepaid their mortgages. 12 U.S.C. § 4114; Tr. 1942-43.

At the time plaintiffs filed their initial notices of intent to prepay for Pioneer Gardens, Claremont Village, and Parthenia, plaintiffs did not know if they wanted to convert to conventional housing, sell the apartments as condominiums, or tear the properties down. Tr. 312, 315; PX30, PX31. Although the G&K partners were uncertain of their plans, they did not have a rule or policy against selling their properties. Tr. 1050.

Later, when given the option of switching to LIHPRHA, each plaintiff refused. Through a process of appraisal and appraisal review, each plaintiff negotiated with HUD regarding what the property's value would be if there had been no HUD restrictions. Tr. 563, 558, 609, 618, 919, 920-21. For Oxford Park, HUD accepted the appraised value proposed by the owners with no

changes. Tr. 701. Ultimately, plaintiffs and HUD agreed upon the following valuations: Claremont Village – $7,976,000; Covina West – $8,342,000; Del Vista – $7,222,000; De Soto – $12,750,000; Kittridge I – $7,365,000; Kittridge II – $5,700,000; Oxford Park – $5,350,000; Parthenia – $1,576,600; Pioneer Gardens – $6,124,000; Puente Park – $7,650,000. See PX1. These agreed-upon valuations were the basis for plaintiffs' incentives in the preservation process. If plaintiffs had chosen to sell their properties under ELIHPA, these values would have also served as the selling price. Had plaintiffs opted to proceed under LIHPRHA, the LIHPRHA valuation process would have been employed. See Tr. 540. Plaintiffs offered no evidence whatsoever to rebut the conclusion that the agreed-upon valuations represented the true market values of the properties. Tr. 1499. Indeed, plaintiffs' expert, Dr. Peiser, relied upon these valuations throughout his economic impact and damages analyses. Tr. 1613, PX1.

Owners seeking a use agreement could choose one of two rent options. They could get rent increases either through the annual adjustment factor, which permitted unlimited distributions to the partners, or they could receive a budget-based rent with a limited distribution. Tr. 540, 983-84. Rent increases under use agreements using an Annual Adjustment Factor ("AAF") were to approximate market rents. Tr. 2106. Owners whose rents were calculated choosing the budget-based option received a fixed percent distribution of project equity. Tr. 540, 985. Claremont Village, Del Vista, De Soto, and Pioneer Gardens chose the budget-based option because of risks associated with security concerns at those projects. Tr. 541, 996, 1003, PX50, PX52, PX53, PX58. The remaining plaintiffs chose unlimited distributions. PX51, PX54-57, DX181.

Use agreements changed the regulations under which the projects operated, perhaps most notably by increasing the annual cash distribution. Tr. 986. Pioneer Gardens' use agreement, for

example, authorized an annual distribution of 8.6 percent of the project's contemporaneous equity. Tr. 991-92, 1479; PX58. The agreed distributions for Claremont Village, Del Vista, and De Soto were set at 7.5 percent, 5.1 percent and 8.0 percent of preservation equity, respectively. PX50, PX52, PX53, DX256. These were all dramatic increases in the allowed distribution. Limits on cash distributions for the remaining properties were lifted completely.

By 1995, each plaintiff had signed a use agreement. PX50-58; DX181.[4] Plaintiffs understood that these agreements amended the original regulatory agreement and revised the restrictions that would govern the projects going forward. Tr. 993-94. Plaintiffs chose to execute use agreements, rather than sell pursuant to the Preservation Statues, because the use agreements were better financially than a sale at fair market value. See Tr. 2266-67. Before signing the use agreement, plaintiffs had learned that restrictions on prepaying might be lifted. Tr. 499-501; DX253.

### E. Delays In Processing

HUD acted reasonably and in good faith in processing thousands of plans of action under the Preservation Statutes. Although their processing of plans of actions sometimes took considerable time, HUD's Los Angeles office was understaffed and its employees were working as quickly as possible. Tr. 729-30, 741. To remedy this, HUD hired additional employees and used employees from other offices to provide assistance. Tr. 1997-2000. Additionally, the Northridge earthquake, which struck Southern California in 1994, affected the ability of the Los Angeles office to handle its regular work. Tr. Tr. 697, 706, 1940. After the earthquake, HUD

---

[4] The fact that plaintiffs obtained funded Title II use agreements does not establish that their as-applied, regulatory taking claims are ripe. Plaintiffs' claims would be ripe only if HUD rejected requests to prepay pursuant to the Preservation Statues, see 12 U.S.C. § 4108, or plaintiffs establish that applying to prepay pursuant to the Preservation Statues was futile. Greenbrier v. United States, 193 F.3d 1348, 1359-60 (Fed. Cir. 1999).

staff provided disaster-related assistance, including providing below market loans so that FHA-insured properties could be repaired. Tr. 934, 1987-88.

Moreover, plaintiffs contributed to the time required for processing by, for instance, requesting reevaluations of rents associated with plans of action or by failing to promptly submit to HUD proposed plans of action. Tr. 922-23. Additionally, the owners' appraisers were sometimes slow in completing their assignments, which further delayed the process. Tr. 922-23. Perhaps most significantly, many plaintiffs chose to wait 18 months or more to pursue plans of action under ELIHPA in order to see if the benefits available under LIHPRHA were better than those currently available. Tr. 924-25; PX274, PX275. Unlike the plaintiffs, one of the properties owned by the G&K partners chose not to delay. Id. As a result, although it started the administrative process a month later than Claremont Village, it received a use agreement two years earlier than the Claremont Village project. Id.

**F. Prepayment**

The Preservation Statutes established a discretionary standard and gave HUD authority to determine whether prepayment would be allowed. See ELIPHA § 225(a); 12 U.S.C. § 4108. Plaintiffs never filed a plan of action to prepay pursuant to the Preservation Statutes and HUD never sent plaintiffs a letter advising them that they should not do so.[5] Tr. 828. Plaintiffs never asked HUD whether the properties affected by LARSO – which, as discussed below, limited rent increases – could meet the Preservation Statutes' prepayment requirements. Tr. 827.

[5] Several of plaintiffs' plans of action originally included reservation of rights language. Tr. 542, 939, 943-44; DX188A; PX260. When HUD objected, PX260, the partnerships removed the reservation language and the other partnerships chose to omit such language. See DX193.

Prepayment created costs and risks for the owner. For this reason, owners did not reflexively prepay their HUD-insured mortgages. Tr. 492, 882; DX107. In fact, even after passage of the HOPE Act, the G&K partners chose to sign use agreements extending regulatory restrictions on some properties that were eligible to prepay. Tr. 882-86.

Plaintiffs claim that HUD advised them that it would have been futile to file a plan of action requesting prepayment. Br. 17. Specifically, they claim they based their decision not to prepay upon some general, off-hand remarks by a HUD employee over drinks at a social event. Tr. 812-23. Plaintiffs offer no evidence about specific projects and offer no notes or other documents substantiating or memorializing any conversation about prepayment. Tr. 820-24.

**G. Sales**

Five plaintiffs – Covina West, Puente Park, Pioneer Gardens, Claremont Village, and Del Vista – sold their properties between 2001 and 2004. Tr. 625, 659, 714, 1049-50. Proceeds from each sale was rolled into new investments under a 1031 exchange, which allowed plaintiffs to sell the properties without paying capital gains taxes. Tr. 1052. Thus, instead of following a "buy and hold" strategy, Br. 63, plaintiffs were willing to sell if they received a sufficient offer and had available a mechanism to avoid adverse tax consequences. Tr. 1051.

**H. Los Angeles Rent Stabilization Ordinance**

Rent control is a restriction on the rent that can be charged or the amount that rents can increase. Tr. 1065, 1495. The Los Angeles City Counsel added the Los Angeles Rent Stabilization Ordinance ("LARSO") to the Los Angeles Municipal Code in 1979. LARSO imposed rent controls on a wide range of multi-family rental units. Tr. 1882.

From its inception, LARSO exempted from regulation "[h]ousing accommodations which a government unit, agency or authority owns, operates, or manages." L.A. Mun. Code § 151.02.

This exemption encompassed federally-subsidized, privately-owned multifamily developments. Id.; Tr. 1882. The "Government owned or operated" exemption from rent control was temporary in that it applied only during the period of Government ownership or regulation. See Tr. 1893.

In 1990, the Los Angeles City Council promulgated amendments to LARSO "to clarify what has always been the intent of the City Council." City of Los Angeles Ordinance No. 166320 § 4 (Oct. 17, 1990) (the amendments do not effect "substantive changes in the law"); Tr. 1070-71, 1893. These amendments confirmed that rental units which were exempt from LARSO because of their Government involvement would become subject to LARSO upon termination of Governmental regulation, and that "such units are not subject to 'vacancy decontrol' during the transitionary period." Id. The City enforced LARSO in the same way with respect to prepaying properties before and after the clarifying amendments. Tr. 1894; DX119B.

Section 221(d)(3) and 236 projects that prepaid in Los Angeles lost their exemption and immediately became subject to LARSO. Tr. 1890; see also Tr. 1074-75; DX119B. LARSO thus prohibited property owners from raising their rents to market after prepaying a HUD-insured mortgage. Independence Park v. United States, 449 F.3d 1235 (Fed. Cir. 2006).

DeSoto, Kittridge I, Kittridge II, Oxford Park, and Parthenia (the "Los Angeles Plaintiffs") are located in the City of Los Angeles and, therefore, would have been subject to LARSO upon prepayment. Tr. 1890. Because LARSO would have prevented the Los Angeles Plaintiffs from raising rents to market, it would not have been economically feasible to obtain new mortgages and prepay the properties' mortgages. Cienega Gardens v. United States, 38 Fed. Cl. 64, 84-85 (1997), rev'd on other grounds, 194 F.3d 1231 (1998); Tr. 1090-91, 1095-98.

In the 1990s, there were several types of tenant-based rental assistance available to low-income individuals. Tr. 304-05, 774, 1098-99. These included Section 8 certificates and vouchers. Id. Apartments rented to tenants with certificates were exempt from LARSO's

restrictions on rent increases, whereas apartments rented to tenants with vouchers were subject to LARSO. Tr. 1083, 1895-96. If Congress had not passed the Preservation Statutes, and if the Housing Authority for the City of Los Angeles ("HACLA") had not given certificates to plaintiffs' tenants upon prepayment, LARSO would have required the owners to "maintain for all existing tenants at the vastly below market rents they were charging those tenants under the HUD program and prohibited the owners from raising those rents." Tr. 1089. Further, if LARSO had limited plaintiffs' rent increases, it would have prevented owners from obtaining the necessary financing to prepay their mortgages. Tr. 1095-98.[6]

LARSO includes a provision that allows a property owner to apply for a just and reasonable rent increase. Tr. 1886. The Los Angeles Housing Department receives approximately two applications each month for a just and reasonable rent increase from the approximately 90,000 properties that are subject to LARSO. Tr. 1889. Plaintiffs offered no evidence that they would have qualified for such a rent increase, or that they would have been permitted to implement such an increase. If granted, a just and reasonable rent increase does not provide market rents, but rather, adjusts rents using the project's net operating income prior to 1978 when LARSO was adopted. Tr. 1888.

LARSO also permits a rent increase to be given to an approved "special class." Tr. 1892. No special class was approved for prepaying HUD projects. Tr. 1893.

---

[6] The Affordable Housing Management Association ("AHMA") had concerns that many properties were unable to raise rents after prepayment due to LARSO. Tr. 1074; DX298. The properties facing this issue had not received certificates upon prepayment and, thus, were subject to LARSO. Tr. 1075-76. This is what would have happened in 1990 or 1991 had there been no preservation statutes and no certificates. Id. AHMA was also concerned that if a property had too many tenants ineligible for certificates, the property would have insufficient income to refinance and prepay. Tr. 860, 862, 1077.

### I. Section 8 Assistance Following Prepayment

HACLA administered tenant-based Section 8 assistance (i.e., vouchers and certificates) in Los Angeles. HACLA maintained a long waiting list for tenant-based Section 8 assistance. Tr. 1085-86. The housing authority would close the waiting list for years at a time because the list was too long. Tr. 1085. Thus, tenants seeking Section 8 assistance from HACLA had to wait years. Id. When it became available, tenant-based Section 8 could come as a voucher or as a certificate. Tr. 303-04. Not until April 1996, as a result of new Federal legislation, was priority given to tenants affected by prepayment who were seeking Section 8 assistance. See Pub. L. 104-34, Title I § 101(e), 110 Stat. 1321 (Apr. 26, 1996) (codified at 12 U.S.C. § 4101 note). Thus, in the absence of the Preservation Statutes, tenants from a prepaying project in the late 1980s and early 1990s would have been given no priority and would have been required to get in line with all other applicants for Section 8 assistance. See 24 C.F.R. § 882.219 (1990).

## DEFENDANT'S CONTENTIONS OF LAW

### I. The Los Angeles Plaintiffs' As-Applied Taking Claims Are Unripe

#### A. As-Applied Taking Claims Do Not Ripen Until The Responsible Government Entity Provides A Final Decision Applying The Regulation At Issue To The Property

The aim of Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 124 (1978), is "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 539 (2005). To establish a taking under Penn Central, a property owner must establish that the regulation at issue "has in substance 'taken' their property by going 'too far.'" Greenbrier v. United States, 193 F.3d 1348, 1357 (Fed. Cir. 1999).

