**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **CLAREMONT VILLAGE, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 94-10002C; 94-10003C; 94-10005C; 94-10006C; 94-10007C; 94-10008; 94-10010C; 94-10020C; 94-10030C; 94-10040C (consolidated)** |
| **v.** | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | **Judge Lettow** |
| **Defendant.** | ) | |
| | ) | |

**PLAINTIFFS' POST-TRIAL REPLY MEMORANDUM**

Everett C. Johnson
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Fax: (202) 637-2201

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

I. LOS ANGELES PLAINTIFFS' CLAIMS ARE RIPE ....................................................1

II. ELIHPA AND LIHPRHA EFFECTED A TEMPORARY REGULATORY TAKING OF PLAINTIFFS' UNFETTERED PREPAYMENT RIGHTS.........................4

A. ELIHPA And LIHPRHA Have The Character Of A Taking .................................4

B. ELIHPA And LIHPRHA Caused Plaintiffs A Severe Economic Impact...............7

1. Plaintiffs' Model Correctly Applies A Return-On-Equity Approach To Demonstrate A Substantial Economic Impact......................7

2. The Government's Suggestion That The Sale Option Eliminated Plaintiffs' Economic Impact Is Factually And Legally Baseless..............11

C. ELIHPA And LIHPRHA Frustrated Plaintiffs' Investment-Backed Expectations.........................................................................................13

1. The Partnerships' Expectations Are Appropriately Measured At The Time The Partnerships Began Their Investments..............................13

2. The Reasonable Investment-Backed Expectations Prong Does Not Turn On One Single Primary Expectation.........................................14

3. Plaintiffs Would Not Have Invested In The HUD Programs But For The Opportunity To Prepay Their Mortgages....................................15

4. Plaintiffs' Expectations To Prepay Their HUD-Insured Mortgages Were Objectively Reasonable..................................................18

D. The *Penn Central* Factors Weighed Together Require A Finding Of A Taking ..........................................................................................20

III. PLAINTIFFS ARE ENTITLED TO JUST COMPENSATION .....................................21

A. Los Angeles Plaintiffs Would Have Prepaid Their Mortgages ............................21

B. Plaintiffs' Damages Model Is A Correct Measure of Just Compensation............23

CONCLUSION.........................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Armstrong v. United States*,
364 U.S. 40 (1960) ....................................................................................20

*Atwood-Leisman v. United States*,
72 Fed. Cl. 142 (2006) ....................................................................................19

*Bingaman v. Department of the Treasury*,
127 F.3d 1431 (Fed. Cir. 1997) ....................................................................................19

*CCA Associates v. United States*,
75 Fed. Cl. 170 (2007) ....................................................................................19, 25

*Chancellor Manor v. United States*,
331 F.3d 891 (Fed. Cir. 2003) ....................................................................................8, 14

*Cienega Gardens v. United States*,
67 Fed. Cl. 434 (2005) .................................................................................... *passim*

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) .................................................................................... *passim*

*Cienega Gardens v. United States*,
265 F.3d 1237 (Fed Cir. 2001) ....................................................................................1, 2

*Creppel v. United States*,
41 F.3d 627 (Fed. Cir. 1994) ....................................................................................15

*Duquesne Light Co. v. Barasch*,
488 U.S. 299 (1989) ....................................................................................8

*First English Evangelical Church of Glendale v. County of Los Angeles*,
482 U.S. 304 (1987) ....................................................................................10

*Goody v. United States*,
189 F.3d 1355 (Fed. Cir. 1999) ....................................................................................15

*Greenbrier v. United States*,
193 F.3d 1348 (Fed. Cir. 1999) ....................................................................................4

*Hodel v. Irving*,
481 U.S. 704 (1987).......................................................................................20

*Independence Park Apartments v. United States*,
61 Fed. Cl. 692 (2004)..........................................................................23, 24, 25

*Independence Park Apartments v. United States*,
465 F.3d 1308 (Fed. Cir. 2006)........................................................................23

*Independence Park Apartments v. United States*,
449 F.3d 1235 (Fed Cir. 2006)..........................................................................11

*MacLeod v. County of Santa Clara*,
749 F.2d 541 (9th Cir. 1984) ...........................................................................15

*Maritrans Inc. v. United States*,
342 F.3d 1344 (Fed Cir. 2003)........................................................................7, 8

*Norman v. United States*,
429 F.3d 1081 (Fed. Cir. 2005).........................................................................15

*Penn Central Transportation Co. v. City of New York*,
438 U.S. 104 (1978)................................................................................ passim

*Pennell v. City of San Jose*,
485 U.S. 1 (1998).............................................................................................7

*Pennsylvania Coal Co. v. Mahon*,
260 U.S. 393 (1922)..........................................................................................4

*Rose Acre Farms v. United States*,
75 Fed. Cl. 527 (2007) .......................................................................................8

*Rose Acre Farms v. United States*,
373 F.3d 1177 (Fed Cir. 2004)........................................................................7, 8

*Verizon Communications, Inc. v. FCC*,
535 U.S. 467 (2002)..........................................................................................8

*Whitney Benefits v. United States*,
926 F.2d 1169 (Fed Cir. 1991)......................................................................12, 13

*Whitney Benefits v. United States*,
30 Fed. Cl. 411 (1994) .....................................................................................25

*Yee v. City of Escondido*,
503 U.S. 519 (1992)....7

**STATUTES AND REGULATIONS**

12 U.S.C. § 1715*l* (1988).... *passim*

12 U.S.C. 1715*l* note § 225....2, 3

12 U.S.C. 1715*l* note § 225(a)(2)(A)....3

12 U.S.C. § 4101 *et seq*.... *passim*

12 U.S.C. § 4108....2

12 U.S.C. 4108 § 218(a)(2)....3

24 C.F.R. § 248....2

24 C.F.R. § 248.141(a)(1)....2, 3

24 C.F.R. § 248.221(a) (1990)....2

24 C.F.R. § 248.233(d)(3) (1990)....22

L.A. Mun. Code § 151, *et seq*.... *passim*

**OTHER AUTHORITY**

142 Cong. Rec. S350 (Jan. 24, 1996)....5

142 Cong. Rec. H1267, H1272 (Feb. 27, 1996)....5

55 Fed. Reg. 38948 § 248.221(b) (1990)....2

55 Fed. Reg. 38949 (1990)....22

Brief for Defendant-Appellant, Cienega Gardens, et al. v. United States,
Nos. 94-1, 10004, 10009, 10013, 10029 (Fed. Cir. June 2, 2006)....21

H.R. Rep. No. 104-384, at 48 (1995)....5

HUD, *Housing in the Seventies: Report for the National Housing Policy Review*
118, 122-23 (1974)....17

## INTRODUCTION

In its post-trial brief, the government largely disregards and mischaracterizes evidence established at trial and the law. For reasons below and in Plaintiffs'[1] Post-Trial Memorandum of Proposed Findings of Facts and Conclusions of Law, this Court should grant Plaintiffs damages incurred as a result of the government's temporary regulatory taking of their property.

## I. LOS ANGELES PLAINTIFFS' CLAIMS ARE RIPE

The government urges the Court to revisit ripeness—albeit this time *only* for L.A. Plaintiffs—on grounds that the standard for approving prepayment under ELIHPA and LIHPRHA "was highly discretionary."[2] Government Brief ("Gov. Br.") at 28.[3] That discretion, the government argues, requires finding that seeking prepayment was not futile for L.A. Plaintiffs and that their claims are not ripe. This position is factually and legally untenable.

*Cienega Gardens v. United States* ("*Cienega VI*"), 265 F.3d 1237 (Fed Cir. 2001), a decision conspicuously absent from the government's analysis, provides the framework for analyzing whether takings claims under ELIHPA and LIHPRHA are ripe. Applying Supreme Court precedent, the court held that the futility test is whether HUD exercised discretion in deciding whether owners could prepay and found LIHPRHA "set forth strict numerical criteria

---

[1] Plaintiffs are partnerships that own the ten subject properties. Herein, the Claremont Village Commons partnership is referred to as Claremont; Covina West Apartments partnership as Covina West; Del Vista Village partnership as Del Vista; DeSoto Gardens Apartments partnership as DeSoto; Kittridge Gardens I partnership as Kittridge I; Kittridge Gardens II partnership as Kittridge II; Oxford Park Apartments partnership as Oxford Park; Parthenia Townhouses partnership as Parthenia; Pioneer Gardens Apartments partnership as Pioneer; and the Puente Park Apartments partnership as Puente Park.

