Nos. 94-10002C, 94-10003C, 94-10005C, 94-10006C, 94-10007C, 94-10008C
94-10010C, 94-10020C, 94-10030C, 94-10040C
Judge Charles F. Lettow

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

CLAREMONT VILLAGE COMMONS, *et al.*,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

DEFENDANT'S POST-TRIAL REPLY BRIEF

---

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

BRIAN M. SIMKIN
Assistant Director

KENNETH M. DINTZER
Assistant Director
DAVID A. HARRINGTON
KENNETH D. WOODROW
TIMOTHY P. McILMAIL
SEAN DUNN
BONDURANT ELEY
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 353-0513

July 10, 2007

Attorneys for Defendant

# TABLE OF CONTENTS

Page

I. The As-Applied, Regulatory Taking Claims Of The Los Angeles Plaintiffs Are Not Ripe . . . . 2

A. Under LARSO, Any Rent Increase Would Have Been Less Than Ten Percent . . . . 2

B. Prepayment Would Not Result In Involuntary Displacement . . . . 4

C. HUD Possessed Discretion To Determine What Area The Plaintiffs' Projects Would Be Expected To Serve And Whether Prepayment Would Have A Material Effect On The Supply Of Low-Income Housing In That Area . . . . 5

II. Plaintiffs' Claims Accrued Upon Obtaining Funded Use Agreements And The Prior Period Of Administrative Processing Is Not Compensable . . . . 5

III. Plaintiffs Have Not Established That The Preservation Statutes, Applied To Their Properties, Effected A Regulatory Taking . . . . 6

A. Plaintiffs Did Not Suffer A Severe Economic Deprivation . . . . 6

1. The Court Should Reject Plaintiffs New Economic Impact Model . . . . 6

2. Plaintiffs Misconstrue Federal Circuit Precedent . . . . 7

3. The Court Must Consider The Effect Of The Preservation Statutes . . . . 8

4. The Plaintiffs Bear The Burden Of Establishing Economic Impact . . . . 10

B. Plaintiffs Have Failed To Prove That ELIPHA And LIHPRHA Had The Character Of A Taking . . . . 14

C. The Preservation Statutes Did Not Affect Plaintiffs Primary Investment-Backed Expectations . . . . 16

1. Investment-Backed Expectations Are Evaluated At "Initial Closing" . . . . 17

**TABLE OF CONTENTS**
-continued-

**Page**


2. Under Penn Central, The Owner's "Primary Expectation" Is The Proper Focus Of The Investment-Backed Expectation Prong . . . . . 17

3. The Opportunity To Prepay More Than 20 Years In The Future Was Not Material To A Reasonable Investor . . . . . 18

4. Plaintiffs Have Provided Insufficient Evidence Of The Partnerships' Actual, Original Expectations . . . . . 19

D. The *Penn Central* Factors, Taken Together, Do Not Establish A Taking . . . . . 21

IV. The Los Angeles Plaintiffs Would Not Have Prepaid . . . . . 21

CONCLUSION . . . . . 23

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**


Andrus v. Allard,
444 U.S. 51 (1979) . . . . . 15

Bass Enters. Prod. Co. v. United States,
381 F.3d 1360 (Fed. Cir. 2004) . . . . . 14

Bonnar v. United States,
438 F.2d 540 (Cl. Ct. 1971) . . . . . 1

Chancellor Manor,
331 F.3d 891 (Fed. Cir. 2003) . . . . . 14, 16, 20, 21

Cienega Gardens v. United States,
331 F.3d 1319 (Fed. Cir. 2003) . . . . . 14, 15

City Line Joint Venture v. United States,
71 Fed. Cl. 486 (2006) . . . . . 7

Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust,
508 U.S. 602 (1993) . . . . . 8

Forest Properties, Inc. v. United States,
177 F.3d 1360 (Fed. Cir. 1999) . . . . . 1, 7, 10, 14

Independence Park v. United States,
449 F.3d 1235 (Fed. Cir. 2006) . . . . . 2, 12

Keystone Bituminous Coal Assn. v. DeBenedictis,
480 U.S. 470 (1987) . . . . . 9

Kirkendall v. Dept. of Army,
479 F.3d 830 (Fed. Cir. 2007) . . . . . 4

Lingle v. Chevron U.S.A., Inc.,
544 U.S. 528 (2005) . . . . . 10

Lucas v. South Carolina Coastal Council,
505 U.S. 1003 (1992) . . . . . 10

Maritrans, Inc. v. United States,
342 F.3d 1344 (Fed. Cir. 2003) . . . . . 6, 7

**TABLE OF AUTHORITIES**
**-continued-**

**Cases:** **Page(s)**

Miller v. Brown,
462 F.3d 312 (4th Cir. 2006) . . . . . 2

Palazzolo v. Rhode Island,
533 U.S. 606 (2001) . . . . . 2

Penn Central Transp. Co. v. New York City,
438 U.S. 104 (1978) . . . . . passim

Rose Acre Farms v. United States,
373 F.3d 1177 (Fed. Cir. 2004) . . . . . 7, 10

Seiber v. United States,
364 F.3d 1356 (Fed. Cir. 2004) . . . . . 7

Suitum v. Tahoe Regional Planning Agency,
520 U.S. 725 (1997) . . . . . 11, 12

United States v. Mendoza,
464 U.S. 164 (1984) . . . . . 14

Whitney Benefits, Inc. v. United States,
926 F.2d 1169 (Fed. Cir. 1991) . . . . . 8, 12, 13

Whitney Benefits v. United States,
752 F.2d 1554 (Fed. Cir. 1985) . . . . . 5, 11, 12, 13

Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City,
473 U.S. 172 (1985) . . . . . 11

**TABLE OF AUTHORITIES**
**-continued-**


| Statutes and Regulations | Page(s) |
|---|---|
| 12 U.S.C. § 4103 | 15 |
| 12 U.S.C. § 4108(a)(1) | 3, 4, 5 |
| 12 U.S.C. § 4109, 4110, 4114 | 5, 11, 15, 18 |
| 24 C.F.R. §§ 215.22(d), 880.613(d), 881.613(d), 882.219(d), 883.714(d), 904.122(d) | 4 |
| 24 C.F.R. § 248.141 | 4 |
| 24 C.F.R. § 882.219 (1990) | 22 |
| 57 Fed. Reg. 12042 (Apr. 8, 1992) | 4 |