An "as-applied" taking claim under Penn Central does not ripen "until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001); Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 186 (1985). This is because "a court cannot determine whether a regulation has gone 'too far' unless it knows how far the regulation goes." MacDonald, Sommer & Frates v. Yolo County, 477 U.S. 340, 350 (1986). Further, where the regulatory restriction can be modified or eliminated by alternate avenues, an "as applied" taking claim does not ripen until every available avenue has been exhausted. Stearns Co. v. United States, 396 F.3d 1354, 1358 (Fed. Cir. 2005); Williamson, 473 U.S. at 186 (requiring the property owner to apply for a variance in order to ripen its claim).

Ripeness is a well-established prerequisite to judicial relief. E.g., Williamson, 473 U.S. at 186 (dismissing plaintiff's unripe regulatory takings claim). For as-applied, regulatory taking claims, the "final decision" requirement not only ensures that a live controversy exists, it also provides certainty about how the property is affected, fixes the start of the alleged taking, and establishes when the statute of limitations begins to run. See MacDonald, 477 U.S. at 350; Bayou des Familles Dev. Corp. v. United States, 130 F.3d 1034, 1038 (Fed. Cir. 1997).

The Preservation Statutes established a complex administrative process by which a project owner could prepay, sell at market value, or modify the project's existing regulatory regimen. See Chancellor Manor, 331 F.3d at 905; 12 U.S.C. §§ 4108-10, 4114. The process had two basic components. First, HUD evaluated whether the project's preservation as low-income housing was necessary. See ELIHPA § 225(a); 12 U.S.C. § 4108. If HUD concluded that prepayment would not have a material effect upon current tenants and the supply of low income housing, the

agency allowed owners to prepay and exit the program. Id. Second, if a project's use as low-income housing was to be preserved, the owner chose between (1) selling at the project's fair market value without HUD-restrictions,[7] and (2) remaining in the program in exchange for relaxed regulations and valuable monetary incentives. ELIHPA §§ 225(b), 230; 12 U.S.C. §§ 4109-10, 4114. If the owner's chosen option did not come to fruition within a fixed period, the owner was allowed to prepay. 12 U.S.C. § 4114.

Consequently, an as-applied taking claim concerning the Preservation Statutes does not ripen until (1) HUD denies prepayment (or the owner's failure to seek prepayment is excused by the doctrine of futility), and (2) the administrative sale or use agreement process reaches a conclusion (i.e., HUD approves and funds the project's sale to a purchaser, HUD offers the owner a funded use agreement, or prepayment is allowed under 12 U.S.C. § 4114). See Stearns, 396 F.3d at 1358.

**B. The Los Angeles Plaintiffs' As-Applied Taking Claims Are Not Ripe Because They Failed To Apply To Prepay Under The Preservation Statutes**

The Los Angeles Plaintiffs never applied to HUD for permission to prepay. Br. 17. Because it is not certain that the Preservation Statutes precluded prepayment by these plaintiffs, their as-applied taking claims are not ripe. See, e.g., Palazzolo, 533 U.S. at 618; Greenbrier, 193 F.3d at 1357.

Both ELIHPA and LIHPRHA allowed owners to submit a plan of action to prepay their Government-insured mortgage.[8] ELIHPA § 221(a); 12 U.S.C. § 4101(a). The standard

---

[7] HUD would provide financial assistance to facilitate sale at market value and permit the project's continued operation as low-income housing. 12 U.S.C. 4110(d).

[8] Prepayment by two Los Angeles Plaintiffs – DeSoto and Kittridge I – was governed by ELIHPA. Prepayment by the remaining Los Angeles Plaintiffs was governed by LIHPRHA.

established in ELIHPA was highly discretionary. Under ELIHPA, HUD was authorized to approve a plan of action to prepay so long as:

> (1) implementation of the plan of action will not materially increase economic hardship for current tenants or involuntarily displace current tenants (except for good cause) where comparable and affordable housing is not readily available; and
>
> (2) (A) the supply of vacant, comparable housing is sufficient to ensure that such prepayment will not materially affect –
>
>> (i) the availability of decent, safe, and sanitary affordable housing to lower income and very low income families or persons in the area that the housing could reasonably be expected to serve. . . .

See ELIHPA § 225(a) (emphasis added). The standard for prepayment under LIHPRHA conferred the same discretion upon HUD, except that an increase in monthly rent exceeding 10 percent was deemed a material "economic hardship for current tenants" that would preclude prepayment.[9] 12 U.S.C. § 4108(a).

Plaintiffs contend that applying to HUD to prepay would have been futile.[10] Br. 17, 40. Yet, plaintiffs never discussed prepayment of these projects with HUD, nor identified any document from HUD indicating that applying to prepay was futile. Tr. 812, 815, 820, 823-24. The Los Angeles Plaintiffs have not established that HUD, in its discretion, could not have

---

[9] LIHPRHA, like ELIHPA, gave HUD discretion to decide what constituted "comparable and affordable housing," a "material increase in economic hardship," a "material affect" upon "the availability of decent, safe, and sanitary housing affordable to low-income and very low-income families," and "the area that the housing could reasonably be expected to serve." 12 U.S.C. § 4108.

[10] A property owner must make at least one application to use their property before invoking the futility exception. Howard W. Heck & Assoc. v. United States, 134 F.3d 1468, 1472 (Fed. Cir. 1998).

approved any plan of action for prepayment.[11] Upon prepayment, LARSO applied to HUD projects in Los Angeles. Tr. 1890; DX119B; Independence Park, 449 F.3d at 1241. LARSO strictly limited rent increases for current tenants in prepaying projects leaving the HUD program. Tr. 1891. Under LARSO, rents typically rose 3 to 4 percent per year and could never exceed 10 percent. Tr. 1885. Consequently, the monthly rent increase for "current tenants" upon prepayment by the Los Angeles Plaintiffs could not have exceeded 10 percent and, therefore, would not "materially increase economic hardship" under the Preservation Statutes.

Further, it was a simple matter for project owners to submit a plan of action that would not evict or otherwise involuntarily displace current tenants. In their post-trial brief, plaintiffs assert that current tenants who could not afford the (minimal LARSO) rent increase would be displaced. Br. 41. A tenant's decision to move because of a small rent increase, however, does not constitute involuntary displacement under the Preservation Statutes. To the contrary, contemporaneous HUD regulations defined "involuntary displacement" as displacement resulting from an action by the owner "other than a rent increase." E.g., 24 C.F.R. § 882.219(d)(iii) (1990).

Lastly, plaintiffs have failed to establish that prepayment would "materially affect" the availability of "decent, safe, and sanitary affordable housing" in the area reasonably expected to be served by plaintiffs' properties. ELIHPA § 225(a); 12 U.S.C. § 4108(a)(2). The "materially affect" standard is inherently discretionary. Where a Government agency possesses discretion, applying for permission to undertake an activity is not deemed futile. E.g., Heck, 134 F.3d at 1472. Further, plaintiffs state that HUD rents were far below market. Br. 40. Given that rent increases would be limited by LARSO, few, if any, tenants would be expected to vacate their

---

[11] With respect to the remaining plaintiffs, we do not contest their claim that they would not have received approval to prepay pursuant to ELIHPA § 225(a) or 12 U.S.C. § 4108.

below-market apartments upon prepayment. HUD could have concluded, therefore, that prepayment by the Los Angeles Plaintiffs would not "materially affect" the local rental market.

Plaintiffs respond that no project in Los Angeles was given permission to prepay, but fail to acknowledge that no project in Los Angeles sought HUD approval to prepay. Br. 41. Indeed, only eight projects nationwide applied to prepay. Greenbrier, 193 F.3d at 1358 (three of eight applications were approved). This is almost certainly because the sale and use agreement options were financially superior to prepayment. See Tr. 2027-28, 2038 (numerous projects sought use agreements and consummated sales after passage of HOPE). This, in turn, is hardly surprising because prepayment was not financially feasible for projects whose rent increases were constrained by LARSO. See Tr. 1095-98, 2110-13.

Plaintiffs also state that the Los Angeles rental market was tight and that there was not a surplus of low-income housing. Br. 41. The only HUD testimony cited by plaintiffs comes from Thomas Vitek – an employee from HUD's San Francisco office. Id. Mr. Vitek was not responsible for deciding prepayment requests from Los Angeles and, moreover, conceded that an owner in Los Angeles could "perhaps" demonstrate that prepayment would not detrimentally affect the supply of low-income housing proximate to their project. Tr. 1963. Testimony to the effect that it would be difficult to obtain approval to prepay is legally insufficient. As the Federal Circuit has explained, the mere fact "[t]hat HUD may have set a high hurdle by imposing stringent requirements for granting . . . permission does not excuse the Owners' failure to seek such permission." Greenbrier, 193 F.3d at 1359; see also Heck, 134 F.3d at 1472 (applying was not futile where plaintiff had received "negative agency comments" and alleged that its application "surely would be denied"). The fact that HUD possessed discretion to evaluate and

permit prepayment precludes a finding of futility. See id. The Los Angeles Plaintiffs have, thus, failed to establish that their as-applied taking claims are ripe.

## II. The Preservation Statutes Did Not Effect A Regulatory Taking Under *Penn Central*

To establish a regulatory taking, an owner must provide evidence regarding: (1) the regulations' economic impact upon the claimant; (2) the extent to which the regulation has interfered with the owner's reasonable, distinct investment-backed expectations; and (3) the character of the Government action. Penn Central, 438 U.S. at 124. The court must then balance the factors in an ad hoc analysis. City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 720 (1999); Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency, 535 U.S. 302, 322 (2002). The aim of Penn Central is "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." Lingle, 544 U.S. at 539. Consequently, although all three factors are to be balanced, "courts have traditionally rejected taking claims in the absence of severe economic deprivation." Rose Acre Farms, Inc. v. United States, 373 F.3d 1177, 1195 (Fed. Cir. 2004).

### A. Plaintiffs Have Not Established An "Extraordinary Delay In Governmental Decisionmaking"

The Preservation Statutes established a detailed permitting process by which a project owner could prepay, sell at market value, or modify the project's existing regulatory regimen. Because delays inherent in a complex regulatory scheme have "long been considered permissible exercises of the police power," the time required to complete the administrative process generally is not compensable under the Fifth Amendment. Tahoe-Sierra, 535 U.S. at 335; Bass Enterprises Production Co. v. United States, 381 F.3d 1360, 1366 (Fed. Cir. 2004).

Courts have nevertheless noted that a taking can conceivably arise by reason of "extraordinary delay in governmental decisionmaking." Wyatt v. United States, 271 F.3d 1090, 1098 (Fed. Cir. 2003); Bass, 381 F.2d at 1366 (quoting Tabb Lakes, Inc. v. United States, 10 F.3d 796, 803 (Fed. Cir. 1993)). Extraordinary delays must last for a substantial length of time. See, e.g., Williamson County, 473 U.S. 172 (finding no taking despite eight year delay); Wyatt, 271 F.3d at 1097-100 (same for a nearly ten-year delay); Tahoe-Sierra, 535 U.S. at 346-47 (refusing to find that a six year delay was a *per se* taking). The length of the delay is not the only, or even the primary, factor to be considered. "Because delay is inherent in complex regulatory permitting schemes, [courts] must examine the nature of the permitting process as well as the reasons for any delay." Wyatt, 271 F.3d at 1098. "Governmental agencies that implement complex permitting schemes should be afforded significant deference." Bass, 381 F.3d at 1367; Wyatt, 271 F.3d at 1098. "Moreover, it is the rare circumstance that . . . a taking based on extraordinary delay [will be found] without a showing of bad faith." Wyatt, 271 F.3d at 1098; Cooley v. United States, 324 F.3d 1297, 1307 (Fed. Cir. 2003).

If a court concludes that delay in the regulatory process is extraordinary, "the question of temporary regulatory takings liability is determined using the Penn Central factors." Appolo Fuels, Inc. v. United States, 381 F.3d 1338, 1351 (Fed. Cir. 2004). Additionally, "only after the delay becomes unreasonable would a taking begin." Tabb Lakes, 10 F.3d at 803. Courts measure any compensation as of this date. Id.

Not until it offered funded use agreements, which each of the plaintiffs in fact signed, could HUD have reached a final decision applying the Preservation Statutes to the plaintiffs' properties. Plaintiffs nevertheless seek compensation for the period of administrative processing between prepayment eligibility and HUD's offer of a use agreement. Plaintiffs fail to assert

"extraordinary delay" in their complaint or their trial briefs and, for this reason alone, the Court should reject such a claim. See Casa de Cambio Comdiv S.A. v. United States, 291 F.3d 1356, 1366 (Fed. Cir. 2002). Additionally, plaintiffs fail to allege a sufficiently long delay, establish the reasons for delay, show what part of the delay was attributable to HUD, and offer evidence, much less clear and convincing evidence, of bad faith. E.g., Am-Pro Protective Agency v. United States, 281 F.3d 1234, 1241 (Fed. Cir. 2005) (requiring clear and convincing proof to overcome the "strong presumption" that Government officials act in good faith).