[2] "L.A. Plaintiffs" are DeSoto, Kittridge I, Kittridge II, Oxford Park, and Parthenia, as their properties are located within the City of Los Angeles. The Emergency Low Income Housing Preservation Act of 1987, 12 U.S.C. § 1715*l* (1988), is referred as ELIHPA or Title II; the Low Income Housing Preservation and Residential Homeownership Act of 1990, 12 U.S.C. § 4101 et seq., is referred to as LIHPRHA or Title VI.

[3] Notably, the government finally concedes that it would have been futile for the *non*-L.A. Plaintiffs to apply to the U.S. Department of Housing and Urban Development ("HUD") for prepayment. Gov. Br. at 29 n.11.

that must be met before HUD may exercise any discretion to approve prepayment requests." *Id.* at 1246 (finding HUD lacked discretion and claims were ripe). Applying that test here, L.A. Plaintiffs' claims are ripe if prepayment would (1) result in a rental payment that exceeds 30% of a tenant's income or increases the rent by more than 10%, whichever is lower, **or** result in involuntary displacement of current tenants without comparable affordable housing; **and** (2) materially affect the supply of vacant comparable housing for low- and very low-income families. 12 U.S.C. § 4108; 24 C.F.R. § 248.141(a)(1); 12 U.S.C. 1715*l* note § 225; 24 C.F.R. § 248; *Cienega Gardens v. United States*, 67 Fed. Cl. 434, 460 n.33 (2005) ("*Cienega IX*").[4]

For the first factor, the government errantly argues that the Los Angeles Rent Stabilization Ordinance, L.A. Mun. Code § 151, et seq. ("LARSO") would have barred L.A. Plaintiffs from increasing rents by more than 10%. Gov. Br. at 28-29. If Section 8 certificates were issued, Plaintiffs would have charged market rents above the statutory limits upon prepayment. Plaintiffs' Brief ("P. Br.") at 35-38.[5] But even if tenants did not receive Section 8 certificates at prepayment, rents would have increased above the statutory limits. Tenants *were already paying 30% of their income for rent* under existing HAP contracts (HUD paid the remainder), PX 286-87; DX 94, 97, 99, 345, so the LARSO-allowable increase would automatically force current tenants to pay *over* 30% of their income for rent. The loss of HUD subsidies upon the HAP contracts' expiration would greatly exacerbate the increase.[6] And had

---

[4] The government is wrong that a rent increase exceeding 10% was only deemed material under LIHPRHA. *See* 24 C.F.R. § 248.221(a) (1990) (ELIHPA regulations providing the same).

[5] HUD's own data demonstrate that this rent increase at prepayment would have caused rent increases exponentially above 10%—indeed 62.7%-64.6% (DeSoto); 88.5%-97.8% (Kittridge I); 52.5%-67.4% (Kittridge II); 37% (Oxford Park); and 61.2%-63.6% (Parthenia). P. Br. at 40 (comparing HUD agreed-upon values to Regulatory Agreement rents); *Cienega VI,* 265 F.3d at 1246-47 (holding owners' compilation of HUD data was sufficient to meet first prong).

[6] Notably, contemporaneous HUD regulations stated: "In cases where the project is currently subject to a section 8 HAP Contract that will continue in effect past the prepayment, the Department intends to examine what the effect of the prepayment on the housing market will be once the section 8 HAP contract expires . . . ." 55 Fed. Reg. 38948 § 248.221(b) (1990).

Plaintiffs removed properties from the rental market or evicted HUD tenants, all rents would have increased to market rate. *See* P. Br. at 35-38, 57-58, 70-71.

On the alternative prong, the government argues that prepayment would not involuntarily displace tenants because moving due to a rental increase is not "involuntary displacement" under ELIHPA and LIHPRHA. Gov. Br. at 29. The government, however, defines "involuntary displacement" under regulations completely unrelated to ELIHPA or LIHPRHA. *Id.* (citing 24 C.F.R. § 882.219(d)(iii) (1990)) (regulations for "Section 8 Existing Housing Program" participation). The *relevant* regulations show that "involuntary displacement" encompasses displacement *due to rent increases upon prepayment*. Under these regulations, HUD could not approve a prepayment plan unless the plan would not "[i]nvoluntarily displace current tenants . . . where comparable and affordable housing is not readily available, determined without regard to the availability of Federal housing assistance that would address any such hardship or involuntary displacement." 24 C.F.R. § 248.141(a)(1)(ii). "[S]uch hardship or involuntary displacement" is clearly financial if federal housing assistance would address it. *Id.*

For the second factor, the government baldly argues that prepayment would not have "materially affect[ed]" available affordable housing for tenants at L.A. Plaintiffs' properties because tenants would have stayed at those properties to take advantage of LARSO-controlled rents. Gov. Br. at 29. The government misreads the law. Under the second factor, one looks at whether the "vacant comparable housing" supply is sufficient so that prepayment will not materially affect housing for "lower income and very low-income families or persons in the area that the housing could reasonably be expected to serve." 12 U.S.C. 1715*l* note § 225(a)(2)(A); 12 U.S.C. 4108 § 218(a)(2). Rents at non-L.A. Plaintiffs' properties are therefore the relevant comparison. *See* P. Br. at 17, 41, 44. L.A. Plaintiffs' properties were located in low-vacancy areas that lacked an affordable housing supply sufficient to accommodate displaced tenants, Tr. 1962:16-1965:13 (Vitek), and "there was a shortage of affordable housing in Los Angeles when

Title II was passed." Tr. at 1963:14-17.[7] Indisputably, prepayment would have "materially affected" the already-tiny affordable housing supply.

In sum, HUD lacked discretion to approve prepayment, so it would have been futile for L.A. Plaintiffs to seek approval. P. Br. at 17. L.A. Plaintiffs' claims are thus ripe for review.

## II. ELIHPA AND LIHPRHA EFFECTED A TEMPORARY REGULATORY TAKING OF PLAINTIFFS' UNFETTERED PREPAYMENT RIGHTS

### A. ELIHPA And LIHPRHA Have The Character Of A Taking

Plaintiffs satisfied the "character" prong under *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104 (1978), proving the same facts *Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) ("*Cienega VIII*"), found dispositive. The government does not offer evidence to undermine these facts.

*First*, the government argues ELIHPA's and LIHPRHA's prepayment bar served an important government interest. Gov. Br. at 44-46. But that fact is not determinative in assessing character where, as here, the government causes a few to shoulder the expense for the many. *Cienega VIII*, 331 F.3d at 1338 ("Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing), but just as clearly, the expense was placed disproportionately on a few private property owners."). Otherwise, the government could evade paying just compensation simply by announcing it sought an important objective. That is not the law. *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 416 (1922) ("[A] strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change.").

*Second*, the government claims that ELIHPA and LIHPRHA did not shift the burden of providing low-income housing onto Plaintiffs. The Federal Circuit, of course, has already

---

[7] The government's citation to *Greenbrier v. United States*, 193 F.3d 1348 (Fed. Cir. 1999), is confounding. Gov. Br. at 30. Putting aside the government's attempt to include evidence in *Greenbrier* in the record here, *Greenbrier* shows that *eight properties nationwide* attempted prepayment. *Id.* This only bolsters the fact that it was futile to apply for prepayment.

rejected that argument. *Cienega VIII*, 331 F.3d at 1338-39 (finding that the government required plaintiffs to shoulder a wholly disproportionate share of the burden of low-income housing where "the alternative was for all taxpayers to shoulder the burden").[8] Apart from applying *Cienega VIII*, this Court should find the record here compels the same result. The record shows that ELIHPA and LIHPRHA prevented Plaintiffs from exiting the HUD programs, and compelled a virtual physical occupation of their properties by government-prescribed tenants. P. Br. at 15, 42-44. The government counters that taxpayers nonetheless bore the burden because taxpayers funded the so-called "benefits" Plaintiffs selected from once the government took their prepayment rights. The government's suggestion that it can preclude a taking by offering partial compensation confuses the fact of a taking with just compensation: any monies the government gave to Plaintiffs after it took their property rights were taken cannot erase that taking.[9]

---

[8] The government's mischaracterizations do not help their claim. While HUD did not handpick individual tenants, the government prescribed the class eligible for tenancy. *See* Gov. Br. at 49. The government's assertion that an owner could "exit" the HUD programs, *id.* at 49-50, is disingenuous—since prepayment was not an option, Plaintiffs were required to either house low-income tenants at below-market rents under the Regulatory Agreements, *see* PX 305, 309, 313-15, 317-19, 321; DX 61 (requiring mortgagees to remain in the HUD programs), sign Use Agreements, or lose their property permanently in a below-market sale.