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| CLAREMONT VILLAGE COMMONS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Nos. 94-10002C, 94-10003C, |
| v. | ) | 94-10005C, 94-10006C, 94-10007C, |
| | ) | 94-10008C, 94-10010C, 94-10020C, |
| THE UNITED STATES, | ) | 94-10030C, 94-10040C |
| | ) | (Judge Charles F. Lettow) |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S POST-TRIAL REPLY BRIEF**

The plaintiffs' reply brief attempts to shift the burden of proof with respect to virtually every part of the test in Penn Central Transp. Co. v. New York City, 438 U.S. 104, 130-131 (1978). See, e.g., Pl.'s Reply at 4 ("The government does not offer evidence . . . ."); id. at 7 ("the government articulates no reason"); id. at 9 ("the government fails to offer its own comparative rate of return"); id. at 11 ("The government again fails to identify . . . any evidence . . . ."); id. at 12 ("the government bore the burden" as to whether "plaintiffs mitigated their damages" through the sale option). Although plaintiffs' position regarding the burden of proof is frequently vague, and although we respectfully disagree that the United States bears the burden of proof with respect to *any aspect* of this action, e.g., Forest Properties, Inc. v. United States, 177 F.3d 1360, 1367 (Fed. Cir. 1999); Bonnar v. United States, 438 F.2d 540, 563 (Cl. Ct. 1971) ("The burden of proof, in the sense of the burden which rests upon a party to establish the truth of a given proposition . . . never shifts during the course of the trial"), pursuant to the Court's February 27, 2007 order, we respectfully submit the following brief in response to these arguments in plaintiffs' reply brief.[1]

---

[1] Plaintiffs also make various arguments that appear for the first time in their reply. See, e.g., Pls.' Reply at 2 (arguing that applying to prepay was futile because it would have caused

(continued...)

**I. The As-Applied, Regulatory Taking Claims Of The Los Angeles Plaintiffs Are Not Ripe**

An as-applied, regulatory taking claim does not ripen until the agency responsible for implementing the regulation at issue reaches a final decision applying the regulation to the plaintiff's property. Palazzolo v. Rhode Island, 533 U.S. 606, 618 (2001). The plaintiff, not the United States, bears the burden of establishing that its taking claim is ripe. E.g., Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006). The Los Angeles Plaintiffs fail to meet this burden.

**A. Under LARSO, Any Rent Increase Would Have Been Less Than Ten Percent**

In their reply brief, plaintiffs assert that "strict numerical criteria" had to be met before HUD possessed discretion to allow prepayment. Pls.' Reply at 1-2 (citing 12 U.S.C. § 4108(a)(1)). Plaintiffs, however, have failed to show that it is certain that these numerical criteria could not be met by the Los Angeles Plaintiffs. Each of the Los Angeles Plaintiffs would have been governed by LARSO upon prepayment and LARSO prohibited rent increases exceeding 10 percent. Tr. 1885, 1890-91; Independence Park v. United States, 449 F.3d 1235, 1241 (Fed. Cir. 2006).

Plaintiffs assert that a rent increase of over 10 percent would have been facilitated by HUD itself because HUD allegedly would have chosen to provide tenants Section 8 certificates

---

[1](...continued)
tenants to pay more than 30 percent of their income as rent); id. at 8-9 n.14 (presenting new, unsupported economic impact calculations); id. at 22 n.26 (maintaining that plaintiffs were unaware that the legislation that lead to the HOPE Act was progressing through Congress in 1995). Although affirmative arguments first appearing in a reply brief should be considered waived, to the extent possible, these arguments are addressed briefly below. By not addressing other arguments in plaintiffs' reply brief, we do not concede their validity. Rather, arguments in this brief address subject areas where plaintiffs have suggested that the United States might bear the burden of proof.

through the Housing Authority of the City of Los Angeles ("HACLA") upon prepayment.[2] Pls.' Reply at 2. Plaintiffs do not contend that HUD lacked discretion to fund Section 8 vouchers, rather than certificates. Nor have plaintiffs established that HUD would have given HACLA sufficient funding to provide any assistance – much less assistance in the form of more expensive certificates – to prepaying projects in the "but for" (*i.e.*, no LIHPRHA) world. Of course, even if plaintiffs' speculation were correct, the rent increase would have been borne by the Government – not the Los Angeles Plaintiffs' tenants – and would be immaterial.[3] See 12 U.S.C. § 4108(a)(1) (providing that Federal assistance is not considered in evaluating an owner's request to prepay).

In their reply brief, plaintiffs assert for the first time that prepayment would have caused tenants to pay more than 30 percent of their income as rent. Pls.' Reply at 2. To support this new assertion, plaintiffs cite HAP contracts on four of the Los Angeles projects. Id. Under these contracts, the Government paid the balance of a tenant's rent if the rent exceeded 30 percent of the tenant's "monthly adjusted income." The mere existence of these contracts does not establish, however, that project rents did exceed 30 percent of any tenant's monthly adjusted income as of a project's prepayment eligibility date or at any other time. 12 U.S.C. § 4108(a)(1).

---

[2] Plaintiffs appear to concede what the evidence at trial unmistakably established, namely, that if funding for tenant-based assistance was unavailable, or if Section 8 vouchers were provided to tenants, LARSO would not have allowed rents to increase more than 10 percent. See Pls.' Reply at 2.

[3] This argument illustrates the absurdity of plaintiffs' claim. Section 8 certificates, as compared to Section 8 vouchers, offer no advantage to a low-income tenant. Yet, according to plaintiffs, HACLA would have used scarce funds to provide certificates – rather than vouchers that required a smaller expenditure of funds – at a time when thousands of low-income tenants were spending years on HACLA's waiting list for Section 8 assistance. See Tr. 1085-86.