Plaintiffs aver that it took between three and seven years to obtain funded use agreements from HUD. Br. 23. As "delay is inherent in complex regulatory schemes," courts have commonly concluded that similar periods are insufficient to establish a taking by extraordinary delay. See, e.g., Williamson County, 473 U.S. 172 (finding no taking despite eight year delay). Further, to establish a taking, plaintiffs must establish the delay that was attributable to the Government. Here, plaintiffs acknowledge the complexities of the administrative process, but fail to establish what periods were attributable to delay by HUD. See Br. 23 (stating only the period of time). Plaintiffs acknowledge that it took time to obtain appraisals, that their own appraisers were sometimes slow, that they chose to initiate negotiations with HUD about preservation values, and that they chose to wait 18 months to see what benefits would be available under LIHPRHA. Tr. 922-26. Much, perhaps most, of the "delay" is thus attributable to plaintiffs.

Nor have plaintiffs shown bad faith. While plaintiffs complain that HUD's Los Angeles office was slow, it is undisputed that the Los Angeles office had one of the largest case loads in the country, moved to hire more employees specifically to handle preservation processing, enlisted employees from other offices to assist with preservation processing in Los Angeles, and was affected by the Northridge earthquake in 1994, which seriously damaged many low-income

housing projects (including some of the plaintiffs) and necessitated an emergency response by numerous HUD employees. Tr. 729-30, 741, 1940, 1987-88, 1997-2000; PX260. Moreover, LIHPRA itself provides retroactive benefits and other protections in the event of Government-caused delays. 12 U.S.C. §§ 4114, 4115.

In sum, plaintiffs have failed to establish an "extraordinary delay" and, therefore, the Court should reject their apparent claim that the period of administrative processing is a taking.[12]

### B. Plaintiffs Have Not Established That The Preservation Statutes, As Applied To Their Projects, Constitute A Regulatory Taking

As explained above, an as-applied, regulatory taking claim concerning the Preservation Statutes does not ripen until (1) prepayment is denied by HUD or excused by the doctrine of futility and (2) the administrative sale or use agreement process reaches a conclusion. The Preservation Statutes allowed, and plaintiffs elected to seek, a use agreement that would alter the regulatory restrictions governing their projects' operations. ELIHPA § 225(b); 12 U.S.C. § 4109. Upon completing the requisite administrative process, HUD offered, and each plaintiff chose to execute, a "Use Agreement And Amended Regulatory Agreement" that superseded the project's original regulatory agreement. PX50-58, DX181. Thus, at the earliest, plaintiffs' taking claims accrued upon signing the use agreements. The new use agreements established a less-restrictive regulatory regimen that governed the projects' operations. See PX50-58, DX181.

---

[12] In addition, the economic impact during the period of administrative processing is insufficient to establish a taking. Even if the entire period (i.e., the time before plaintiffs' signed use agreements) were deemed an extraordinary delay, which it plainly is not, the economic impact would be no more than 38 percent. Tr. 2359; DDX645. We are unaware of any court that has found such an impact to be a "serious financial loss" constituting a regulatory taking.

Plaintiffs offer an analysis that erroneously treats the original regulatory agreements as remaining in force and otherwise misapplies the Penn Central factors. Accordingly, the Court should reject plaintiffs' as-applied, regulatory taking claims as legally deficient.

### 1. The Preservation Statutes Caused No Economic Impact

Plaintiffs obtained amended regulatory agreements through the preservation process. PX50-58, DX181. Plaintiffs offer no measure of economic impact that evaluates the increased returns (and concomitant reduction in regulatory restrictions) resulting from these regulatory agreements. For this reason, plaintiffs have failed to establish that they suffered any measurable economic impact and their taking claims must fail. Seiber v. United States, 364 F.3d 1356, 1370 (Fed. Cir. 2004) (dismissing claim because plaintiff "failed to introduce convincing evidence to show the amount, if any, by which the value of the relevant property was reduced"); Forest Properties, Inc. v. United States, 177 F.3d 1360, 1367 (Fed. Cir. 1999) (same). In addition, plaintiffs' general approach suffers from numerous other flaws, each of which renders it unsuitable for measuring the economic impact of the Preservation Statutes in this action.

#### a. Plaintiffs' Did Not Offer A Diminution In Value Measure Of Economic Impact

The plaintiffs only offer an economic impact model that compares the return on equity obtained from the annual cash distribution allowed by the original regulatory agreements to an 8.5 percent return on equity benchmark. Tr. 1433-35. Plaintiffs offer no diminution-in-value measure of economic impact.[13] Because the "court must 'compare the value that has been taken

[13] Plaintiffs rely upon figures extracted from draft reports prepared by Stephen Crosson and argue that they show a diminution in value supporting a taking. Br. 59-60. The draft reports were not proffered, and no testimony about the deleted figures was elicited, during Mr. Crosson's direct examination. Further, the extracted figures are based upon the erroneous assumption that restrictions in original regulatory agreement remain in place in perpetuity, Tr. 1869, and, thus, consider the wrong starting point, ending point, and regulatory restrictions.

from the property with the value that remains in the property,'" Maritrans Inc. v. United States, 342 F.3d 1344, 1358 (Fed. Cir. 2003) (quoting Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987)) (emphasis added), plaintiffs cannot satisfy the burden of proof and the Court should reject their taking claims. Forest Properties, 177 F.3d at 1367.

Disregarding Maritrans, plaintiffs argue that the Court possesses "discretion" to choose the economic impact test. Br. 48 (citing Rose Acre, 373 F.3d at 1190).[14] The Rose Acre panel, however, could not have overruled Maritrans, see Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 n.3 (Fed. Cir. 2006), and, thus, did not authorize trial courts to ignore the change-in-value approach. At most, Rose Acre permits trial courts to consider other metrics in conjunction with the time-tested diminution-in-value measure of economic impact. Thus, after Rose Acre, a plaintiff's failure to present a valid calculation of diminution in value is no less fatal to its claim.

**b. Plaintiffs Assess The Economic Impact Of The Wrong Restrictions At The Wrong Time**

Plaintiffs' economic impact model compares plaintiffs' return on equity under the original regulatory agreements in the first year after prepayment eligibility to an arbitrary 8.5 percent benchmark. Tr. 1429-1435, 1452; DDX634. This snapshot measure of economic impact, thus, falls at a point during preservation processing. Plaintiffs do not measure economic impact in any other year, tr. 1423, 1427, 1451-52, 1481, nor do they measure economic impact after signing use agreements at the conclusion of preservation processing, despite their own expert's admission that these agreements would affect economic impact. Tr. 1427, 1481. By disregarding the use

[14] Plaintiffs' suggestion that use of the change-in-value approach will "license – even incentivize – confiscatory conduct by the Government" is a canard. Br. 52. The Penn Central test does not apply if the Government has seized or occupied property. Further, plaintiffs disregard the fact that Penn Central itself takes the character of the Government action into account. If the Government enacted or applied legislation in bad faith, something not alleged here, a court would properly take that into account in evaluating a takings claim.

agreements, plaintiffs disregard HUD's application of the very statutes at issue. It is difficult to imagine a more fundamental error in analyzing an alleged, as-applied taking.[15]

Plaintiffs attempt to justify their approach by characterizing the use agreements as "mitigation." Br. 16, 21. Use agreements obtained through the preservation process are no more mitigation than a variance obtained in a land use case. See Williamson County, 473 U.S. at 187-91 (requiring plaintiff to seek a variance to ripen its claim). In either case, the administrative process must be exhausted to enable the responsible agency to apply the challenged regulatory scheme to plaintiffs' property. E.g., id. at 190-91. Here, the preservation process culminated in use agreements that defined the regulatory restrictions under which plaintiffs' projects would operate. If plaintiffs have a viable as-applied taking claim, it is based upon the economic impact of these use agreements. By disregarding the use agreements, plaintiffs offer a profoundly flawed approach that takes a snapshot of the wrong regulatory restrictions at the wrong time.

**c. Plaintiffs' Measure Of Economic Impact Uses An Arbitrary Benchmark That Is Divorced From Plaintiffs' Claims Of Alleged Damages**

Plaintiffs' economic impact model uses an 8.5 percent rate of return benchmark – the rate earned by Fannie Mae bonds near the time of plaintiffs' initial prepayment eligibility. Tr. 1433-34. Plaintiffs use this arbitrary benchmark, despite acknowledging that their properties might not have achieved an 8.5 percent rate of return upon prepayment and that they would not have invested in Fannie Mae bonds in the "but-for" world.[16] Tr. 1459. Dr. Peiser concedes that the Fannie Mae bond rate actually fluctuated dramatically over the alleged taking period, Tr. 1434,

---

[15] It is undisputed that, for at least one property, the return under the use agreement eliminated all economic impact, even under plaintiffs' snapshot model. Tr. 1479, 1482.

[16] Under plaintiffs' model, plaintiffs would have suffered no economic impact if they had sold their properties at prepayment eligibility and invested in Fannie Mae bonds. Tr. 1437.

and that these changes would have affected his economic impact calculation, had he bothered to take them into account. Tr. 1435. The 8.5 percent Fannie Mae benchmark is completely divorced from plaintiffs' "but for" world and has no independent economic significance. Its use as a benchmark for measuring economic impact is, therefore, arbitrary and unjustified.

#### d. Even If The Court Were To Use Plaintiffs' Flawed Returns-Based Approach, The Economic Impact Of The Preservation Statues Would Be Minimal

Plaintiffs' diminution-in-return-on-equity approach suffers from additional inherent shortcomings: it fails to evaluate economic impact on the property as a whole, tr. 1450; it is insensitive to the duration of the alleged taking due to its focus on a single point in time, tr. 1485; and it does not consider plaintiffs' "but for" world, tr. 1439. It is, thus, irredeemably unsound and provides no meaningful incite. Nonetheless, if the use agreements are considered, even plaintiffs' flawed snapshot approach yields an insufficient economic impact to establish a taking.

It is well-settled that the economic impact of an alleged taking must be measured by reference to the parcel as a whole. Keystone, 480 U.S. at 497; Penn Central, 438 U.S. at 130-31; Tabb Lakes, 10 F.3d at 802. Plaintiffs' snapshot approach fails to do so. Tr. 2318-19. Dr. Peiser implicitly acknowledged this fundamental flaw when he identifies three types of returns from an investment in real estate: cash flow, tax benefits, and property appreciation. Tr. 1449. Plaintiffs' snapshot methodology focuses solely upon the cash flow available under the original regulatory agreements. Tr. 1450, 2329. Because plaintiffs' methodology does not use the properties' total returns, it fails to evaluate the parcel as a whole. See Tr. 2355 (if total returns were considered, plaintiffs' snapshot would show economic impact no greater than 45 percent); DDX 644.[17]

[17] The Court should also reject the plaintiffs' justification for using a returns based approach. Plaintiffs suggest that such an approach is permitted for temporary takings. Br. 49-50. However, by alleging and arguing that the Government took the plaintiffs' right to prepay, and

Plaintiffs snapshot approach also fails to take into account the duration of the alleged taking. Tr. 1485, 2318-19, 2321. "A temporary restriction is necessarily less burdensome to the property owner than a permanent restriction." Appolo Fuels, 381 F.3d at 1352. A valid approach to economic impact would reflect this economic reality.

Plaintiffs' approach similarly fails to consider information from plaintiffs' "but-for" market scenario. Tr. 1437-39. This leads to absurd results. For example, if the regulations' effect upon plaintiffs were reduced $20 million as a result of LARSO, this would not be reflected in the claimed economic impact.[18] Tr. 1447-48. Similarly, Dr. Peiser's model admittedly shows that – even in the alleged "Market Scenario" – the plaintiffs would have suffered economic impact. Tr. 1474-75. This makes no sense, of course, but it demonstrates why the use of an artificial benchmark in an economic impact model is intellectually and legally unsound.

In any event, if plaintiffs' use agreements are considered, even Dr. Peiser's flawed snapshot approach shows an insufficient economic impact to establish a taking. For instance, the Pioneer Gardens use agreement authorizes an 8.6 percent rate of annual return. Tr. 1479; PX58 at 7; DX256. Because the 8.6 percent annual return exceeds plaintiffs' 8.5 percent benchmark rate, plaintiffs' approach shows no economic impact. Tr. 1482. Some use agreements provide for slightly lower returns, but in no event would plaintiffs' approach show an economic impact

---

that this right will never be returned, plaintiffs are asking the Court find a permanent taking. Tr. 1423-24, 1487. Indeed, five properties sold while allegedly subject to the challenged restrictions. It is hard to understand how or why plaintiffs continue to frame the alleged takings as "temporary."

[18] In fact, in the alleged "Market Scenario," plaintiffs would have had negative cash flows during at least one year during the alleged taking period. Tr. 2325-26. In that year, not only would plaintiffs have failed to achieve the 8.5 percent benchmark, they would have failed to achieve returns equal to those achieved in the HUD scenario. A rational return-on-equity metric should indicate no adverse economic impact in such a situation. Tr. 2325-26; PX630. Plaintiffs' approach does not.

exceeding 40 percent. E.g., PX50 at 7 (7.5 percent return); DX256 (5.1 percent return); PX53 at 6 (8 percent return).