[9] The government's suggestion that its conduct does not have a taking character because it did not start the taking sooner is nonsense. *See* Gov. Br. at 48 ("[T]he Court should consider the fact that the owners had been enjoying the benefits of the HUD program for years"). If correct, the government could eliminate through regulation all remaining productive use of a property so long as the owner had previously obtained benefits from it. Likewise, the government's claim that the HOPE Act was a remedy for the statutes' "drain upon the public fisc," for landowners "who had no intention of prepaying," Gov. Br. at 48, is revisionist history. There is no evidence that Congress believed it was wasting money paying incentives to owners of properties like these, which would otherwise have been lost to low-income housing. Moreover, there were many other motives behind Congress's enactment of HOPE, including: preventing disinvestment by project owners that would result in significant deterioration of housing stock, concerns about the cost to the FHA insurance fund of foreclosure of projects, enabling a range of entities to utilize creative financial mechanisms to create more affordable housing, preserving the nation's affordable housing stock, and providing a final payment to effectively terminate the prior method of addressing preservation of housing stock. *See* 142 Cong. Rec. S350 (Jan. 24, 1996); H.R. Rep. No. 104-384, at 48 (1995); 142 Cong. Rec. H1267, H1272 (Feb. 27, 1996).

*Third*, the government's suggestion that the existence of certain "options" somehow proves that ELIHPA and LIHPRHA did not unfairly shift the expense of the affordable housing crisis onto Plaintiffs, Gov. Br. at 46-48, fares no better. Plaintiffs' showed (1) the statutes effected a taking of Plaintiffs' unfettered prepayment rights, P. Br. at 41-66 (2) the restricted prepayment "option" was unavailable to Plaintiffs, *id.* at 39-41, and (3) the monetary incentives "option" offered under the Use Agreements failed to justly compensate Plaintiffs, *id.* at 48-52, 68-72. Although the government persists that it was viable for Plaintiffs to sell their properties, Gov. Br. at 47, there is no evidence that a Title II sale was possible or occurred. P. Br. at 54-57. And beyond the fact that Title VI sales are irrelevant because Plaintiffs proceeded under Title II, *see id.* at 45 n.20, there was no evidence that Title VI sales afforded sellers complete recompense for the taking. ELIHPA (and LIHPRHA) sales were at a price HUD set (not the free market) years before an actual sale would occur. *See id.* at 54-57; *see also id.* at 16-19; Tr. 2184:9-25 (Hamm) (stating a fair market transaction requires a willing seller and a willing buyer).[10]

The government's suggestion more generally that the statutes lack the character of a taking because Plaintiffs could have given up their property, Gov. Br. at 47, borders on the absurd. Congress enacted ELIHPA and LIHPRHA to maintain properties as low-income housing for government-approved tenants at government rates. The option to sell the properties to a narrow class of government-approved buyers on terms the government set constituted a drastic limitation on Plaintiffs' rights to transfer the properties because it eliminated a fundamental stick in their bundle of rights. *See* P. Br. at 54-57. That limited option which dictates to whom Plaintiffs must sell their property and on what terms does not alter the character of their nature of the actions. Indeed, to the extent the statutory options and the programs'

---

[10] The fact that there was a possibility of proceeding under LIHPRHA is irrelevant to character. Evidence concerning LIHPRHA sales and the ability to change from proceeding under ELIHPA to LIHPRHA is relevant only as *mitigation* evidence. Tr. 2026:11-21 (Court) (admitting LIHPRHA sales evidence only because "the mitigation put at issue concerns reasonableness of the actions that the plaintiffs took"). Moreover, Plaintiffs acted reasonably because the Title II benefits were superior. Tr. 323:4-324:4 (Glodney); Tr. 2852:10-24 (Vitek).

administration are relevant to character, they confirm the government's actions had the character of a taking. *See Cienega IX*, 67 Fed. Cl. at 468-71.[11]

### B. ELIHPHA And LIHPRHA Caused Plaintiffs A Severe Economic Impact

#### 1. Plaintiffs' Model Correctly Applies A Return-On-Equity Approach To Demonstrate A Substantial Economic Impact

The government offers a variety of criticisms of Dr. Peiser's methodology. Both this Court and the Federal Circuit have upheld that methodology against many of these same criticisms; the government articulates no reason why the Court should chart a new course here.

*First*, the government critiques Dr. Peiser's model on the grounds that under *Maritrans Inc. v. United States*, 342 F.3d 1344 (Fed Cir. 2003), this Court lacks any discretion over the methodology used to calculate economic impact and *must* apply a change-in-value methodology. That is misleading. *Maritrans* concerned whether the Court of Federal Claims' economic impact calculation in a case involving a categorical taking was clearly erroneous. *Maritrans* did not turn on—indeed the Federal Circuit explicitly had no basis to consider, *see* 342 F.3d at 1358 ("On appeal, Maritrans has not pointed us to a different [economic impact] analysis . . .".)—whether the change-in-value methodology was more appropriate than a competing return-on-equity methodology. The Federal Circuit did, however, consider that issue the next year in *Rose Acre*

---

11 The government's claim that ELIHPA and LIHPRHA were akin to "standard rent control ordinances," Gov. Br. at 49-50, is wrong. First, rent control ordinances are laws of general applicability aimed at controlling otherwise unreasonably high rates—not regulations which apply to a discreet, targeted group of property owners and force them to rent at unreasonably low rates. Second, while rent control laws merely regulate rents, ELIHPA and LIHPRHA required owners to continue operating as landlords, and only to low-income tenants besides, and forbade the use or conveyance of the property for other purposes. *Cf. Yee v. City of Escondido*, 503 U.S. 519, 527-28 (1992) (rent control statutes do not "*require*[] the landowner" to continue "rent[ing] their land" to tenants); *see also* PX 305, 309, 313-15, 317-19, 321; DX 61. Moreover, rent control laws pass takings muster because they address market failures that produce extra-competitive rents. *See Pennell v. City of San Jose*, 485 U.S. 1, 20 (1998) (Scalia, J., concurring in part and dissenting in part) ("Since the owner's use of the property . . . is the source of the social problem, it cannot be said that he has been singled out unfairly."). That is hardly the case here where Congress enacted ELIHPA and LIHPRHA to ensure housing for low-income families that cannot afford market rents—a problem Plaintiffs did not create but sought to cure.

*Farms v. United States*, 373 F.3d 1177, 1188-89 (Fed Cir. 2004), where it rejected the government's claim that the diminution-in-value method was the only approach and suggested that it may be "less appropriate" in cases "concern[ing] the economic impact, albeit temporary, of government regulations on a going business."[12] The government counters that Plaintiffs wrongly suggest that *Rose Acre* permits a return-on-equity approach here because that reading conflicts with *Maritrans* and one panel cannot overrule another. Gov. Br. at 36. The government is right on its last point, which demonstrates the fallacy of its own position: if *Maritrans* required courts to apply a change-in-value approach, not only would *Maritrans* have to be read as overruling the decisions in *Cienega VIII*, 331 F.3d at 1342-43, and *Chancellor Manor v. United States*, 331 F.3d 891, 902, 905 (Fed. Cir. 2003) (approving return-on-equity model), but *Rose Acre* would have to be read as overruling *Maritrans*.[13] The correct reading of *Maritrans* is that the Court held the Court of Federal Claims' change-in-value methodology application (the only methodology presented) was not clear error. That holding with *Rose Acre* reinforces *this Court's discretion* to apply a return-on-equity methodology here.[14]

---

12 *See also Rose Acre Farms v. United States*, 75 Fed. Cl. 527, 533 (2007) (applying a model that examined lost profits on remand and finding a regulatory taking).

13 Indeed, the Supreme Court has itself used several different valuation methods, depending on the circumstances and, for example, when analyzing utility rate regulations, has applied a return-on-equity approach. *See, e.g.*, *Verizon Communs, Inc. v. FCC*, 535 U.S. 467, 526 n.36 (2002); *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307 (1989). The Government's brief includes no suggestion that these cases reached the wrong result or are no longer good law.