Further, because Parthenia did not execute a HAP contract, plaintiffs proffer no evidence whatsoever that Parthenia could not have met LIHPRHA's "strict numerical criteria."

**B. Prepayment Would Not Result In Involuntary Displacement**

Plaintiffs' claim that any rent increase – no matter how small – that prompts a tenant to move constitutes "involuntary displacement." Pls.' Reply at 3. Before enactment of LIHPRHA in 1990, however, HUD had established a standard definition of the term "involuntary displacement" that applied across a wide range of programs. See, e.g., 24 C.F.R. §§ 215.22(d), 880.613(d), 881.613(d), 882.219(d), 883.714(d), 904.122(d). Under this standard definition, a tenant who elects to move as a result of an owner's rent increase does not suffer "involuntary displacement." Id. (the owner's action must be "other than a rent increase").

Plaintiffs offer no evidence that HUD adopted and applied some other definition of involuntary displacement under the Preservation Statutes. Plaintiffs point the Court to 24 C.F.R. § 248.141. Pls.' Reply at 3. This regulation does not contain an alternative definition of involuntary displacement, but merely repeats the pertinent statutory language, and was not promulgated until April 1992 – after the prepayment eligibility dates of all plaintiffs except Oxford Park.[4] See 57 Fed. Reg. 12042 (Apr. 8, 1992). In addition, the construction of "involuntary displacement" urged by plaintiffs would render the numerical criteria for "material economic hardship" in 12 U.S.C. 4108(a)(1)(A) superfluous and, therefore, should be rejected. Kirkendall v. Dept. of Army, 479 F.3d 830, 855 (Fed. Cir. 2007).

---

[4] Contrary to plaintiffs assertion, it does not follow that "involuntary displacement" is "plainly financial" because Federal housing assistance could address it. Pls.' Reply at 3. An evicted tenant could be assisted by, for instance, being placed in a public housing project.

### C. HUD Possessed Discretion To Determine What Area The Plaintiffs' Projects Would Be Expected To Serve And Whether Prepayment Would Have A Material Effect On The Supply Of Low-Income Housing In That Area

The determination of what constitutes a "material" effect on the supply of "comparable housing" in the area that the owner's project "could reasonably be expected to serve" is inherently discretionary. See 12 U.S.C. § 4108(a)(2). Plaintiffs bluster that it is "indisputable" that prepayment would have had a material effect on the supply of affordable housing. Pls.' Reply at 4. The only HUD witness addressing this subject, however, stated otherwise. Tr. 1963 (indicating that it would be difficult – but not impossible – to satisfy this condition).

## II. Plaintiffs' Claims Accrued Upon Obtaining Funded Use Agreements And The Prior Period Of Administrative Processing Is Not Compensable

The use agreement and sales options should not be deemed "mitigation" of any sort. Rather, they are means of changing or avoiding restrictions in a project's original regulatory agreement.

Aggrieved property owners "must show that they have done everything they reasonably could to take advantage of any hardship exceptions or other escape hatches that the regulations under attack allow." Whitney Benefits v. United States, 752 F.2d 1554, 1559 (Fed. Cir. 1985) ("Whitney I"). The use agreement and sale options are such "escape hatches." Through these avenues, an owner can alter regulatory restrictions, exit the program with a cash payment of the project's fair market value, or exit the program by prepayment. 12 U.S.C. §§ 4109, 4110, 4114. As previously explained, plaintiffs' as-applied, regulatory taking claims accrued upon obtaining funded use agreements from HUD. Def.'s Br. at 34. The period of administrative processing prior to the offer of funded use agreements is not compensable. Id.

## III. Plaintiffs Have Not Established That The Preservation Statutes, Applied To Their Properties, Effected A Regulatory Taking

### A. Plaintiffs Did Not Suffer A Severe Economic Deprivation

Plaintiffs have failed to present a valid basis for assessing economic impact. As explained by Dr. Hamm and our post-trial brief, plaintiffs' methodology focuses on the wrong point in time, ignores universally accepted methods for valuing of income-generating property, and violates fundamental precepts concerning risk and the time-value of money. Therefore, it sheds no light upon the economic impact suffered by the plaintiffs due to the alleged taking.

#### 1. The Court Should Reject Plaintiffs New Economic Impact Model

Recognizing the fragility of their economic impact approach, plaintiffs present in their reply brief a new economic impact analysis that was never discussed at trial. Plaintiffs' last-minute attempt to offer change-in-value figures based upon Stephen Crosson's draft reports cannot suffice to meet their burden of proof and must be ignored. Pl. Reply at 8-9 n.14. The draft reports were not proffered by defendant, and no testimony about the deleted figures was elicited, during Mr. Crosson's direct examination. Thus, contrary to plaintiffs' claim, these numbers were not sponsored by the Government. Moreover, plaintiffs cannot, in their *post-trial reply brief*, proffer new expert opinions without a sponsoring expert witness, an explanation of their methodology, or any opportunity for cross-examination. Basing any conclusions whatsoever on the plaintiffs' new numbers would seriously prejudice the Government. In any event, the extracted figures are based upon the erroneous assumption that (1) all restrictions in the *original* regulatory agreement remain in place *in perpetuity*, and (2) the owners received no reduction in regulation or increase in rents. Tr. 1869. Thus, the plaintiffs new calculations consider the wrong starting point, ending point, and regulatory restrictions.