**e. The Statutory Sale Option Eliminated Any Economic Impact**

Plaintiffs erroneously ignore the statutory sale option provided by the Preservation Statutes. The sale option permitted program participants to realize equity and exit the HUD program. Tr. 2238-39, 2242-43. The sale price was statutorily fixed at the projects fair market value at its highest and best use, 12 U.S.C. § 4103, and HUD facilitated and funded the transaction. 12 U.S.C. § 4110(d). Because project owners could realize their project's fair market value through the sale option, this eliminated any economic impact.

Plaintiffs heap criticism on the sale option. See Br. 55-57. Yet, there is no dispute that each of the plaintiffs possessed the option to sell their properties pursuant to either Title II or Title VI. Tr. 1036, 1934-35, 924-25. Nor is it disputed that dozens of projects in California, and the Los Angeles area specifically, successfully consummated sales under the Preservation Statutes. Tr. 1898-99, 1931, 1943, 2027-30; DX493. Using the fact that most owners proceeded under Title VI, plaintiffs question the viability of sales under Title II.[19] Yet, plaintiffs offer no evidence that Title II's statutory option was illusory. Moreover, given that plaintiffs were always free to opt into Title VI, tr. 1036, 924-5, and that numerous owners in Los Angeles area consummated Title VI sales, the supposed inability to sell under Title II is beside the point.

Plaintiffs also point out that not every preservation sale was completed. Br. 55. Yet preservation sales continued after Congress enacted HOPE, and into 1997. The sales only ceased

[19] It was rational for plaintiffs to proceed to sell under Title VI once the option became available, because Title VI guaranteed the owner either a sale or the opportunity to prepay, 12 U.S.C. §§ 4110, 4114**,** which is what plaintiffs claim to have wanted all along.

when HUD eventually ran out appropriated funds. Tr. 2028-30. The availability of non-profit purchasers was never an issue and owners who proceeded diligently consummated sales. Id.

Plaintiffs further criticize the sales option as a "HUD-regulated sale," while claiming, without support, that it would not result in a fair market price. Br. 56. By statute, the sale price was set at the project's "fair market value at its highest and best use." 12 U.S.C. § 4103. Plaintiffs offer no evidence that HUD failed to comply with this statutory directive. Nor do plaintiffs offer evidence that the preservation value they negotiated with HUD – a value adopted by plaintiffs' own expert in this action – was less than a fair market price.[20] See Tr. 1613. Indeed, the preservation value for Oxford Park was identical to the appraisal value plaintiff submitted to HUD. Tr. 701.

As a HUD witnesses explained, the appraisal process was to yield an estimate of fair market value – the equivalent of the price that would be reached in an open market sale. Tr. 1936-37, 2222. Appraisals are the accepted way to determine a property's fair market value. Furthermore, given that HUD funded transaction costs and otherwise facilitated the sale, 12 U.S.C. § 4110(d), it is likely the case that preservation sales were superior to sales on the open market.[21]

According to plaintiffs, the sale option should be considered an offer of compensation that is irrelevant to the economic impact analysis. Br. 54-55. But it would be error to rig the Penn

---

[20] Plaintiffs cite appraisals from the preservation process as evidence regarding the projects' market value. Br. 19 n. 9. The cited appraisals are hearsay, were admitted only for a limited purpose – not for the truth of the appraised values – and, therefore, are not evidence of the projects' fair market values. Tr. 598, 628. The Court should thus disregard these citations.

[21] Additionally, because real estate values were declining in the Los Angeles area during the early 1990s, the fair market value of a HUD project was likely lower than the preservation value at the time of sale. See Tr. 2245.

Central test by considering restrictions, while ignoring benefits, conferred by challenged regulations. In Penn Central itself, the Supreme Court explained that statutory benefits must be "taken into account in considering the impact of regulation" even if the benefits "may well not have constituted 'just compensation' if a 'taking' had occurred." 438 U.S. at 137. It is a fundamental principle of the Penn Central test that the entire statute must be examined when assessing whether the statute effects a compensable taking. Id.; Cienega Garden v. United States, 33 Fed. Cl. 196, 221-22 (1995) (financial incentives from ELIHPA and LIHPRHA are to be considered in assessing economic impact because they "may mitigate the harsh economic impact of the prepayment restrictions, even though they would not necessarily be adequate as 'just compensation' in the event of a taking."), rev'd on other grounds, 194 F.3d 1231 (1998).

Plaintiffs cite Whitney Benefits as support for their argument that the Court should ignore the sale option in performing the Penn Central analysis. Br. 41. In Whitney Benefits, the Federal Circuit considered a provision permitting property owners to exchange their land on which strip mining was forbidden for land where the mining was allowed. Whitney Benefits, Inc. v. United States, 926 F.2d 1169, 1176 (Fed. Cir. 1991); Whitney Benefits, Inc. v. United States, 752 F.2d 1554 (Fed. Cir. 1985). The Preservation Statutes are not analogous to the regulations in Whitney Benefits because Whitney Benefits did not involve a cash sale (at market value), but, rather, a potential exchange of mineral rights (of uncertain value).

By preserving plaintiffs' pre-existing option to sell the property at a market rate, and providing funding to facilitate sale at an unrestricted market price, 12 U.S.C. §§ 4103(b), 4110(d)(2), Congress provided protections to ensure that plaintiffs did not lose any economic value in their property. In addition, because the sale option merely regulated an existing use of plaintiffs' property, it cannot be construed as a "new" or separate right granted as "compensation"

in exchange for restrictions upon the prepayment opportunity. See Suitum v. Tahoe Reg. Planning Agency, 520 U.S. 725, 747 (1997) (Scalia, J., concurring) (distinguishing right to use one's own land from a new right conferred upon the landowner in exchange for the taking).

#### 2. The Preservation Statutes Do Not Have The Character Of A Taking

The second prong of Penn Central addresses the character of the Government action. Describing the nature of the investigation into the character of the Government's action, the Federal Circuit explained:

> a reviewing court consider[s] the purpose and importance of the public interest reflected in the regulatory imposition. In effect, a court [must] balance the liberty interest of the private property owner against the Government's need to protect the public interest through imposition of the restraint.

Loveladies Harbor, Inc. v. United States, 28 F.3d 1171, 1176 (Fed. Cir. 1994). Court's consider two significant factors when evaluating the Government action: (1) the nature of the interest the Government pursued in implementing the regulation; and (2) whether the Government sought to shift a public burden on to the shoulders of a few. See Bass, 381 F.3d at 1369-70.

Here, the Preservation Statutes were enacted to promote a significant Government objective and the cost of achieving this objective was borne by the public fisc. Thus, the Government's actions do not have the character of a taking.

##### a. *Cienega VIII* Is Not Dispositive

Contrary to plaintiffs' assertions, the Federal Circuit has not "held 'as a matter of law' that ELIPHA and LIHPRHA's abrogation of the Model Plaintiffs' prepayment rights 'had a character that supports a holding of compensable taking." Br. 42 (citing Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003) ("Cienega VIII")). Cienega VIII is not a dispositive statement of the law regarding the character prong of the Penn Central test.

The analysis in a takings case is an ad hoc factual inquiry based upon the record at trial. The trial record in Cienega VIII was different than the record made in this case – most notably, Cienega VIII involved a record made in a breach of contract case and, as such, character of the Government action was not at issue. In its remand, the Federal Circuit recognized this, stating that the remaining non-model plaintiffs would not be limited to the conclusions from Cienega VIII, 331 F.3d at 1353-54. Furthermore, factual findings made in one case cannot be used against the Government in another action. United States v. Mendoza, 464 U.S. 164 (1984). By leaving open the application of the Penn Central test to the remaining plaintiffs upon remand, the Federal Circuit expressly preserved the character prong for further judicial determination.

**b. The Preservation Statutes Promoted Important, Long-Standing Government Objectives**

The Federal Circuit has instructed that, in considering the character of the Government's action, a court should "consider the purpose of the regulation and its desired effects in determining whether a taking has occurred." Bass, 381 F.3d at 1370. Thus, courts should consider a regulation's potential effect on the public in evaluating whether Government action has effected a taking. Id. The court should also determine "whether there is a nexus between the regulation and its underlying public purpose," and not simply whether "a less restrictive alternative to the government action existed or was 'possible.'" Rose Acre, 373 F.3d at 1194.[22]

Congress enacted the Preservation Statutes with the objective of protecting housing for low-income tenants throughout the country. Ensuring that a wave of mortgage prepayments did

[22] Thus, there is no relevance to plaintiffs' argument that Congress could have avoided the underlying need for the Preservation Statutes by adopting different funding priorities earlier in the decade. Br. 7, 43-44. Given plaintiffs' lack of expert testimony regarding these decisions and the amount of money spent on housing programs, there is also no support for plaintiffs' claims that the Government was in some way shirking its responsibility to procure affordable housing.

not leave thousands of low-income families homeless was a significant Government concern falling directly within the ambit of national housing policy. See Bass Enters. Prod. Co. v. United States, 54 Fed. Cl. 400, 403 (2002) (actions "to prevent injury to the public welfare" do not have the character of a taking), aff'd, 381 F.3d 1360 (Fed. Cir. 2004).

In the late 1980s, Congress and housing experts had become concerned that a large number of 221(d)(3) and 236 projects might prepay and exit the HUD programs, thus reducing the supply of low-income housing throughout the country. See S. Rep. No. 101-316 at 105 (1990), reprinted in 1990 U.S.C.C.A.N. 5763, 5867; H. Rep. No. 100-122, reprinted in 1987 U.S.C.C.A.N. 3317, 3351, 3370. Congress enacted ELIHPA to provide an "interim solution to this very serious problem" while further investigation was performed and a long-term solution developed. 1987 U.S.C.C.A.N. at 3317, 3351; see also ELIHPA § 202(a)(10). In enacting ELIHPA, "every attempt was made to balance the contract rights of owners with the need to try to preserve the existing stock of housing for low income persons." 1987 U.S.C.C.A.N. at 3353. Thus, HUD was given discretion to allow project owners to exit Government low-income housing programs, ELIHPA § 225(a), and to ensure that owners remaining in the programs received "a fair return on the investment," ELIHPA §§ 224, 225(b). Indeed, plaintiffs' expert testified that Congress' objective in passing ELIHPA was to provide financial compensation to allow property owners a fair market return on the market value of their property while they continued to face HUD restrictions. Tr. 1499-1500.

Following passage of ELIHPA, Congress established a Preservation Commission that estimated owners would terminate low-income affordability restrictions on approximately 243,000 units during the next 15 years and that a Federal preservation strategy was, by far, the most cost-effective approach to "protect[] the interests of the owners, the tenants and the

communities in which the housing is located." 1990 U.S.C.C.A.N. 5763, 5867-68. In 1990, Congress passed LIHPRHA to address the expected low-income-housing crisis, while protecting the pecuniary interest of project owners. Thus, Congress enacted both ELIHPA and LIHPRHA to further the Government's important, long-standing commitment to promote an adequate supply of low-income housing.

**c. The Preservation Statutes Did Not Shift The Burden Of Providing Low-Income Housing On To Plaintiffs**

In an as-applied, regulatory taking claim, "the complaining party must offer evidence to show that the government has improperly shifted a public burden to a small class of private parties." Cienega VIII, 331 F.3d at 1328. The Federal Circuit has not only recognized that the benefits and opportunities available under challenged statutes are relevant in determining the character of the government action, but has expressly directed that such benefits be considered in determining the nature of the Government action. See Chancellor Manor, 331 F.3d at 905.

**i. Taxpayers Bore The Burden Of Extending Benefits To Developers Under ELIPHA And LIHPRHA**

Contrary to plaintiffs' assertions, the Preservation Statutes were designed and implemented to ensure that property owners did not bear the financial burden. 1990 U.S.C.C.A.N. 5763, 5867; Tr. 1499-1500. For owners affected by ELIHPA and LIHPRHA, the Preservation Statutes offered a series of taxpayer-funded options. First, the owners could seek permission to prepay. If HUD determined that the prepayment would not have a material adverse affect on the local housing market, the agency permitted prepayment. ELIHPA § 225(a); 12 U.S.C. § 4108. Second, an owner could sign a use agreement, modifying the original regulatory agreement, increasing rents, lifting limits on the return rate, and permitting the withdrawal of equity from the properties, in exchange for a commitment to continue some use restrictions on the

property. 12 U.S.C. § 4109; ELIHPA §§224(b), 225(a). Finally, an owner could select a Government subsidized sale to a non-profit organization at a fair market rate. 12 U.S.C. § 4110. The use agreement and sale options were each based upon appraisals of the owner's apartment building as if there were no restrictions. 12 U.S.C. § 4103(b).

The statutorily available benefits – funded by taxpayers – must be balanced against any burdens imposed upon the private owners. Thus, the only expectation potentially affected by the Preservation Statutes was the opportunity to benefit from the residual value of the housing. Under the sale option, however, project owners could realize their property's market value through a HUD-subsidized sale. See Parkridge Investors LP v. Farmers Home Admin., 13 F.3d 1192, 1199 (8th Cir. 1994) ("fair market value is exactly what the partnership would receive as a result of a statutorily compelled sale to a non-profit"). The sale option ensured that the Preservation Statutes did not shift a public burden on to project owners.

Plaintiffs criticize the sale option arguing that the sale option either was not feasible, or was, in practice, akin to a transfer of property by eminent domain without sufficient compensation. See Br. 46-48. It is undisputed, however, that at least thirty owners sold HUD properties in Los Angeles, and it was never difficult to find potential purchasers. See Tr. 1931, 1941, 2026-27, 2229-30. Because plaintiffs could select between Title II and Title VI, it is irrelevant which statute funded more sales.