14 In any event, even under a diminution-in-value model that *applies the numbers of the government's own expert*, Plaintiffs suffered a sufficient economic impact to warrant a finding of a taking under *Penn Central*. P. Br. 59-60 & n.26. The government retorts that Mr. Crosson's numbers were not proffered "during Mr. Crosson's *direct* examination." Gov. Br. at 35 n.13. Those numbers, however, were introduced into evidence during Mr. Crosson's *cross* examination and are properly in evidence. *See* Tr. 1823:10-1834:17 (Crosson); PX 14.

The government further contends the Court should disregard Plaintiffs' change-in-value numbers because Mr. Crosson based his reports upon the "erroneous assumption" that Plaintiffs would be subject to HUD rental rates once the Use Agreements expired. Gov. Br. at 35 n.13. Using Mr. Crosson's own numbers to correct that assumption, one would calculate the market value at the prepayment date based on market rents and the resulting Net Operating Income ("NOI"), growing at his market growth rate and received in perpetuity. The calculation

*Second*, the government contends that Plaintiffs' reliance on an 8.5% rate-of-return is arbitrary. Because the government fails to offer its own comparative rate of return, this Court is only left to decide whether Plaintiffs' proposed rate is reasonable. *Cienega VIII*, 331 F.3d at 1343 n.39 (applying the 8.5% rate because (1) the trial court found Dr. Peiser's testimony was credible; (2) "the government offers us no other way to interpret" plaintiffs' economic impact when they were left with a 0.3% rate of return; and (3) it was "the most conservative basis for comparison offered to us"). Both this Court—which described 8.5% as "prudent"—and the Federal Circuit have already correctly judged it so. *See Cienega IX*, 67 Fed. Cl. at 476 (noting that this is "the same rate approved by *Cienega VIII*") (citing 331 F.3d at 1342-43). As the Federal Circuit noted in *Cienega VIII*, and as Dr. Peiser testified at trial here, Tr. 1308:1-4; 1469:16-24 (Peiser), the 8.5 % Fannie Mae rate represents a low-risk, conservative benchmark of the returns Plaintiffs would have got had they sold the properties on their prepayment dates and

---

for that is simply Mr. Crosson's year 20 market NOI divided by his market cap rate. In the HUD Scenario, the property value is the present value of the sum of HUD returns of 6% of original equity during years 20 to 40 (the takings period) plus property value reflecting growing market rents thereafter, in perpetuity. The HUD 6% annual returns would be discounted using Mr. Crosson's HUD implied discount rate—the sum of his HUD growth rate and HUD cap rate. The market NOI at year 40 is calculated by applying his market growth rate to his year 20 market NOI. Dividing this year 40 market NOI by Mr. Crosson's market cap rate gives the market value of the property at year 40. This property value at the end of the mortgage term would be discounted to year 20 (the beginning of the takings period) using Mr. Crosson's implied discount rate. (For the market scenario, residual market value at the end of the mortgage term is automatically embedded in the perpetuity calculated as of year 20.) When the year 20 market scenario and HUD scenario numbers are compared, they demonstrate a change in value in Plaintiffs' properties of between 70% and 80%, depending on the specific property.

For example, for Claremont, Crosson's Market Value at Year 20 is $8,623,923. This is calculated as Crosson's Market Net Operating Income at Year 20 of $668,354 divided by Crosson's Market cap rate of 7.75%. The Present Value at Year 20 of the Market Value Calculated at Year 40 is $2,045,697. This much lower year 20 value results from the 20 year delay in receiving market rents. The calculation is Market Value as of Year 40 divided by (1 + Implied Market Discount Rate) raised to 20th power: $18,535,991/(1+11.65%)^{20}$. Finally, Economic Impact is 74.45%. This results from taking 1 – ((Present Value at Year 20 of the Market Value Calculated at Year 40) + (Present Value at Year 20 of the limited dividends between Year 20 and Year 40) / Crosson's Market Value at Year 20): 1 – ($2,045,697 + $157,395)/$8,623,923.

invested in Fannie Mae Bonds. Adjusting this rate to account for annual changes would introduce unnecessary complexities into an already complex model.

*Third*, the government argues that Plaintiffs' economic impact model is flawed because it focuses on a temporal slice of Plaintiffs' ownership. The government's argument is unpersuasive. For instance, the government's assertion that "[i]t is well-settled that the economic impact of an alleged taking must be measured by reference to the parcel as a whole," Gov. Br. at 38, simply proves too much. All of the cases the government cites for that rule applied the parcel-as-a-whole rule in the context of categorical takings, *see id.*; tellingly, the Supreme Court has never applied the parcel-as-a-whole rule to analyze the in-period effect of a temporary regulatory taking. And with good reason—the government's rule would allow it to strip an owner *of the total use of his property* for a period of several years or decades without paying any recompense, so long as the property's useful life was comparatively much greater.

A far more reliable guide of how this Court should consider the taking duration in computing impact is in *First English Evangelical Church of Glendale v. County of Los Angeles*, 482 U.S. 304 (1987), where the Court analyzed whether the Takings Clause requires just compensation when the government terminates a regulation that if applied permanently would constitute a taking. The Court held that the Fifth Amendment "requires that the government pay the landowner for the value *of the use of the land during this period*." *Id.* at 319 (emphasis added). So long as the Constitution demands just compensation for the government's use of the property *during the period of a temporary taking*, it logically follows that the best measure of economic impact is the amount of Plaintiffs' lost rents during that period.

*Fourth*, the government also criticizes Dr. Peiser's model as arbitrary (but fails to offer an alternative benchmark) because it "leads to absurd results" when his central factual assumptions prove false. Gov. Br. at 39. The government is overreaching. Dr. Peiser's model assumes that Plaintiffs would raise rents to market rates but for ELIHPA and LIHPRHA. PX 1. He further

assumes based on facts in the record that even if LARSO applied, Plaintiffs would obtain certificates (thereby raising their rents to market) *or*, in the absence of certificates, would raise their rents to market rates within a few years as a result of tenant turnover. *See* Tr. 389:8-391:7, 475:20-483:17 (Hirsch); Tr. 117:14-118:24 (Goldrich); 1262:23-1272:16 (Peiser); PX 630; *cf.* P. Br. at 58 n.24. If those assumptions are false, the model would yield abnormal results— a fact true of any economic model. The government's criticisms are thus beside the point.

*Finally*, the government erroneously persists in arguing that Plaintiffs' decision to sign Use Agreements (and thus accept a proffer of offsetting compensation) should alter the economic impact calculus and thus the determination of whether there was a taking. Gov. Br. at 39. The government cites no authority for this argument and that is not accidental: the closest case on point, *Independence Park v. United States*, 449 F.3d 1235 (Fed Cir. 2006), squarely conflicts with the government's argument. There, the court held that the Use Agreements constituted "an offer by the government as something of value to offset the prepayment rights taken by the statute"—a situation "analogous to a physical taking in which the government appropriates a plaintiff's property at the outset and then takes steps to mitigate the financial impact of the taking, rather than returning the property." *Id.* at 1247 (noting that "the enactment of ELIHPA and LIHPRHA took the plaintiff's prepayment rights," and that the Use Agreements should be considered at the just compensation stage); *see also Cienega IX*, 67 Fed. Cl. at 740 (same).

**2. The Government's Suggestion That The Sale Option Eliminated Plaintiffs' Economic Impact Is Factually And Legally Baseless**

The government makes several factually and legally untenable assertions about the so-called "sale option." None of those arguments require a different result. P. Br. at 54-57.