### 2. Plaintiffs Misconstrue Federal Circuit Precedent

Contrary to plaintiffs' portrayal, there is no "all or nothing" choice between change-in-value and returns-based approaches for measuring economic impact. In Maritrans, Inc. v. United States, 342 F.3d 1344, 1358 (Fed. Cir. 2003), the Federal Circuit held that the trial court *must consider* the change-in-value methodology in evaluating the economic impact of an alleged regulatory taking. The Federal Circuit's holding in Maritrans, however, need not conflict with Rose Acre Farms v. United States, 373 F.3d 1177 (Fed. Cir. 2004). In Rose Acre, the Federal Circuit refused to endorse the rate-of-return analysis over the change-in-value analysis, but permitted the trial court to consider, in the first instance, which approach provided the better insight into economic harm. The bottom line is that, while the trial court may consider other metrics in evaluating economic impact, it "*must* 'compare the value that has been taken from the property with the value that remains in the property,'" Maritrans, 342 F.3d at 1358 (quoting Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 497 (1987)) (emphasis added).[5] Here, because plaintiffs offer no valid measure of economic impact that considers the effect of the Preservation Statutes upon the value of plaintiffs' properties, they have failed to meet their burden and their takings claims must fail. Seiber v. United States, 364 F.3d 1356, 1370 (Fed. Cir. 2004) (dismissing claim because plaintiff "failed to introduce convincing evidence to show the amount, if any, by which the value of the relevant property was reduced"); Forest Properties, 177 F.3d at 1367 (same).

More fundamentally, the debate about whether Maritrans requires the Court to adopt the change-in-value approach over a returns-based approach should be beside the point. The

[5] In City Line Joint Venture v. United States, 71 Fed. Cl. 486 (2006), for example, the trial court considered a variety of alternative measures to gauge economic impact and upon reviewing both change-in-value and returns-based approaches, the court concluded that neither showed a "significant loss."

change-in-value approach should produce a similar measure of economic impact as a properly executed returns-based metric. This is because, for an income-producing property, both approaches *measure the same thing*: lost rents during the period of the alleged taking. A critical flaw in plaintiffs' methodology is that Dr. Peiser's approach does not measure *all returns* accruing to the plaintiffs during the period of the alleged taking. Instead, plaintiffs' economic impact model compares the return on equity derived from the annual cash distribution of the original regulatory agreement – one of several returns accruing to the owner – to an arbitrary 8.5 percent return-on-equity benchmark. Tr. 1433-35. Plaintiffs ignore returns earned pursuant to their use agreements, as well as by property appreciation and other avenues during the alleged taking.[6] Therefore, while it is possible for a properly executed, returns-based approach to shed some light upon economic impact, the approach used by Dr. Peiser fails to provide any meaningful information.

### 3. The Court Must Consider The Effect Of The Preservation Statutes Upon All Of Plaintiffs' Property Rights

Plaintiffs' criticism of the "parcel as a whole" rule fails both as a matter of law and of economics. The Supreme Court *requires* trial courts to consider the effect of a challenged regulation upon the entirety of plaintiffs' property. As the Supreme Court explained in Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 644 (1993), the appropriate analytical framework for a regulatory taking is to look at the entire property, not just that portion being restricted. Plaintiffs here would have the Court focus upon

[6] If total returns were considered, plaintiffs' snapshot would show an economic impact no greater than 45 percent**.** See Tr. 2355; DDX 644.

the "total destruction" of the property interest in the prepayment right.[7] However, in Concrete Pipe, the Supreme Court specifically rejected this approach:

> While Concrete Pipe tries to shoehorn its claim into this analysis by asserting that "[t]he property of [Concrete Pipe] which is taken, is taken in its entirety," Brief for Petitioner 37, we rejected this analysis years ago in Penn Central Transp. Co. v. New York City, 438 U.S. 104, 130-131 (1978), where we held that a claimant's parcel of property could not first be divided into what was taken and what was left for the purpose of demonstrating the taking of the former to be complete and hence compensable.

Id. at 643-44. Continuing, the Court explained that "[t]o the extent that any portion of property is taken, that portion is always taken in its entirety; the relevant question, however, is whether the property taken is all, or only a portion of, the parcel in question. Id. at 644 (citing Keystone Bituminous Coal Assn. v. DeBenedictis, 480 U.S. 470, 497 (1987) ("[O]ur test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, [and] one of the critical questions is determining how to define the unit of property 'whose value is to furnish the denominator of the fraction' ") (citation omitted)).

The "parcel as a whole" rule means, in the context of a regulatory taking, that the Court must consider the effect of the challenged regulation on *all returns* earned by the property during the period of the alleged taking. The change-in-value approach comports with the "parcel as a whole" rule because it considers the impact of the Preservation Statutes upon the income expected to be earned by the property during the alleged taking period. Because the value of an incoming producing property is based upon the return (*i.e.*, income) it is expected to produce from rents, any diminution in income would result in a concomitant reduction in value.

---

[7] "ELIHPA and LIHPRHA took Plaintiffs' property interest in *the prepayment right*. The total destruction of that right – tied to Plaintiffs' present use of income-producing property – makes this analogous to Whitney Benefits, not Penn Central." Pl. Reply Br. at 13.

Tr. 2327, 2566 (Hamm). Thus, the change-in-value approach measures lost returns, albeit in the context of the total value of the owner's property.

Plaintiffs' chief criticism of the "parcel as a whole" is that it "proves too much" because it would allow the Government to "strip an owner of the total use of his property for a period of several years or decades without paying any recompense, so long as the property's useful life was comparatively much greater." Pl. Reply Br. at 10. This results-oriented criticism rests upon the faulty assumption that the Preservation Statutes destroyed the "total use" of the plaintiffs' property. It is undisputed that the plaintiffs retained possession of their property at all times and continued to obtain rents and increases in equity during the alleged taking period. Tr. 1455 (Peiser). More importantly, the plaintiffs' criticism ignores the very purpose of the economic impact test: to determine whether a given regulatory restriction – considered in the context of the plaintiffs' entire bundle of property rights – produces a severe economic deprivation. See Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 539 (2005) (Penn Central's aim is "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain."); Rose Acre, 373 F.3d at 1195 (holding that "courts have traditionally rejected taking claims in the absence of severe economic deprivation."); see also Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1019 n.8 (1992) ("in at least some cases the landowner with 95% loss will get nothing").

### 4. The Plaintiffs Bear The Burden Of Establishing Economic Impact

Plaintiffs' criticism of the sale and incentive options ignores the bedrock requirement that the entire regulatory regimen must be considered in assessing economic impact. Additionally, plaintiffs attempt to shift the burden of proof by asserting that the Government failed to establish the viability of the sale option under Title II. Pls.' Reply at 11.