Furthermore, plaintiffs' eminent domain analogy is misplaced, as there is no evidence that plaintiffs were forced to sell or transfer their property. To the contrary, owners of HUD-insured properties were free to reject offers by prospective purchasers, tr. 1941, and to back out of prospective plans of action. Tr. 1939. That the buyers were HUD-approved and HUD-subsidized

makes no difference.[23] The appraisal process, into which the owners had substantial input, was designed to produce a sale at the property's unrestricted fair market value. 12 U.S.C. § 4103. This is no different than what an open market sale would produce. Thus, regardless of the identity of the purchaser, sales under Titles II or VI and sales on the open market would yield a comparable economic benefit. Tr. 2214-16, 2222-23. Plaintiffs offer no evidence that, contrary to statute, preservation sales would provide owners "cents on the dollar." See Br. 45.

Moreover, the Court should also consider the fact that the owners had been enjoying the benefits of the HUD program for years. As the plaintiffs concede, these benefits were the initial inducements for private developers to enter into the HUD program and included low-risk, highly-leveraged initial financing and generous tax shelters. See, e.g., Tr. 77-78, 121-22, 140, 401, 1508, 2075-76, 2093-94. The Preservation Statutes had no effect upon the owners' enjoyment of these benefits, nor did they affect subsidiary expectations such as the ability to obtain management fees and the payment of annual cash dividends. Tr. 227, 238, 844-45.

Eventually, Congress eventually stopped funding LIHPRHA because of its drain upon the public fisc, after receiving testimony, for example, that the Preservation Statutes were "tax payer ripoffs" that allowed "windfall profits" because they paid costly incentives to owners who had no intention of prepaying their mortgages. Hearing before the Subcommittee on VA, HUD, and Independent Agencies of the House Committee on Appropriations, 104th Cong., 1st Sess. (January 24, 1995).

---

[23] California had established its own preservation program. As a result, if owners wanted to sell, they had to offer their property to qualified California purchasers. Tr. 1039-41; DX152. Plaintiffs are, therefore, mistaken to suggest that in the absence of the Preservation Statutes, they were free to sell to a purchaser of their choice. See DX170.

### ii. The Preservation Statutes Are Akin To Rent Control

Even if the Court disregards the sale option and use agreements, at worst the Preservation Statutes are simply akin to standard rent control ordinances. Tr. 1065, 1495. Rent control statutes – in addition to regulating allowable rent increases – often restrict or regulate the conversion of apartments to condominiums and the selling of the units at market rates. See, e.g., Bohbot v. Santa Monica Rent Control Bd., 34 Cal. Rptr. 3d 827 (Cal. App. Dist. 2005) (rent control law limiting owners' ability to convert to condominiums); Steinbergh v. City of Cambridge, 604 N.E.2d 1269 (Mass. 1992) (regulation requiring apartment owners to seek permission from rent control board before converting to condominiums held not to be a physical intrusion into property owners' property, and did not deny property owners all economically beneficial or productive use of their interest in property); see also Gilbert v. City of Cambridge, 932 F.2d 51, 43 (1st Cir. 1991). New York City's rent control and stabilization laws, for example, prevent owners from converting their apartments to condominiums as a means of evicting tenants from rent controlled units. See generally Resolution Trust Corp. v. Diamond, 18 F.3d 111, 114 (2d Cir.), rev'd on other grounds, 513 U.S. 801 (1994). Rent control statutes are nevertheless not generally considered to have the character of a taking. See Yee v. City of Escondido, 503 U.S. 519, 528-29 (1992); FCC v. Florida Power Corp., 480 U.S. 245, 251-52 (1987).

There is no basis in fact for plaintiffs' argument that ELIHPA and LIHPRHA were akin to a holdover tenancy, where the right to transfer or convey property has been completely curtailed. Br.45. It is undisputed that plaintiffs retained their ability as owners to manage their properties, to turn away prospective tenants, and even to leave their units vacant. E.g., Tr. 243-44, 856, 928, 930. HUD, of course, had no input into the selection of plaintiffs' tenants. Tr. 928-30. Further,

the option to exit the HUD program was always open. By allowing the owners to select tenants and providing exit options, the Preservation Statutes did not "compel" plaintiffs to house Government-approved tenants.[24] Having failed to distinguish the Preservation Statutes from general rent control statutes, plaintiffs have failed to show that the Preservation Statutes have the character of a taking.

**3. The Preservation Statutes Did Not Frustrate Investment-Backed Expectations**

The Penn Central test's third prong requires courts to consider whether a challenged Government regulation affected the plaintiff's "primary expectation concerning the use" of the affected property. Penn Central, 438 U.S. at 136. This expectation "must be more than a 'unilateral expectation or an abstract need;'" it must be reasonable. Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1005 (1984). Consequently, the Court must examine the expectations of a hypothetical, reasonable investor in the claimant's property. Chancellor Manor, 331 F.3d at 904. In addition, a plaintiff cannot recover absent actual (i.e., subjective) expectations frustrated by the challenged regulation. Cienega VIII, 331 F.3d at 1346. The caselaw thus establishes a two part test: first, to determine if a reasonable, objective investor would have considered the alleged expectation a primary reason to invest in the project; and second, to ensure that plaintiff actually (subjectively) had such an expectation.

Plaintiffs would turn the legal standard on its head. They suggest that the Court accept *post hoc* claims about the partnerships' supposed expectations and bless these claims as

[24] In addition to the option to sell their properties at market value, Tr. 1928, 1933-34; 12 U.S.C. § 4110; ELIHPA § 230, owners could prepay in the event that a sale could not be consummated, incentives were unavailable, or HUD determined that preserving the project was unnecessary. E.g., Tr. 1942-43, 1962-63; 12 U.S.C. §§ 4108, 4114; ELIHPA § 225(a).

"reasonable," while, at the same time, disregard the contemporaneous, documentary evidence. See Br. 62-68. The caselaw does not support this approach.

**a. Investment Backed Expectations Are Measured At The Initial Closing**

Each property's initial closing is the proper time to measure the partnership's expectations because that was the time the plaintiff partnerships were formed, the regulatory agreement was executed, and the partnerships committed to build and operate a low-income housing project. E.g., Tr. 462-63, 468, 475, 2669. Thus, under Penn Central, the investment-backed expectation inquiry assesses the expectation of a reasonable, profit-motivated investor as of the initial closing with HUD. Chancellor Manor, 331 F.3d at 904 (expectations are measured when the owner "entered into the activity that triggered the obligation, specifically when the [owner] entered the programs").

**b. The Preservation Statutes Did Not Interfere With A Reasonable Partnerships' Primary Expectations**

Under the Penn Central test, courts are required to consider "the extent to which the regulation has interfered with distinct investment-backed expectations." Penn Central, 438 U.S. at 124 (emphasis added). In extreme cases, regulation may "so frustrate" expectations that it amounts to a taking. Id. (citing Pennsylvania Coal v. Mahon, 260 U.S. 393(1922)). In contrast, where multiple uses can be expected of property, but the law does not interfere with an owner's "primary" investment-backed expectation, a taking will not lie. See Penn Central, 438 U.S. at 136; MacLeod v. County of Santa Clara, 749 F.2d 541, 547 (9th Cir. 1984). This is true even where regulation, while not disturbing the primary use, nevertheless frustrates other, more profitable, expected uses. MacLeod, 749 F.2d at 547-48.

The trial record establishes that superior financing and exceptional tax benefits were the primary expectations that would have prompt a reasonable investor to participate in these low-income housing projects. Tr. 1508, 2661, 2670; DX420. The distant possibility realizing any residual value after 20 years was trivial in comparison and would not have been material to a reasonable investor. Tr. 2763, 2779; DX420. Thus, this prong of Penn Central does not support a taking.

**i. Reasonable Investors Anticipated That The Principal Returns Would Be Obtained Through Tax Benefits**

Participation in the Section 221(d)(3) and 236 programs was driven by below-market, Government-insured loans, which provided financing far superior to what was available for conventional multi-family housing projects, and generated exceptional returns from tax benefits. Tr. 80, 119-121, 1508-12. Section 221(d)(3) and 236 projects were financed with Government-insured loans from private lenders that were amortized over 40 years and that funded 90 percent of the project's replacement cost. Tr. 2656-58, 2672. This provided greater leverage and a longer amortization than financing for conventional multi-family housing, which typically was amortized over 25-years and required a 20 to 25 percent downpayment. Tr. 2657-58, 2090, 2672. As Mr. Hirsch put it, "Any reasonable businessman who was involved in building would see the light of having to put 10 percent or less equity into a given development as opposed to a normal 25 percent equity." Tr. 2092.

In addition, HUD provided the partnership a credit called the Builder's and Sponsor's Profit and Risk Allowance ("BSPRA"). Tr. 2657-58. The BSPRA further reduced the partnership's initial cash investment. Tr. 128, 400, 2082, 2658, 2670-71. As a result, the initial equity investment for a HUD project was between two to three percent of the project's total replacement cost, whereas investors were typically required to put down 20 to 25 percent to

finance a comparable conventional project. Tr. 400, 2082, 2657-58, 2670-71, 2758-59. While plaintiffs contend that BSPRA does not reduce a partnerships' "original investment," Br. 64 (citing ambiguous testimony to suggest the BSPRA was paid to G&K Construction), plaintiffs are mistaken. Contemporary treatises noted and touted the fact that BSPRA reduced needed equity. Tr. 2758-59, 2763-64. Also, plaintiffs' partnership agreements expressly stated that BSPRA was to be waived by the construction contractor and would inure to the benefit of the partnerships. E.g., PX130, PX138; PX144. Indeed, in submission to HUD, the partnerships used BSPRA to reduce the partnerships' equity investment. E.g., DX7E, DX7I, DX12A; see also Tr. 415-19.

The unique financing of Section 221(d)(3) and 236 projects produced tax benefits far superior to (nearly 10 times) the benefits that would be derived from a comparable investment in conventional multi-family housing. Tr. 1634, 2675, 2686-87, 2735, 2740-41; DDX704. As plaintiffs' own tax expert acknowledged, "if you built two side by side buildings . . . for the exact same amount, one conventional and one low-income, you would expect more tax losses earlier in the low-income." Tr. 1624-25. These benefits were derived by combining accelerated depreciation and the mortgage loan's high leverage and long amortization. Tr. 2733-34, 1625. The result was significant tax losses that were available for use as a tax shelter. Tr. 2075, 2674-75. Indeed, favorable financing and tax benefits made the investment in low-income housing almost immediately profitable. Tr. 2739-41, 2760-61 (projecting tax benefits of $240,000 on a $25,000 investment over 10 years); DDX704 (showing a 116 percent return in year one); DDX705 (same).

HUD projects also generated annual cash distributions. Tr. 844, 2079, 2658-59. The properties paid these distributions from rents, which were set by a budget that included a dividend of six percent of the partnership's original stated equity (i.e., 10 percent). Id. Because the

partnership's actual investment was substantially less than 10 percent, the actual return on the original investment was substantially higher. Tr. 2688 (20 to 30 percent).

There also existed a possibility that a project owner could benefit from the project's residual value (i.e., the owner's equity) at some point in the future. Tr. 2660-61. The leading, contemporary treatise cautioned:

> [N]ormally a developer of real estate . . . hopes that the property's residual value will be such that he is able to recover his total equity investment (after retiring the outstanding mortgage and paying income taxes and other costs arising from sale), plus an additional profit by reason of appreciation. There are several reasons why in normal course this expectation might not be realized in federally-assisted housing.

Tr. 2766-67 (quoting Charles L. Edson & Bruce S. Lane, A Practical Guide to Low- and Moderate-Income Housing (B.N.A. 1972)) (emphasis added).[25] Due to its dubious value and long time horizon, this was not a material consideration for the reasonable investor. Tr. 2663, 2692, 2699, 2775, see also Tr. 2096-97 (conceding surprise at the rise in property values over 20 years). Partners understood that the prepayment clock would not start for one to three years after initial closing because of the time needed to construct the project and complete the administrative steps to obtain HUD's final endorsement. Tr. 474-75; see also PX103, PX317 (23 month delay). As delays were commonplace, Tr. 471, 473-75, 2089, the original investors (i.e., partners as of initial closing) participated despite uncertainty about when prepayment could occur. When coupled with possibility that future market conditions might make prepayment financially undesirable,

[25] The Edson & Lane treatise contemplates that residual value will be realized through sale after 20 years, whereas plaintiffs contend that they intended to realized residual value by converting to market-rate operations and earning income from the project. It is a well-established financial principle that the value of an asset is equal to the present value of future income. See Tr. 1547, 2691, 2771. For this reason, it makes no difference whether residual value (i.e., owner's equity) is realized through sale or the project's continued operation. The two approaches are economically equivalent. Tr. 2691, 2771.

reasonable investors recognized that realizing residual value was, at best, a distant and highly speculative possibility. Tr. 2775.