Chiefly, the government once again reverts to its factually unsupported claim that Title II gave Plaintiffs the "option" of selling their properties. The government again fails to identify (1) any evidence of a single Title II sale; (2) a single regulation that established a process for a Title II sale; and (3) any evidence that shows that a Title II sale yielded a fair market value. Instead,

the government retreats to its declaration that Plaintiffs bore the burden to show that a Title II sale was not viable. *See* Gov. Br. at 40 ("[P]laintiffs offer no evidence that Title II's statutory option was illusory."); *id.* at 41 ("Plaintiffs offer no evidence that HUD failed to comply with this statutory directive. Nor do Plaintiffs offer evidence that the preservation value . . . was less than a fair market price."). Putting aside the government's suggestion that Plaintiffs must prove a negative, this Court rejected this argument when it found that evidence of Title VI sales was relevant only to the determination of whether Plaintiffs *mitigated their damages*. Tr. 2026:11-21. As the party seeking to prove mitigation, the government bore the burden to show the viability of a Title II sale, *see* P. Br. at 54 n.23 (collecting cases), but failed to carry it.[15]

The government similarly fails to explain why the incentives, including the government-funded sale option, are not an offer of compensation (as opposed to a factor that cuts against finding economic impact). The government steadfastly relies on one line it plucks from *Penn Central*, but *Penn Central* concerned a very different regulation from the one here. In *Penn Central*, New York City enacted a statute that limited an owner's ability to build above a certain height, but allowed an affected owner to exercise his development rights to an adjacent property he owned. The regulation was thus akin to a basic zoning regulation. As the Federal Circuit noted in *Whitney Benefits v. United States*, 926 F.2d 1169 (Fed Cir. 1991) (decided 13 years after *Penn Central*), the *Penn Central* regulation—which allows an owner his continued income-generating use of the existing property, and simply transfers his right to future development of that property to an adjacent property the owner already owns—is very different from one that prevents an owner from its total present use of income-generating property (as in *Whitney Benefits*). The government quibbles that the *Whitney Benefits* taking is not identical to the one it

15 The government's claim that the statutory sale price was somehow for a "fair market" price fares no better. Under Title II, the price was set by HUD—not by an independent third party's appraisal. P. Br. at 19. Moreover, as Mr. Vitek made clear, not only was the Title VI sale process fraught with administrative delays that lasted for multiple years, but it was HUD's practice not to update the sale price following that process. Tr. 534:25-535:20 (Glodney); Tr. 1984:15-1985:8 (Vitek). There is no evidence that a Title II sale guaranteed fair market value.

effected here because the *Whitney Benefits* plaintiffs did not receive a cash sale offer. Gov. Br. at 42. But that fact was not determinative in *Whitney Benefits*. Instead, the court found it determinative "that in *Penn Central* the owners retained the railroad station and that in this case the Claims Court found a total destruction of Benefits' coal property right." 926 F.2d at 1175. As Plaintiffs have all along asserted, ELIHPA and LIHPRHA took Plaintiffs' property interest in *the prepayment right*. The total destruction of that right—tied to Plaintiffs' present use of income-producing property—makes this case analogous to *Whitney Benefits*, not *Penn Central.*

### C. ELIHPA And LIHPRHA Frustrated Plaintiffs' Investment-Backed Expectations

The critical question under the expectations prong is "whether a reasonable developer confronted with the particular circumstances facing the Owners would have expected the government to nullify their twentieth-year prepayment right in the mortgage contract and in the regulations." *Cienega VIII*, 331 F.3d at 1346. The evidence conclusively shows (1) Plaintiffs invested in the subject properties in reliance on their unfettered prepayment rights, *see* P. Br. at 62-66, and (2) that their specific investment-backed expectations were eminently reasonable because they were based on express language in their Trust Notes and Secured Notes and then-existing HUD regulations, and were shared by members of the industry and government officials.[16] P. Br. at 66-68. None of the government's arguments undercut the voluminous evidence that Plaintiffs possessed a reasonable investment-backed expectation to prepay.

#### 1. The Partnerships' Expectations Are Appropriately Measured At The Time The Partnerships Began Their Investments

For the first time in more than 13 years of litigation, the government argues now that the "initial closing" is the proper time at which to measure Plaintiffs' expectations. There is neither

---

16 The government argues that because Plaintiffs looked first to subjective expectations and second to objective expectations, that Plaintiffs "turn the legal standard on its head." Gov. Br. at 50-51. Not only is the government wrong, *see Cienega VIII*, 331 F.3d at 1346, the order in which the Court analyzes the prongs is irrelevant, since Plaintiffs meet them both.

legal nor factual support for that conclusion. As the Federal Circuit has already made clear, the relevant time is the moment at which Plaintiffs "*entered into the activity* that triggered the obligation." *Chancellor Manor,* 331 F.3d at 904 (emphasis added). The evidence here demonstrated that the general partners entered into the activity well before the initial closing; in fact, they began selecting locations for development, investing significant personal monies, and participating in the HUD administrative process for the 221(d)(3) and 236 programs ("HUD programs") nearly two years before the initial closing.[17] Plaintiffs proved they intended to prepay the HUD-insured mortgages at the time they entered into the activity—and indeed did at all times. P. Br. at 62-68.

### 2. The Reasonable Investment-Backed Expectations Prong Does Not Turn On One Single Primary Expectation

The government wrongly argues that this Court should only consider Plaintiffs' "primary" expectation. Gov. Br. at 51-52. That is nonsensical: if an owner who invested with nine distinct expectations, eight of which each constituted 11% of the investor's motivation and one of which constituted 12%, a myopic focus on the "primary" expectation would consider only the 12% expectation relevant for takings purposes. But as this Court found, in *Cienega IX*, 67 Fed. Cl. at 473 n.47, "[t]here is not one magical, reasonable set of expectations that a business could have; hundreds of business plans could be deemed reasonable." Moreover, by focusing attention on only an owner's decision to participate in the program generally, the government's "primary" expectation inquiry fully neglects other factors relevant to the owner's decision to invest, such as development location and building quality level.[18]

---

[17] Mr. Hirsch testified that it took approximately 30 days for Mr. Hirsch or Mr. Stern to select land (subject to Mr. Goldrich's approval), purchase an option on the land, purchase architectural plans, and work with brokers and lenders. Tr. 403:14-414:21, 436:6-12. Then, they would submit a request for firm commitment, which took on average 1 ½ to 2 years. Tr. 451:20-452:8. The initial closing occurred more than a year after the firm commitment, and another 4 months to one year passed before final closing. Tr. 462:6-12, 472:2-473:9. (Hirsch).

[18] The government's contrary view rests on a misreading of *Penn Central*. Gov. Br. at 51. Although the Court in that case contrasted the plaintiffs' decades-later desire to build an office

### 3. Plaintiffs Would Not Have Invested In The HUD Programs But For The Opportunity To Prepay Their Mortgages

The government argues that Plaintiffs have not sufficiently proved Plaintiffs' actual expectations because the testimony of controlling partners only reflects a minority of the partnership interests. Gov. Br. at 9. That is wrong. The evidence shows that Messrs. Goldrich, Kest, Hirsch, and Stern made the decision to enter the HUD programs, invested substantial labor, time, and money, and would not have entered into these programs but for the ability to prepay. *See* P. Br. at 62-66. These partners' expectations were in fact those of the partnerships because they were Plaintiffs' decision makers and "retained control of the partnerships." *See Cienega IX*, 67 Fed. Cl. at 474; *see also* Tr. 367:17-23, 394:23-395:1, 402:3-24 (Hirsch) (testifying that Goldrich, Kest, Hirsch, and Stern "retained control" of the projects); Tr. 119:16-22 (Dintzer) (referring to Goldrich, Kest, Hirsch, and Stern as "the G&K partners"). Notably, the contemporaneous documentary evidence concerning Plaintiffs' investments bears the names and signatures of these four partners. *See* PX 98-104, 115, 305, 309, 314-15, 317-19, 321; DX 7E, 7J, 12A, 20, 44C, 56-57, 61.[19]

---

tower above their property with what was clearly their "primary expectation" of operating a railroad station, 438 U.S. at 136, it never held nor suggested that proving frustration of a single primary expectation is the *sine qua non* of a regulatory taking claim. Indeed, the only other case the government cites for its theory, *MacLeod v. County of Santa Clara*, 749 F.2d 541, 547 (9th Cir. 1984), acknowledged "two . . . primary uses of the property."

Ultimately, the government's view cannot be reconciled with over a decade of this Circuit's decisions, all of which ask whether takings claimants "bought their property in reliance on the nonexistence of the challenged regulation." *See, e.g.*, *Creppel v. United States*, 41 F.3d 627, 632 (Fed. Cir. 1994); *Goody v. United States*, 189 F.3d 1355, 1360-61 (Fed. Cir. 1999); *Norman v. United States*, 429 F.3d 1081, 1093 (Fed. Cir. 2005).