Plaintiffs bear the burden of establishing a regulatory taking. Forest Properties, 177 F.3d at 1367. Having offered no documents or testimony establishing that the sale option was illusory, plaintiffs have failed to meet their burden. The Government, on the other hand, has no burden to prove any facts relating to successful Title II sales, particularly when plaintiffs possessed the choice to sell under either Title II or VI. Tr. 924-5, 1036. Even if the Government were required to prove the viability of the sale option, however, the Government did so at trial.

Plaintiffs do not, and cannot, dispute that each plaintiff possessed the option to sell their properties pursuant to either Title II or Title VI. Tr. 924-25, 1036, 1934-35. Nor can plaintiffs dispute that dozens of projects in California, and the Los Angeles area specifically, successfully consummated sales under the Preservation Statutes. Tr. 1898-99, 1931, 1943, 2027-30; DX493. Rather than reflecting a failure of proof, the paucity of Title II sales simply reflects the reality that Title II was quickly superceded by Title VI and that rational owners would sell under Title VI, once given the option, because Title VI guaranteed the owner the ability to prepay if a sale was not promptly consummated. 12 U.S.C. § 4114. In sum, plaintiffs' suggestion that the sale option was not truly available is meritless.

Plaintiffs' attempt to characterize the use agreement and sale options as "mitigation" – a concept not recognized in taking jurisprudence – is equally without merit. Use agreements established a new regulatory regimen under which a project would operate. See PX50-58, DX181. Pursuing a use agreement is akin to seeking a variance process in a land use case, which no court has considered "mitigation." See Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 187-91 (1985) (requiring plaintiff to seek a variance to ripen its claim); Whitney I, 752 F.2d at 1559 (an owner must "take advantage of any hardship exceptions or other escape hatches"). Because the plaintiffs' use agreements establish

"the extent of the governmental restriction" on the property's use, they must be considered in the Penn Central analysis. See Suitum v. Tahoe Regional Planning Agency, 520 U.S. 725, 746 (1997) (Scalia, J., concurring). The sale option is another "escape hatch" permitted by the Preservation Statues, which allows the owner to realize project equity or prepay and exit the HUD program entirely. 12 U.S.C. §§ 4110, 4114. The sale option does not confer a "new right" on an owner, but rather, affirms and facilitates plaintiffs' preexisting right to sell to third parties and, moreover, affects "the extent of governmental restriction" on the property's use. As such, it is properly considered in evaluating whether any taking has occurred. See Suitum, 520 U.S. at 747; Whitney I, 752 F.2d at 1559.

Plaintiffs contend that Independence Park "squarely conflicts" with this argument. Pls.' Reply at 11. In Independence Park, of course, a taking had already been established. 449 F.3d at 1236-37. The issues before the Federal Circuit only concerned the measure of just compensation. Id. at 1237. Consequently, Independence Park does not address, and cannot constitute authority relating to, whether statutory options are relevant to economic impact.

Plaintiffs also cite the Whitney Benefits cases as support for disregarding the sale option. Pl. Reply Br. at 12. In the two Whitney Benefits cases, the Federal Circuit concluded that a provision permitting property owners to exchange land on which strip mining was forbidden for Government land on which mining would be allowed was an offer of compensation. Whitney I, 752 F.2d at 1558-59; Whitney Benefits, Inc. v. United States, 926 F.2d 1169, 1176 (Fed. Cir. 1991) ("Whitney II"). The statutory options under the Preservation Statutes are fundamentally different than the coal exchange program in Whitney Benefits.

Perhaps most significantly, unlike in Whitney Benefits, the Preservation Statutes contain no mechanism for the Government to acquire the plaintiffs' property rights. See Whitney I, 752

F.2d at 1554 ("Here the language to be construed provides more than mere regulation. It specifically visualizes government acquisition of interests in land."); Whitney Benefits v. United States, 18 Cl. Ct. 394, 398 (1989) (the SMCRA exchange provision "allows claimants to exchange their coal property for federal coal property"). As noted above, the use agreement option permits owners to reduce regulatory restrictions on their project; the sale option enables owners to sell to third parties at a fair market value or, in the event that a sale is not consummated, to prepay. Neither option is an avenue for the Government to acquire an owner's property in order to provide compensation. Consequently, the options are properly considered under Penn Central. Whitney I, 752 F.2d at 1558 (acknowledging that an exchange option frequently will "have a bearing on whether or when a taking has occurred).

The Whitney Benefits cases are further distinguished by the effect of the regulatory restriction at issue. In Whitney Benefits, the surface mining act expressly abrogated the owner's right to mine its land, thereby depriving it of all economic value. Whitney II, 926 F.2d at 1174. Here, much like Penn Central, the owners continued a profitable use of their property by continuing to rent it to low-income tenants. Whitney II, 926 F.2d at 1175 (contrasting the situation in Penn Central where the owner retained continued use of its railroad station, with the situation but in Whitney where the owner's property right to mine was abrogated and no profitable alternative use was available).

Because the statutory options in the Preservation Statues alter regulatory restrictions and materially affect economic impact, consideration of the options is necessary to determine if any taking has occurred. See Penn Central, 438 U.S. at 137 (statutory benefits must be "taken into account in considering the impact of regulation" even if the benefits "may well not have constituted 'just compensation' if a 'taking' had occurred . . . ."); Whitney I, 752 F.2d at 1559

(an owner must take advantage of "hardship exceptions or other escape hatches"); Whitney II, 926 F.2d at 1175 (where "a regulation [is] not meant to take an interest in land" an exchange provision may properly be considered "in determining whether and when a taking occurred").

**B. Plaintiffs Have Failed To Prove That ELIPHA And LIHPRHA Had The Character Of A Taking**

Plaintiffs assert that the "government does not offer evidence" showing that ELIPHA and LIHPRHA lacked the character of a taking. Pls.' Reply at 4. Plaintiffs misstate the burden of proof. Forest Properties, 177 F.3d at 1367. Moreover, the Preservation Statutes served important, long-standing Government objectives, and placed the burden of meeting those objectives squarely upon the public fisc. The arguments in plaintiffs' reply brief do not warrant a different conclusion.