#### ii. The Preservation Statutes Did Not Frustrate The Expectations Of Reasonable Investors

The Preservation Statutes did not frustrate the principal expectations of reasonable investors. Neither ELIHPA nor LIHPRHA prevented project owners from obtaining Government-insured financing or from taking advantage of the BSPRA. See, e.g., DX33A. Nor did the Preservation Statutes affect the available tax benefits. Indeed, the owners realized these benefits years before Congress passed Title II. Tr. 2699. The Preservation Statutes likewise did not affect subsidiary expectations such as the ability to receive annual cash distributions. The only expectation even potentially affected was the opportunity to realize residual value in the project after 20 plus years. Of course, banking on a large increase in a project's value more than 20 years in the future would not be reasonable. See Tr. 2692-93, 2775, 2766-67. Moreover, by allowing the owner to cash out at the project's fair market value, the Preservation Statutes protected that interest as well. See 12 U.S.C. §§ 4103(b), 4110 (enabling the owner to realize equity by selling at the market value without HUD restrictions). Because the Preservation Statutes neither disturbed a property's primary use as low-income housing, nor frustrated primary expectations, the Pen Central test's investment-backed expectations prong does not support the conclusion that a regulatory taking occurred. See Penn Central 438 U.S. at 136.

Attempting to turn the burden of proof on its head, plaintiffs argue that the Court should "assume" that the ability to prepay was material to a reasonable investor. Br. 66. It is of course the plaintiff who bears the burden of establishing a regulatory taking. Forest Properties, 177 F.3d at 1367. Citing the Cienega IX decision, plaintiffs next question whether tax benefits were in fact the primary basis for an investment the low-income housing projects at issue. Br. 67-68. Neither

testimony nor factual findings in other cases may be invoked by plaintiffs in this action. See, e.g., Mendoza, 464 U.S. 154. The record evidence in this action is clear: the principal expectation for reasonable, profit-motivated participants in plaintiffs' Section 221(d)(3) and 236 projects were high leverage, low-risk financing and tax benefits. Tr. 1625, 2076-81, 2656-58, 2675, 2686-87, 2740-41. The Preservation Statutes did not affect these expectations. Tr. 2686-87. The possibility of realizing project equity in the distant future was trivial by comparison and, in any event, was preserved by the Preservation Statutes' sale option. Tr. 2692-93, 2775, 2779.

**c. Plaintiffs Have Produced Insufficient Evidence Of The Respective Partnerships' Actual, Original Expectations**

Plaintiffs flee from contemporaneous evidence about their actual investment-backed expectations. Plaintiffs would have the Court disregard contemporaneous FHA forms, provisions in the original partnership agreements, and representations in the 1972 Skyline View prospectus for the simple reason that each of these documents undercut plaintiffs' contentions. E.g., DX7F, DX13B, DX24C. Even plaintiffs' *post hoc* evidence is lacking. At best, each plaintiff offers testimony from one or two minority partners whose statements about prepayment are undercut by their own testimony conceding the significance of high leverage financing, tax benefits, and low risk.

Plaintiffs presented no testimony from the only non-corporate partner in the Kittridge II and Oxford Park partnerships (Robert Stern), while acknowledging that the corporate partners invested for the project's tax benefits. Tr. 2075-76, 2705-06. Thus, there is no evidence that prepayment held any significance to any partner in the Kittridge II and Oxford Park partnerships.

The evidence concerning the actual expectations at initial closing of the remaining partnerships is nearly as weak. Messrs. Goldrich and Hirsch were not partners in all of the plaintiffs and, together represented a majority interest in only one of the partnerships. DX494

(Covina West – 25 percent; Claremont – 32.5 percent; Del Vista – 12.5 percent; De Soto – 28.5 percent; Kittridge I -- 37.5 percent; Kittridge II – 0 percent; Oxford Park – 0 percent; Parthenia – 66.7 percent; Puente Park – 50 percent; Pioneer – 12.5 percent). Further, the after-the-fact claim of these minority partners that the "most important" consideration was the ability to end HUD regulatory restrictions by prepayment, see Br. 62, is nonsensical. It simply cannot be that ending regulatory restrictions was reason for agreeing to the restrictions in the first instance; other factors necessarily were at play. Not surprisingly, these factors were high leverage financing, Tr. 369, 397-98, 400, 2090 (superior financing allowed the partners to construct many more projects), and superior tax benefits, Tr. 139-40, 143, 2081 (HUD projects had tax advantages not available for conventional projects and the partners made use of those tax benefits); see also Tr. 2077-79 (Sam Mesler and Ziggy Taube invested for the tax benefits), 2075 (corporate partners invested for tax benefits), 2094 (tax benefits were the "primary advantage" in obtaining investors and the main reason that HUD projects were syndicated). The only contemporaneous, documentary evidence – FHA forms, the partnership agreements and the Skyline View prospectus – confirm that the partnerships consciously considered and took advantage of the programs' low-risk, high leverage financing and the exceptional tax benefits generated by HUD projects.[26] See, Tr. 2686, 2704, 2721-24; PX131. Indeed, Mr. Goldrich testified that for some of the plaintiffs, he could not have obtained financing to build conventional housing, and others he chose to build low-income housing to avoid the risk of owning conventional apartments. Tr. 171-80.

---

[26] Plaintiffs contend that the properties' "locations," the "quality of construction" and the purportedly "high level of maintenance" provide evidence of an intention to prepay after 20-plus years. Br. 63. Good locations are beneficial without regard to prepayment and are sought by all developers. The quality of construction was prescribed by HUD and HUD's construction standards were in fact more stringent than those for conventional projects. Tr. 88-89. Similarly, "first class" maintenance was required by HUD. Tr. 102, 108. In sum, none of this supposed contemporaneous evidence shows that prepayment held any particular significance.

In weighing the three Penn Central factors, the Court should conclude that the Preservation Statutes did not amount to a taking under the Fifth Amendment.

## III. Plaintiffs Are Owed No Compensation

### A. The Los Angles Plaintiffs Are Not Entitled To Compensation Because They Would Not Have Prepaid Their Mortgages On Their Initial Eligibility Dates

Because of LARSO, the Los Angeles Plaintiffs would not have prepaid their mortgages on their prepayment eligibility dates, regardless of the enactment of ELIPHA and LIHPRHA. Five projects – DeSoto, Kittridge I, Kittridge II, Oxford Park, and Parthenia – are located within the City of Los Angeles and, therefore, are subject to LARSO. L.A. Mun. Code § 151, et seq. Br. 35.[27] LARSO makes it "unlawful for any landlord to demand, accept or retain more than the maximum adjusted rent permitted pursuant to [LARSO] or regulations or orders adopted pursuant to [LARSO]," Cienega Gardens v. United States, 265 F.3d 1237, 1247 (Fed. Cir. 2001), and prohibits property owners from raising their rents to market rates after prepaying their HUD-insured mortgages. Independence Park, 449 F.3d at 1241.

It is undisputed that LARSO would have prevented the Los Angeles plaintiffs from prepaying their mortgages, because no rational owners would exit the program and its subsidies if it knew that its properties' rents would be restricted to HUD-proscribed below market rents. Tr. 1090-91. Property owners, like the Los Angeles plaintiffs, that were managed by Goldrich & Kest and were subject to LARSO, would not have prepaid their HUD-insured mortgages regardless of the effect of ELIPHA or LIHPRHA because, with rents "basically fixed" by LARSO at the time of the Los Angeles plaintiffs' pre-prepayment eligibility dates, they would have been

[27] Plaintiffs' assertion that LARSO would not have applied to prepayments before 1990 (i.e., DeSoto and Kittridge I) is unsupported. The 1990 "amendment" to LARSO merely clarified what LARSO always meant, and the city enforced LARSO the same way with respect to prepaying properties both before and after the amendment. Tr. 1894; DX119B.

unable to obtain sufficient funds to pay off the existing mortgages, making it impossible for the Los Angeles plaintiffs to have prepaid their mortgages. See Tr. 1095-98, 2111-13. In view of LARSO, it would not have been economically feasible for the Los Angeles plaintiffs to obtain new mortgages and prepay the mortgages on the subject properties. See Cienega Gardens v. United States, 38 Fed. Cl. 64, 84-85 (1997), rev'd and remanded on other grounds, 265 F.3d 1237 (Fed. Cir. 2001). Certainly, plaintiffs have offered no evidence that, with LARSO's limits on rent increases, that they could have obtained the financing necessary to prepay.

Plaintiffs do not directly deny that LARSO would have made it impossible for the Los Angeles plaintiffs to prepay their mortgages on their prepayment eligibility dates. Br. 35-38.[28] Rather, they assert that LARSO would not have prevented the Los Angeles plaintiffs from "raising their rents to market rates." Br. 35. Even if that assertion is correct, it does not prove that the Los Angeles plaintiffs would have been able to raise rents sufficiently (that is, in enough units in time enough) to be able to obtain sufficient funds to pay off their existing mortgages. Indeed, one G&K partner – the de facto chief financial officer responsible for financial planning and advising Mr. Goldrich and others upon issues of property refinancing – testified that, because of LARSO, G&K would have been unable to obtain sufficient funds to pay off HUD mortgages. Tr. 2110-13. The Court should take this as an admission by plaintiffs. This testimony, moreover, is supported by expert economic testimony: in order to obtain financing for a loan that the Los Angeles plaintiffs would have needed to pay off their HUD-insured loans, they would had have to been able to demonstrate to the lender the ability to "cash flow" the loan by generating net operating income that was at least 1.2 times the debt service requirements. Tr. 2272-75.

---

[28] Given their prior arguments in this litigation, plaintiffs are foreclosed from making such arguments. See Data General Corp. v. Johnson, 78 F.3d 1556, 1565 (Fed. Cir.1996); Rhone-Poulenc Agro, S.A. v. DeKalb Genetics Corp., 272 F.3d 1335, 1353 (Fed. Cir. 2001).

Plaintiffs do not even attempt to demonstrate that the Los Angeles plaintiffs would have been able to meet that test.

Furthermore, plaintiffs' assertions regarding might have happened with respect to Section 8 certificates if ELIPHA and LIHPRHA had not been enacted is unsupported, self-serving speculation. For example, plaintiffs' suggestion that the Los Angeles plaintiffs might have obtained "class rent increases," Br. 37, is inconsistent with testimony establishing that no LARSO "special class" was ever created for prepaying properties. Tr. 1893. Plaintiffs also assume, without support, that (1) HUD and HACLA would have had the budget authority to provide tenant-based Section 8 assistance to every tenant in HUD-insured housing, (2) HACLA would have disregarded applicable regulations to give priority to tenants affected by prepayment, and (3) that HUD and HACLA would have, in choosing to provide Section 8 certificates instead of Section 8 vouchers, acted in a manner directly contrary to the national housing policy, which was to preserve the stock of affordable housing. Tr. 2280-96; 24 C.F.R. § 882.219 (1990). Having no documentary evidence or testimony from HUD or HACLA witnesses, plaintiffs rely upon the "certificates experience" of Independence Park and Beck Park in 1997. Br. 37. Section 8 certificates were provided to tenants in Independence Park and Beck Park in 1997, as the result of a statutory change occurring in April 1996. See Pub. L. 104-34, Title I § 101(e), 110 Stat. 1321 (Apr. 26, 1996) (codified at 12 U.S.C. § 4101 note) (providing that tenant-based Section 8 assistance be provided to tenants in prepaying projects). Actions in the post-HOPE period are not indicative of what HUD would have done on the Los Angeles Plaintiffs' prepayment eligibility dates – a period when HUD was governed by materially different statutes and regulations. Because plaintiffs' compensation model is based upon the assumption that Congress would have passed certain, beneficial legislation seven years earlier than it actually did, the model is speculative and unsound. Tr. 1015, 1044.

### B. Plaintiffs' Model Does Not Properly Measure Just Compensation

The Court should reject plaintiffs' lost-profits model as it overcompensates plaintiffs for any regulatory taking.

#### 1. Plaintiffs Are Only Entitled To Nominal Damages

The Court should conclude that, even if a regulatory taking has occurred, plaintiffs are only entitled to nominal damages for the Government's taking of an opportunity plaintiffs would not have pursued.

Given the benefits available under the Preservation Statutes, there is no evidence that, had they been given a choice, plaintiffs would have chosen to forgo the preservation benefits and prepay their HUD-insured mortgage. In December 1994, an informed person with an interest in subsidized housing would have known that the Office of Management and Budget was attempting to convince the President to repeal the prohibition on prepayment. Tr. 2211. By January 1995, Congress was considering a bill that would have restored plaintiffs' unlimited opportunity to prepay their mortgage. DX228. Nine of the plaintiffs (all except Puente Park Apartments), nevertheless, chose to sign use agreements and receive the incentives while this bill was under consideration. Other properties, moreover, owned and controlled by the G&K partners, signed use agreements even after Congress passed the HOPE Act; still others chose not to prepay even after all restrictions on prepayment were lifted. Tr. 882-86.

These decisions undermine any claim that the G&K partners operated with some overarching plan to prepay all properties. Certainly, before Title II, the partners never spoke in specifics about which properties they might prepay. Tr. 872. Plaintiffs, moreover, failed to identify a single contemporaneous document demonstrating an intent to prepay the properties absent the Preservation Statutes, or that, even if plaintiffs had possessed the opportunity to prepay

in the "but-for" world, plaintiffs would have chosen not to sign the funded use agreements anyway. As such, plaintiffs are entitled only to nominal compensation for any taking.