[19] In any event, Messrs. Goldrich, Kest, Hirsch, and Stern, or entities wholly owned by them, had a majority interest in the partnerships by the time they executed official partnership agreements. (Claremont-100%; Covina West-50%; DeSoto-75%; Del Vista-50%; Kittridge I-100%; Kittridge II-100%; Oxford Park-100%; Parthenia-100%; Pioneer-100%; Puente Park-100%.) DX 494. The other 50% initial general partner interest in Covina West belonged to Milton Gottlieb and Leslie Sugar, who owned the land and "felt very strongly about the area and its up side and wanted to contribute to his daughter and son-in-law an investment." Tr. 464:15-19, 470:9-12 (Hirsch). The other general partners later "bought them out." *Id.* As for DeSoto, Richard Gunther, who owned 12.5% at the outset, invested because he owned the land and in

The government's suggestion that it was unreasonable for Plaintiffs to expect to exercise their prepayment rights because they were actually motivated by other aspects of the HUD programs, Gov. Br. at 56-7, is a non-sequitur. *Cienega VIII* held that it was reasonable for Model Plaintiffs to expect to realize the benefits of the prepayment option, which was a material inducement the government provided to encourage participation in the HUD programs. 331 F.3d at 1348; *see also Cienega IX*, 67 Fed. Cl. at 440, 473 & n.7. The fact that participation in the HUD programs also entailed other potential benefits does not undermine that conclusion.

The government's statements about other potential benefits are likewise untrue. *First*, the government falsely asserts that entering the HUD programs required little capital investment and entailed no risk. Gov. Br. at 56-7. Plaintiffs, however, incurred substantial costs for planning and specification preparation, land acquisition, project approval, and closings prior to receiving their (limited) return. Tr. 386:23-389:7 (Hirsch). Those cash outlays were often not recovered in the loans, and if actual construction costs exceeded the budget, Plaintiffs incurred the excess costs. *Id.*; Tr. 82:9-18 (Goldrich); Tr. 388:20-389:2, 472:6-13 (Hirsch). Plaintiffs built above and beyond HUD specifications and thus often had far more invested than was reported on HUD Form 2264 (detailing mortgages costs). P. Br. at 63-64; Tr. 386:23-389:7 (Hirsch). Indeed, a seminal HUD study published when Plaintiffs made their investments predicted that 20% of 236 projects and 30% of 221(d)(3) projects would fail in the first 10 years and concluded that the

---

anticipation of the "upside" after 20 years, *id.*, and still retains his interest in the form of a family trust. DX 494; Tr. 168:2-11 (Goldrich). As for Del Vista, Mr. Mesler who owned 50% at the outset, has long since passed away. Tr. 135:15-20 (Goldrich); DX 494. And while the general partners may have sold some shares to raise capital, they have purchased them back, and currently maintain the following ownership interests: Claremont-97.225%; Covina West-96.5%; DeSoto-75%; Del Vista-100%; Kittridge I-99.9%; Kittridge II-99.9%; Oxford Park-99.9%; Parthenia-100%; Pioneer-100%; Puente Park-98.33%. *Id.*

Entities fully owned by the general partners or held in trust for their family bear the general partners' last names or initials. *See* DX 494. Active Cleaning & Maintenance, an Oxford Park general partner, was owned equally by Mr. Goldrich and Mr. Kest. Tr. 151:2-5.

high failure rates *reflect the riskiness of the undertaking*." HUD, *Housing in the Seventies: Report for the National Housing Policy Review* 118, 122-23 (1974) (emphasis added).

*Second*, the government's claim that Plaintiffs invested for the tax benefits associated with low-income housing, Gov. Br. at 52-58, is factually inaccurate. On the evidence presented, this Court must find that the testimony plainly demonstrated that the general partners did not invest for tax benefits. *See* P. Br. at 65-66; Tr. 401:16-19 (Hirsch) (explaining "as a young, growing businessman, without a substantial income of any kind, frankly the tax advantages did not have any great lure to us."); Tr. at 139-40, 143, 2080-81 (Goldrich) ("I don't know enough details because I am not a CPA.").

*Third*, the government posits that "contemporaneous FHA forms, provisions in the original partnership agreements, and representations in the 1972 Skyline View prospectus" demonstrate that Plaintiffs "took advantage" of the programs' low-risk, high-leverage financing, and tax benefits. Gov. Br. at 57. This is another gross mischaracterization. As stated above, the FHA forms do not reflect the true level of initial investment. The government also supports this assertion with Mr. Malek's speculation that a change of ownership distribution in Claremont's amended partnership agreement is really secret code for the partners' intentions to change their tax "depreciation allowance." *See* PX 131; Tr. 2722:11-17 (Malek). Nowhere does the agreement actually *mention* tax benefits or depreciation. PX 131.[20] The Skyline View prospectus is also entirely irrelevant. Skyline View is not involved in this litigation, and a prospectus is a document prepared by "syndicators," also non-existent in this case. *See also* Tr. 2703:16-20 (noting that the prospectus was not prepared by the G&K partners).[21]

[20] The amended agreement was entered into after the time to measure expectations, and certainly after the initial closing, highlighting the government's inconsistent analysis. PX 131.

[21] The FHA forms and partnership agreements demonstrate that general partners spent significant time, money, and resources investing in programs that would appreciate over 20 years and were built above HUD standards, *see* P. Br. at 64, thus underscoring Plaintiffs' prepayment expectation. *See* Gov. Br. at 56 (citing DX 7F, 13B, 24C).

*Fourth*, the government argues that the 6% return on the equity investment was Plaintiffs' real motivation to enter the HUD programs. That is counterfactual. Six percent is significantly less than the return Plaintiffs normally expected from their investments. *See* Tr. 1433:17-25 (Peiser) (stating that one could get even an 8.5% return for "a relatively low risk investment"). And as stated above, the return was often lower than 6% of the actual initial investment, since HUD did not approve all costs. Tr. 388:20-389:2, 472:6-13 (Hirsch). As Mr. Goldrich testified, "I would not have done all that work for only 6 percent." Tr. 84:3-5 (Goldrich).

*Finally*, the government is wrong again when it argues that the Builders and Sponsor's Profit and Risk Allowance, the HUD-approved profit for building the project, was the "real" reason Plaintiffs participated in the HUD programs. Gov. Br. at 52-53. The government has no economic justification for ignoring the sweat equity these developers invested in their properties. *See* Tr. 2788:6-2790:19 (Malek) (acknowledging builders are entitled to a profit on their work). Again, Plaintiffs adduced significant evidence showing that they often ultimately had far more invested than was reported on the HUD Form 2264. *See, e.g.*, Tr. 386:23-389:7 (Hirsch).[22]

**4. Plaintiffs' Expectations To Prepay Their HUD-Insured Mortgages Were Objectively Reasonable**

The document terms, then-existing HUD regulations, and testimony of a former government official charged with promoting the programs all indicate that Plaintiffs' investment-

[22] Other arguments concerning Plaintiffs' expectations are equally nonsensical. The government claims that Mr. Goldrich invested in the HUD programs because he could not obtain conventional financing and because conventional housing was too risky. Gov. Br. at 57. This is simply untrue. While conventional financing may have been more difficult to obtain in certain low-income areas, Mr. Goldrich developed and owned *many* conventional properties. Tr. 125:10-11, 170:24-171:25 (Goldrich). And the record is full of evidence that HUD programs were at least as risky as conventional projects. *See* P. Br. at 34-35; Tr. 143:9-17 ("It is much harder to deal with HUD than build a conventional project. . . . The effort to build a HUD project was tremendous."). The government also argues that there were no prepayment expectations because the "G&K Partners" signed Title VI Use Agreements that extended restrictions on properties eligible to prepay. Gov. Br. at 22. The evidence the government cites to support this assertion concerns rehabilitated hotel projects participating under the capital loan program and is irrelevant to this point. Tr. 887:11-888:12 (Glodney).

backed expectations were reasonable. P. Br. at 66-68; *Cienega IX*, 67 Fed. Cl. at 474 (holding expectations were "reasonable given the deed of trust notes, the existing regulations, the type of properties involved, the location of the properties, and the importance of an exit strategy in entering such a program."); *CCA Associates v. United States.*, 75 Fed. Cl. 170, 193-94 (2007) (same).[23] Rather than contest these facts, the government argues that tax benefits and preferential loans were also important. Gov. Br. at 52-53. But an appreciation of the tax consequences—early tax benefits that later became tax detriments—only reinforces the value of the prepayment right.