Plaintiffs concede that enactment of the Preservation Statutes furthered important Governmental goals – averting a housing crisis and protecting low-income housing for tenants around the country – and that these goals should be given significant weight in evaluating the character of the Government action under Penn Central. Although plaintiffs protest that this is not "determinative," they do not, and indeed, cannot, dispute that the Court must "consider the purpose of the regulation and its desired effects in determining whether a taking has occurred." Bass Enters. Prod. Co. v. United States, 381 F.3d 1360, 1370 (Fed. Cir. 2004).

Plaintiffs' attempt to exclude consideration of the benefits and opportunities afforded by the Preservation Statutes has no basis in law. The Federal Circuit has recognized that benefits and opportunities available under the Preservation Statutes are relevant in determining the character of government action and has expressly directed that such benefits be considered in determining the character of the Government action. Chancellor Manor v. United States,

331 F.3d 891, 905 (Fed. Cir. 2003). Cienega Gardens v. United States, 331 F.3d 1319 (Fed. Cir. 2003) ("Cienega VIII"), cited by plaintiffs, does not dictate a different result. Not only are factual findings in a given case not binding in cases brought by other plaintiffs, United States v. Mendoza, 464 U.S. 164 (1984), the Federal Circuit expressly declined to extend its factual findings in Cienega VIII beyond the group of model plaintiffs actually before it. Cienega VIII, 331 F.3d at 1353-54.

Plaintiffs oppose considering the benefits and opportunities available under the Preservation Statutes for the simple reason that they undercut their taking claims. So long as the entire statutory scheme is considered, the plaintiffs' claim that they shouldered a disproportionate share of the burden of providing low income housing is unsupportable. Def. Br. at 46-48. The Preservation Statutes left untouched plaintiffs' enjoyment of the direct and indirect taxpayer-funded benefits that were hallmarks of the original HUD program, namely, tax shelters, favorable property financing, full occupancy, management fees, and annual cash dividends. Tr. 121-22, 226, 238, 401, 844-45, 2075-76, 2093-94. At the same time, the Preservation Statutes authorized property owners to modify the original regulatory agreements to increase rents, end limits on the annual rate of return, and withdraw equity from the projects. 12 U.S.C. § 4109, ELIHPA §§ 224(b), 225(a). The cost of providing increased financial returns was borne by the taxpayer. Id. In addition, and perhaps more significantly, plaintiffs remained free under the Preservation Statutes to exit the HUD program by selling their property in a taxpayer-subsidized transaction at a price no different from what an open market sale would have produced. 12 U.S.C. § 4103, Tr. 2214-16, 2222-23. Given that taxpayer monies allowed plaintiffs to benefit fully from the residual value of their property through this sale, and that they were free to reject potential offers, tr. 1941, or pull out of the process entirely at their option,

tr. 1939, the fact that the class of buyers would ultimately be government-approved did not constitute the "elimination" of any "fundamental stick" in plaintiffs' bundle of ownership rights. Andrus v. Allard, 444 U.S. 51, 65-66 (1979). Rather, the sales option under ELIPHA and LIHPRHA was yet another benefit to the plaintiffs that was offered at taxpayer expense in order to avert the looming national low-income housing crisis while protecting plaintiffs' rights as property owners.

Finally, plaintiffs are unable to discredit the analogy between the Preservation Statutes and ordinary rent control measures. Rent control statutes by definition mandate a rent that is below what the market will bear, which is all that the Preservation Statutes accomplished in the instant case. Within this framework, owners of HUD properties remained free to manage their properties, to turn away prospective tenants, and to leave their units vacant if they chose to do so. Tr. 243-44, 856, 928, 930. Moreover, owners could elect at any time to exit the class of landlords to which the Preservation Statutes were applicable and to cease operating as landlords to low-income tenants altogether by conveying their property to others at an open market sales price. Having failed to distinguish the Preservation Statutes from general rent control statutes, plaintiffs have failed to show that the Preservation Statutes have the character of a taking.

### C. The Preservation Statutes Did Not Affect Plaintiffs Primary Investment-Backed Expectations

Plaintiffs offer a stunted view of the investment-backed expectations inquiry. Pls.' Reply at 13. A mere change in Government regulations is insufficient. See Chancellor Manor, 331 F.3d at 904. Only if the new regulation affected the primary reason for a reasonable investor's participation in the project, and has likewise affected the plaintiff's actual expectations, would this factor support a taking claim. Def.'s Br. at 50.

### 1. Investment-Backed Expectations Are Evaluated At "Initial Closing"

Investment-backed expectations are evaluated on the date the plaintiff "entered into the activity that *triggered the obligation*, specifically when the [plaintiff] *entered the programs*." Chancellor Manor, 331 F.3d at 904 (emphasis added). The plaintiffs here are 10 partnerships that participated in HUD's section 221(d)(3) or 236 programs. The partnerships committed to participate in these programs upon executing a regulatory agreement at "initial closing." Tr. 462-63, 468, 475, 2669. Thus, investment-backed expectations are assessed as of initial closing.

Plaintiffs assert that "general partners" took various actions "well before" initial closing. Pls.' Reply at 14. Before initial closing, there were no "general partners" because the plaintiff partnerships did not exist. Tr. 468. Furthermore, the individuals who later became the plaintiffs' general partners had no obligation to participate in any HUD program before executing a regulatory agreement at initial closing. It is, therefore, the plaintiff partnerships' respective expectations at initial closing that matter for purposes of Penn Central.

### 2. Under Penn Central, The Owner's "Primary Expectation" Is The Proper Focus Of The Investment-Backed Expectation Prong

Citing no Supreme Court authority, plaintiffs contend that the Court should not focus on the primary expectation of a reasonable investor. Pls.' Reply at 14. However, Penn Central itself identifies the "primary expectation concerning the use" of the affected property as the proper focus of judicial inquiry. Penn Cent. Transp. Co. v. New York City, 438 U.S. 104, 136 (1978). Government regulation that affects only a subsidiary expectation does not support a taking. Id.