### 2. Plaintiffs' Damage Model Overstates Just Compensation

Even if the Court concludes that plaintiffs are entitled to compensation under the Fifth Amendment, a position with which we disagree, the Court should still hold that Dr. Peiser's model overstates the compensation to which plaintiffs are entitled by calculating compensation at the end of the alleged taking, and by employing an *ex-post* perspective. In addition, plaintiffs' calculations use inappropriate discount and interest rates and unwarranted assumptions.

#### a. Plaintiffs Incorrectly Assesses Compensation At The End Of The Alleged Taking Period Using *Ex Post* Data

The Court should reject Dr. Peiser's model because it incorrectly measures compensation as of trial, rather than at the time of the alleged taking. It is a well settled principle that the proper date for valuing property taken by Government action – whether by condemnation, occupation, or regulation – is the date on which the taking occurred. See, e.g., First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304, 320 (1987) (noting "the unexceptional proposition that the valuation of property which has been taken must be calculated as of the time of the taking"); United States v. 50 Acres of Land, 469 U.S. 24, 29 (1984) (just compensation is "'market value of the property at the time of the taking contemporaneously paid in money'"); Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 803 (Fed. Cir. 1993) ("Compensation is always measured from the time the taking occurs.").

This "time of the taking" rule embodies important public policy judgments. It means, for example, that the Government bears the risk that the property's value drops after the taking. United States v. Dow, 357 U.S. 17, 24 (1958); see also Almota Farmers Elevator & Warehouse Co. v. United States, 409 U.S. 470, 477-78 (1973). In addition, the rule allows Government

officials to make informed decisions about the likely cost of a proposed regulation, taking, or condemnation.

Dr. Peiser's model violates this rule in two ways. First, he utilizes *ex post* data – data that was not available at the time of the alleged taking. Second, he measures the taking from the trial date for properties plaintiffs still own, and from the sale date for those they sold. Tr. 1522-3. Plaintiffs argue that they can break the rule regarding when to value the property taken because they allege a temporary taking. Br. 31-32. This position is factually and legally invalid.

First, plaintiffs' complain that the Government took their "right to prepay." Br. 30. Five plaintiffs contend that they were still subject to restrictions on prepaying when they sold their properties and left the program. Br. 31. The remaining five plaintiffs contend that they will not ever be able to prepay, as their use agreements obligate them to remain in the HUD program until the mortgage is paid off. Br. 31. These contentions are, unmistakably, the arguments for permanent takings. Accordingly, plaintiffs may not drape themselves in a temporary taking garment. See Independence Park, 449 F.3d at 1247.

Second, measuring compensation as of the trial, plaintiffs argue that the relevant date for valuing their prepayment rights should based upon an arbitrary date. This would be an error even if plaintiffs were alleging a temporary taking. Plaintiffs' approach would produce odd and unjust results in cases where market values change after a taking. If market values were to decline, for example, the Government would owe compensation only for the value remaining at the end of the taking period, not for the value of the property taken from the owner. Additionally, plaintiffs' approach would deny the Government the ability, *ex ante*, to estimate the cost of proceeding with a temporary taking, because the compensation award would depend not on the market value of the owner's property at the time of the taking but on unknowable events occurring during the takings period. Plaintiffs approach cannot be reconciled with the bedrock principle that "just"

compensation is no more or less than "the market value of the property at the time of the taking contemporaneously paid in money." 50 Acres of Land, 469 U.S. at 29 (emphasis added). The determinative question in calculating just compensation is "what a willing buyer would pay in cash to a willing seller at the time of the taking." United States v. 564.54 Acres of Land, 441 U.S. 506, 511 (1979) (internal quotation omitted) (collecting cases). Such a test logically precludes the notion that *post hoc* fluctuations in value affect compensation.

Furthermore, both the Supreme Court and the Federal Circuit have firmly rejected the notion that temporary takings and permanent takings are somehow subject to different valuation rules. See First English, 482 U.S. at 318 (temporary takings "are not different in kind from permanent takings"); Yancey v. United States, 915 F.2d 1534, 1543 (Fed. Cir. 1990) ("[f]air market value under the Fifth Amendment is normally ascertained at the date the governmental restrictions are imposed, which is the date of the taking.").

The practical effect of Dr. Peiser's choice of valuation date is to cause a material increase in the compensation award to plaintiffs. That is because plaintiffs' nominal damages in each year of the takings period must be discounted to real-dollar terms to calculate a final total. Using the trial date as proper valuation date, plaintiffs adjust their nominal losses upward by the discount rate. Because valuation must occur as of the time of the taking, all such nominal losses should have been adjusted downward by the discount rate.[29] Indeed, under plaintiffs' *ex post* methodology, a temporary taking could require greater compensation than a permanent taking of the very same property interest. A proper *ex ante* valuation – based upon information available to

[29] This difference arises because the discount rate used in the valuation process (here 10 percent, see DX426, differs from the rate at which interest is assessed. Discounting plaintiffs' nominal losses forward (and thus upward) at 10 percent to the end of the alleged takings, and then applying the prejudgment interest rate, is erroneous. The correct approach is to discount nominal losses backward (and thus downward) to the time of the taking, and then apply the lower prejudgment interest rate going forward. Id.

the parties at the time of the taking – could not result in such a nonsensical outcome. DX426.[30]

The Court, moreover, should reject Dr. Peiser's model because it measures the consequence of the alleged taking. Dr. Peiser acknowledged that his model sought to provide plaintiffs with what they would have expected to have if the taking had never taken place. Tr. 1585. Thus, under the law, Dr. Peiser seeks to provide plaintiffs with expectancy damages. See Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355 (Fed. Cir. 2001). Lost profits, such as those sought here, are one form of expectancy damages. See Glendale Fed. Bank, FSB v. United States, 239 F.3d 1374, 1380 (Fed. Cir. 2001). The Federal Circuit, however, has refused to award lost profits for a taking. Yuba Natural Res., Inc. v. United States, 904 F.2d 1577, 1583 (Fed. Cir. 1990) (Court affirmed the trial court's refusal to award such damages on the temporary taking of a gold mine.). Thus, the Court should reject plaintiffs' lost-profits model.

**b. At Most, Plaintiffs Would Be Entitled To Fair Rental Value**

If the Court concludes that plaintiffs have suffered a temporary taking, a position with which we disagree, see Independence Park v. United States, 465 F.3d 1308, 1311-12 (Fed. Cir. 2006), then the proper measure of compensation is lost rents.

"The usual measure of just compensation for a temporary taking . . . is the fair rental value of the property taken for the period of the taking." Yuba, 904 F.2d at 1581. The first step in this analysis is determining the market value of what was taken as of the date of the taking. Bass, 54

[30] If the allegedly taken property is valued at the time of the taking (the initial prepayment date), the concept of mitigation is not relevant, as the value cannot change based upon plaintiffs' subsequent actions. If, however, the Court concludes that damages should be measured from some time other than the initial taking date – a position with which we disagree – then plaintiffs had and have a clear duty to mitigate the necessary compensation by selling their properties at the earliest possible date, either under the Preservation Statutes or subsequent to the passage of the HOPE act. As the basis for his damages model, Dr. Peiser adopts the agreed-upon values from the parties' use agreements. If plaintiffs had sold for these values under the use agreement, compensation would have ceased to accrue further. Tr. 1437, 1525.

Fed. Cl. at 404, aff'd, 381 F.3d 1360; see also Nemmers v. City of Dubuque, 764 F.2d 502, 504-05 (8th Cir. 1985) (citing San Diego Gas & Elec. Co. v. City of San Diego, 450 U.S. 621, 659 (1981)); Hamilton Bank v. Williamson County Reg'l Planning Comm'n, 729 F.2d 402, 403, 408-409 (6th Cir. 1984) (affirming a verdict based upon a fair rate of return on the value of the property during the time of the taking), rev'd on other grounds, 473 U.S. 172 (1985). The second step is to calculate the proper rental value, or interest rate of return, on this property value during the taking period. See Yuba, 904 F.2d at 1581; Wheeler v. City of Pleasant Grove, 833 F.2d 267, 271 (11th Cir. 1987).[31] Finally, the court should subtract from the award any benefits the property owner received under the challenged regulatory regime. Independence Park, 449 F.3d at 1247. At trial, Dr. Peiser acknowledged that his model did not calculate how much rent plaintiffs would have sought on the dates of the alleged takings, for the opportunity to prepay. Tr. 1584, 1596-97. Because plaintiffs have failed to provide the proper analysis to quantify damages from their alleged temporary taking, they are, at most, entitled to only nominal damages.

### 3. Plaintiffs' Lost-Profit Model Contains Numerous Errors

Dr. Peiser's lost-profits model contains numerous errors that render it speculative.[32]

#### a. Dr. Peiser's Valuations For The Five Properties That Were Sold Is Inherently Speculative

As part of his compensation model, Dr. Peiser calculates damage that five of the plaintiffs allegedly incurred when they sold their HUD-subsidized apartment. Tr. 1521-24. Specifically,

---

[31] When dealing with intangibles, such as plaintiffs' opportunity to prepay, the proper way to calculate "fair rental value" is to value the property on the day of the taking and then determine a reasonable return on the value taken. Wheeler, 833 F.2d at 271 (citing Nemmers, 764 F.2d 502).

[32] Plaintiffs assert that the United States offers no alternative damages model. Br. 70. Plaintiffs are incorrect. See DX426 (offering a compensation model based upon the Preservation Statutes' sales option ).

he attempts to measure the difference between the price at which the properties actually sold and the price he believes plaintiffs would have received if the properties had not been subject to use agreements. Tr. 1523-24. Because Dr. Peiser's method of calculation was admittedly flawed, the Court should reject the model as speculative.

The calculation of the alleged damage on sale is based entirely upon the hypothetical valuations of the properties free from any restraint at the time of sale. Plaintiffs could have hired an appraiser to value these properties, but chose not to do so. Tr. 1529-30. Instead, Dr. Peiser valued the properties, over our objection, even though he was not qualified as an appraisal expert. Tr. 1167. Indeed, Dr. Peiser was neither proffered nor accepted as an expert in any form of valuation. Tr. 1174. Thus, Dr. Peiser's efforts to offer hypothetical, retrospective valuations for the five sold properties is beyond his expertise and should be rejected under Federal Rule of Evidence 702 and Daubert v. Merrell Dow Pharmaceutical, Inc., 509 U.S. 579 (1993).

Dr. Peiser, moreover, used an approach at odds with recognized appraisal methodologies. First, Dr. Peiser chose not to value the properties using the market comparison approach. Tr. 1540. This approach, which is a standard method that appraisers routinely use, involves comparing the sale price of comparable properties on or near the date of the appraisal. Tr. 1538-40. Dr. Peiser testified that this approach is "neither trivial nor unnecessary." Tr. 1540. Dr. Peiser also acknowledged that had he utilized this method – which appraisers typically use in conjunction with the market capitalization approach (described below) – he would have reached a different result. Tr. 1533.

Instead, Dr. Peiser based his valuations solely upon the market capitalization approach. Tr. 1532. Under this approach, appraisers derive a valuation by dividing the property's net operating income by the capitalization rate. Tr. 1541. Because the capitalization rate is so significant, using an incorrect capitalization rate can result in a serious pricing error. Tr. 1558-61.

As Dr. Peiser acknowledged, professional appraisers "always" derive capitalization rates based upon properties identified as comparable sales. Tr. 1569. Indeed, one of the expertises of an appraiser is deriving the appropriate capitalization rate. Tr. 1543-44.

Dr. Peiser's approach is contrary to all published information regarding the market capitalization approach. 1547-48, 1556-64. For example, the textbook that Dr. Peiser uses in his classes states that, to find the proper market capitalization "the best procedure to follow . . . is to choose an R, that would be the cap rate, based on a careful reexamination of data . . . to determine the comparables that are most like the subject property." Tr. 1556-58. Dr. Peiser acknowledged that his method is not described in the textbook he has used for many years. Indeed, as Dr. Peiser himself conceded, appraisers are not taught to use the method that Dr. Peiser adopted in this case. Tr. 1540. And, as Mr. Crosson explained, Dr. Peiser's approach is contrary to professional appraisal standards, i.e., USPAP. Tr. 1746-51.

Dr. Peiser ignored the approach "always" be used by professional appraisers. Instead, he adopted published market averages for the entire City of Los Angeles as his capitalization rates. Tr. 1565-66. Dr. Peiser acknowledged that he did not know how these market averages he used were derived. Tr. 1568-72 (admitting that he did not know if the data was an arithmetic average or a median, did not know whether the data contained outliers and, if not, what percentage of outliers were removed, and did not know the number of data points used). Dr. Peiser conceded the data he relied upon was likely incomplete and possibly biased. Tr. 1567.

Dr. Peiser's method is inconsistent with The Appraisal of Real Estate, a book that Dr. Peiser describes as authoritative, which states that the direct capitalization approach requires an "ample supply of comparable sales," and USPAP. Tr. 1561-64, 1746-51. Dr. Peiser, of course, never identified comparable sales because he used an aggregation of market data – an approach which he could not support with a citation to a single publication.