The tax benefits of accelerated depreciation upon which the government relies, which generated losses that could be deducted, was complete as of approximately the mortgage's twentieth year. Tr. 2818:24-2819:18 (Malek). Thereafter, Plaintiffs received "phantom income"—i.e., imputed income without actual cash flow on which they nonetheless paid taxes. *Id.* For this reason, Mr. Malek confirmed that under this tax scheme, it would be wiser for an owner to convert properties to higher-income producing properties than to sell them—precisely what Plaintiffs sought to do by prepaying their mortgages. Tr. 2820:2-2821:8; *see also* Tr. 139:8-15 (Goldrich); *Cienega IX*, 67 Fed. Cl. at 473 (finding the tax consequences made "the prepayment right . . . even more important" in order to generate an actual income stream to compensate for the tax losses they would be sustaining).[24]

---

[23] The government is wrong that factual findings in other *Cienega* proceedings cannot be used to estop the government here. *Atwood-Leisman v. United States*, 72 Fed. Cl. 142, 151 (2006); *see also Bingaman v. Dept. of the Treasury*, 127 F.3d 1431 (Fed. Cir. 1997).

[24] Moreover, the tax benefit of accelerated depreciation was available in *both* conventional and low-income housing. Tr. 2651:1-11 (Malek) (testifying that the same section of the Internal Revenue Code governed accelerated depreciation for both low-income and conventional housing); Tr. 1511:20-1512:1 (Peiser) (testifying that the tax laws allowed investors in *any* property generating tax losses to offset earned income, interest, and dividend income). The government's citation to Mr. Goldrich's testimony to support its dubious argument about tax benefits, Gov. B. at 57 (citing Tr. 139-40, 143, 2081), is unavailing: "[Low income housing] offered some tax privileges, but I don't remember the details"; "I don't remember"; and "I don't know enough details because I am not a CPA." Tr. at 139-40, 143, 2080-81 (Goldrich).

The government also argues that realizing residual value was "a distant and highly speculative possibility" because of HUD delays. Gov. Br. at 54-55. The government thinks that because delays were common, owners should have expected 20 extra years of required participation in the HUD programs. That is ridiculous; it was reasonable for participants to expect to exercise their *unfettered* prepayment rights on their prepayment eligibility dates.[25]

### D. The *Penn Central* Factors Weighed Together Require A Finding Of A Taking

Balanced together, the *Penn Central* factors demonstrate that by "forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole," *Armstrong v. United States*, 364 U.S. 40, 49 (1960), ELIHPA and LIHPRHA unmistakably took Plaintiffs' property interest in the prepayment right. At bottom, the *Penn Central* analysis compels the Court not to simply *evaluate* the *Penn Central* factors separately but to *weigh them* collectively. That is important because whether this Court applies (1) a change-in-value approach, (2) the far better return-on-equity method, or (3) even a combination of both models, it will find that economic impact, when weighed alongside the character of the government's decision to compel Plaintiffs to lease their property to the poor and Plaintiffs' reasonably-investment backed expectation that they could exercise full control over the property once they prepaid, compels the conclusion that ELIHPA and LIHPRHA took Plaintiffs' prepayment right. *See Hodel v. Irving*, 481 U.S. 704, 715-16 (1987) (weighing factors and holding that a statute that abrogated a right to devise to one's heirs even a small portion of a property interest and caused less than a 35% economic impact was a taking).

The government cannot escape that conclusion with a belated offer of compensation by a sale or Use Agreement. That would allow the government to do an end run around the Just Compensation Clause by paying compensation anytime it hoped to avoid determining whether

---

[25] The government also unconvincingly argues that it was unreasonable to expect to realize residual value after 20 years. Gov. Br. at 53. For support, the government cites a non-admitted book relied upon by Mr. Malek (and incidentally written by an attorney who lectured about how the unconstitutionality of ELIHPA and LIHPRHA). Tr. 2778:1-17 (Malek).

that payment was just. That cannot be the law. Instead, the sensible reading of those actions—as the Federal Circuit recognized in *Whitney Benefits* and the government itself previously urged in Set II, *see* Brief for Defendant-Appellant at 66, Cienega Gardens, et al. v. United States, Nos. 94-1, 10004, 10009, 10013, 10029 (Fed. Cir. June 2, 2006)—is that the government's proffer of payment was compensation—or, put another way, an implicit admission that a taking occurred.

## III. PLAINTIFFS ARE ENTITLED TO JUST COMPENSATION

### A. Los Angeles Plaintiffs Would Have Prepaid Their Mortgages

Aided primarily by mischaracterizations of the evidence, the government argues that L.A. Plaintiffs would not have prepaid their mortgages and are not entitled to just compensation. Gov. Br. at 58-60. The evidence is to the contrary. *See* P. Br. at 35-38. Plaintiffs established that LARSO would not have prevented L.A. Plaintiffs from prepaying and raising rents to market on their prepayment eligibility dates because HUD and the Housing Authority of the City of Los Angeles ("HACLA") would have provided LARSO-exempt Section 8 certificates at market rents to tenants (as the vast majority were certificate-eligible on prepayment eligibility dates). *Id.* at 36. If tenants did not receive Section 8 certificates upon prepayment (which is unlikely given what occurred in 1996), L.A. Plaintiffs would have applied for a LARSO "just and reasonable" rent increase (80% likely to be approved), or a LARSO "class rent increase" (which have been approved to induce landlords to accept low-income tenants), or paid tenants to move so units would be subject to vacancy decontrol. *Id.* at 37; Tr. 1900:21-1901:21 (Ortega). Notably, LARSO would not have prevented DeSoto and Kittridge I from prepaying and raising rents to market rates on their prepayment eligibility dates because the relevant LARSO provision was not yet enacted. *Id.* Moreover, even assuming worst case scenario—that LARSO would have held rents below market for a few years as units transitioned to market under vacancy control—Plaintiffs would have prepaid. Tr. 389:8-391:7, 475:20-483:17 (Hirsch); Tr. 117:14-118:24

(Goldrich); *see also* Tr. 2275:6-23 (Hamm) (testifying it could be economically beneficial to prepay where rent control would limit rental increase rate).

The government's attempts to deny these facts fail. The government is wrong that Plaintiffs would not have been able to pay their mortgages. Tr. 373:2-14, 391:9-392:7 (Hirsch) ("[T]here would have been financing sources, without a question, to pay off the existing HUD loans.); *see also* P. Br. at 7.[26] The government is also wrong that issuing Section 8 certificates over vouchers was "directly contrary to national housing policy." Gov. Br. at 60. Incredibly, the government cites regulations that have *nothing to do* with priority between certificates and vouchers. Gov. Br. at 60. Relevant HUD regulations, on the other hand, set forth HUD's intent to issue Section 8 assistance when approving prepayment so that "current tenants will not be involuntarily displaced." 24 C.F.R. § 248.233(d)(3) (1990); 55 Fed. Reg. 38949 (1990). Finally, the government's own expert's testimony rebuts the government's proposition that the post-HOPE Act issuance of Section 8 certificates to prepaying properties is not relevant to what would have happened had Plaintiffs prepaid. *See* Tr. 2525:2-2528:10 (Hamm).[27]

---

[26] Relatedly, the government argues that Dr. Peiser overstates damages by assuming Plaintiffs would have obtained permanent financing at market rates on the prepayment dates when in reality they would have had to use bridge financing with "higher interest payments" and "transaction costs." Gov. Br. at 74. The evidence does not support this assertion. Tr. 373:2-14, 391:9-392:7 (Hirsch). Regardless, Dr. Peiser's conservative assumption regarding the interest rate for the permanent financing more than compensates for any increased transaction costs. *See* Tr. 1374:19-1375:16 (Peiser) (stating "the error is in favor of the government").