### 3. The Opportunity To Prepay More Than 20 Years In The Future Was Not Material To A Reasonable Investor

The trial record establishes that a reasonable partner at initial closing expected highly-leveraged, Government-insured financing that generated exceptional tax benefits. Def.'s Br. at 51; DX420. Of lesser importance was the expectation of annual cash distributions from the project's operations. Id. On the other hand, the option to prepay more than 20 years in the future, if market conditions were such that prepayment was advisable, was not material to a reasonable partner. Id.

Plaintiffs do not dispute that HUD financing provided greater leverage, longer amortization, less risk and, thus, was far superior to the financing available to construct conventional multi-family housing. Pls.' Reply at 18-19; see also Tr. 121, 1509, 2670, 2756-59. Additionally, plaintiffs' own expert conceded that greater tax benefits were generated by HUD projects than by conventional multi-family housing. Tr. 1624-25. Plaintiffs' respond that "early tax benefits later became tax detriments." Pls.' Reply at 19. This effect, which is inherent in almost any tax shelter, was more pronounced in conventional multi-family housing and, therefore, would not diminish the attractiveness the HUD programs for a reasonable investor. Tr. 2818-19; DDX704, 705. Indeed, this effect was considered in the analyses performed by Mr. Malek. Even after taking into account so-called "phantom income," the ability to realize residual value after 20 plus years was trivial in comparison to the projects' tax benefits and annual cash distributions. Tr. 121-2, 2079, 2076, 2663; DX420.[8]

---

[8] Plaintiffs also state that the Government thinks that "owners should have expected 20 extra years of required participation in the HUD programs." Pls.' Reply at 20. This mischaracterizes both our brief and the preservation process. As explained in our brief, as of initial closing, the plaintiffs did not know how long it would be before prepayment would be possible. Def.'s Br. at 54. They chose to participate in the HUD program despite this

(continued...)

### 4. Plaintiffs Have Provided Insufficient Evidence Of The Partnerships' Actual, Original Expectations

The only original general partners to testify at trial were Jona Goldrich and Robert Hirsch, who together owned a majority interest in only one plaintiff. Def.'s Br. at 56-57 (citing DX494). No testimony from Robert Stern, Sol Kest, Leslie Sugar, Milton Gottlieb, Richard Gunter, or Sam Mesler – general partners in one or more of plaintiffs – was presented, and the only testimony about the plaintiffs' corporate general partners confirmed that they invested to take advantage of tax benefits. Tr. 2075-76, 2705-06. Plaintiffs have thus failed to show that each partnership – as opposed to one or two minority partners – placed any significance on the option to prepay.

Plaintiffs seek to compensate for this lack of evidence with inapposite arguments and invective. See Pls.' Reply at 15-18 (asserting that unfavorable facts are "false," "wrong," "untrue," "factually inaccurate," "gross mischaracterizations," or "counterfactual"). Plaintiffs note, for instance, that some of deed of trust notes and regulatory agreements were signed by Messrs. Stern and Kest. See Pls.' Reply at 15. This proves nothing. The fact remains that no testimony from either Mr. Stern or Mr. Kest (or from Messrs. Sugar, Gottlieb, Gunther or Mesler) was received in evidence. Similarly, plaintiffs' refer to findings about the Model Plaintiffs in Cienega VIII. However, Cienega VIII expressly directed this Court to "to develop an appropriate record" with respect to these plaintiffs and, thus, findings regarding other plaintiffs are inapposite. See Pls.' Reply at 16. Moreover, as explained above, plaintiffs offer a

[8](...continued)
uncertainty. Id. Moreover, the Preservation Statutes did not require 20 extra years of participation in the original program. Even disregarding the ability to apply to prepay, the option to exit the program by selling at fair market value was always available. 12 U.S.C. § 4110. Further, the plaintiffs could (and did) alter the terms of the original program through a use agreement. 12 U.S.C. § 4109.

stunted view of the investment-backed expectations inquiry. It is not enough to show a change in Government regulations. Only where the changed regulation affected the primary reason for participation by reasonable investors (and also affected the plaintiff's actual expectations) does this factor support a taking claim. Def.'s Br. at 50.

Plaintiffs' reply brief attempts to call into question established facts concerning benefits provided by the section 221(d)(3) and 236 programs. Plaintiffs first claim that they incurred "substantial costs" before initial closing.[9] Pls.' Reply at 16. Plaintiffs focus on the wrong time – a time before the plaintiff partnerships even existed. Def.'s Br. at 51; Tr. 468. Moreover, the low cash investment required to develop HUD projects is well-established by uncontradicted expert testimony, a contemporary treatise, and contemporaneous FHA forms that plaintiffs submitted to HUD. Def.'s Br. at 56. Plaintiffs' own witness – Robert Hirsch – rebuts the corollary suggestion that the FHA forms used at initial closing are inaccurate. Tr. 456, 2089 (describing FHA Forms 2013 and 2264 as providing the "most accurate numbers" for HUD-insured projects).

Plaintiffs next cite a "seminal study" that was not introduced in evidence at trial. Pls.' Reply at 16. Not only is the study not before the Court, it undermines plaintiffs claim regarding the supposed significance of the option to prepay. If 20 to 30 percent of section 221(d)(3) and 236 projects were in fact expected to fail during their first 10 years, as plaintiffs contend, then the option to prepay after 20 years would have little value – far less value than tax benefits realized during a project's early years.

---

[9] Plaintiffs also state that "often" projects did not recover all cash outlays "if" actual construction costs exceeded the budgeted amount. Pls.' Reply at 16. However, no evidence that these plaintiffs did not recover cash outlays was introduced at trial and, moreover, any focus on the period after initial closing would be misplaced. Chancellor Manor, 331 F.3d at 904.

Plaintiffs also argue that they actually placed little importance on tax benefits. Pls.' Reply at 17. They fail to explain, however, their own partners' testimony to the contrary. See Tr. 139-40, 143, 2081 (HUD projects had tax advantages that were not available for conventional projects and the partners made use of those tax benefits), 2077-79 (Sam Mesler and Ziggy Taube invested for the tax benefits), 2075 (corporate partners invested for tax benefits), 2094 (tax benefits were the "primary advantage" in obtaining investors and the main reason that HUD projects were syndicated).