At trial, Dr. Peiser explained how sensitive his valuations were to errors in the capitalization rates. In his valuation of Covina West, if the capitalization rate he adopted was one-half of one percentage point high, he will have over-estimated damages by $1 million. Tr. 1552. Inevitably, Dr. Peiser admitted that his approach, used to assess millions of dollars against the Government, was not “optimal.” Tr. 1572.

The Court should conclude that Dr. Peiser’s valuations cannot satisfy the test described in Daubert, 509 U.S. at 582. The Daubert factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and, (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. Terran v. Sec’y of Health & Human Servs., 195 F.3d 1302, 1316 (Fed. Cir. 2000). Dr. Peiser’s valuations fail each of these factors. First, plaintiffs have made no effort to test Dr. Peiser’s valuation methods. Indeed, they declined to employ an expert appraiser to perform the valuations. Second, Dr. Peiser’s methodology is at odds with qualified publications, which require the use of comparable properties when determining capitalization rates. Third, plaintiffs offer no evidence as to the significance of the errors they have introduced by using market average comparables. Finally, Dr. Peiser’s admission that his methodology does not appear in textbooks, nor is it taught to professional appraisers, demonstrates that his methodology does not enjoy general acceptance among appraisers. Tr. 1532, 1540. Indeed, of the 10 appraisals that plaintiffs provided to the Government under the preservation process, not one utilized Dr. Peiser’s short-cut approach. As such, the Court should reject Dr. Peiser’s model and refuse to award damages based upon the sale of the five properties. Indeed, because the five properties were sold to buyers incentivizes with Government funded tax credits, there is no basis to assume that the sales price was affected by the

properties' use agreements. Tr. 896-97, 1574-75.

In addition, "depressed sales damages" are remote and consequential "damages" of the type that are non-recoverable. See United States v. Gen. Motors Corp., 323 U.S. 373, 380 (1954); Yuba, 904 F.2d at 1581. Their proof depends upon undertakings independent of and collateral to the Government actions that plaintiffs allege constitutes a taking – sales transactions with third parties – making them too remote and uncertain to be considered as part of just compensation. Cf. Northern Helex Corp. v. United States, 524 F.2d 707, 720-21 (Ct. Cl. 1975) (breach of contract case); North Star Alaska Hous. Corp. v. United States, 76 Fed. Cl. 158, 216-17 (2007) (same).

#### b. Plaintiffs' Model Ignores HAP Contracts That Overlapped With The Prepayment Dates

Prior to their initial prepayment dates, seven plaintiffs voluntarily entered into five-year Section 8 subsidy contracts with HUD.[33] These contracts conferred significant benefits on those plaintiffs. By supplementing rents, the contracts provided a more stable source of income for the buildings. Tr. 852. It was not disputed at trial that the HAP contracts provided a benefit to the owners. Tr. 853. The HAP contracts, however, also limited each owner's ability to raise rents on the units covered by the HAP contract, even in the absence of other HUD restrictions. Tr. 855. Each of the plaintiffs chose to renew its HAP contract for a five-year period extending beyond the property's assumed prepayment date.

Dr. Peiser's damage model begins accumulating damage on the initial prepayment date, upon the assumption that every unit owned by the plaintiffs could have immediately gone to market values. Tr. 1522-23, 1594. He makes an admittedly "counterfactual assumption that

[33] Claremont Village, Pioneer Gardens, Puente Park, DeSoto Gardens, Kittridge Gardens I and II, and Oxford Park. See DX97, DX98, DX99, DX103A, DX130, DX345.

before Title II, before 1987, in 1986, plaintiffs didn't sign those five year HAP contracts." Tr. 1598. Instead, he assumes that owners would have been offered and signed shorter, tailor made HAP contracts that end on the prepayment date. There is no evidence to support this assumption. Indeed, Ms. Glodney testified that in 1986, well before the passage of Title II, plaintiffs tried to negotiate shorter HAP contracts because they faced between 8 and 24 months of overlap; HUD would not allow shorter term HAP contracts. Tr. 786-87. Thus, Dr. Peiser's assumption that HUD would have made shorter HAP contracts available is not valid.

Plaintiffs respond in two ways. First, they point out that later – in 1996 – HUD began using one-year HAP contracts. Br. 25. While true, this is irrelevant. Five year contracts were the only ones available in the late 1980s and early 1990s, when plaintiffs were signing contracts that overlapped with their prepayment eligibility date. Plaintiffs also cite a vague excerpt from the deposition of Michael Winiarski to the effect that the length of a HAP agreement may vary according to circumstances. Tr. 1124. This testimony does not indicate what period was being referenced. Certainly, Mr. Winiarski could not have been talking about the period before 1990, as he did not work for HUD at that time. Tr. 2052. Nor could he have been talking about the period from 1990 through 1992, when he was an intern without any role in the negotiation of HAP contracts. Tr. 2053. There simply is no evidence to counter Ms. Glodney's actual experience of requesting, and being denied, HAP contracts shorter than five years.

Plaintiffs also suggest that if tailor-made contracts had not been available they would have simply walked away from the HAP contracts. This assertion cannot be reconciled with the fact that Kittridge Gardens I and II, De Soto Gardens, and Puente Park all signed 5 year Section 8 contracts before 1988. Indeed, Ms. Glodney testified that, when presented with HAP contracts in 1986 and 1987 – before she had any knowledge of Title II – she invariably signed the contracts even though she knew they would extend past the initial prepayment date. Tr. 870-71.

The Court should, thus, conclude that the existence of the Preservation Statutes did not affect plaintiffs' decisions to sign overlapping HAP contracts. Moreover, because Dr. Peiser's model fails to take these HAP contracts into consideration, it overstates required compensation.

**c. Dr. Peiser Employs The Wrong Discount Rates**

It is undisputed that, when discounting cash flow streams, each stream must be discounted based upon the riskiness of the cash flows. Dr. Peiser's model ignores this basic economic principle in discounting the cash flows from the "actual" world.

Cash flows from HUD-insured properties are less risky than cash flows from conventional properties. Tr. 121-22, 166, 177-78, 181. Investors in HUD-subsidized properties avoid numerous risks faced by those investing in conventional properties, such as low vacancy rates, and reduced credit risk. Generally, HUD properties maintain rents below market rates, which makes the apartments precious commodities. HUD property owners maintain waiting lists with the names of potential tenants. Tr. 243-44. These lists reduce the likelihood that property owners will face an un-rented – and thus unprofitable – apartment. Tr. 181. The G&K partners do not have such waiting lists for their conventional properties. Tr. 244. HUD, moreover, allows owners to bill for a unit even when that unit is vacant, which results in reduced vacancy losses. Similarly, apartments with assistance contracts faced a reduced risk that tenants would fail to pay the rent because, under the HAP contracts, the Government provided lump-sum rental payments to plaintiffs at the beginning of each month. Tr. 780-81, 852.

Because of the lower risk on the cash flows from HUD-insured properties, Dr. Peiser should have discounted those cash flows at lower discount rates. Tr. 2354-55. Dr. Peiser, however, discounts cash flows from properties with HUD-insured mortgages at the same rate he applies to conventional properties. Tr. 1200. By using a single discount rate to apply to all of the cash flows in his model, Dr. Peiser erroneously concludes that the risks associated with the cash

flows from HUD-subsidized operations is equal to the risks associated with cash flows from the conventional market. Additionally, Dr. Peiser's model illogically assigns the same degree of risk to the payment of a judgment by the United States Treasury as to cash flows from tenants paying rent in the conventional market. These errors improperly inflate plaintiffs' alleged damages.

**d. Dr. Peiser Makes No Allowance For Phasing-In Market Rents**

Dr. Peiser's lost-profits model incorrectly assumes that plaintiffs would have immediately increased rents to market rates in the but-for world. Properties controlled by the G&K partners had the practice, when leaving the HUD program, of phasing in rent increases. Tr. 1063. This made rents increases more agreeable to tenants and avoided losses that would accompany widespread tenant evacuations. DX426; Tr. 1064. Dr. Peiser ignores this practice in his model, and in doing so, overstates damages. Tr. 1594.

**e. Dr. Peiser Acknowledged That His Use Of The Annual Adjustment Factor Renders His Model Unreliable**

Dr. Peiser's model is speculative because it systematically overstates rents in his market scenario. Dr. Peiser assumes in his model that the final rents and valuations achieved through the plan of action process represent market values. Tr. 1613. Thus, he uses these rents as benchmark "market" rents in his damage model. Id. He then escalates the rents to determine market rents for the years after the signing of the use agreements, and de-escalates the use agreement rents for the years before the signing of the use agreement. Dr. Peiser admits, however, that the number used to de-escalate the market rents is flawed.[34] By overstating market rents, Dr. Peiser's model overstates compensation and the court should reject it as speculative.

[34] At trial, Dr. Peiser testified that he used HUD's "Annual Adjustment Factor" ("AAF") to de-escalate rents in the market scenario. Tr. 1615. He then testified that the AAF under-estimated the annual market increase. Tr. 1616. Finally, he testified that by using a below market rent increase as a de-escalator, his model overstated market rents for the period before plaintiffs signed use agreements. Tr. 1621.

**f. Dr. Peiser Incorrectly Assumes That Each Plaintiff Could Have Immediately Obtained Permanent Financing**

Dr. Peiser overstates damages by assuming that each plaintiff would have obtained permanent financing at market rates on its initial prepayment date. Tr. 2416-17. There is no basis in fact for this assumption. Indeed, Ms. Glodney testified that the G&K partners had the practice of obtaining bridge loans to pay off the HUD-insured mortgages, when converting to conventional operations. Tr. 1063, 1622. The partnerships would only later change these bridge loans to long-term financing. Tr. 2416-17. The most likely avenue available to plaintiffs outside the City of Los Angeles[35] involved a short-term bridge loan for several years while the properties demonstrated their earning power to the lenders. Tr. 1623; DX426. Then, and only then, would plaintiffs have been able to obtain market-rate loans. Id. This method of financing would have included higher interest payments on the bridge loan, and more transaction costs in obtaining two loans rather than one. Tr. 2416-17. Dr. Peiser's model ignores those costs. Accordingly, the Court should reject the model as it overstates compensation due to plaintiffs.

**g. Dr. Peiser Adopts Incorrect Inflated Interest Rates**

Dr. Peiser adopts excessive interest rates that improperly inflate the sought compensation.

First, Dr. Peiser uses a 10 percent interest rate to bring most cash flows forward to the date of trial. There is no basis for this. Courts typically provide plaintiffs with interest calculated at the Government's rate of borrowing. Rose Acre Farms v. United States, 55 Fed. Cl. 643, 665 (2003), rev'd on other grounds, 373 F.3d 1177 (Fed. Cir. 2004); NRG Co. v. United States, 31 Fed. Cl. 659, 670 (1994); Pettro v. United States, 47 Fed. Cl. 136, 155 (2000) (1-year Treasury bill). A lower rate is particularly relevant in takings cases because the obligation to pay the

[35] As described above, the Los Angeles plaintiffs would have been subject to LARSO and unable to secure such financing.

deficiency is an obligation of the United States, a creditor whose obligation embodies no risk of default. See King v. United States, 504 F.2d 1138, 1143 (Ct. Cl. 1974) (holding that government bonds is an appropriate measure for interest); Gargoyles, Inc. v. United States, 37 Fed. Cl. 95, 109 (1997) (concluding that the 52-week Treasury bills was an appropriate basis for interest).

Dr. Peiser decision to bring his cash flows forward at a flat 10 percent rate that greatly exceeds the Government's borrowing rate, Tr. 1523, is without any legal or economic basis. Dr. Peiser acknowledges that his 10 percent rate is merely an exercise in "applying compound interest." Tr. 1586-87. Economic fairness, however, only requires interest at the Government rate. As Dr. Hamm explained, the risk of the United States not honoring a final judgment by the Court is perceived to be close to zero, if not zero. Accordingly, the appropriate rate to use in conformance with the general economic principle of using the defendant's unsecured borrowing rate would be a Treasury rate. Tr. 2487-89, 2501-02, DDX 687.

Second, Dr. Peiser adopts a 20-year STRIPS rate to bring forward cash flows from the properties that sold. Tr. 1522-23. While lower than the 10 percent rate, this too overcompensates plaintiffs. As Dr. Hamm explained, the 10-year STRIPS rate already overcompensates plaintiffs for the risk that they allegedly assumed by being creditors of the United States because (1) it is a pre-tax rate; and (2) it contains a liquidity premium designed to compensate investors for investing their money for ten years. Tr. 2495-99. Here, of course, there is no need for such a premium because the rate is set after the time has passed and plaintiffs face no risk that interest rates rise. Thus, if the Court chooses to award compound interest, it should do so at the 10-year Treasury strip rate. Tr. 2495-99.

## CONCLUSION

The evidence and testimony presented at trial demonstrates that Preservation Statutes did not effect a taking and that plaintiffs are not entitled to compensation.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Brian M. Simkin

BRIAN M. SIMKIN
Assistant Director

s/ David A. Harrington

KENNETH M. DINTZER
Senior Trial Counsel
DAVID A. HARRINGTON
KENNETH D. WOODROW
TIM McILMAIL
SEAN DUNN
BONDURANT ELEY
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0282

June 12, 2007

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on the 12th day of June 2007, a copy of "DEFENDANT'S POST-TRIAL MEMORANDUM OF CONTENTIONS OF FACT AND LAW" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David A. Harrington