[27] The government's argument that Plaintiffs are only entitled to nominal damages because Plaintiffs would have foregone prepayment and chosen incentives, Gov. Br. at 61, is belied by the vast evidence that Plaintiffs would have prepaid on their prepayment eligibility dates. *See* P. Br. at 61-66. Plaintiffs sought prepayment whenever that right was or might be available, demonstrating their intent and desire to exit the HUD programs as early as possible. *See*, *e.g.*, PX 18, 19, 28-32A. As soon as Plaintiffs learned of the HOPE Act, they sought release from their Use Agreements to prepay. Tr. 807:2-14 (Glodney). The government is similarly wrong that Plaintiffs should have known in 1994 that Congress was considering repealing the prepayment bar. Gov. Br. at 61. The government cites a proposed bill that, to Ms. Glodney's knowledge, simply rescinded incentives funding and was unrelated to the restoration of prepayment rights. Tr. 805:14-806:4 (Glodney); DX 253. Ms. Glodney testified that HUD did not advise her that Congress might restore a prepayment right prior to the execution of Plaintiffs' Use Agreements. Tr. 806:5-807:1. In any case, it is unreasonable to rely on an expectation that

**B. Plaintiffs' Damages Model Is A Correct Measure of Just Compensation**

The government makes several unavailing attempts to discredit Dr. Peiser's reliable, accepted damages model. *First*, the government argues that damages should be measured from the beginning of the taking. Gov. Br. at 62. In reality, damages must be valued at the end of the taking because the taking is an ongoing series of acts (takings of income stream) that continue through the period, not occurring at one point in time. *Independence Park Apartments v. United States*, 61 Fed. Cl. 692, 707 (2004) (holding "any market price that one may attempt to estimate in determining the just compensation for plaintiffs' loss must take the plaintiffs' foregone rent increases into account").[28] The government also contests the measurement of damages from the trial, Gov. Br. at 63, which ignores *Independence Park Apartments v. United* States, 465 F.3d 1308, 1311 (Fed. Cir. 2006) which held that takings continue through the Use Agreement terms.

*Second*, this Court has rejected the government's criticism of Dr. Peiser's use of *ex post* data. *Independence Park*, 61 Fed. C1. at 710 n.16 ("[T]he events during the temporary takings period are relevant not just to delineate the period itself but also to provide an objective, non-speculative basis for assessing value."); *Cienega IX*, 67 Fed. Cl. at 490 n.75 ("[E]vents during the temporary takings period are not in any rational sense *ex post* at all."). Moreover, the government's own experts admitted that it is proper to rely on *ex post* data and in fact relied on *ex post* data in their analyses. *See, e.g.*, Tr. 2525:2-2528:10 (Hamm).

*Third*, the government contends that Dr. Peiser's valuations are unreliable. Gov. Br. at 67. However, the government's appraisal expert demonstrated the conservative nature of Dr. Peiser's analysis. While Dr. Peiser relies on the government's own numbers (HUD agreed-upon values), Mr. Crosson retrospectively values the properties as of their prepayment dates at values

---

proposed legislation will be enacted, as was aptly demonstrated when the President vetoed the HOPE Act's predecessor.

[28] The government also again suggests that Plaintiffs allege a permanent taking. Gov. Br. at 63. If the government believes ELIHPA and LIHPRHA created a permanent taking, they should have paid Plaintiffs just compensation for the permanent taking of their property.

(in all but one case) *above* the HUD values. P. Br. at 32. The government is also ill-positioned to argue that Dr. Peiser should not have used an income capitalization methodology, since their own expert Mr. Crosson did the same. Tr. 1414:15-22; DX 400-09. The government's criticism of the use of City of Los Angeles market averages, Gov. Br. at 68, also misses its mark: Dr. Peiser used these averages when there was insufficient Realfacts data in the property's zip code and contiguous zip codes. *See* Tr. 1150:3-1152:23 (Peiser). This is a reasonable assumption and reliable data; moreover, the government offered no reasonable alternative. *See id.*

*Fourth*, the government errantly insists that the discount rate in the market scenario should be higher than in the HUD-Restricted Scenario because of allegedly increased risks in the former. Gov. Br. at 72-73. That argument is misguided: the risk attendant to operating a HUD-restricted property is equivalent to, if not greater than, operating conventionally. P. Br. at 34-35 (describing Plaintiffs' experiences with several regulatory risks with the HUD programs); *see also Independence Park*, 61 Fed. C1. at 710 (noting "the use of these divergent discount rates . . . worked to bias the government's calculation against plaintiffs"); *Cienega IX,* 67 Fed. Cl. at 491. To the extent there are differences, Dr. Peiser accounts for those risks in the underlying cash flows, thus eliminating a need to use differential rates. PX 1; Tr. 1338:23-1341:7 (Peiser).[29]

---

[29] Other criticisms are equally misplaced. The government criticizes Dr. Peiser's model for failing to phase in new rents. Gov. Br. at 73. Dr. Peiser's conservative assumptions of 50% turnover upon prepayment and a 6-month lease-up period more than compensate for any decrease in income caused by phased-in rents. Tr. 1214:15-17 (Peiser); *see Cienega IX*, 67 Fed. Cl. at 485-86 ("Dr. Peiser's adjustment was more generous to the government than would be required by the plaintiffs' actual experiences."). Further, had Plaintiffs prepaid, the government would have issued Section 8 certificates to existing eligible tenants thereby precluding turnover. P. Br. at 36-38. The government also wrongly criticizes Dr. Peiser's use of the annual adjustment factor. Gov. Br. at 73. It is reasonable to use HUD data to adjust rents for years when RealFacts data is not available and the government offered no better alternative. Tr. 1618:24-1619:7 (Peiser). Furthermore, it is conservative considering that the Use Agreement rents were not adjusted to account for market increases during the years between the appraisals of Plaintiffs' properties and the Use Agreement rent determinations. *See* P. Br. at 24-25. Finally, the government contends Plaintiffs' HAP contracts would have prevented Plaintiffs from raising rents upon prepayment. Gov. Br. at 70-72. This argument should be rejected, as the evidence demonstrated that, but for ELIHPA and LIHPRHA, Plaintiffs could and would have

*Finally*, the government contends Dr. Peiser's pre- and post-judgment interest rates are "excessive." Gov. Br. at 74-75. However, this Court has already found a STRIPS rate is the appropriate measure for interest. *See Independence Park*, 61 Fed. Cl. at 716-17 (applying the prudent-investor rule); *Cienega IX*, 67 Fed. Cl. at 492-93 (noting "Treasury STRIPS are low-risk investments"). Here, the 20-year U.S. Treasury STRIPS rate is appropriate because Plaintiffs will not be paid until at least 20 years after their prepayment dates. P. Br. at 73. Compound interest is necessary to put them in the position they would have occupied but for the taking and to compensate for uncertainty surrounding the compensation will be paid. P. Br. at 73-75. *See, e.g., Independence Park*, 61 Fed. Cl. at 717-18; *CCA Assocs*., 75 Fed. Cl. at 205; *Whitney Benefits v. United States*, 30 Fed. Cl. 411, 415-16 (1994). Plaintiffs are small partnerships and their ability to conduct business depends on their access to capital, which has been materially impacted by the taking. Tr. 1464:11-16 (Peiser). Plaintiffs lost the opportunity to reinvest the funds in other income-producing properties and could not have replaced those funds by borrowing at a risk-free rate. *Id*.; *see also* P. Br. at 75; *Independence Park*, 61 Fed. Cl. at 710.

**CONCLUSION**

For the above reasons, and as stated in Plaintiffs' Post-Trial Memorandum of Proposed Findings of Facts and Conclusions of Law, Plaintiffs should be awarded $100,803,400, representing (1) $6,962,833, $13,492,306, $10,089,067, $7,545,584, and $8,486,258 for Claremont, Covina West, Del Vista, Pioneer, and Puente Park, respectively, plus compound interest from December 31, 2006, until judgment is paid and (2) $23,351,704, $13,733,366, $6,802,951, $7,791,461, and $2,547,870, for DeSoto, Kittridge I, Kittridge II, Oxford Park, and Parthenia, respectively updated to judgment and including compound interest until judgment is paid; and other appropriate relief, including attorneys' fees, expert fees, and expenses to be determined at a later date.

---

negotiated short-term HAP contracts with expiration dates coinciding with their prepayment eligibility dates. *See* P. Br. at 25-26 (citing Hamm, Winiarski, and Glodney).

Dated: June 29, 2007

Respectfully submitted,

By s/ Everett C. Johnson, Jr.

Everett C. Johnson, Jr.

LATHAM & WATKINS
555 11th Street, NW
Suite 1000
Washington, DC 20004
Tel (202) 637-2200
Fax (202) 637-2201

Attorneys for Plaintiffs