Lastly, plaintiffs assert for the first time that it is wrong to ignore "sweat equity" by individuals who subsequently became general partners. Pls.' Reply at 18 (implying a connection to BSPRA). Plaintiffs are mistaken. Work performed before the plaintiff partnerships were established at initial closing was not performed by the "plaintiffs." See Chancellor Manor, 331 F.3d at 905.[10]

### D. The *Penn Central* Factors, Taken Together, Do Not Establish A Taking

Plaintiffs have failed to establish a "serious financial loss," show that the character of the Preservation Statutes differs in any material respect from rent control laws, or demonstrate that the Preservation Statutes interfered with the primary investment-backed expectation of a reasonable investor. Accordingly, the Court should find that no taking has occurred.

## IV. The Los Angeles Plaintiffs Would Not Have Prepaid

Plaintiffs' claim that HUD "would have provided LARSO-exempt, Section 8 certificates at market rents" to tenants in the "but for" world, thus making it possible to obtain new mortgages to prepay the projects' existing HUD-insured loans. Pls.' Reply at 21. This claim is

[10] Plaintiffs also have not shown that "sweat equity" was ignored. See, e.g., PX130 ¶ 6 (Claremont Village) (paying Messrs. Hirsch and Stern for administrative services and Messrs. Goldrich and Kest by specifying that management services would be provided by their company); PX131 ¶ 7 (Covina West) (same).

pure speculation. Plaintiffs rely upon regulations promulgated under the Preservation Statutes – which would not exist in the "but for" world – and upon the provision of certificates to tenants of two projects in 1997 under statutory authority first given to HUD in April 1996 – over four years after the plaintiffs' prepayment eligibility dates. Pls.' Reply at 21-22 (citing 24 C.F.R. § 248.233(d)(3) and the "post-HOPE Act issuance of Section 8 certificates"). Anecdotal evidence about the issuance of certificates to tenants from two projects in 1997 under a recently-passed statute does not establish what would have occurred years earlier under a different statutory scheme that did not mandate Section 8 assistance.[11] Plaintiffs' argument that HUD would have chosen to provide Section 8 certificates to tenants of the Los Angeles Plaintiffs during the early 1990's should be rejected as speculative and unsound.

Plaintiffs also argue that the Los Angeles projects would have prepaid even if "LARSO would have held rents below market." Pl. Reply at 21. Yet, plaintiffs entered into use agreements despite their awareness of pending legislation that proposed to repeal restrictions on prepayment – legislation that within a year became the HOPE Act. Tr. 501, 2210-12. Furthermore, in making this argument, plaintiffs assume the same turnover rate for their below-market, LARSO-controlled units as for non-LARSO units. Plaintiffs' assumption runs contrary to basic economic principles, is unsupported by empirical data, and was refuted at trial. Tr. 2241-45. Simply put, because of the large difference between market and LARSO-controlled rents at

[11] Plaintiffs mischaracterize testimony by Dr. Hamm to suggest that it is supportive of their claim. Pl. Reply at 22. In fact, Dr. Hamm stated, "I don't think that Independence Park's experience in 1997 is necessarily indicative of anything as far as 1989, 1990, 1991, and 1992. . . . [T]he fact that Congress and HUD took certain actions in 1997, in my opinion, is not necessarily indicative of what would have happened in the earlier period, the more relevant period." Tr. 2300-01 (Hamm). Dr. Hamm is certainly correct as political control of both the legislature and executive changed between 1990 and 1996.

the plaintiffs' projects, the plaintiffs' turnover rate would be significantly below the 30 percent average turnover for all rental properties in the city. Id.

Plaintiffs also rely on a vague statement by Mr. Hirsch – a partner in only one of five Los Angeles projects, tr. 363, 403.[12] Pl. Reply at 22 ("there would have been financing sources"). Mr. Hirsch's statements are contradicted by testimony from Warren Breslow – the chief financial officer responsible for providing financial planning and advice on property refinancing. Tr. 2110-13. Mr. Breslow testified that, if LARSO applied, partnerships would have been unable to obtain financing to pay off their HUD-insured mortgages. Id. Mr. Breslow's conclusion is buttressed by uncontradicted expert testimony. As Dr. Hamm explained, to obtain financing to pay off their HUD-insured loans, the Los Angeles Plaintiffs would have had to demonstrate to prospective lenders that a project's cash flow would be at least 1.2 times debt service requirements – an underwriting standard that LARSO almost certainly would have prevented the Los Angles Plaintiffs from satisfying. Tr. 2272-76.

## CONCLUSION

For these reasons, and the reasons stated in our post-trial brief, the evidence and testimony presented at trial demonstrates that Preservation Statutes did not effect a taking and that plaintiffs are entitled to no compensation.

---

[12] Plaintiffs also question the United States' citation to 24 C.F.R. § 882.219 (1990), which plaintiffs note has nothing to do with the priority between certificates and vouchers. Pl. Reply at 22. Plaintiffs misapprehend the significance of section 882.219. Because this regulation gives no priority to tenants from prepaying projects who are seeking Section 8 assistance, the plaintiffs' tenants would start at the end of the line and would likely receive neither Section 8 certificates nor vouchers. See Tr. 1085-86.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JEANNE E. DAVIDSON
Director

s/ Brian M. Simkin

BRIAN M. SIMKIN
Assistant Director

s/ David A. Harrington

KENNETH M. DINTZER
Assistant Director
DAVID A. HARRINGTON
KENNETH D. WOODROW
TIM McILMAIL
SEAN DUNN
BONDURANT ELEY
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
Tele: (202) 307-0282

July 10, 2007

Attorneys for Defendant

**CERTIFICATE OF FILING**

I hereby certify that on the 10th day of July 2007, a copy of "DEFENDANT'S POST-TRIAL REPLY BRIEF" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ David A. Harrington